# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

STEPHANIE PRICE, ET AL.,

                Plaintiffs,

      v.

NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES, COMMISSIONER, ET AL.,

             Defendants.

Case No. 21-cv-25-PB

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS

Cheryl S. Steinberg (#10063)
NEW HAMPSHIRE LEGAL ASSISTANCE
117 N. State Street
Concord, NH 03301
T: (603) 206-2210
csteinberg@nhla.org
Kay E. Drought (#12851)
NEW HAMPSHIRE LEGAL ASSISTANCE
154 High Street
Portsmouth, NH 03801
T: (603) 206-2253
kdrought@nhla.org

Kierstan E. Schultz (#20682)
kschultz@nixonpeabody.com
Mobile: 412-303-0648
W. Daniel Deane (#18700)
ddeane@nixonpeabody.com
Mark Tyler Knights (#670991)
mknights@nixonpeabody.com
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
T: (603) 628-4000
F: (603) 628-4040

Pamela E. Phelan (#10089)
Pamelap@drcnh.org
Mobile: (603) 491-4157
Todd R. Russell (#14237)
Toddr@drcnh.org
Mobile: (603) 264-4943
DISABILITY RIGHTS CENTER–
NEW HAMPSHIRE
64 North Main Street, Suite 2
Concord, NH 03301
T: (603) 228-0432
F: (603) 225-2077

Kelly Bagby (pro hac vice)
M. Geron Gadd (pro hac vice)
Mobile: (202) 603-5020
Susan Ann Silverstein (pro hac vice)
kbagby@aarp.org
ggadd@aarp.org
ssilverstein@aarp.org
AARP FOUNDATION
601 E Street NW
Washington, DC 20049
T: (202) 434-2060
F: (202) 434-6622

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

STANDARD OF REVIEW ..................................................................................... 3

ARGUMENT ....................................................................................................... 4

I.   Plaintiffs Assert Well-Founded ADA and Rehabilitation Act Claims Against
     Defendants. ................................................................................................ 4

     A.   A federal statutory framework prohibits disability discrimination in a
          state's administration of programs and services including through
          unnecessary institutionalization of people with disabilities................... 4

     B.   Defendants' efforts to disclaim liability for their unlawful administration
          of the CFI Waiver program are legally and factually misguided.......... 7

          1.   Defendants have violated the federal "integration mandate" by
               administering the CFI Waiver program in a manner that risks
               unnecessary institutionalization .................................................. 8

          2.   Defendants, not case managers and service providers, are
               responsible for placing Plaintiffs at risk of unnecessary
               institutionalization.................................................................. 12

          3.   The ADA's and Rehabilitation Act's implementing regulations
               expressly forbid both direct and indirect disability discrimination ......... 15

          4.   Defendants' reliance on part of an ADA regulation regarding
               licensing and certification programs is misplaced .................... 16

     C.   Plaintiffs seek actual delivery of services that Defendants have determined
          they need to live in their communities..................................... 19

     D.   Plaintiffs have asserted proper ADA and Rehabilitation Act claims under
          Olmstead and its progeny................................................... 23

     E.   Defendants' failure to administer the CFI Waiver program in a manner
          that avoids discrimination is an actionable government policy, practice,
          and/or procedure under the ADA and Rehabilitation Act .................... 25

          1.   The plain language of the ADA's and Rehabilitation Act's
               methods of administration regulations supports claims predicated
               upon unnecessary institutionalization and the risk thereof .......... 26

          2.   Case law interpreting methods of administration regulations
               likewise embraces claims predicated upon risk of unnecessary
               institutionalization................................................................ 27

II.  Defendants' Administration, Operation, and Responsibility for the CFI Waiver
     Program Constitute State Action for Plaintiffs' Medicaid and Due Process Claims........ 29

     A.   The Commissioner is responsible for administering the CFI Waiver
          program regardless of third-party involvement .................................. 30

1.  The Commissioner's legal responsibility for the administration of the CFI Waiver program is non-delegable ................................. 30

2.  Defendants' own statements belie their attempt to disavow responsibility for the conduct at issue in this case .................................. 33

B.  *Blum* is not controlling here ................................................................. 34

III.  Plaintiffs Have Stated Viable Claims Under 42 U.S.C. § 1396(a)(3) and the Due Process Clause of the Fourteenth Amendment. ................................................ 37

A.  Defendant's failure to provide plaintiffs notice of the effective denial of their request for CFI Waiver services denies them the due process required by the Medicaid Act and the U.S Constitution ..................................... 38

B.  The alleged adequacy of Defendant's "notice" cannot be adjudicated at the pleading stage of this litigation ............................................................ 41

REQUEST FOR ORAL ARGUMENT ................................................................... 43

CONCLUSION ......................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H.R. v. Washington State Health Care Authority*,
    469 F. Supp. 3d 1018 (W.D. Wash. 2016)............................................................11, 12, 24, 31

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015)............................................................................................................37

*Armstrong v. Manzo*,
    380 U.S. 545 (1965)............................................................................................................41

*Atkins v. Parker*,
    472 U.S. 115 (1985)............................................................................................................43

*Ball v. Rodgers*,
    492 F.3d 1094 (9th Cir. 2007) ............................................................................................11

*Ball v. Rodgers*,
    No. CV 00-67-TUC-EHC, 2009 WL 1395423 (D. Ariz. Apr. 24, 2009) ..............11, 12, 14, 24

*Blessing v. Freestone*,
    520 U.S. 329 (1997)............................................................................................................37

*Blum v. Yaretsky*,
    457 U.S. 991(1982)..................................................................................................30, 34, 35

*Brantley v. Maxwell-Jolly*,
    656 F. Supp. 2d 1161 (N.D. Cal. 2009) ....................................................................24, 28, 29

*Brown v. Tennessee Department of Finance and Administration*,
    649 F. Supp. 2d 780 (M.D. Tenn. 2009)..............................................................................16

*Bryson v. Shumway*,
    308 F.3d 79 (1st Cir. 2002)......................................................................................11, 37, 42

*Buchanan v. Maine*,
    469 F.3d 158 (1st Cir. 2006)..........................................................................................23, 27

*Calero-Cerezo v. U.S. Department of Justice*,
    355 F.3d 6 (1st Cir. 2004)....................................................................................................5

*City of West Covina v. Perkins*,
    525 U.S. 234 (1999)............................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Day v. District of Columbia,*
    894 F. Supp. 2d 1 (D.D.C. 2012) .....................................................................28, 29

*Disability Rights California v. County of Alameda,*
    No. 20-cv-05256-CRB, 2021 WL 212900 (N.D. Cal. Jan. 21, 2021) ....................21

*Doe v. Commissioner, New Hampshire Department of Health and Human Services,*
    No. 18-cv-1039-JD, 2020 WL 2079310 (D.N.H. Apr. 30, 2020) ....................18, 30

*Doe v. Pfrommer,*
    148 F.3d 73 (2d Cir. 1998)...................................................................................23

*Doxzon v. Department of Human Services,*
    No. 1:20-CV-00236, 2020 WL 3989651 (M.D. Pa. July 15, 2020) ............... *passim*

*Estades-Negroni v. CPC Hospital San Juan Capestrano,*
    412 F.3d 1 (1st Cir. 2005)....................................................................................36

*Fisher v. Oklahoma Health Care Authority,*
    335 F.3d 1175 (10th Cir. 2003) ........................................................................6, 24

*Garcia-Rubiera v. Fortuno,*
    665 F. 3d 261 (1st Cir. 2011)...............................................................................43

*Georgia Advocacy Office v. Georgia,*
    447 F. Supp. 3d 1311 (N.D. Ga. 2020) ...............................................................18

*Goldberg v. Kelly,*
    397 U.S. 254 (1970)............................................................................................41

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002)............................................................................................37

*Gonzalez-Maldonado v. MMM Healthcare, Inc.,*
    693 F.3d 244 (1st Cir. 2012)................................................................................36

*Guggenberger v. Minnesota,*
    198 F. Supp. 3d 973 (D. Minn. 2016)......................................................31, 32, 42

*Helen L. v. DiDario,*
    46 F.3d 325 (3d Cir. 1995)........................................................................22, 25, 26

*Ivy v. Williams,*
    781 F.3d 250, 256 (5th Cir. 2015) ..................................................................17, 18

*Jarvis v. Village Gun Shop, Inc.,*
    805 F. 3d 1 (1st Cir. 2015)...................................................................................36

iv

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Karpinski v. Union Leader Corp.*,
No. 18-cv-1214-PB, 2019 WL 3203144, 2019 DNH 110 (D.N.H. July 16, 2019) ....... 3, 14, 34

*Katie A., ex rel. Ludin v. Los Angeles County*,
481 F.3d 1150 (9th Cir. 2007) ............................................................... 32

*M.R. v. Dreyfuss*,
663 F.3d 1100 (9th Cir. 2011) ............................................................... 24

*Manhattan Community Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ......................................................................... 35

*Mental Hygiene Legal Service on behalf of Oliviah C.C. v. Delaney*,
176 A.D.3d 24, 109 N.Y.S.3d 469 (N.Y. App. Div. 3d Dept. Aug. 8, 2019) .......... 19

*Morin v. Eastern Bearings, Inc.*,
No. 20-cv-615-PB, 2020 WL 7406391 (D.N.H. Dec. 16, 2020) .............................. 3

*Mullane v. Central Hanover Bank and Trust Co.*,
339 U.S. 306 (1950) ............................................................................. 41

*Murphy by Murphy v. Harpstead*,
421 F. Supp. 3d 695 (D. Minn. 2019) .......................................... 32, 39, 40

*Murphy by Murphy v. Minnesota Department of Human Services*,
260 F. Supp. 3d 1084 (D. Minn. 2017) ......................................... *passim*

*National Association of the Deaf v. Harvard University*,
377 F. Supp. 3d 49 (D. Mass. 2019) ......................................................... 18

*Noel v New York City Taxi & Limousine Commission*,
687 F.3d 63 (2d Cir. 2012) ................................................................ 17, 18

*Nunes v. Massachusetts Department of Corrections*,
766 F.3d 136 (1st Cir. 2014) ............................................................. 27, 28

*O.B. v. Norwood*,
838 F.3d 837 (7th Cir. 2016) ............................................................. 29, 30

*Oliveras-Sifre v. Puerto Rico Department of Health*,
214 F.3d 23 (1st Cir. 2000) ..................................................................... 5

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) ............................................................................ *passim*

*Pennsylvania Protection & Advocacy, Inc. v. Pennsylvania Deparment of Public Welfare*,
402 F.3d 374 (3d Cir. 2005) .............................................................. 28, 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) .............................................................................6, 24

*Pathways Psychosocial v. Town of Leonardtown, Maryland*,
    133 F. Supp. 2d 772 (D. Md. 2001) ...........................................................27

*Pitts v. Greenstein*,
    No. CIV.A. 10-635-JJB-SR, 2011 WL 1897552 (M.D. La. May 18, 2011) ..............24, 28, 29

*Radaszewski ex rel. Radaszewski v. Maram*,
    383 F.3d 599 (7th Cir. 2004) .......................................................................22, 23

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982).......................................................................................35

*Rockwell v. Cape Cod Hospital*,
    26 F.3d 254 (1st Cir. 1994)...........................................................................36

