**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Stephanie Price et al.**</u>

v.

<u>**Lori Shibinette, Commissioner of**</u>
<u>**the New Hampshire Department of**</u>
<u>**Health and Human Services et al.**</u>

Case No. 21-cv-25-PB
Opinion No. 2021 DNH 179

<u>**MEMORANDUM AND ORDER**</u>

Plaintiffs in this class action are disabled individuals enrolled in New Hampshire's Choices for Independence Waiver ("CFI Waiver"), a Medicaid program administered by the New Hampshire Department of Health and Human Services ("DHHS" or "Department").  The CFI Waiver program provides home and community-based care services to adults who otherwise would be Medicaid-eligible for nursing home care.  The complaint alleges that DHHS and its Commissioner have failed to remedy defects in the administration of the program, leading to significant gaps in plaintiffs' waiver services that place them at risk of unnecessary institutionalization.  Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a putative class, alleging violations of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, and the Fourteenth Amendment's due process clause. Defendants move to dismiss the complaint for failure to state a claim.  For the following reasons, I deny the motion.

## I.   __BACKGROUND__

### A.   __The Medicaid Program__

Medicaid is the primary federal program for providing medical care to needy individuals.  The program is subsidized by the federal government and administered by each participating state.  To opt in to the program, a state must submit to the Secretary of the U.S. Department of Health and Human Services ("Secretary") for approval a "State Plan," which describes the services that the state will cover through Medicaid and how the state will administer the program.  See 42 U.S.C. § 1396a. Services provided through Medicaid are subject to several requirements, including that they must be available state-wide, see id. § 1396a(a)(1), and comparably offered to all eligible individuals, see id. § 1396a(a)(10)(B).

Section 1915(c) of the Social Security Act (in which the Medicaid Act is embedded) authorizes the Secretary to waive certain Medicaid rules when a state applies to establish a program to provide home and community-based services to persons who otherwise would require institutionalization.  See id. § 1396n(c); 42 C.F.R. §§ 441.300 et seq.  In its application for a § 1915(c) waiver, a state must provide a range of assurances to the Secretary concerning waiver services.  One such assurance is that "necessary safeguards (including adequate standards for provider participation) have been taken to protect the health

and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services." 42 U.S.C. § 1396n(c)(2)(A); see 42 C.F.R. § 441.302.   Another assurance is that the average per capita expenditures for persons receiving benefits under the waiver do not exceed the average estimated per capita cost of providing Medicaid services to the same group of individuals in an institutional setting.   See 42 U.S.C. § 1396n(c)(2)(D).

**B.    New Hampshire's Long-Term Care Statute**

New Hampshire has in place a statutory scheme for long-term care of Medicaid-eligible adults.   See generally N.H. Rev. Stat. Ann. § 151-E.   It was enacted in part to "expand[] choices available" to persons who qualify for nursing home services but who "prefer to be cared for at home or in other settings less acute than a nursing facility."   Id. § 151-E:1.   The Long-Term Care statute provides that an eligible person "shall have the right to receive nursing facility services; however, the person shall be offered and may choose to receive services in a less restrictive setting if such services are available" under a Medicaid waiver program for home and community-based care.   Id. § 151-E:4, I; see id. §§ 151-E:2, IV, VI; 151-E:3.   To qualify for waiver services, individuals must be at least 18 years of age, clinically eligible for nursing facility care, and financially eligible for Medicaid coverage.   See id. § 151-E:3,

I.  Clinical eligibility criteria require a qualified medical professional working for DHHS to determine that the individual requires 24-hour care.  See id. § 151-E:3, II.  The statute authorizes DHHS to promulgate rules for the operation of the waiver program.  See id. § 151-E:12.

## C.    The CFI Waiver Program

Pursuant to the Long-Term Care statute, New Hampshire has sought and obtained a § 1915(c) waiver from the Secretary to provide home and community-based services to Medicaid-eligible persons who choose this alternative over nursing home placement. The waiver program has come to be known as the CFI Waiver program.[1]  The state's § 1915(c) waiver application and administrative rules promulgated by DHHS outline how the program operates.  See Doc. No. 23-3 (§ 1915(c) waiver application); N.H. Admin. R. He-E 801, 805.[2]

DHHS is the state's Medicaid agency "responsible for CFI waiver operations, including waiver program monitoring."  Doc. No. 23-3 at 15.  It employs "state staff who are specifically designated to oversee the performance of each entity performing

---

[1] It was formerly named the Home and Community-Based Care for the Elderly and Chronically Ill program.

[2] The relevant administrative rules are publicly available at: http://www.gencourt.state.nh.us/rules/state_agencies/he-e800.html & http://www.gencourt.state.nh.us/rules/state_agencies/he-c200.html (last visited November 17, 2021).

waiver operational and administrative functions." Id. at 17. The Commissioner of DHHS ("Commissioner") has "the ultimate authority over all of NH's [home and community-based service] waivers." Id. at 15.

Applications for enrollment into the CFI Waiver program are submitted to and processed by DHHS. The Department enrolls eligible participants after determining their financial and clinical eligibility and verifying that they can be served with home or community-based services at a cost no greater than the average annual cost of nursing facility placement. See N.H. Admin. R. He-E 801.03, 801.04.