*Rodriguez v. City of New York*,
    197 F.3d 611 (2d Cir. 1999).........................................................................23

*Steimel v. Wernert*,
    823 F.3d 902 (7th Cir. 2016) ...................................................6, 10, 12, 25

*Townsend v. Quasim*,
    328 F.3d 511 (9th Cir. 2003) .................................................................21, 22, 23

*Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*,
    293 F.R.D. 254 (D.N.H. Sept. 17, 2013) ....................................4, 6, 24, 37

*Vargas v. Trainor*,
    508 F. 2d 485 (7th Cir. 1974) ......................................................................42

*Voss v. Rolland*,
    592 F.3d 242 (1st Cir. 2010)........................................................................27

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993)..............................................................................4

*Woods v. Thompkins County*,
    No. 516CV0007LEKTWD, 2019 WL 1409979 (N.D.N.Y. Mar. 28, 2019) ..........................19

*Wright v. Giuliani*,
    230 F.3d 543 (2d Cir. 2000).........................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

29 U.S.C. § 794(a) ...........................................................................................4
42 U.S.C. § 1396(a) .......................................................................................16
42 U.S.C. § 1396(a)(3).............................................................37, 38, 39, 40, 42
42 U.S.C. § 1396(a)(3).....................................................................37, 42
42 U.S.C. § 1396(a)(30)(A) ..........................................................................37
42 U.S.C. § 12131(1)(A), (B) .........................................................................4
42 U.S.C. § 12132 ..........................................................................................4

**Other Authorities**

28 C.F.R. § 35.130(b)(1).............................................................................15
28 C.F.R. § 35.130(b)(3)(i)..........................................................5, 7, 26, 27
28 C.F.R. § 35.130(b)(3)(ii).........................................................................26
28 C.F.R. § 35.130(b)(6).........................................................................16, 17
28 C.F.R. § 35.130(b)(7)...............................................................................5
28 C.F.R. § 35.130 (d) .................................................................................4
28 C.F.R. § 41.51(b)(1).................................................................................15
28 C.F.R. § 41.51(b)(3).................................................................................5
28 C.F.R. § 41.51(b)(3)(i).........................................................................7, 26
28 C.F.R. § 41.51(b)(3)(ii).........................................................................26
28 C.F.R. § 41.51(d).....................................................................................4
42 C.F.R. § 431.10(e).....................................................................................32
42 C.F.R. § 431.201.......................................................................................38
42 C.F.R. §431.206(c)(2).........................................................................38, 40
81 Fed. Reg. 86382-01, 86395 (Nov. 30, 2016) .........................................38
U.S. Dep't of Justice, *Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,* https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020)................................................................. 6, 9, 15
N.H. Admin. R. He-E801.12(a) ....................................................................16

Plaintiffs Stephanie Price, Emily Fitzmorris, and Kathleen Bates, on behalf of themselves and all others similarly situated, submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

## PRELIMINARY STATEMENT

Plaintiffs' Complaint challenges Defendants' failure, in their administration of a Medicaid waiver program, to meet their obligations under federal law, specifically, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), the Medicaid Act, and the Due Process Clause of the Fourteenth Amendment. In response to each of these claims, Defendants insist that they are not liable for violating federal law because they have attempted to minimize their role in the operation of the Choices for Independence ("CFI") Waiver program by relying on private third parties to deliver certain program services. But federal law does not allow them to avoid responsibility for their maladministration of the state's CFI Waiver program merely because they rely on service providers to perform some functions within it.

Defendants' characterization of their role in administering the CFI Waiver program is inaccurate and incomplete. Defs.' Mem. 8-15, ECF No. 23-1. By their own admissions, the CFI Waiver program is a state program that Defendants initiated and operate, and for which they are legally and practically responsible. Compl. ¶ 24, ECF No. 1; Declaration of Anthony J. Galdieri in Support of Defendants' Motion to Dismiss ("Galdieri Decl."), Ex. A (CFI Waiver) 15, ECF 23-3 ("The DHHS Office of Medicaid Services is responsible for CFI Waiver operations, including the waiver program monitoring. The Commissioner of Health and Human Services retains ultimate authority over all NH's [Home and Community-Based Services] waivers."). In proposing, obtaining approval for, and operating the CFI Waiver program, the New Hampshire

Department of Health and Human Services ("NHDHHS") undertook to deliver specific services (the same services Plaintiffs seek) to a population of Medicaid-eligible New Hampshire residents (including Plaintiffs). Compl. ¶ 115 (CFI Waiver services); N.H. Admin. R. He-E 801.12(b) (same); *cf.* Defs.' Mem. 10-12. Defendants also represented to the Centers for Medicare and Medicaid Services ("CMS"), which reviewed and approved Defendants' CFI Waiver application, that NHDHHS "administers the CFI Waiver program."  Galdieri Decl., Ex. A (CFI Waiver) 5.

To be sure, Defendants administer the CFI Waiver program. NHDHHS enrolls eligible participants in the program by determining their financial and clinical eligibility, creating a preliminary list of their "identified needs," confirming that they can be served in the community and at a cost that is not greater than the average annual cost of a nursing facility placement, and connecting newly-enrolled participants with case managers who coordinate their CFI Waiver services. Compl. ¶¶ 29-30, 52-53, 116-20. NHDHHS also operates the authorization system through which each CFI Waiver participants' services must be requested and approved for payment, as well as the technological infrastructure through which this authorization system operates. Compl. ¶¶ 41-43. Finally, Defendants operate the notice system through which notice of requested and approved CFI Waiver services is provided to waiver participants – but no notice is given to the Plaintiffs when there is no provider available to deliver the requested waiver service. Compl. ¶¶ 23, 42, 53-57.

This case is about Defendants' unlawful failure to adequately administer the CFI Waiver program and the resulting "net effect" on CFI Waiver participants who "do not receive needed services."  Compl. ¶ 49. NHDHHS fails to uniformly discharge its duties under (or to oversee the implementation of) its CFI Waiver policies and procedures. *Id.* It fails to provide clear directives to the case management agencies and service providers who deliver CFI Waiver services to

participants. *Id.* It fails to develop a coherent and effectively working system for care planning; needs assessments; the submission, review, and approval of requests for CFI Waiver services; and monitoring of service gaps and the discrepancies between authorized services and those that are actually delivered. Compl. ¶¶ 38-43, 45-50, 52-53. Because of these failures, CFI Waiver program participants find themselves at risk of unnecessary institutionalization notwithstanding that avoidance of such risk is a foundational purpose of the program.

**STANDARD OF REVIEW**

On a Rule 12(b)(6) motion to dismiss, this Court "accept[s] as true the well-pleaded factual allegations of the complaint, draw[s] all reasonable inferences therefrom in the plaintiff[s'] favor and determine[s] whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." *Karpinski v. Union Leader Corp.*, No. 18-cv-1214-PB, 2019 WL 3203144, 2019 DNH 110 at 6-7 (D.N.H. July 16, 2019) (quoting *Martin v. Applied Cellular Tech.*, 284 F.3d 1, 6 (1st Cir. 2002)), *appeal dismissed*, No. 19-1795, 2019 WL 7944629 (1st Cir. Nov. 7, 2019)).

Plaintiffs' factual allegations must be sufficient to "state a claim to relief that is plausible on its face." *Morin v. Eastern Bearings, Inc.*, No. 20-cv-615-PB, slip op. at 4-5 (D.N.H. Dec. 16, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible if it pleads 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 5.

In addition to accepting all plausibly pleaded facts as true, this Court may also take into account certain matters of public record or other matters which are susceptible to judicial notice. *Karpinski*, 2019 DNH 110 at 7 (quoting *Lydon v. Local 103, IBEW*, 770 F.3d 48, 53 (1st Cir. 2014)). These categories of documents—and facts set forth therein—include documents the

authenticity of which is not disputed by the parties; official public records; documents central to

plaintiffs' claim; or documents sufficiently referred to in the complaint. *Watterson v. Page*, 987

F.2d 1, 3-4. This is especially so where plaintiffs introduce the documents themselves. *Id.* at 4

(citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he problem

that arises when a court reviews statements extraneous to a complaint generally is the lack of

notice to the plaintiff. . . .Where plaintiff has actual notice … and has relied upon these

documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one

under Rule 56 is largely dissipated)).

## ARGUMENT

**I.      Plaintiffs Assert Well-Founded ADA and Rehabilitation Act Claims Against Defendants.**

### A.      A federal statutory framework prohibits disability discrimination in a state's administration of programs and services including through unnecessary institutionalization of people with disabilities.

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified

individual with a disability shall, by reason of such disability, . . . be subjected to discrimination

by any [public] entity."  42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a) (corresponding

provision of the Rehabilitation Act). A "public entity" includes "any State or local government."

42 U.S.C. § 12131(1)(A), (B). The implementing regulations of the ADA and Rehabilitation Act

similarly provide that "[a] public entity shall administer services, programs, and activities in the

most integrated setting appropriate to the needs of qualified individuals with disabilities."  28

C.F.R. § 35.130(d) (integration mandate of the ADA); 28 C.F.R. § 41.51(d) (integration mandate

of the Rehabilitation Act); *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D.

254, 259 (D.N.H. 2013) (recognizing "needless segregation of persons with disabilities" violates

the integration mandate of the ADA and Rehabilitation Act). These regulations further provide

that "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration [] [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(3)(i) (ADA); 28 C.F.R. § 41.51(b)(3) (companion provision for Rehabilitation Act).

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the United States Supreme Court held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. *Id.* at 597, 601. In so holding, the Supreme Court interpreted the ADA's "integration mandate" to require that persons with disabilities be served in the community when: (1) the state determines that community-based treatment is appropriate; (2) the individual does not oppose community placement; and (3) community placement can be reasonably accommodated. *Id.* at 607. The *Olmstead* court further held that the ADA's implementing regulations require public entities to make reasonable modifications in their policies, practices, or procedures when modifications are necessary to *avoid* discrimination on the basis of disability, including segregation in institutions, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of its services or programs. 28 C.F.R. § 35.130(b)(7) (emphasis added); *Olmstead*, 527 U.S. at 603-06. The ADA and the Rehabilitation Act, together with their implementing regulations, are construed coextensively for purposes of the integration mandate, and clearly impose an affirmative duty on Defendants to provide Plaintiffs services in the most integrated setting appropriate to their needs and to make reasonable modifications to their programs, including the CFI Waiver, to avoid discrimination, including discrimination in the form of unnecessary institutionalization recognized in *Olmstead*.  *See, e.g.*, *Oliveras-Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 25 n.2 (1st Cir. 2000); *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The "integration mandate" is central to Plaintiffs' Complaint and cannot be avoided by Defendants. Defendants retain legal responsibility for complying with the integration mandate and can be found liable for noncompliance with that obligation even if they rely on private parties to address the needs of people with disabilities. *See* U.S. Dep't of Just. ("DOJ"), *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C., Questions 7 through 8, https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) ("A state's obligations under the ADA are independent from the requirements of the Medicaid program . . . Once public entities choose to provide certain services, they must do so in a nondiscriminatory fashion.") (hereinafter "Statement on Enforcement of the Integration Mandate")[1]; *Steimel v. Wernert*, 823 F.3d 902, 907 (7th Cir. 2016) (While "[p]articipating states have significant discretion in how they craft their waiver programs . . . [they] must comply with the [ADA]'s integration mandate[.]"). The ADA's and Rehabilitation Act's "methods of administration" regulations further underscore this responsibility – public entities have a duty to utilize criteria and methods of administering their programs and services in a manner that does not "have the effect of subjecting" people with disabilities to disability discrimination. 28 C.F.R § 35.130(b)(3)(i); 28 C.F.R. § 41.51(b)(3)(i).