Following enrollment, a CFI participant either selects or is assigned to a case management agency from a list provided by DHHS. See He-E 805.07. Case management agencies are private entities licensed by the state and enrolled as Medicaid providers. He-E 805.04(a). They contract with DHHS "to provide targeted case management services to CFI participants." He-E 805.02(c). Those services include assisting participants in gaining access to the needed CFI waiver services and coordinating with the participants' service providers. He-E 805.02(s). Each participant is assigned a case manager who works for the case management agency and is primarily tasked with delivering the required case management services to the participant. He-E 805.05.

At the outset, the designated case manager must work with the participant to develop a written "comprehensive care plan through a person-centered planning process."  He-E 801.05(a); see He-E 805.05(c).  This care plan must identify all requested waiver services, the names of selected providers of those services, and any unfulfilled needs or gaps in services.  He-E 805.05(c).  CFI waiver services that a participant may request include, among others, home health aide, homemaker, personal care, and skilled nursing services.  He-E 801.12(b); see He-E 801.14-801.28 (defining and setting forth requirements for each type of CFI waiver service).  The participant has "the right to freely select from among any willing and [Medicaid-]qualified providers of waiver services."  Doc. No. 23-3 at 134.  Case managers inform participants of all eligible Medicaid providers in their geographical area and apprise them of their right to self-direct their services and choose providers who are not yet enrolled but who wish to become Medicaid providers.  Id.

Once the comprehensive care plan is prepared, the case manager must request authorization from DHHS for the services contained in the plan, including the specific providers the participant has selected.  He-E 801.05(b).  "DHHS has the final authority for approval" of the plan.  Doc. No. 23-3 at 135.  The Department must authorize services that are consistent with the participant's needs.  He-E 801.06(a).  The authorization must

describe "specific types, units, and frequencies of medical and other services" and must "be issued to specific service providers identified by the participant's case manager."  He-E 801.06(b)-(c).

Each service provider whom DHHS authorizes to provide waiver services must develop a written care plan for the participant.  He-E 801.30(a).  That plan must contain, among other information, a description of the participant's needs and the scope of services to be provided.  He-E 801.30(a)(3).  To ensure that this provider-specific care plan is consistent with and addresses the service needs identified in the participant's comprehensive care plan, the provider must communicate the elements of the care plan to the participant's case manager. He-E 801.30(a)(2), (5).

Authorized waiver services are eligible for payment when they are provided as specified in the participant's comprehensive care plan and comply with the DHHS criteria for the type of service at issue.  He-E 801.12(a).  To receive payment, a provider must submit a claim to the state's Medicaid fiscal agent within one year of the service date.  He-E 801.31(a).  Payments are made in accordance with rates established by DHHS, which must follow statutory rate-setting provisions.  He-E 801.31(d).

A case manager is responsible for ongoing monitoring of the participant's comprehensive care plan and attendant waiver services.  He-E 805.02(d); see Doc. No. 23-3 at 136.  Monitoring includes making at least one monthly telephonic contact and one in-person contact with the participant every sixty days.  He-E 805.05(d).  Among the goals of such monitoring is for the case manager to ensure "that services are adequate and appropriate for the participant's needs, and are being provided, as described in the comprehensive care plan" and "that the participant is satisfied with the comprehensive care plan."  He-E 805.05(d)(2), (4).

The state does not operate a system that affords CFI participants the opportunity to register grievances or complaints with DHHS concerning the delivery of services under the CFI Waiver program.  See Doc. No. 23-3 at 174-75.  Instead, administrative regulations require each case management agency to establish its own written policies and procedures for participant complaints, including how participants are informed of those policies and procedures.  He-E 805.04(c)(10).  The agency must ensure that grievance procedures are followed and enforced.  Id.

The regulations also provide for quality management reviews of case management agencies.  Each agency must conduct quarterly reviews of a sample of participant records and any reported

complaints relating to the delivery of waiver services.  He-E
805.10.  The purpose of the participant record review is "to
evaluate the delivery of services identified in the
comprehensive care plan to ensure that participants' needs are
being met in the community."  He-E 805.10(a).  The agency must
document the results of its reviews in reports that include any
deficiencies that were identified, remedial actions planned or
taken, and a summary of unmet service needs.  He-E 805.10(a)-
(b).  Quarterly quality management reports must be retained for
two years and made available to DHHS upon request.  He-E
805.10(d).

At least once a year, DHHS must make a monitoring visit to
each case management agency.  He-E 805.10(f)-(g).  During the
visit, DHHS reviews a sample of participant records, quarterly
quality management reports, and agency employee records related
to provider qualifications.  He-E 805.10(g).  When DHHS
discovers "individual problems," it remedies them through
discussions with the case management agency or the responsible
service provider.  Doc. No. 23-3 at 53.  "When problematic
trends are suspected or confirmed," DHHS conducts a quality
improvement review and shares suggested remediation strategies
with the involved agency or provider.  Id.  The Department may
also require the submission of a corrective action plan and
conduct a follow-up to evaluate the effectiveness of the

implemented strategies.  Id.  Another option available to DHHS is terminating the Medicaid provider participation agreement, which would preclude that agency or provider from participating in the CFI Waiver program.  See id. at 114-15.