---

[1] "The DOJ's interpretation of the mandate 'warrants respect' because Congress gave it the task of issuing the relevant regulations."  *Steimel*, 823 F.3d at 911. The DOJ's guidance further provides, as numerous courts have recognized, that the integration mandate applies to people with disabilities at risk of institutionalization as well as those currently institutionalized. *Statement on Enforcement of the Integration Mandate*, Question 6, *supra*; *see, e.g.*, *Watt R.*, 293 F.R.D. at 260 ("The Court accepts the [at risk of institutionalization] theory as viable."); *see also Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003).

**B.     Defendants' efforts to disclaim liability for their unlawful administration of the CFI Waiver program are legally and factually misguided.**

Defendants' first gambit for avoiding Plaintiffs' ADA and Rehabilitation Act claims invites the Court to rule, as a matter of law, that Defendants cannot be liable for the "private acts or omissions" of third-party case managers and service providers. Defs.' Mem. 29. The Court need not and should not decide this question, and especially not at this stage. Plaintiffs' Complaint alleges that it is *Defendants*' failures in their administration of the CFI Waiver program – what Defendants themselves have chosen not to do – that place Plaintiffs at risk of unnecessary institutionalization in violation of the ADA and Rehabilitation Act. Plaintiffs' claims are not based on the conduct and decision-making of CFI Waiver case managers and service providers.

Moreover, the controlling federal statutes and their implementing regulations obligate *Defendants* to *provide* Plaintiffs services in the *most integrated setting* appropriate to Plaintiffs' needs. Defendants' obligation under the integration mandate is not delegable and is unaffected by the service delivery system Defendants have chosen to employ in their administration of the CFI Waiver program. As the public entity subject to the ADA's and Rehabilitation Act's integration mandate, Defendants bear the legal responsibility for compliance with this federal mandate. In determining whether Defendants have violated the integration mandate by placing Plaintiffs at risk of unnecessary institutionalization, it is irrelevant that Defendants have chosen to rely on third-party case managers and service providers to deliver CFI Waiver services. Therefore, the Court need not decide whether Defendants can be liable for the conduct of third-party case managers and service providers who act as Defendants' agents for all purposes relevant to Defendants' compliance with the ADA and Rehabilitation Act.

Similarly, the Court need not decide whether Defendants can be held liable for the conduct of CFI Waiver case managers and service providers under the ADA's regulation governing licensing and certification programs because the CFI Waiver is neither. *See* n. 4, *infra*, for the full text of this regulation. Yet even if, *arguendo*, the Court were to conclude that licensure is a component of the CFI Waiver program, Defendants would still be liable for violation of the ADA's and Rehabilitation Act's integration mandate because, as the responsible state agency, they must avoid placing Plaintiffs at risk of unnecessary institutionalization. This requirement is the linchpin of Title II of the ADA and the Supreme Court's holding in Olmstead. Defendants' cannot release themselves from their statutory obligations merely by relying on third parties to deliver services.

Simply stated, Defendants' attempt to blame the CFI Waiver case managers and service providers on whom they rely to deliver community-based services to Plaintiffs does not constitute a legal defense to Plaintiffs' claims under the ADA and Rehabilitation Act. *See* Defs.' Mem. 30-5 (Section I.E.1).

> ### 1. Defendants have violated the federal "integration mandate" by administering the CFI Waiver program in a manner that risks unnecessary institutionalization.

Defendants violate the integration mandate by placing Plaintiffs at risk of unnecessary institutionalization through their administration of the CFI Waiver program. Defendants likewise violate the ADA and Rehabilitation Act by failing to reasonably modify their administration of the CFI Waiver program to avoid that risk. The very purpose of the CFI Waiver program is to ensure that the Plaintiffs can continue to live in the community with the services that they need. In the absence of those services, Plaintiffs' health predictably deteriorates to an extent that they need short or long-term institutionalization that could have been avoided. *See* Compl. ¶¶ 4, 6, 59-

69, 77-8, 84-5, 91-2, 98-9[2]; DOJ, *Statement on Enforcement of the Integration Mandate*, *supra*, at 4 ("[A] plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution."). Defendants cannot avoid their responsibilities under the integration mandate by relying on a network of providers to deliver services.

By citing to authorities that are inapposite to the circumstances presented in this case, *see* Defs.' Mem. 31, Defendants imply that this may be a case of first impression. It is not. Multiple courts have directly held that state Medicaid agencies violate the integration mandate by placing beneficiaries at risk of institutionalization through their failure to provide community-based services, even where those state agencies relied on private providers to deliver services. For example:

- In *Doxzon v. Dep't of Human Servs.*, No. 1:20-CV-00236, 2020 WL 3989651 (M.D. Pa. July 15, 2020), the court granted plaintiff's motion for preliminary injunction after finding that she was likely to prevail on the merits of her claim that the state agency administering a waiver program providing long-term, community-based services violated the integration mandate by failing to provide waiver services *to her*. *Id.* at *10-11. In granting this relief, the court rejected the agency's argument that its entry into a contract with a third-party managed care organization relieved it of responsibility for complying with Medicaid requirements. *Id.* at *8, 10-11. The court credited the plaintiff's contention

---

[2] That Plaintiffs *can* be served in the community cannot be disputed here. Defendants made the determination that each Plaintiff and Plaintiff Class member can be served in the community at or below the average annual cost of serving them in a nursing facility when Defendants enrolled them in the CFI Waiver program. *See* Compl. ¶¶ 29-31, 116-117 (citations omitted).

that "she is eligible for numerous services that the defendants do provide but have not

provided to her," and concluded that because defendants provided the relevant services

"to some, [it] 'must provide them in accordance with the ADA's anti-discrimination

mandate.'" *Id.* (citing *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1302 (M.D. Fla. 2010)).

Defendants could not show that a fundamental alteration would be needed to comply with

the integration mandate and, therefore, they were required to provide services to plaintiff

in the community rather than a nursing home. *Id.* at *10.

- In *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016), the Seventh Circuit vacated

  defendants' summary judgment on plaintiffs' integration mandate claim where plaintiffs

  "provided evidence that they need constant supervision and, despite their best efforts, the

  services provided under the [] waiver have proved inadequate to prevent life-threatening

  gaps in care." *Id.* at 913. The *Steimel* plaintiffs were people with developmental

  disabilities who had been enrolled in one waiver operated by the Indiana Family and

  Social Services Administration, but who were moved to another waiver program

  providing fewer services due to changes in eligibility criteria. The plaintiffs sued to

  restore the prior level of community-based services "under whatever program umbrella

  w[ould] accomplish that end." *Id.* at 916. The court rejected defendants' argument that it

  would be unreasonable to force the state to alter the eligibility requirements for the

  waiver beneficiaries, recognizing that "the state creates the waiver programs, and

  therefore those programs' eligibility criteria." *Id.* The court concluded that the

  integration mandate "would be meaningless" if the state could circumvent the mandate

  simply by artfully crafting eligibility criteria. *Id.*

- In *A.H.R. v. Wash. State Health Care Auth.*, 469 F. Supp. 3d 1018 (W.D. Wash. 2016), the court granted a preliminary injunction in favor of Medicaid-eligible children with disabilities who were at risk of institutionalization as a result of the state's failure to provide them in-home private duty nursing services. *Id.* at 1043-46, 1048-49.  The state agency had determined that the children were all eligible for in-home nursing services through its Medicaid program, for at least 16 hours per day, but nonetheless failed to deliver that level of care to plaintiffs. *Id.* at 1029. The court acknowledged that the agency failed to provide these services because the third-party home health agency on which it relied failed to recruit enough nurses to deliver 16 hours of services per day for each eligible child. *Id.* Nevertheless, finding that the "most integrated setting appropriate" for the plaintiffs is the family home in which they had been authorized to receive those services, the court concluded that plaintiffs were likely to succeed on the merits of their ADA claim against the state agency. *Id.* at *1045.

- In *Ball v. Rodgers*, No. CV 00-67-TUC-EHC, 2009 WL 1395423 (D. Ariz. Apr. 24, 2009), a class action on remand from the Ninth Circuit following a bench trial, the district court concluded that the Arizona Medicaid agency violated the ADA and Rehabilitation Act by "fail[ing] to provide [a certified class of older, physically disabled, and developmentally disabled Medicaid beneficiaries] adequate [attendant care] services to avoid unnecessary gaps in service and institutionalization."  *Id.* at *1, 5; *Ball v. Rodgers*, 492 F.3d 1094, 1097 (9th Cir. 2007) (citing the application process and goals of HCBS waiver program in *Bryson v. Shumway*, 308 F.3d 79, 82 (1st Cir. 2002)). The court found that the Arizona Medicaid agency's "failure to provide plaintiffs with the necessary services caused them to suffer grave consequences, such as complete immobility, hunger,

thirst, muscle aches, and other physical and mental distresses." *Ball*, 2009 WL 1395423
at *5. Finding that it was the state agency's "policy [] that HCBS beneficiaries assume
the risk, by choosing to remain at home rather than being institutionalized, that services
that they are dependent upon will not be delivered," the trial court concluded that the
state agency's "failure to prevent unnecessary gaps in service[s] and properly monitor the
HCBS program improperly discriminated against persons with disabilities by limiting
their ability to maintain their social and economic independence and depriving them of a
real choice between home and institutional care." *Id.* at *5 (modifying previously-issued
injunction).

NHDHHS, like the Medicaid agencies in *Doxzon*, *Steimel*, *A.H.R.*, and *Ball*, is legally
responsible for ensuring that it administers its programs and services in a way that complies with
the integration mandate without regard to how the state has chosen to design the service delivery
system. As the Seventh Circuit observed in *Steimel*, the "state cannot avoid the integration
mandate by painting itself into a corner and then lamenting the view."  823 F.3d at 918. "The
state designs, applies for, develops policies regarding, and executes its waiver programs. If those
programs in practice . . . render [persons with disabilities] at serious risk of institutionalization,
then those programs violate the integration mandate unless the state can show that changing them
would require a fundamental alteration of its program[.]" *Id.*

> ## 2. Defendants, not case managers and service providers, are responsible for placing Plaintiffs at risk of unnecessary institutionalization.

Defendants misguidedly suggest that CFI Waiver case managers' role in "assuring" the
adequacy of CFI Waiver services provided to participants means that case managers, and not
Defendants, are responsible for placing Plaintiffs at risk of unnecessary institutionalization.
Defs.' Mem. 30-31. Yet nothing in the New Hampshire Administrative Rules defining "targeted

case management" supports Defendants' suggestion that CFI Waiver case managers are themselves responsible for ensuring that they can secure the services that they are charged with coordinating. Again, it is Defendants who bear the legal responsibility to ensure that Plaintiffs receive the community-based services that Plaintiffs have been assessed to need to avoid institutionalization in hospitals and/or nursing facilities. Further, only Defendants and not the CFI case managers can change the CFI Waiver service delivery system—one which they designed and are implementing—to minimize the risk to the Plaintiffs of unnecessary institutionalization.