**C.**   **The "Fair Hearing" Regime**

Section 1902(a)(3) of the Social Security Act requires that state Medicaid plans "provide for granting an opportunity for a fair hearing before the State [Medicaid] agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).  The federal regulations implementing this provision state that this fair hearing regime "must meet the due process standards set forth in Goldberg v. Kelly, 397 U.S. 254 (1970), and any additional standards specified in this subpart." 42 C.F.R. § 431.205(d).

The regulations also specify when notice must be provided to individuals under the fair hearing regime.  See id. § 431.206.  The circumstances that trigger the notice requirement include when (1) an individual first applies to Medicaid; (2) the state agency denies a claim for eligibility, benefits, or services; (3) the state agency terminates, suspends, or reduces an individual's services or eligibility; or (4) there is a request for a hearing by an individual who "believes" that the state agency has either denied a claim for

eligibility, benefits, or services, not acted upon the claim with reasonable promptness, or erroneously terminated, suspended, or reduced that individual's services or eligibility. See id. §§ 431.206(c), 431.201, 431.220(a).  The specific contents of the notice are governed by § 431.210.

The CFI Waiver program provides a hearing regime for claimants that incorporates by reference the federal regulations discussed above.  See Doc. No. 23-3 at 169.  The state's § 1915(c) waiver application specifies that individuals are entitled to an administrative hearing when (1) they are not given the choice of CFI Waiver services as an alternative to institutional care, (2) they are denied services or providers of their choice, or (3) their services are denied, suspended, reduced, or terminated.  Id.  Administrative regulations promulgated by DHHS further guarantee a hearing to any "person adversely affected by a [DHHS] decision or action."  N.H. Admin. R. He-C 201.02(b).

The regulations also specify when DHHS must provide individualized notice of an applicant's right to a hearing. Notice is required (1) upon a determination of ineligibility for the CFI Waiver program, He-E 801.04(e); (2) when DHHS does not authorize all the waiver services requested, He-E 801.06(d); (3) upon termination of eligibility for the program, He-E 801.07(e);

and (4) when the waiver services previously authorized are reduced or terminated, id.

Under this regime, a hearing is deemed to be an "appeal" of a decision made by DHHS.  See N.H. Rev. Stat. Ann. § 126-A:5, VIII; N.H. Admin. R. He-C 201.01.  A presiding officer appointed by the Commissioner conducts the hearing and makes a final decision on behalf of the Commissioner unless the Commissioner orders otherwise in a particular matter.  He-C 201.05.  The Commissioner's final decision may be challenged on appeal to the New Hampshire Supreme Court.  See N.H. Rev. Stat. Ann. § 541:6; N.H. Sup. Ct. R. 10.

D.   **The Complaint**

The named plaintiffs in this action, Stephanie Price, Emily Fitzmorris, and Kathleen Bates, are disabled New Hampshire residents who have been enrolled in the CFI Waiver program and authorized to receive a range of waiver services concomitant with their needs.[3]  They have struggled to receive the full extent of their authorized waiver services on a timely and consistent basis.  They bring this suit on behalf of themselves and a class of similarly situated persons against DHHS and its Commissioner Lori Shibinette on the ground that defendants'

---

[3] Paul Scott was also a named plaintiff but recently passed away.

failure to adequately administer the CFI Waiver program violates plaintiffs' federal statutory and constitutional rights.

The complaint alleges that defendants' deficient administration of the program has caused plaintiffs to go without the CFI waiver services "in the amount and with the frequency that they have been assessed to need."  Compl. ¶ 32, Doc. No. 1.  Plaintiffs claim that they "suffer protracted delays in the onset of all or part of their waiver services, frequent interruptions in their waiver services, [] or the unexpected cessation of their waiver services."  Id. ¶ 33. Plaintiffs refer to these delays and interruptions in service as "service gaps."  Id.  The severity of such service gaps is alleged to place plaintiffs at risk of needing to be institutionalized to receive the care they need.  The experiences of the three named plaintiffs are illustrative.

Price is thirty-four years old and lives in an apartment. She is disabled, requires administration of medication through a port, and uses a wheelchair for mobility.  She wants to live in her home, regain her mobility, and avoid institutionalization. In September 2019, DHHS determined that Price was eligible for the CFI Waiver program.  The Department authorized her request for personal care and homemaker services in the amount and frequency consistent with her needs.  Price, however, had to wait nearly a year to receive any waiver service and since then

13

has received only a fraction of the authorized services.  Her
brother and mother provide her with some support, but without
the full extent of the waiver services for which she has been
approved, Price remains for long periods of time in her bed,
sometimes in her own urine, and is unable to bathe, toilet, and
prepare appropriate meals.  As a result, her mobility has
deteriorated, and she has experienced falls and infections, some
of which have required hospitalization.  Id. ¶¶ 71-78.

Fitzmorris is a thirty-six-year-old mother who became a
tetraplegic as a result of an accident in 2018.  She lives in
her own apartment with her teenage son, wants to continue living
in her own home safely and with reliable services, and wants to
avoid institutionalization.  In December 2018, DHHS determined
that Fitzmorris was eligible for enrollment in the CFI Waiver
program.  She was authorized to receive 37 hours a week of
personal care, homemaker, and nursing services through the
program.  Other than for brief periods of time since December
2018, Fitzmorris has not been provided those waiver services.
Apart from four to six hours of nursing services she receives
every week through the Visiting Nurses Association, Fitzmorris
must rely on her 70-year-old mother to assist her on a daily
basis.  Without the waiver services she has been authorized to
receive, she is at risk of developing pressure sores,

infections, and other complications that could result in hospitalization.  Id. ¶¶ 79-85.