Defendants' attempts to disclaim an ability to respond to gaps in services identified by case managers in the course of "coordinating" and "monitoring" care for CFI Waiver participants illustrates how Defendants are placing Plaintiffs at risk of unnecessary institutionalization each day. Defendants have failed to establish any formal, reliable mechanism for reporting gaps in services. *See* Compl. ¶¶ 40-1, 31 n.18; *cf.* Galdieri Decl., Ex. A (CFI Waiver) 22 ("When individual problems are discovered, they are remediated through discussions with the enrolled Medicaid Provider by the NHDHHS Provider Relations staff or the CFI Waiver Administrator), 53 (same).

Moreover, Defendants' description of their purportedly "minimal" relationship with CFI Waiver case managers and service providers is, as set forth above, inaccurate. Even if it were true that Defendants have a limited relationship with their agents, however, it would be an administrative choice by Defendants and a dereliction of their responsibilities. Defendants can make different administrative choices that would not create a risk of unnecessary institutionalization for Plaintiffs. Defendants cannot avoid Title II liability by taking a "hands

off" approach to how they oversee CFI Waiver case management while failing to ensure that the CFI Waiver program can deliver the services that Plaintiffs need to avoid institutionalization.

Defendants are wrong in their contention that "a shortage of service providers in the State is not a method of administration or a state policy, practice, or procedure," Defs.' Mem. 33, that can sustain Plaintiffs' integration mandate and methods of administration claims under the ADA and Rehabilitation Act. *See* Defs.' Mem. 32-4. Defendants' failure to manage and properly oversee the CFI Waiver and its capacity is a set of actionable practices. It is also a "policy of [Defendants] that [CFI Waiver] [participants] assume the risk, by choosing to remain in their homes rather than being institutionalized, that services that they are dependent upon will not be delivered." *Ball*, 2009 WL 1395423 at *5. New Hampshire's service provider shortage is well-documented in Plaintiffs' Complaint, ¶ 11, and in the public record, *id.*, yet the Complaint alleges that Plaintiffs' injuries result from Defendants' poor choices in administering the program. These administrative choices result in inefficient deployment of the resources available to the CFI Waiver program, which is "a state policy, practice, or procedure" on which a plausible claim rests. Compl. ¶¶ 11, 47, 28, 43, 46-49. Indeed, Defendants have made their administrative failures that have led to participants being deprived of needed CFI Waiver services a matter of public record. Within the last month, they released the findings of consultants they hired to investigate precisely these issues within NHDHHS' long-term support system, which includes the CFI Waiver program. *See* Guidehouse Inc., *New Hampshire Long Term Supports and Services [] for Seniors & Individuals with Physical Disabilities, Findings and Recommendations* (Mar. 12, 2021), https://bit.ly/330bLxn; *see also Karpinski*, 2019 DNH 110 at 7 (allowing court to take account of matters of public record). These collective failures result in the compromised system that places Plaintiffs at risk of institutionalization.

### 3. The ADA's and Rehabilitation Act's implementing regulations expressly forbid both direct and indirect disability discrimination.

Further and significantly, the ADA's and Rehabilitation Act's implementing regulations expressly prohibit Defendants from discriminating on the basis of disability in the provision of "services *directly, or indirectly through contractual, licensing, or other arrangements*." 28 C.F.R. § 35.130(b)(1) (emphasis added), (b)(3) (prohibition of direct and indirect utilization of criteria or methods of administration that subject people with disabilities to disability discrimination); 28 C.F.R. § 41.51(b)(1) (prohibition of direct and indirect discrimination in provision of services), (b)(3) (prohibition of direct and indirect utilization of criteria or methods of administration that subject people with disabilities to disability discrimination).

DOJ's guidance on the enforcement of the integration mandate likewise confirms that "a *public entity* may violate the ADA's integration mandate when it: (1) *directly or indirectly* operates facilities and/or programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) *through its planning, service system design, funding choices, or service implementation practices, promotes* or relies upon the segregation of individuals with disabilities in private facilities or programs." *Statement on Enforcement of the Integration Mandate*, *supra* at 3, Question 2 (emphasis added).

Plaintiffs do not allege that CFI Waiver case managers or service providers have discriminated against them generally or that these case managers or service providers have placed them at risk of unnecessary institutionalization in violation of the ADA or the Rehabilitation Act. The case management and service provider agencies on which Defendants rely to deliver CFI Waiver services have neither the duty nor authority to provide services to Plaintiffs except at the direction of and under the authority bestowed upon them by Defendants. *See* Compl. ¶¶ 52-53; N.H. Admin. R. He-E 801.05(b) (case manager shall request authorization

for services in care plan). Indeed, providers may only obtain compensation for those services when specifically authorized by Defendants. *See* N.H. Admin. R. He-E801.12(a) (services shall be covered when specified in the comprehensive care plan and authorized by BEAS); *see also Brown v. Tenn. Dep't of Finance and Admin.*, 649 F. Supp. 2d 780, 791 (M.D. Tenn. 2009) (observing that the "community-based services [available through the state's Medicaid waiver programs] are primarily offered by private provider, not the Defendants [but that] . . . services offered by private providers would not exist without the State's involvement.").[3] To be clear, the Complaint alleges that Defendants have placed Plaintiffs at risk of unnecessary institutionalization by administering the CFI Waiver program in a manner that fails to deliver the services that they have been assessed to need to avoid institutionalization. *See* Compl. ¶¶ 4, 6, 59-69, 77-8, 84-5, 91-2, 98-9.

### 4.   Defendants' reliance on part of an ADA regulation regarding licensing and certification programs is misplaced.

Defendants' reliance on the final sentence of 28 C.F.R. § 35.130(b)(6), is wholly misplaced.[4]  Defs.' Mem. 30-1. The CFI Waiver program is not a licensing or certification

---

[3] This follows the enactment of the Affordable Care Act, which clarified that a state's duty to provide medical assistance under the Medicaid Act means "payment of part or all of the cost of the following care and services or the care and services themselves, or both[.]" 42 U.S.C. § 1396a (2013). Courts have observed that "it appears that Congress intended to 'clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them[.]" *A.H.R.*, 469 F. Supp. 3d at 1049 (quoting *John B. v. Emcee's*, 852 F. Supp. 2d 944, 951 (M.D. Tenn. 2012), and citing *Dunakin v. Quigley*, 99 F. Supp. 3d 1297 (W.D. Wash. Apr. 10, 2015)).

[4] The complete regulation makes clear that the public entity, NHDHHS, may not engage in disability discrimination in its administration of a contracting or licensing program. 28 C.F.R. § 35.130(b)(6) provides in full:

A public entity *may not administer a licensing or certification program* in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The

program; it exists to affirmatively provide home and community-based services that support participants in the community. *See* Galdieri Decl., Ex. A 1 ("Purpose of the HCBS Waiver Program"), 5 ("The goal of the Choices for Independence [] Waiver, administered by the NH Department of Health and Human Services [], is to support elders and adults with disabilities to live independently in the community."); *see also Olmstead*, 527 U.S. at 601 (acknowledging that "[s]ince 1981, Medicaid has provided funding for state-run home and community-based care through a waiver program."). NHDHHS' reliance on a network of enrolled Medicaid providers does not convert the waiver program into a licensing or certification program for purposes of 28 C.F.R. § 35.130(b)(6).

The authority cited by Defendants reveals the weakness of their argument. Defs.' Mem. 31. This case is not remotely analogous to a regulatory scheme governing driver's education, private taxi services, or liquor stores. The CFI Waiver program and Defendants' role overseeing it is much more comprehensive than a state's licensing or certification program under 28 C.F.R. § 35.130(b)(6). First, NH DHHS is obligated to administer the CFI Waiver program in a manner designed to ensure the delivery of waiver services, whereas Texas and New York had no duty to provide the driver education and taxi services at issue in *Ivy* and *Noel*, respectively. *See Ivy v. Williams*, 781 F.3d 250, 256 (5th Cir. 2015) (Texas Education Agency, which licensed and regulated private driver education schools, was not liable for the physical inaccessibility of programs because the state-licensed program were not a service, program, or activity of the TEA); *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012) (New York City Taxi and Limousine Commission as licensor and regulator of private taxi service was not liable

---

programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part. (emphasis added).

for the inaccessibility to taxis to wheelchair users); *but cf. Ga. Advocacy Office v. Ga.*, 447 F. Supp. 3d 1311 (N.D. Ga. 2020) (denying motion to dismiss the advocacy organization's claims and finding that discovery could show that the state defendant, in discharging its responsibility for "developing rules and procedures regulating the operation of the [] grant" and "monitoring [the program] to ensure compliance with Federal and state policies, procedures, rules and the delivery of [] services[,]" "made decisions that would constitute administering [the program]")[5]; *compare* Galdieri Decl., Ex A (CFI Waiver) at 5 (NHDHHS representing to CMS, in its approved waiver application, that it administers the CFI Waiver).

Second, courts in the First Circuit (including this Court) have rejected efforts by defendants to use third-party relationships to insulate themselves from liability resulting from their lax performance of functions that they are obligated to discharge. *See, e.g.*, *Doe v. Comm'r., N.H. HHS*, 2020 DNH 070 at *13-15 (rejecting NHDHHS Commissioner's argument that she is not responsible for the due process rights of persons subject to an IEA order while such persons remain in a private third-party hospital emergency department because upon the issuance of an IEA order such persons are admitted into the state's mental health system for which she is statutorily responsible); *Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 62-3 (D. Mass. 2019) (distinguishing *Noel* and *Ivy* because plaintiffs' allegations were not based on an assertion that Harvard was only a regulator of its websites and platforms developed by third

---

[5] Defendant cites *Georgia Advocacy Office* for the proposition that the allocation of funding among different long-term care programs is not a "method of administration" or an existing "policy, practice, or procedure" of the public entity, or more particularly, Defendants. *See* Defs.' Mem. 33-4. Yet the *Georgia Advocacy Office* court found that the state defendant could "administer" the GNETS grant even though Georgia's constitution and statutes reserve decision-making regarding educational services to the local educational agency based, in part, on Plaintiffs' allegation that the "state had a role in the management and direction of GNETS such that it 'administers' the program." *See Georgia Advocacy Office*, 447 F. Supp. 3d at 1317-22.

parties, but rather on allegations of Harvard's conduct in developing the content on its websites and platforms, including its use of "'administrative methods, practices, procedures and policies' that result in the lack of captioning or inaccurate captioning").

Third, even the cases Defendants cite that involved home and community-based services do not support Defendants' position here. For instance, in *Woods v. Thompkins Cty.*, No. 516CV0007LEKTWD, 2019 WL 1409979, *4-5, *9-10 (N.D.N.Y. Mar. 28, 2019), the Plaintiff sued the wrong defendant, alleging that she did not receive services because the service provider refused to provide services based on her mental health condition. However, even in that case, the district court denied the county defendant's motion to dismiss, which raised similar arguments to those advanced by Defendants here. *See* 2016 WL 5107120 at *5. The decision in *Mental Hygiene Legal Serv. on Behalf of Oliviah C.C. v. Delaney*, 176 A.D.3d 24, 109 N.Y.S.3d 469 (N.Y. App. Div. 3d Dept. Aug. 8, 2019), is likewise inapposite because the plaintiff sought a fundamental alteration of the HCBS system without establishing any improper administration of the program. *Id.* at 479-80.