Bates, who is fifty-nine years old, has been diagnosed with cerebral palsy and scoliosis.  She lives in a home that she rents from her parents and wants to continue living there.  She uses a wheelchair and needs assistance for transfers in and out of bed and chair, dressing, toileting, and bathing.  DHHS determined that Bates was eligible for waiver services in 1992. Currently, she is authorized to receive over 35 hours a week in personal care services but is getting only a few hours of those services every week.  When her service providers are not available, she must choose between staying in bed without food and water or calling a friend who has a limited ability to assist her.  These circumstances are jeopardizing her health and putting her at risk of institutionalization.  Id. ¶¶ 86-92.

Plaintiffs allege that defendants' shoddy administration of the CFI Waiver program is the root cause of their service gaps. There are four categories of systemic deficiencies in the administration of the program alleged in the complaint.

First, defendants have allegedly failed to attract or recruit a sufficient number of providers for some waiver services.  Plaintiffs allege that there is a "longstanding and well-documented shortage of available service providers."  Id. ¶ 34.  This shortage has impacted some waiver services more than

others, with personal care, home health aide, and homemaker services experiencing a "particularly acute" scarcity of providers.  Id. ¶ 35.  The lack of available service providers allegedly results in part from defendants' failure to set adequate rates of compensation for CFI Waiver services relative to the compensation provided to nursing facilities.  Id. ¶ 36. Defendants also have purportedly "failed to take reasonable non-monetary measures" to expand the number of waiver service providers, including failing to engage in "active efforts to recruit, train, and place would-be providers."  Id. ¶ 37.

Second, defendants have allegedly failed to adequately monitor whether CFI participants are receiving their authorized waiver services.  Plaintiffs assert that defendants do not "attempt to systematically and accurately quantify the discrepancy between" the authorized services and the services CFI participants actually receive.  Id. ¶ 39.  For example, defendants do not solicit reports from the participants' case managers on the nature or magnitude of service gaps.  Id. ¶ 40.

Third, defendants have allegedly failed to act when they have been advised of service gaps.  The complaint alleges that DHHS has payment data showing that the authorized waiver services are significantly underutilized.  See id. ¶ 45.  Yet defendants have purportedly failed to take reasonable action in response, such as developing an adequate infrastructure for

self-directed care or reforming program policies and procedures that allegedly offer "unclear directives to case management and service provider agencies" and fail to ensure "a coherent and effective working system for assessments, service authorizations, care planning, and service delivery." Id. ¶¶ 48-49.

Fourth, the complaint alleges that defendants have failed to provide plaintiffs with adequate notice of their right to challenge their service gaps in an administrative hearing. Plaintiffs maintain that those service gaps amount to "effective" denials, terminations, or reductions of their waiver services. See id. ¶¶ 55-57. As a result, plaintiffs assert that defendants are required to provide them with notice that they have the right to challenge service gaps via the administrative hearing process described above. See id.

The alleged actions and omissions attributed to defendants form the basis of three sets of claims asserted in the complaint: (1) violations of the integration mandate and the methods of administration regulation promulgated under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act ("the Rehabilitation Act"), 29 U.S.C. §§ 794 et seq. (Counts I-IV); (2) denial of reasonably prompt services in violation of Title XIX of the Social Security Act ("the Medicaid Act"), 42

U.S.C. § 1396a(a)(8) (Count V); and (3) failure to provide
adequate notice of an opportunity to be heard when service gaps
arise, in violation of federal procedural due process and the
Medicaid Act, 42 U.S.C. § 1396a(a)(3) (Counts VI-VII)("fair
hearing claims").  Defendants have challenged the sufficiency of
plaintiffs' allegations and moved to dismiss the complaint in
its entirety.

## II.  **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion to dismiss for failure to
state a claim, a plaintiff must make factual allegations
sufficient to "state a claim to relief that is plausible on its
face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This
standard "demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation." Id.  A claim is facially
plausible if it "pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." Id.

In testing a complaint's sufficiency, I employ a two-step
approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1,
12 (1st Cir. 2011).  First, I screen the complaint for
statements that "merely offer legal conclusions couched as fact
or threadbare recitals of the elements of a cause of action."
Id. (cleaned up).  A claim consisting of little more than

"allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  Second, I credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations and then determine if the claim is plausible.  Id.  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  Twombly, 550 U.S. at 556.  The "make-or-break standard" is that those allegations and inferences, "taken as true, must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

### III. **ANALYSIS**

Defendants contend that plaintiffs' three sets of claims fail to state viable claims for relief.  First, they argue that plaintiffs' disability discrimination claims must be dismissed primarily because (1) private entities, not defendants, are responsible for the alleged service gaps, and (2) plaintiffs are improperly attempting to use the ADA and the Rehabilitation Act to assert standard of care claims.[4]  Second, defendants maintain

---

[4] The relevant provisions of the Rehabilitation Act mirror the ADA, and the parties' briefing assumes that the claims under the two statutes are coextensive.  Cf. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision.").  For ease of reference, I discuss the claims in terms of the ADA.

that plaintiffs' Medicaid Act and due process claims fail for lack of state action.  In the alternative, defendants argue that plaintiffs' fair hearing claims must be dismissed because the CFI Waiver program's hearing regime provides plaintiffs with adequate notice and opportunity for a hearing to challenge any service gaps.  I address defendants' arguments in turn and conclude that they are not persuasive.