### C.   Plaintiffs seek actual delivery of services that Defendants have determined they need to live in their communities.

Defendants' second challenge to Plaintiffs' ADA and Rehabilitation Act claims requires the Court to determine whether Plaintiffs seek a "standard of care" or "preferred level of benefits"—"more," "better," or "different" services—for which *Olmstead* affords no relief, or whether Plaintiffs seek only the actual delivery of the services that Defendants provide through the CFI Waiver and have assessed Plaintiffs to need to avoid institutionalization. Plaintiffs' Complaint is quite clear that Plaintiffs seek only CFI Waiver services that Defendants *already provide* through the CFI Waiver program and which Defendants and their agents have assessed them to need.

19

Defendants mischaracterize the relief that Plaintiffs seek as the "delivery of a desired standard of care and/or a preferred level of benefits" and attempt to support that mischaracterization with selective citations to the Complaint. *See* Defs.' Mem. 35-7. Plaintiffs do seek the actual delivery of adequate (relative to the amount of services that they have been assessed to need), regular, reliable, and consistent CFI Waiver services. Defendants' failure to provide these services to Plaintiffs places them at risk of unnecessary institutionalization in hospitals and nursing facilities. Compl. ¶¶ 3, 5, 32, 39 (Defendants fail to provide services Plaintiffs have been assessed to need), 60, 115-17. This is precisely the form of discrimination that *Olmstead* unequivocally prohibited. *Olmstead*, 527 U.S. at 603 n.14 (holding that "[s]tates must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide").

Defendants nevertheless argue that Plaintiffs are in essence seeking services beyond what the CFI Waiver provides. Defs.' Mem. 35-7. That line of argument was squarely rejected in *Doxxon v. Dep't of Human Servs.*, No. 1:20-CV-00236, 2020 WL 3989651 at *10 (M.D. Pa. July 15, 2020), and it should fail here. As this Court should do, the *Doxxon* court rejected defendants' attempt to recast the plaintiffs' allegations:

> [D]efendants contend that Doxxon's claims are "standard of care" and "level of benefits" type claims that the Supreme Court in *Olmstead* held were not cognizable. . . . But the defendants misconstrue Doxxon's claims. Dozxon is not claiming that the defendants violated a standard of care as to the medical services that were provided to her. Nor is she claiming that he defendants should provide benefits in addition to those that it already provides under the Medicaid Act and the CHC waiver. Rather, she contends that she is eligible for numerous services that the defendants do provide but have not provided to her. Having provided these services to some, the defendants "must provide them in accordance with the ADA's anti-discrimination mandate."

*Id.* The same is true here.

The recent decision in *Disability Rights Cal. v. Cty. of Alameda*, No. 20-cv-05256-CRB 2021 WL 212900 (N.D. Cal. Jan. 21, 2021), on which Defendants rely, ironically confirms the viability of Plaintiffs' claims here. As in that case, the present case is about "the location of services," not a demand for services. *Disability Rights Cal.*, 2021 WL 212900 at *8 (quoting *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003)). As the court explained,

> when a state provides a particular service, the state must "provide community-based treatment for [qualified] persons with ... disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with ... disabilities."

*Id.* at *9 (quoting *Olmstead*, 527 U.S. at 607). "*Olmstead* provides a remedy for when state and local governments deliver services in institutional settings that could reasonably be delivered in community settings—or when government conduct creates an unnecessary risk that patients will need to enter an institution to obtain services they could otherwise obtain in the community." *Id.* at *11 (citing *Townsend*, 328 F.3d at 517).

The Complaint clearly alleges that Defendants provide the specific CFI waiver services that they have assessed the Plaintiffs to need. *See* Defs.' Mem. 10 (listing the CFI Waiver services New Hampshire provides); *see also* Comp. ¶¶ 2, 5-6, 22, 29-30, 124. The provision of these CFI services in the community is specifically intended to allow persons with disabilities to remain in their communities. N.H. RSA 151-E:1, II; Galdieri Decl., Ex A (CFI Waiver) at 5 ("The goal of the [CFI] Waiver . . . is to support elders and adults with disabilities to live independently in the community."); Compl. ¶¶ 4 ("Avoiding unnecessary segregation in hospitals and nursing facilities is precisely why the CFI Waiver program exists."), 26-27 (goal of CFI waiver to provide services to support individuals in the community and avoid

institutionalization). Defendants are nevertheless failing to provide these services, in whole or in part, to eligible persons who desire to remain in their communities. Compl. ¶¶ 2, 22, 32, 59.

The claims in this case fall well within the purview of the integration mandate articulated in *Olmstead* and its progeny. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 611 (7th Cir. 2004) ("Although a State is not obliged to create entirely new services or to otherwise alter the substance of the care that it provides to Medicaid recipients in order to accommodate an individual's desire to be cared for at home, the integration mandate may well require the State to make reasonable modifications to the form of existing services in order to adapt them to community-integrated settings."); *Townsend*, 328 F.3d at 517 (if services could be characterized as "new" because they are not currently being provided in the community "*Olmstead* and the integration mandate would be effectively gutted"); *Helen L. v. DiDario*, 46 F.3d 325, 337-39 (3d Cir. 1995) (finding that the state violated the integration mandate by not delivering attendant services in a community setting rather than in a nursing facility). The relief sought by Plaintiffs here does not require the degree of modification that *was* compelled under *Olmstead* and its progeny:  the Complaint is clear that Plaintiffs only seek delivery of services that Defendants already provide and have assessed Plaintiffs to need in the community.

Plaintiffs' use in the Complaint of the term "adequate" does not mean that Plaintiffs seek "new services."  The CFI Waiver services sought by Plaintiffs are services NHDHHS already provides, through the CFI Waiver and in institutional settings. Defendants have an obligation to deliver those services in a non-discriminatory manner and, when necessary, to make reasonable modifications to avoid causing persons with disabilities to be unnecessarily institutionalized. That Defendants may be required to make reasonable modifications to the way they administer, operate, and oversee the CFI Waiver program does not absolve them of that responsibility. The

protections of the ADA and Rehabilitation Act would otherwise be meaningless. *See Radaszewski*, 383 F.3d at 611; *Townsend*, 328 F.3d at 517. Having chosen to provide CFI Waiver services, Defendants must do so "'in accordance with the ADA's anti-discrimination mandate.'" *Doxzon*, 2020 WL 3989651 at *9 (quoting *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1302 (M.D. Fla. 2010)).

The cases Defendants cite are inapposite. *Buchanan v. Maine,* 469 F.3d 158 (1st Cir. 2006), was not an integration mandate case, and *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998), which preceded *Olmstead*, was not based on an alleged violation of the integration mandate. In fact, the issues in both *Buchanan* and *Doe* involved failed claims based on an assertion of a right to individually-tailored services. *Buchanan*, 469 F.3d at 174-75; *Doe*, 148 F.3d at 82-83. Neither case involved an alleged risk of institutionalization absent the provision of the services demanded by the plaintiffs. In *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999), plaintiffs sought safety monitoring services that the public entity was not providing to anyone in any setting. *Id.* at 618 (state could not unlawfully discriminate by failing to provide a service "it provides to no one"). Likewise, in *Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000), the record that plaintiffs had the opportunity to develop in discovery did not clearly demonstrate that the services they sought were services the defendants were already providing. *Id.* at 548-49.

D.    **Plaintiffs have asserted proper ADA and Rehabilitation Act claims under Olmstead and its progeny.**

Defendants' third challenge to Plaintiffs' ADA and Rehabilitation Act claims requires the Court to decide whether *Olmstead* and its progeny support the distinction drawn by Defendants between the risk of "unnecessary institutionalization" faced by Plaintiffs and the "unjustified isolation" that the *Olmstead* court condemned.  Defs.' Mem. 38-9. Insofar as the distinction

23

drawn by Defendants here merely repurposes their mistaken claim that Plaintiffs seek "new and different services," it should be summarily rejected.

The linchpin of Defendants' effort is their mistaken characterization of the CFI Waiver services sought by Plaintiffs here as "new and different" services from those currently being provided by Defendants through the CFI Waiver. Institutionalization in the absence of "new and better" services, Defendants contend, is not "unjustified isolation." *See* Defs.' Mem. 38-9. But that "unnecessary institutionalization" that can and does result from Defendants' failure to provide Plaintiffs the very services that Defendants offer and provide through the CFI Waiver program—just not to Plaintiffs in the amount and with the frequency that Plaintiffs have been assessed to need—is precisely the "unjustified isolation" that the *Olmstead* Court found to constitute disability discrimination under the ADA.  Plaintiffs allege viable claims for an integration mandate violation because Defendants' actions (or more appropriately, inaction) places them at risk of unnecessary institutionalization, which is a well-recognized form of unlawful discrimination. *See* Compl. at ¶ 22; *see also Olmstead*, 527 U.S. at 597-603; *Kenneth R.*, 293 F.R.D. at 259; *Pashby*, 709 F.3d at 322; *M.R. v. Dreyfuss*, 663 F.3d 1100, 1116-17 (9th Cir. 2011); *Fisher*, 335 F.3d at 1181; *Doxzon*, 2020 WL 3989651 at *10-11; *A.H.R.*, 2016 U.S. Dist. LEXIS 2587 at *49-55; *Pitts v. Greenstein*, No. CIV.A. 10-635-JJB-SR, 2011 WL 1897552, *2-3 (M.D. La. May 18, 2011); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1175-76 (N.D. Cal. 2009); *Ball*, 2009 U.S. Dist. LEXIS 45331, *15-17.

Insofar as Defendants suggest that a plausible *Olmstead* claim must be based on allegations "that persons outside the CFI Waiver program are receiving a benefit or service that CFI Waiver participants are not receiving," Defs.' Mem. 38, this proposition is wrong as a matter of law and fact. As a legal matter, "the Supreme Court held that 'discrimination' under [the

ADA] included 'not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated*.'" *Steimel*, 823 F.3d at 910 (citing *Olmstead*, 527 U.S. at 597-603) (emphasis in original and internal citations omitted).

As a factual matter, the Complaint alleges a putative class consisting only of those persons who have been assessed to need certain CFI Waiver services, are not receiving them, and are at risk of unnecessary institutionalization as a result. Compl. ¶¶ 122, 124. While Defendants' administration of the CFI Waiver program places all CFI Waiver participants at risk that, on any given day, they will not receive the services that they need and, as a result, they can face avoidable medical or psychosocial crises that require institutionalization, Plaintiffs do not allege that, on any given day, every CFI Waiver participant is missing services. *See* Compl. ¶¶ 2, 3, 22, 59, 66-69, 123, 129.