## A.    Disability Discrimination Claims

The complaint alleges that the CFI Waiver program offers long-term care services in the most integrated settings appropriate to plaintiffs' needs – their homes and communities. Defendants' failure to remedy unnecessary gaps in those services as part of their administration of the program, however, is alleged to place plaintiffs at risk of unnecessary institutionalization in violation of the ADA.  Plaintiffs base their claims on an ADA regulation known as the integration mandate and a related methods of administration regulation. Defendants argue that these claims must be dismissed principally because (1) they seek to hold defendants liable for private acts or omissions of the third-party case management agencies and case managers who are responsible for the alleged service gaps, and (2) they amount to standard of care claims that are not cognizable under the ADA.

1.   The Integration Mandate and the Methods of
     Administration Regulation

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Department of Justice ("DOJ") has issued regulations implementing this provision, two of which are at issue in this case: the integration mandate and the methods of administration regulation.

The integration mandate requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The preamble to the regulation defines "the most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B.

Relatedly, public entities may not "utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination." 28 C.F.R. § 35.130(b)(3).  Courts have recognized methods of administration claims as distinct causes

of action.  See, e.g., Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan, 293 F.R.D. 254, 259-60 (D.N.H. 2013); Day v. District of Columbia, 894 F. Supp. 2d 1, 22-23 (D.D.C. 2012).[5]

A public entity must make "reasonable modifications in policies, practices, or procedures" to ensure that the offered services are provided in the most integrated setting.  See 28 C.F.R. § 35.130(b)(7).  This obligation, however, is not absolute.  The regulations "allow States to resist modifications" to the extent such modifications "entail a fundamental alteration" of the offered services and programs. Olmstead v L.C. ex rel. Zimring, 527 U.S. 581, 603 (1999) (cleaned up); see 28 C.F.R. § 35.130(b)(7).

The integration mandate reflects the DOJ's view "that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II."  Olmstead, 527 U.S. at 596.  The Supreme Court has identified "two evident judgments" in the mandate.  Id. at 600.  The first is that "institutional

---

[5] To the extent defendants argue that a methods of administration claim cannot be based on an alleged failure to provide services in the most integrated setting appropriate, I recently rejected the same argument in G.K. v. Sununu, 2021 DNH 143, 2021 WL 4122517, at *12 (D.N.H. Sept. 9, 2021) (citing 28 C.F.R. § 35.130(d)).  Defendants cite no authority that would give me cause to reexamine my interpretation of the regulation.

placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Id. The second is that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 601. In Olmstead, the Supreme Court concluded that the DOJ's views embodied in the integration mandate "warrant respect" in part because "Congress explicitly identified unjustified segregation of persons with disabilities as a form of discrimination." Id. at 598-600 (cleaned up). Olmstead ultimately "held that the word discrimination as used in § 12132 includes not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, no matter how anyone else is treated." Amundson ex rel. Amundson v. Wis. Dep't of Health Servs., 721 F.3d 871, 874 (7th Cir. 2013) (cleaned up).

Following Olmstead, the DOJ released informal guidelines "directing that the integration mandate be read broadly." Steimel v. Wernert, 823 F.3d 902, 911 (7th Cir. 2016). The DOJ's guidance specifies that "[i]ntegrated settings are located in mainstream society." U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate

of Title II of the Americans with Disabilities Act and Olmstead
v. L.C. (June 22, 2011).[6]  Such settings "offer access to
community activities and opportunities at times, frequencies and
with persons of an individual's choosing; afford individuals
choice in their daily life activities; and, provide individuals
with disabilities the opportunity to interact with non-disabled
persons to the fullest extent possible."  Id.

    In line with the DOJ's view, the Seventh Circuit has held
that the integration mandate, by its plain terms, must be read
broadly and that the DOJ's interpretation is entitled to
deference.  See Steimel, 823 F.3d at 911.  The court reasoned
that the mandate is written in "maximalist language" that
"demands the most integrated setting appropriate, which it
defines as allowing interaction with non-disabled persons to the
fullest extent possible."  Id. (cleaned up).  The integration
mandate thus "logically applies to all settings, not just to
institutional settings" and "bars unjustified segregation of
persons with disabilities, wherever it takes place."  Id.[7]

---

[6] Available at https://www.ada.gov/olmstead/q&a_olmstead.htm
(last visited November 17, 2021).

[7] I disagree with defendants' narrow reading of the integration
mandate as only prohibiting isolation for which the sole
explanation is impermissible discrimination based on disability.
As I explained in rejecting a similar argument in G.K., this
view is inconsistent with both the plain language of the
integration mandate and the Supreme Court's holding in Olmstead.
See G.K., 2021 WL 4122517, at *11.