**E.**  **Defendants' failure to administer the CFI Waiver program in a manner that avoids discrimination is an actionable government policy, practice, and/or procedure under the ADA and Rehabilitation Act.**

Defendants' fourth challenge to the Plaintiffs' ADA and Rehabilitation Act claims asks this Court to require Plaintiffs to plead disparate impact to state a cognizable methods of administration claim under the ADA and Rehabilitation Act. Defs.' Mem. 39-41. This Court should decline to do so. Defendants' construction would narrow the existing scope of federal regulations promulgated to implement the ADA's and Rehabilitation Act's mandate to redress disability discrimination in a manner contrary to the express purpose of those statutes. *See Olmstead*, 527 U.S. at 588-89 (recognizing that, in enacting the ADA, "Congress . . . intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"); *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995) ("[T]he ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the

'invisibility of the disabled' . . . [and is] intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner that shunts them aside, hides, and ignores them.").[6]

> **1.**     **The plain language of the ADA's and Rehabilitation Act's methods of administration regulations supports claims predicated upon unnecessary institutionalization and the risk thereof.**

The essence of Defendants' argument is that methods of administration claims cannot be based on an allegation of disability discrimination that consists of unnecessary institutionalization or the risk thereof. Defs.' Mem. 40-1. There is nothing in the ADA's or the Rehabilitation Act's regulations that supports Defendants' position. In so arguing, Defendants urge this Court to substantially narrow the scope of these regulations in a manner not supported by their language, the authorities on which Defendants rely, or the decisions of other courts which have declined to adopt Defendants' reading of these regulations.

These regulations prohibit public entities from "utilize[ing] [] methods of administration [t]hat have the *effect* of *subjecting* qualified individuals with disabilities *to discrimination on the basis of disability*."  28 C.F.R. § 35.130(b)(3)(i); 28 C.F.R. § 41.51(b)(3)(i) (emphasis added). They further prohibit public entities from "utilize[ing] [] methods of administration [] that have the *purpose* or *effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program* with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii); 28 C.F.R. § 41.51(b)(3)(ii) (emphasis added). Nothing in the language of these regulations, or the broad remedial purpose of the statutes they were promulgated to implement, suggests that the regulations are intended to exclude forms of disability discrimination that

---

[6] The Third Circuit's decision in *Helen L.* likewise recounts the similar remedial purpose of the Rehabilitation Act. *Id.*, 46 F.3d at 329-32.

manifest as unnecessary institutionalization. To reach this conclusion, Defendants urge the Court

to read such a limitation into the regulation when it is plainly not there. Defs.' Mem. 41.

Moreover, Defendants mischaracterize the First Circuit's decision in *Nunes v. Mass.*

*Dep't of Corr.*, 766 F.3d 136 (1st Cir. 2014), as holding that "a claim brought pursuant to these

regulations . . . requires an allegation of disparate impact." Defs.' Mem. 41. While the *Nunes*

court cited 28 C.F.R. § 35.130(b)(3)(i) in connection with disparate impact claims, the court did

not hold that methods of administration claims are only cognizable when rooted in allegations of

disparate impact. *Id.*, 766 F.3d 145; *cf. Pathways Psychosocial v. Town of Leonardtown, MD*,

133 F. Supp. 2d 772, 788 (D. Md. 2001) (similarly rejecting defendants' argument that a

"methods of administration" claim requires disparate impact allegation).

> ### 2.    Case law interpreting methods of administration regulations likewise embraces claims predicated upon risk of unnecessary institutionalization.

Defendants are wrong in their contention that *Olmstead*'s definition of disability

discrimination (i.e., unnecessary institutionalization) applies only to ADA integration mandate

claims and not ADA methods of administration claims. Defs.' Mem. 40. First, the authorities on

which Defendants rely in support of their effort to limit *Olmstead*'s application to integration

mandate *claims* do not support this contention. *See* Defs.' Mem. 40 (citing *Voss* and *Buchanan*);

*Voss v. Rolland*, 592 F.3d 242, 255 (1st Cir. 2010) (rejecting the applicability of *Olmstead* to

plaintiffs' claims because plaintiffs were resisting transfers from nursing facilities compelled by

an entirely different federal statute – the Nursing Home Reform Amendments to the Medicaid

Act); *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006) (observing that *Olmstead* did not apply to

adequacy of treatment claim of man with mental illness fatally injured in encounter with police).

Notably, neither of these cases involved people with disabilities who faced a risk of unnecessary

institutionalization challenged under the ADA's methods of administration regulation.

Second, Defendants ignore contrary authorities in which courts considered, and

sustained, methods of administration claims that were predicated upon allegations of unnecessary

institutionalization that also supported integration mandate claims. *See, e.g., Pa. Prot. &*

*Advocacy, Inc. v. Pa. Dep't of Public Welfare*, 402 F.3d 374, 385 (3d Cir. 2005) (appellate

court's rejection of district court's determination that fundamental alteration defense applied to

integration mandate claim also undermined district court's grant of summary judgment to

defendant on discriminatory administration claim); *Day v. District of Columbia*, 894 F. Supp. 2d

1, 23-24 (D.D.C. 2012) (denying defendant's motion to dismiss or in the alternative motion for

summary judgment after considering disability discrimination claims alleging ADA and

Rehabilitation Act violations where defendants had utilized criteria or methods of administration

that did not appropriately facilitate transition to community-based care in lieu of unnecessary

segregation in nursing facilities); *Pitts v. Greenstein*, No. CIV.A. 10-635-JJB-SR, 2011 WL

1897552, *2-3 (M.D. La. May 18, 2011) (denying motion to dismiss converted into one for

summary judgment where Louisiana Medicaid beneficiaries asserted methods of administration

claim predicated upon risk of institutionalization from reduced personal care services in violation

of the integration mandate); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1175-76 (N.D.

Cal. 2009) (rejecting defendant's standing-based challenge to plaintiffs' methods of

administration claims against the state agency and its director based on services reductions that

placed plaintiffs at risk of unnecessary institutionalization in nursing facilities).

Third, Defendants' contention that *Olmstead* constitutes a narrow exception to a general

rule requiring plaintiffs asserting ADA claims to allege disparate treatment or impact is belied

both by the authorities that Defendants cite and those that they ignore. While Defendants rely

heavily on *Nunes v. Mass. Dep't of Corr.*, that court did not hold that all ADA claims, except

those alleging violations of the integration mandate, required allegations of disparate treatment or impact. *Id.*, 766 F.3d at 145-46 (recognizing an entire category of ADA claims that do not require an allegation of disparate treatment or impact). Moreover, as noted above, courts have sustained methods of administration claims rooted in allegations of unnecessary institutionalization, or the risk thereof, where plaintiffs did not allege disparate treatment. *See, e.g., Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 385; *Day*, 894 F.Supp.2d at 23-34; *Pitts*, 2011 WL 1897552 at *2-3; *Brantley*, 656 F. Supp. 2d at 1175-76.

Because Defendants are responsible for administering the CFI Waiver program, and their collective actions and failures to act in administering the waiver place Plaintiffs at risk of institutionalization, Plaintiffs amply pleaded actionable violations of the integration mandate and methods of administration claims under the ADA and Rehabilitation Act and Defendants' Motion to Dismiss should be denied.

## II.    Defendants' Administration, Operation, and Responsibility for the CFI Waiver Program Constitute State Action for Plaintiffs' Medicaid and Due Process Claims.

Defendants' challenge to the Plaintiffs' Medicaid Act and Due Process claims is predicated on whether the alleged conduct bears the hallmarks of "state action." Defs.' Mem. 42-8. This challenge rests on a faulty premise. The actionable conduct alleged in the Complaint is that of the Commissioner, a state actor. She is the one with the duty to administer, oversee, and manage the CFI Waiver program in a manner that ensures the delivery of waiver services with reasonable promptness. Her obligations are more than merely the obligation to pay for services. *See O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016). Further, the Commissioner must administer and oversee Medicaid programs and services in a manner that comports with the notice and hearing requirements of the Medicaid Act and the Fourteenth Amendment. *Murphy by Murphy v. Minn. Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084 (D. Minn. 2017).

For the same reasons that Defendants cannot disavow their responsibility for administering the CFI Waiver program as required by the ADA and Rehabilitation Act, *see* Section I, *supra*, the Commissioner cannot evade her obligations under the Medicaid Act and the Fourteenth Amendment. There is no need for the Court to engage in the "state action" analysis applied in *Blum v. Yaretsky*, 457 U.S. 991(1982).

### A.   The Commissioner is responsible for administering the CFI Waiver program regardless of third-party involvement.

As another judge of this Court recently held in *Doe v. Comm'r, N.H. HHS*, 2020 DNH 070, "'[s]tate action may be found where a state actor has a duty to act but fails to do so.'" *Id.* at 14 (quoting *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983), and citing *Goodall v. Binienda*, 405 F. Supp. 3d 253, 270-71 (D. Mass. 2019)). State action also exists where the state actor "is responsible for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004.

### 1.   The Commissioner's legal responsibility for the administration of the CFI Waiver program is non-delegable.

The Commissioner has the ultimate responsibility to ensure that participants receive the services that they have been assessed to need even though she may rely on other parties to perform functions within the service system. Compl. ¶¶ 23, 25, 51-8, 113-14, 121. In *O.B.*, the Seventh Circuit Court of Appeals affirmed a preliminary injunction in favor of plaintiffs who sought to compel the state agency to take prompt action to solve the nursing shortage affecting their ability to secure services. *O.B.*, 838 F.3d at 841-43. The court found it to be an "erroneous assumption" that all Medicaid required of the state agency was to pay for services, not provide the services. *Id.* at 842. While some courts previously had interpreted the Medicaid Act as only a "payment scheme," that interpretation was upended by Congress when it enacted the Patient Protection and Affordable Care Act ("ACA"). *Id.* at 843. In enacting the ACA, "Congress intended to clarify that where the Medicaid Act refers to the provision of services, *a*

*participating State is required to provide (or ensure the provision of) services, not merely pay for them*." *Id*. (quoting *A.H.R.*, 469 F. Supp. 3d at 1040) (emphasis added)). Not only does the Medicaid Act require a state entity to provide the required services (directly or indirectly), but it must also do so with reasonable promptness. *Id.*

Likewise, in *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973 (D. Minn. 2016), the district court explained that, "[b]ecause Medicaid regulations require the state to '[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures,' a state's "mismanagement of allocated funding, which leads to an unreasonable delay in the provision of services, may establish a violation of the reasonable promptness requirement." *Id.* at 1012 (quoting 42 C.F.R. § 435.930). It did not matter to the viability of plaintiffs' reasonable promptness claim that the state relied on counties to assess service needs and to develop service plans to meet those needs. The counties were not named as defendants. *Id.* at 1013 (holding that "Plaintiffs have also plausibly alleged that [the state agency] has oversight over the State's Waiver Services program such that their claims are redressable even in the absence of the counties as individual parties in this case.").

The plaintiffs in *Murphy by Murphy v. Minn. Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084 (D. Minn. 2017), like Plaintiffs here, were already enrolled in the Medicaid waiver at issue, but were experiencing unwarranted delays in getting housing services under the waiver that might allow them to transition out of segregated settings. 260 F. Supp. 3d at 1097-98. Plaintiffs sought declaratory and injunctive relief compelling the state agency to take prompt steps to deliver the services, and to provide adequate notice and opportunity for a fair hearing when such services were not so delivered. In denying the agency's motion to dismiss, the court held, among other things, that the reasonable promptness provision of the Medicaid Act requires a participating

31

state to provide or ensure the delivery of services in a reasonably prompt manner. *Id*. at 1108.