2.   Whether the Complaint Seeks to Hold Defendants Liable
     for Actions of Third Parties

Defendants argue that plaintiffs' integration mandate and
methods of administration claims fail because they are premised
on the actions and omissions of private actors – case management
agencies and case managers – for which defendants cannot be held
liable.  According to defendants, it is those private actors who
are responsible for the service gaps that plaintiffs allege are
placing them at risk of institutionalization.  Defendants'
attempt to recast the complaint's allegations to disclaim their
alleged role in causing the service gaps fails to persuade.

The complaint plausibly alleges that defendants are
responsible for administering the CFI Waiver program, that the
program was designed to provide plaintiffs with long-term care
services in the most integrated settings appropriate to their
needs, and that defendants have failed to administer that
program in a manner that ensures plaintiffs actually receive the
services they were authorized to receive and need to prevent
unnecessary institutionalization.  Contrary to defendants'
contention, the complaint plausibly alleges that defendants' own
actions or omissions are responsible for the service gaps.
Defendants' alleged deficiencies include setting inadequate
compensation rates for waiver services, failing to monitor
service gaps, and failing to respond to those gaps by changing

their methods of administration.  As these allegations show, plaintiffs do not seek to hold defendants liable for the failures of their contractors but for a predicament of defendants' own making.

The First Circuit has recently rejected a similar argument made by the Commissioner in an analogous context.  In Doe v. Shibinette, a class of plaintiffs sued the Commissioner on the ground that they were held at private hospitals pursuant to an involuntary emergency admission order for too long without due process due to a lack of available beds at the state's psychiatric facilities.  -- F.4th --, 2021 WL 4958249, at *1-2 (1st Cir. Oct. 26, 2021).  The Commissioner argued that the plaintiffs' injury was not fairly traceable to her conduct because "the state circuit court system, law enforcement, the state legislature, and private hospitals are . . . the ones responsible for failing to hold a hearing, failing to transport patients to a hearing, failing to appropriate enough money to expand the number of beds at [the state's] facilities, and the control of emergency departments, respectively."  Id. at *6.  The First Circuit disagreed.  The court reasoned that the complaint plausibly alleged that the Commissioner "is the one who bars [plaintiffs] from being released . . . until a probable cause hearing is conducted . . . . [and] she has not ensured that a probable cause hearing is held as soon as [plaintiffs]

26

contend that it must be." Id.  The complaint here likewise alleges that plaintiffs' injuries stem from service gaps that the Commissioner must address and has failed to address through her administration of the CFI Waiver program.

To the extent defendants suggest that they can insulate themselves from ADA liability by contracting out to private entities their obligation to provide services in compliance with the ADA, they are wrong.  The ADA's implementing regulations expressly prohibit defendants from discriminating on the basis of disability in the provision of services "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1); see id. § 35.130(b)(3) (prohibiting both direct and indirect use of methods of administration that subject the disabled to discrimination based on disability).  Indeed, among the assurances that the state had to provide to the Secretary when obtaining the § 1915(c) waiver was that services would be "delivered in accordance with the service plan, including the type, scope, amount, duration and frequency specified in the plan."  Doc. No. 23-3 at 150.  That defendants may have chosen to fulfill that obligation in part through contracts with private parties does not absolve them of potential liability for violating the ADA by failing to deliver services in the most integrated settings appropriate to plaintiffs' needs.  See 28 C.F.R. § 35.130(b)(1), (3); cf. Katie A. ex rel. Ludin v. Los

27

Angeles Cnty., 481 F.3d 1150, 1159 (9th Cir. 2007) ("Even if a
state delegates the responsibility to provide treatment [for
children eligible for medical assistance under the Medicaid Act]
to other entities such as local agencies or managed care
organizations, the ultimate responsibility to ensure treatment
remains with the state."); A.H.R. v. Wash. State Health Care
Auth., 469 F. Supp. 3d 1018, 1034 (W.D. Wash. 2016 (even where
the state contracted with managed care organizations to provide
medical assistance to Medicaid-eligible children, holding that
the state "bears the responsibility to ensure that the State
Plan complies with federal law and that Plaintiffs received the
required treatment").

Defendants' reliance on part of an ADA regulation that
addresses licensure and certification programs is also
misplaced.  Defendants cite the final sentence of 28 C.F.R.
§ 35.130(b)(6) for the proposition that the integration mandate
does not cover programs or activities of private entities that
are licensed or certified by a public entity.  That is true but
inapposite.  The CFI Waiver program is not a licensing or
certification program.  It is a program created by the state and
administered by DHHS to provide home and community-based
services to eligible residents.  The Department's reliance on a
network of private case management agencies and other Medicaid
providers licensed by the state to deliver those services does

not convert the waiver program into a private licensing or certification program for purposes of the federal regulation.

The cases defendants cite do not suggest otherwise. See Ivy v. Williams, 781 F.3d 250, 256 (5th Cir. 2015) (Texas Education Agency, which licensed and regulated private driver education schools, not liable for physical inaccessibility of those programs); Noel v. NYC Taxi & Limousine Comm'n, 687 F.3d 63, 70-72 (2d Cir. 2012) (city licensor and regulator of private taxi service not liable for inaccessibility of taxis to wheelchair users). In fact, the Fifth Circuit in Ivy distinguished cases where public entities were liable for private actors' violations of the ADA on the ground that those private actors were not merely licensed by the public entity but had a contractual relationship with that entity. See 781 F.3d at 256-57 (collecting and analyzing cases). Here, the complaint alleges that DHHS contracts with case management agencies to provide services to participants of the Department's own program. Defendants' argument that they merely license those agencies cannot be squared with either the complaint's allegations or the regulations that govern the CFI Waiver program.