The court further discussed the state agency's obligation to provide adequate notice and

opportunity for fair hearing under both the Medicaid Act and the Constitution. *Id*. at 1112-13. As

in *Guggenberger*, it did not impact the viability of the claims that the state relied on the third-

party counties, which were not defendants in the case, as part of its delivery system. *Id*.

Following discovery, the plaintiffs succeeded in securing summary judgment on their due

process claims (again notwithstanding defendants' argument that they relied on the third-parties

to issue the notices at issue). *Murphy by Murphy v. Harpstead*, 421 F. Supp. 3d 695, 704, 709 (D.

Minn. 2019).

  While states have flexibility in how they administer Medicaid waiver programs and

services, it is well-settled that such flexibility does not enable a state to rid itself of the

overarching duties to ensure the reasonably prompt delivery of services under a waiver and to

ensure participants receive written notice of service denials. *See e.g.*, 42 C.F.R. § 431.10(e)

("The Medicaid agency may not delegate, to other than its own officials, the authority to

supervise the plan or to develop or issue policies, rules, and regulations on program matters.");

*Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1159 (9th Cir. 2007) (explaining that

"[e]ven if a state delegates the responsibility to provide treatment to other entities such as local

agencies or managed care organizations, the ultimate responsibility to ensure treatment remains

with the state."); *Doxzon*, 2020 WL 3989651, at *8 (citing "cases that reject the suggestion that a

state escapes responsibility [for providing services] by entering into an M[anaged] C[are]

O[rganization] contract"); CMS, *Application for a § 1915(c) Home and Community-Based

Waiver: Instructions, Technical Guide and Review Criteria*, 8 ("Monitoring the implementation

of the service plan is also a critical waiver operational activity."), 9 (noting the limits of state

Medicaid agency's ability to delegate operation of the waiver) (Jan. 1, 2019),

https://bit.ly/3xCMCqv (last accessed April 27, 2021).

> **2.    Defendants' own statements belie their attempt to disavow responsibility for the conduct at issue in this case.**

Defendants' representations to CMS in the CFI Waiver Application and elsewhere confirm their responsibility for the conduct on which Plaintiffs' claims rest. By way of example, Defendants have stated:

- "The DHHS Office of Medicaid Services is responsible for CFI waiver operations, including waiver program monitoring. The Commissioner of Health and Human Service retains the ultimate authority over all of NH's HCBS waivers." *See* Galdieri Decl., Ex A (CFI Waiver) at 15.

- "The State operates a formal, comprehensive system to ensure that the waiver meets the assurances and other requirements contained in this application. Through an ongoing process of discovery, remediation and improvement, the State assures the health and welfare of participants by monitoring: (a) level of care determinations; (b) individual plans and services delivery; (c) provider qualifications; (d) participant health and welfare; (e) financial oversight and (f) administrative oversight of the waiver. The State further assures that all problems identified through its discovery processes are addressed in an appropriate and timely manner, consistent with the severity and nature of the problem. During the period that the waiver is in effect, the State will implement the Quality Improvement Strategy specified in Appendix H." *Id*. at 8; *see also id*. at 150 (requiring granular monitoring of contents of person-centered plans).

- NHDHHS' "Bureau of Elderly and Adult Services (BEAS) provides a variety of social and long-term supports [which includes CFI Waiver services] to adults age 60 and older

and to adults between the ages of 18 and 60 who have a chronic illness or disability."
NHDHHS, Division of Community-Based Care, https://bit.ly/3tdsdoR (last visited April
29, 2021).

The stark contrast between Defendants' assertions in the motion and the role the
Commissioner actually plays in the state's CFI Waiver program also is evident in Defendants'
public statements and actions. On Defendants' public-facing website, the Commissioner
announced the "Guidehouse, Inc. report" that she commissioned, approved, and released on
March 12, 2021. *See* NHDHHS, Bureau of Elderly and Adult Services (Mar. 12, 2021),
https://bit.ly/3gNhaQz (last visited April 2, 2021); *Karpinski*, 2019 DNH 110 at 7 (allowing
Court to consider matters of public record on motion to dismiss). Consistent with the
Commissioner's authority and administrative responsibility for providing services, Defendants
described the purpose of the Guidehouse report "to conduct an independent assessment of NH's
[Long Term Services and Supports] model for seniors and individuals with physical disabilities
and to advise DHHS/BEAS" and "to assist DHHS/BEAS as it aims to continue its efforts to
improve NH's current LTSS delivery system for seniors and individuals with physical
disabilities." *Id*. Notably, the report itself not only acknowledges the Commissioner's
responsibility for the *state's* system, it also largely confirms the widespread problems with her
administration of the program alleged in the Complaint. *See* Guidehouse, Inc.,
https://bit.ly/330bLxn, at 10-20 (last visited April 29, 2021).

   **B.**   ***Blum* is not controlling here.**

The U.S. Supreme Court's analysis in *Blum v. Yaretzky* does not apply here, where
Plaintiffs challenge the Defendant Commissioner's own actions and inactions. Defendants try to
reframe this lawsuit as one challenging only the decisions of case management agencies and
services providers. Defs.' Mem. 42-43. That is not what this case is about. This case is about

Defendants' administration of the CFI Waiver program in a way that violates not only the ADA and Rehabilitation Act, but also the Medicaid Act and the Fourteenth Amendment by not ensuring the delivery of those services with reasonable promptness and by failing to provide fair notice and opportunity to be heard when those services are delayed or not provided at all. *See* Section I, *supra*.

The claim remaining in *Blum*, when it reached the Supreme Court, challenged the clinical decisions of private entity nursing homes to discharge or transfer nursing home plaintiffs. 457 U.S. at 997-98. Plaintiffs objected to being discharged or transferred without certain procedural safeguards under the Fourteenth Amendment. *Id.* The decisions, however, were clinical decisions made by solely by nursing facility staff. *Id.* at 1008. Although the defendant state officials regulated the nursing facilities, they played no role in clinical discharge/transfer decisions. *Id.* Moreover, unlike here, plaintiffs did not challenge any particular state regulation or procedures. *Id.* at 1003. Accordingly, the question presented was whether the state actors could be liable under the Fourteenth Amendment for the clinical decisions made by the private nursing facility staff; the answer was no. *Id.* at 1012.

The other cases cited by Defendants are equally unavailing. Unlike here, those cases were, like *Blum*, about a private actor's conduct or actions in which the state entity had no role. The claims in this case arise from the Commissioner's actions (or inaction) and the Medicaid Act, which is not merely a licensing or regulatory regime, nor a payment scheme. *See* Section I.A.4, *supra*. Moreover, none of these cases involve a state's obligations under the Medicaid Act. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) (holding that city's designation of a private entity as a public access channel analogous to a license did not make the private entity a state actor in a case alleging a violation of the First Amendment); *Rendell-Baker*

*v. Kohn*, 457 U.S. 830 (1982) (ruling that private school was not a state actor when deciding to terminate plaintiff teachers even though the school received public funds to operate and a state regulation required state approval to hire such teachers); *Jarvis v. Vill. Gun Shop, Inc.*, 805 F. 3d 1 (1st Cir. 2015) (holding that private gun storage shop that stored guns seized by police was not transformed into a state actor when it auctioned guns to satisfy gun owner's unpaid storage fees where state had no role in how the private entity stored the guns, charged fees to the gun owners for storage, or eventually disposed of the guns); *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244 (1st Cir. 2012) (finding that HMO was not a state actor when it ended contracts with two doctors for failing to accept capitation payments for services even though the HMO received state funds but the state did not compel the capitation payment scheme at issue nor have a role in managing or controlling HMO); *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1 (1st Cir. 2005) (ruling that private hospital was not a state actor when its doctors participated in plaintiff's involuntary commitment even though hospital received federal funds, plaintiff's care was covered by state insurance, and state statute authorized the commitment process); *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254 (1st Cir. 1994) (finding that private hospital did not act under the color of state law when its doctors restrained and involuntarily admitted plaintiff under a state law authorizing but not compelling the involuntary admission even though hospital received federal funds).

Defendants' efforts to reframe Plaintiffs' claims must fail here because Plaintiffs' claims arise from the Commissioner's own actions in administering the state's CFI Waiver program. *See* Section II.A., *supra*. Just as NHDHHS is responsible for the delivery of services under the state's other Medicaid waiver and service programs, the Commissioner bears the ultimate responsibility for the delivery of CFI Waiver services regardless of whether she elects to do so directly or

indirectly. *See generally Doe*, 20 DNH 070, at 29-30 (denying motion to dismiss finding the NHDHHS Commissioner has a duty to ensure persons in the mental health system under an IEA receive a timely due process hearing even though those persons may be being held by private third-party hospitals because of a lack of available beds at the state's psychiatric hospital); *Kenneth R.,* 293 F.R.D. 254 (D.N.H. 2014) (certifying class action against the state in a case under the ADA and Rehabilitation Act for failing to develop an adequate array of community mental health services which the state provides through private third-party programs); *Bryson v. Shumway*, 308 F.3d 79, 91 (1st Cir. 2002) (remanding case for determination of whether NHDHHS was acting with reasonable promptness in the delivery of services under the state's Acquired Brain Disorder Medicaid Waiver, which services were "actually carried out, under the direction of [NHDHHS], by a group of 'area agencies'").

## III.    Plaintiffs Have Stated Viable Claims Under 42 U.S.C. § 1396(a)(3) and the Due Process Clause of the Fourteenth Amendment.

Defendants' final challenge raises two issues for the Court's resolution:  whether under 42 U.S.C. § 1396(a)(3) and the Due Process Clause of the Fourteenth Amendment, Defendants must provide Plaintiffs with written notice of the effective denial of their requests for CFI Waiver services, and whether the adequacy of the notice which Defendants purportedly provide can be resolved, as a matter of law, at this stage of the proceedings.[7]  The Commissioner is

---

[7] The Defendant Commissioner does not deny that Plaintiffs have a private right of action to enforce Section 1396(a)(3) of the Medicaid Act. Defs.' Mem. 49 n.22. Defendants acknowledges that the First Circuit has found that the reasonable promptness provision, § 1396a(a)(8), is privately enforceable in a Section 1983 action. *Id.* The statutory provisions of § 1396a(a)(3) and (a)(8) are strikingly similar, as both are focused on the rights of individual Medicaid applicants and beneficiaries. Both provisions are privately enforceable under U.S. Supreme Court precedent. *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). Defendants cite *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), Defs.' Mem. 49, but that case concerned the right of Medicaid *providers* to enforce a very different Medicaid Act provision, 42 U.S.C. § 1396a(a)(30)(A).

required, under federal Medicaid and constitutional law, to provide written notice of the effective

denial of Plaintiffs' requests for CFI waiver services. Only with such written notice would

Plaintiffs be lawfully apprised of their opportunity to request a fair hearing to appeal their lack of

those services. Whether the purported notice may be adequate is a factual issue not ripe for

resolution on a motion to dismiss.