The home and community-based service cases the defendants cite also fail to support their contention. For example, in Woods v. Tompkins County, the plaintiff was a disabled

individual who sued a county that administered a Medicaid program for in-home aide services provided by private agencies. See No. 516CV0007LEKTWD, 2019 WL 1409979, at *3-5 (N.D.N.Y. Mar. 28, 2019).  The gist of the complaint was that the private agencies were sending aides who had trouble working well with the plaintiff and ultimately refused to serve her.  See id. Although the district court granted the county's motion for summary judgment, it did so because the plaintiff did not allege any deficiencies in the administration of the program and instead focused solely on the private agencies' refusal to provide services.  See id. at *10.  Here, by contrast, plaintiffs expressly challenge defendants' administration of the waiver program, which is precisely the type of claim that the court in Woods concluded could support a viable cause of action. See id.  Defendants' arguments to the contrary are meritless.

   3.   Whether the Complaint Asserts Nonactionable Standard of Care Claims

Defendants also argue that the ADA claims must be dismissed because they merely seek to recover for a standard of care violation, which Olmstead rejected as a viable theory of liability under the integration mandate.  Defendants once again misconstrue plaintiffs' claims.

According to defendants, plaintiffs' allegations concerning gaps in their authorized waiver services challenge the quality

of care that plaintiffs receive.  To improve that quality of
care, plaintiffs purportedly seek "new" or "better" services
that are not alleged to be provided to anyone else, such as
recruitment of new service providers and better monitoring of
the service delivery.  These types of claims, defendants say,
amount to standard of care claims that the Supreme Court has
disclaimed as a basis for liability under the integration
mandate.  See Olmstead, 527 U.S. at 603 n.14 (stating that the
integration mandate guarantees neither a "standard of care" nor
"a certain level of benefits to individuals with disabilities").
Although I agree that standard of care claims cannot be
challenged under the integration mandate, defendants' argument
is a nonstarter because plaintiffs do not assert such claims.

     The complaint seeks services in an integrated setting that
defendants already provide through the CFI Waiver program and
have assessed plaintiffs to need to avoid institutionalization.
Plaintiffs do not quibble with the quality of services they
actually received.  Nor do they allege that they are entitled to
additional services beyond those that DHHS has authorized.  For
these reasons, this case is distinguishable from Buchanan v.
Maine, where the First Circuit construed the plaintiff's claim
to concern "the adequacy of treatment." 469 F.3d 158, 175 (1st
Cir. 2006).  There, the claims before the court were couched as
discriminatory denial of service claims (not violations of the

integration mandate) but were in reality complaints about either the quality of the services plaintiff received or defendants' failure to provide services that the state's providers determined were unnecessary.  See id.  Here, by contrast, plaintiffs are not dissatisfied with the services they received but instead challenge defendants' failure to deliver services in the amount and frequency that DHHS has determined they need.

Other district courts presented with similar claims have likewise determined that they assert viable integration mandate claims.  See, e.g., Doxzon v. Dep't of Human Servs., No. 1:20-CV-00236, 2020 WL 3989651, at *10-11 (M.D. Pa. July 15, 2020); A.H.R., 469 F. Supp. 3d at 1043-46; Ball v. Rodgers, No. CV 00-67-TUC-EHC, 2009 WL 1395423, at *5 (D. Ariz. Apr. 24, 2009). The court in Doxzon expressly rejected the defendants' argument that the plaintiff was asserting a standard of care claim.  See 2020 WL 3989651, at *10.  In that case, the plaintiff alleged that the state defendants had enrolled her in a home and community-based care waiver program, but she was not getting the needed services.  Id. at *1.  The court granted the plaintiff's request for a preliminary injunction, finding that she would likely prevail on the merits of her integration mandate claim. Id. at *10-11.  Because the plaintiff contended that she was "eligible for numerous services that the defendants do provide but have not provided to her," the court concluded that she was

"not claiming that the defendants violated a standard of care as to medical services that were provided to her." Id. at *10.  So too here.

Defendants' argument that plaintiffs are seeking new services not provided to anyone else also misses the mark. Plaintiffs are not requesting services beyond what they are currently authorized to receive under the CFI Waiver program. To the extent the complaint alleges that defendants must implement new measures such as monitoring of the waiver services and provider recruitment and training, plaintiffs are merely seeking changes to the way in which the waiver program is administered to ensure that they are provided with the services that DHHS has already agreed they should receive.  Because plaintiffs seek services that exist and are given to others, this case is distinguishable from the cases defendants cite in support of their argument.  See Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (affirming the district court's denial of a preliminary injunction requesting adequate emergency housing for homeless persons with HIV where the record did not enable the court to determine whether plaintiffs sought reasonable modifications to existing programs, as opposed to new substantive benefits); Rodriquez v. City of N.Y., 197 F.3d 611, 618-19 (2d Cir. 1999) (holding that defendants were not required to provide plaintiffs enrolled in a Medicaid waiver program with

new safety monitoring services not provided to anyone in any
setting where plaintiffs alleged this type of service was
comparable to existing services and necessary to enable
plaintiffs to stay in their homes); Disability Rts. Cal. v.
Cnty. of Alameda, No. 20-cv-05256-CRB, 2021 WL 212900, at *11-12
(N.D. Cal. Jan. 21, 2021) (dismissing integration mandate claims
that sought expansion of existing community programs rather than
pointing to specific services that were being provided in an
institutional setting but could be provided in community
settings).  Thus, defendants' challenges to the ADA claims fall
flat.