**A.    Defendant's failure to provide plaintiffs notice of the effective denial of their request for CFI Waiver services denies them the due process required by the Medicaid Act and the U.S. Constitution.**

Plaintiffs allege that they requested Medicaid services by applying for available waiver

services under the CFI program; the Defendant has found them eligible to receive services, but

Defendants have not provided those services with reasonable promptness or at all. Compl. ¶¶ 72-

75, 81-83, 88-90. The relevant provision of the Medicaid Act, 42 U.S.C. § 1396a(3), states that

"[a] State plan for medical assistance must … provide for granting an opportunity for a fair

hearing before the State agency to any individual whose *claim* for medical assistance under the

plan is *denied or is not acted upon with reasonable promptness*." (Emphasis added.) Under 42

C.F.R. §431.206(c)(2), Defendants must notify Plaintiffs in writing of the adverse action and

their fair hearing rights "[a]t the time the agency denies an individual's claim for eligibility,

benefits or services; … or takes other action as defined in § 431.201…". "Action" under 42

C.F.R. § 431.201 broadly includes "a termination, suspension of, or reduction in covered benefits

or services, or a termination, suspension of, or reduction in Medicaid eligibility.…"  In other

words, when Medicaid beneficiaries receive none or only some of their authorized services, they

have the right to written notice and a fair hearing.

CMS guidance supports Plaintiffs' position, construing the term "claim" broadly. *See* 81

Fed. Reg. 86382-01, 86395 (Nov. 30, 2016) ("a 'claim' in §431.220(a)(1) . . . refers broadly to

any claim by an applicant or beneficiary for Medicaid, whether such claim be for eligibility for

coverage in general, or for a particular benefit or service[.]"); *Murphy v. Harpstead*, 421 F. Supp. 3d at 707. "CMS also provides that 'denial' of a claim in §431.220(a)(1) includes situations in which the agency authorizes an amount, duration or scope of a service which is less than that requested by the beneficiary or provider." *Id*. at 707-08. "The CMS guidance does not tie 'claim' to a 'specific application,' or limit 'denial to simply rejecting an application." *Id*. at 708.[8]

In *Murphy*, the Minnesota district court considered similar Section 1396(a)(3) and federal due process claims by Medicaid waiver beneficiaries. The plaintiffs alleged that the state agency's notice policy violated the Medicaid Act by failing to provide them with notices of action when their requests for services were effectively denied. The agency's policy failed to explain "what constitutes an action that denies, terminates, or reduces the person's service," and did not instruct that notices be sent when "a request for services is not acted upon within a certain timeline or with reasonable promptness."  421 F. Supp. 3d at 704. As a result, Plaintiffs argued that the third-party providers charged with sending such notices were only doing so when "a formal, final decision that they will not authorize specific Disability Waiver services" had been made, but not when recipients experienced a lack of services while providers attempted to secure services "regardless of how long that attempt last[ed]."  *Id*. The plaintiffs alleged that the ensuing delay in services was an "effective[] 'deni[al]' and Notice of Action is required."  *Id*. Because the state agency's notice policy "leaves the decision of what constitutes a 'denial'

---

[8] Further, the CMS State Medicaid Manual at § 2901.1 directs the Defendant Commissioner to send advance written notice "whenever you propose to terminate, reduce, or suspend Medicaid covered services" (10-day advance written notice) and "whenever you propose to deny, terminate, reduce, or suspend eligibility or covered services because of data disclosed through a matching program…" (30-day advance written notice). CMS, *The State Medicaid Manual*, https://go.cms.gov/3gOHzgJ (last visited April 27, 2021). Plaintiffs' CFI services were reduced or terminated and they were entitled to prior written notice before those events occurred.

entirely within the discretion of [providers]," the agency's lack of guidance led providers to "believe that they [were] not required to provide Notice of Action as long as they think that they are working on a Disability Waiver recipient's case and believe that progress is being made." *Id*. As a consequence, plaintiffs argued, they would "go months and sometimes years without services or explanatory notice of a denial in violation of their federal rights." *Id*. at 704-05.

Based on the broad construction of "claim" and "denial" in the relevant CMS guidance, the *Murphy* court rejected defendant's "narrow reading" of Section 1396(a)(3) that notice was required *only* in the event of a formal denial, finding it "illogical." *Id*. at 707-08. The court reasoned that defendant's interpretation of Section 1396(a)(3) "presupposes that Disability Waiver recipients know exactly what services are available and to specifically apply for them before due process requirements are triggered. 'This improperly places on the recipient the burden of acquiring notice whereas due process directs [Defendant] to supply it.'" *Id*. at 708 (quoting *Schroeder v. Hegstrom*, 590 F. Supp. 121, 128 (D. Or. 1984)).

Ultimately, the *Murphy* court concluded that "a denial under 42 C.F.R. 431.206(c)(2) is not limited to rejection of an application for services; a denial also occurs—and a Notice of Action is required—when an agency does not authorize services that a beneficiary requests, and when an agency authorizes services but does not provide the type or amount of requested services." *Id*. This Court should follow the *Murphy* court's reasoning and reject Defendant's argument that Plaintiffs are not entitled to written notice of their right to appeal. Defendants' position would eviscerate the protections that Congress intended for Plaintiffs and would force them to endure indefinite waits to obtain Medicaid CFI services that Defendants and their agents have assessed them to need to avoid unnecessary stays in institutions.

Plaintiffs' constitutional claim further supports the conclusion that they have plausibly stated claims for relief. Under the Fourteenth Amendment "an elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank and Tr. Co.,* 339 U.S. 306, 314 (1950). The opportunity to be heard must be granted "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965).

Plaintiffs have plausibly pled their due process claim. They assert that the Defendant failed to provide meaningful notice at a meaningful time, i.e., when the agency failed to provide the proper amount of requested and authorized CFI services. As a result, Plaintiffs do not receive written notice of their right to appeal. *See Murphy* at 708-09 (ruling that the Medicaid agency's notices fail to satisfy due process under the Fourteenth Amendment if "recipients could wait indefinitely for requested services, never receiving an explanation on the status of the request, and without an opportunity to appeal").

**B.      The alleged adequacy of Defendant's "notice" cannot be adjudicated at the pleading stage of this litigation.**

Defendant contends that her agency properly discharges its duty to provide adequate notice of Plaintiffs' fair hearing rights, through "the federal regulations, the CFI Waiver, and state law."  Defs.' Mem. 53. What is "adequate," however, is a factual issue. Plaintiffs have raised triable issues of fact regarding the adequacy of the notice.

"The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268-9 (1970). The process that is due is "notice reasonably calculated, under *all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*

339 U.S. at 314 (emphasis added). The notice to which public medical assistance recipients, such as the Plaintiffs, are entitled must take into account their circumstances as "persons who are aged, blind, or disabled, many of whom defendant [state agency] could have anticipated, would be unable or disinclined, because of physical handicaps and, in the case of the aged, mental handicaps as well, to take the necessary affirmative action." *Vargas v. Trainor*, 508 F. 2d 485, 489 (7th Cir. 1974).

Plaintiffs have not received the notice to which they are entitled. As in *Bryson*, in which the First Circuit remanded the Medicaid beneficiaries' 42 U.S.C. § 1396a(a)(3) claim "to the district court for further factual findings" given "New Hampshire's recent claim that it has modified its notification procedure and is now in accord with statutory and constitutional requirements," further factual development is warranted here. *See Bryson*, 308 F.2d at 91; *see also Guggenberger*, 198 F. Supp. 3d at 1023 (denying motion to dismiss due process and Section 1396a(a)(3) claims while acknowledging that if "further factual development reveals that Plaintiffs were in fact provided proper notice explaining their right to a fair hearing, the Court may ultimately reach a different conclusion.")

The cases Defendants cite do not support the proposition that Plaintiffs must rely on publicly available documents like a 234-page federal waiver application to be apprised of their right to a fair hearing. Defs.' Mem. 52. In two of those cases, the Supreme Court found that the state entities had not violated procedural due process rights, but only where plaintiffs had received written notices that are completely lacking here. In *City of West Covina v. Perkins*, 525 U.S. 234 (1999) the Court addressed the government's obligation to inform property owners of how to reclaim property seized in a criminal investigation, in a scenario where the police department *did* provide property owners with written notice that their property was seized after a

search warrant was executed. In *Atkins v. Parker*, 472 U.S. 115 (1985), Massachusetts food stamps recipients *did* receive a notice of a "mass change" in federal law regarding the calculation of the earned income disregard deduction – that mass change resulted in a reduction in every recipient's underlying food stamp entitlement.

In *Garcia-Rubiera v. Fortuno*, 665 F. 3d 261 (1st Cir. 2011), the First Circuit found a due process violation. The *Garcia-Rubiera* court recognized that the "requirements of due process vary with the particulars of the circumstance at issue." *Id*. at 272. Analyzing the Commonwealth's process for notifying vehicle owners of their right to state reimbursement of duplicative insurance payments, the court concluded that the Commonwealth's reliance on so-called "legislative notice" of a visit to the "appropriate office of government" "falls below the [due process] standard." *Id*. at 273-274. As in *Garcia-Rubiera*, Defendant's position that Medicaid recipients including the Plaintiffs should know to peruse government regulations and a 234-page waiver application is both unrealistic and violative of Plaintiffs' due process rights.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs request that the Court conduct oral argument on Defendant's Motion to Dismiss. Given the complexity of this case and the multiple issues raised by Defendants, Plaintiffs seek the opportunity to address the Court on the issues raised in the pleadings and answer questions from the Court.

## CONCLUSION

Because Plaintiffs' Complaint pleads plausible claims for relief, Defendants' Motion to Dismiss should be denied.

Dated:  April 30, 2021

STEPHANIE PRICE, EMILY
FITZMORRIS, and KATHLEEN BATES
on behalf of themselves and all others
similarly situated,

By Their Attorneys,

Cheryl S. Steinberg (#10063)
NEW HAMPSHIRE LEGAL ASSISTANCE
117 N. State Street
Concord, NH 03301
T: (603) 206-2210
csteinberg@nhla.org
Kay E. Drought (#12851)
NEW HAMPSHIRE LEGAL ASSISTANCE
154 High Street
Portsmouth, NH 03801
T: (603) 206-2253
kdrought@nhla.org

Kierstan E. Schultz (#20682)
kschultz@nixonpeabody.com
Mobile: 412-303-0648
W. Daniel Deane (#18700)
ddeane@nixonpeabody.com
Mark Tyler Knights (#670991)
mknights@nixonpeabody.com
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
T: (603) 628-4000
F: (603) 628-4040

*/s/ Pamela E. Phelan*
Pamela E. Phelan (#10089)
Pamelap@drcnh.org
Mobile: (603) 491-4157
Todd R. Russell (#14237)
Toddr@drcnh.org
Mobile: (603) 264-4943
DISABILITY RIGHTS CENTER–
NEW HAMPSHIRE
64 North Main Street, Suite 2
Concord, NH 03301
T: (603) 228-0432
F: (603) 225-2077

Kelly Bagby (*pro hac vice*)
M. Geron Gadd (*pro hac vice*)
Mobile: (202) 603-5020
Susan Ann Silverstein (*pro hac vice*)
kbagby@aarp.org
ggadd@aarp.org
ssilverstein@aarp.org
AARP FOUNDATION
601 E Street NW
Washington, DC 20049
T: (202) 434-2060
F: (202) 434-6622

**CERTIFICATE OF SERVICE**

I, Pamela E. Phelan, hereby certify that the foregoing Memorandum of Law in Opposition to Motion to Dismiss was filed through the ECF system and served electronically on the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: April 30, 2021                     _/s/ Pamela E. Phelan_____
                                          Pamela E. Phelan