**B.   Medicaid Act and Due Process Claims**

   1.   State Action Doctrine

   Defendants argue that plaintiffs' Medicaid Act and due
process claims fail for lack of state action.  This challenge
rests on the same faulty premise as one of defendants'
challenges to the ADA claims – that the complaint seeks to hold
them liable for the acts of private parties.

   Defendants contend that this case is really about actions
of private parties – case management agencies and case managers
who are responsible for any gaps in waiver services – that do
not amount to state action under any recognized theory.  Cf.
Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928
(2019) (describing the theories under which a state actor can be

liable for actions of a private party).  As I explained in
rejecting the same argument in the context of the ADA claims,
however, defendants misconstrue plaintiffs' allegations.

At bottom, the actionable conduct alleged in the remaining
counts of the complaint is that of the Commissioner.  Those
counts are based on her alleged failures to provide Medicaid-
covered services with reasonable promptness and to notify
recipients of their right to challenge gaps in their waiver
services in a hearing before the Department.  The complaint
plausibly alleges that flawed administration of the CFI Waiver
program, over which the Commissioner has the ultimate authority,
has led to unreasonable delays in the provision of waiver
services.  The fact that the Commissioner chose to delegate the
provision of those services to case management agencies and
other providers does not mean that she can evade her duty to
ensure a reasonably prompt delivery of services.  Nor can she
use those relationships to insulate herself from claims that
she, not those third parties, must comply with the notice
requirements under the Medicaid Act and the due process clause.
See, e.g., 42 C.F.R. § 431.10(e) ("The Medicaid agency may not
delegate, to other than its own officials, the authority to
supervise the plan or to develop or issue policies, rules, and
regulations on program matters."); Katie A., 481 F.3d at 1159
("Even if a state delegates the responsibility to provide

35

treatment to other entities such as local agencies or managed care organizations, the ultimate responsibility to ensure treatment remains with the state."); Catanzano v. Dowling, 60 F.3d 113, 118 (2d Cir. 1995) ("[I]t is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity.") (cleaned up); Doxzon, 2020 WL 3989651, at *8 (rejecting the argument that a state can evade its responsibility for providing Medicaid services by entering into a managed care contract with a private entity).

 To the extent defendants argue that the challenged actions are akin to those found to be private actions in Blum v. Yaretsky, 457 U.S. 991, 1002 (1982), their argument fails to persuade.  Plaintiffs in Blum challenged the clinical decisions of private nursing home physicians and administrators to discharge or transfer nursing home patients without certain procedural safeguards.  Id. at 997-98.  In holding that those decisions were not state actions, the Supreme Court reasoned that "the State is [not] responsible for the decision to discharge or transfer particular patients.  Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State."  Id. at 1008.  Here, by contrast, plaintiffs' claims arise from the Commissioner's own actions and omissions in

administering the CFI Waiver program, for which she remains
ultimately responsible.  Defendants' attempt to reframe
plaintiffs' claims as resting on private action is fruitless.

    2.   Viability of the Fair Hearing Claims

    Defendants also challenge plaintiffs' claims under
§ 1396a(a)(3) of the Medicaid Act and the due process clause
that defendants must provide them with adequate notice of their
right to challenge service gaps in an administrative hearing.
The parties agree that any CFI Waiver participant who believes
that a service gap constitutes an effective denial of service
can request a hearing on that basis, and DHHS must provide it
under 42 C.F.R. § 431.220(a)(1) and New Hampshire Administrative
Rule He-C 200.  The question is whether service gaps trigger the
notice requirement and, if so, whether the publicly available
material, including the § 1915(c) waiver and federal and state
regulations, satisfy that requirement.

    Under the due process clause, "[t]he opportunity to be
heard must be tailored to the capacities and circumstances of
those who are to be heard." Goldberg, 397 U.S. at 268-69.  The
opportunity to be heard must be coupled with "notice reasonably
calculated, under all the circumstances, to apprise interested
parties of the pendency of the action and afford them an
opportunity to present their objections." Mullane v. Cent.
Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950).  The federal

regulations implementing the Medicaid Act incorporate this standard by reference into the fair hearing regime under 42 U.S.C. § 1396a(a)(3).  See 42 C.F.R. § 431.205(d).

Given the focus on reasonableness and case-specific circumstances when addressing notice issues, further factual development is warranted where, as here, the court cannot conclude that plaintiffs can prove no set of facts under which their claims might be proper.  Because the requirement and adequacy of notice are better suited for resolution at summary judgment, I decline to dismiss the fair hearing claims at this stage.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss (Doc. No. 23) is denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 18, 2021

cc:  Counsel of Record