# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Stephanie Price, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 3:21-cv-00025-PB |
| | ) | |
| Commissioner, currently Lori Shibinette | ) | |
| in her official capacity as Commissioner of | ) | |
| the New Hampshire Department of Health | ) | |
| and Human Services, *et al.*, | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 4

ARGUMENT ............................................................................................................... 4

   I.   Plaintiffs Have Not Proved that the Putative Class is Ascertainable. .................................. 5

      A.  Receiving Less than 50 Percent of Authorized Services in One of
          48 Months Does Not Prove A "Serious Risk of Unjustified Institutionalization." ...... 6

      B.  An Individualized Inquiry is Required to Determine if "Serious Risk
          of Unjustified Institutionalization" Was *Caused* By Defendants. ............................. 10

      C.  Plaintiffs' Putative Class is a Fail-Safe Class. ........................................................... 11

   II.  Plaintiffs Have Not Proved Numerosity. ...................................................................... 11

  III.  Plaintiffs Have Not Proved Commonality. ................................................................... 12

      A.  Plaintiffs Have Not Proved Commonality With Respect to their
          Substantive ADA, Rehabilitation Act, or Reasonable Promptness Claims. ............... 14

      B.  Plaintiffs Have Not Proved Commonality With Respect to their
          Procedural Notice-and-Hearing Claims. ..................................................................... 20

  IV.  Plaintiffs Have Not Proved Typicality. ........................................................................ 21

      A.  The Named Plaintiffs' Claims Are Not Typical Because They
          Receive A Type of Service Different than Most Putative Class Members ................... 21

      B.  The Named Plaintiffs' Claims Are Not Typical Because Their Needs and
          Challenges Are Not Typical of the Putative Class ...................................................... 22

      C.  The Named Plaintiffs' Claims Are Not Typical Because Their Lack of
          Services Was Caused By Their Unique Demands. ...................................................... 25

   V.  Plaintiffs Have Not Proved Adequacy. ......................................................................... 26

  VI.  Plaintiffs Have Not Proved that the Requested Relief is "Appropriate Respecting
      the Class as a Whole." ................................................................................................... 27

      A.  Plaintiffs' Requested Injunctive Relief Does Not "Describe in
          Reasonable Detail" the Acts Restrained or Required. ............................................... 27

      B.  The Putative Class Members Have Not Been Harmed in the Same
          Way Such that the Injunctive Relief Would Benefit the Entire Putative Class. ......... 28

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Am. Postal Workers Union v. Frank*,
   968 F.2d 1373 (1st Cir. 1992) ............................................................. 6

*Anderson v. Team Prior, Inc.*,
   No. 19-452, 2022 WL 1156056 (D. Me. Apr. 19, 2022) ...................... 14

*Anderson v. Weinert Enterprises, Inc.*,
   986 F.3d 773 (7th Cir. 2021) ............................................................... 12

*Andrews v. Bechtel Power Corp.*,
   780 F.2d 124 (1st Cir. 1985) ............................................................... 26

*Bieneman v. City of Chicago*,
   864 F.2d 463 (7th Cir. 1988) ............................................................... 27

*Carrier v. Am. Bankers Life Assurance Co. of Fla.*,
   No. 05-CV-430-JD, 2008 WL 312657 (D.N.H. Feb. 1, 2008) ................ 6

*Carson P. v. Heineman*,
   240 F.R.D. 456 (D. Neb. 2007) ............................................................ 19

*Belezos v. Board of Selectmen of Hingham, Mass.*,
   No. 17-12570, 2019 WL 6358247 (D. Mass. Nov. 27, 2019) ................ 24

*Clinton L. v. Wos*,
   No. 10-cv-123, 2014 WL 4274251 (M.D.N.C. Aug. 28, 2014) ........... 6, 8

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................ 5

*Crosby v. Social Sec. Admin.*,
   796 F.2d 576 (1st Cir. 1986) ............................................................. 5, 6

*Doe v. Comm'r, N.H. Dept. of Health and Human Servs.*,
   No. 18-1039, 2020 WL 2129717 (D.N.H. May 4, 2020) ...................... 16

*Elisa W. v. City of New York*,
   No. 15-5273, 2021 WL 4027013 (S.D.N.Y Sept. 3, 2021) ............... 14, 26

*EQT Production Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ............................................................... 19

*Fisher v. Oklahoma Health Care Authority*,
335 F.3d 1175 (10th Cir. 2003) ........................................................................ 1

*Gomes v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
561 F. Supp. 3d 93 (D.N.H. 2021) .................................................................. 16

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ............................................................................... 13

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ........................................................................... 5, 11

*J.B. v. Valdez*,
186 F.3d 1280 (10th Cir. 1999) ...................................................................... 19

*Jamie S. v. Milwaukee Pub. Sch.*,
668 F.3d 481 (7th Cir. 2012) ............................................................... 14, 19, 30

*Kenneth R. v. Hassan*,
293 F.R.D. 254 (D.N.H. 2013) .................................................................. 11, 16

*M.D. v. Perry*,
675 F.3d 832 (5th Cir. 2012) ............................................................... 13, 27, 29

*M.R. v. Dreyfus*,
663 F.3d 1100 (9th Cir. 2011), *as amended* 697 F.3d 706 (9th Cir. 2012) ................................ 1

*Maldonado v. Ochsner Clinic Foundation*,
493 F.3d 521 (5th Cir. 2007) .......................................................................... 29

*McDaniel v. Bd. of Educ. of Chicago*,
No. 13-3624, 2013 WL 4047989 (N.D. Ill. Aug. 9, 2013) ............................... 19

*Mielo v. Steak 'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018).............................................................................. 12

*Nored v. Tenn. Dep't of Intellectual and Dev. Disab.*, No. 19-214, 2021 WL 3729617 (E.D.
Tenn. Aug. 23, 2021) ................................................................................... 2, 20

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. (1999).................................................................................................. 8

*Oster v. Lightbourne*,
No. C09-4668, 2012 WL 685808 (N.D. Cal. Mar. 2, 2012)............................... 1, 16

*Parent/Prof'l Advocacy League v. City of Springfield*,
934 F.3d 13 (1st Cir. 2019) .................................................................... passim

*Pimentel v. City of Methuen*,
No. 17-11921, 2019 WL 6699667 (D. Mass. Dec. 9, 2019) ...................................... 24

*Reid v. Donelan*,
17 F.4th 1 (1st Cir. 2021) ........................................................................... 27

*S.J. v. Tidball*,
No. 20-04036, 2020 WL 5440510 (W.D. Mo. Sept. 10, 2020) ................................. 2

*Shanley v. Cadle*,
277 F.R.D. 63 (D. Mass. 2011) .................................................................... 6

*Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*,
543 F.3d 597 (10th Cir. 2008) ......................................................... 27, 29, 30

*Steimel v. Wernert*,
823 F.3d 902 (7th Cir. 2016) ................................................................ 1, 6, 11

*T.R. v. Sch. Dist. of Philadelphia*,
No. 15-4782, 2019 WL 1745737 (E.D. Pa. Apr. 18, 2019) .................................. 14, 19, 30, 31

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
350 F.3d 1181 (11th Cir. 2003) ................................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......................................................................... passim

*Woods v. Tompkins Cnty.*,
No. 16-cv-7, 2019 WL 1409979 (N.D.N.Y. Mar. 28, 2019) ................................... 20

**Statutes**

42 U.S.C. § 1396n(c) .............................................................................. 2, 6

N.H. Rev. Stat. § 126-A:5 ......................................................................... 20

**Other Authorities**

Approved Choices for Independence Waiver Application (July 1, 2022) ...................... 3, 4, 9, 18

CMS, Medicaid Long Term Services and Supports Annual Expenditures
Report (Dec. 9, 2021) .............................................................................. 16

DHHS, *Spending Plan for Implementation of the American Rescue Plan*

*Act of 2021* (July 2021).............................................................................................................. 4

Herbert B. Newberg et al., NEWBERG ON CLASS ACTIONS § 3:26
    (5th ed. 2014) ....................................................................................................................... 22

**Rules**

N.H. Admin R. He-E § 801.02............................................................................................ 18, 23

N.H. Admin R. He-E § 801.03.................................................................................................... 6

N.H. Admin R. He-E § 801.04.................................................................................................. 20

N.H. Admin R. He-E § 801.06.................................................................................... 3, 7, 21, 26

N.H. Admin R. He-E § 801.13-801.31 ...................................................................................... 9

N.H. Admin R. He-E § 801.21.................................................................................................. 22

N.H. Admin R. He-E § 801.24.................................................................................................. 22

N.H. Admin R. He-E § 801.26.................................................................................................. 23

N.H. Admin R. He-E § 801.27.................................................................................................... 4

N.H. Admin R. He-E § 805.02.................................................................................................... 3

N.H. Admin R. He-E § 805.05.................................................................................................... 3

Fed. R. Civ. P. 23 ................................................................................................................... 1, 2

Fed. R. Civ. P. 23(a)(1) .......................................................................................................... 12

Fed. R. Civ. P. 23(a)(4) .......................................................................................................... 26

Fed. R. Civ. P. 23(b)(2) .......................................................................................................... 27

Fed. R. Civ. P. 65(d)(1) .......................................................................................................... 29

**Regulations**

42 C.F.R. § 431.210 ................................................................................................................ 20

## INTRODUCTION

The two Named Plaintiffs are sympathetic advocates facing challenging circumstances. However, that is not the standard for class certification. As the Supreme Court held in *Wal-Mart Stores, Inc. v. Dukes*, Federal Rule of Civil Procedure 23 permits class certification only when there is a "common question" "central to the validity of each one of the claims" that can be resolved in "one stroke" for all class members. 564 U.S. 338, 350 (2011). To meet this standard, plaintiffs generally must prove that defendants have an "official policy" or "an unofficial yet well-defined practice" that drives the alleged legal violation and "work[s] similar harm on the class plaintiffs." *See Parent/Prof'l Advocacy League v. City of Springfield*, 934 F.3d 13, 28-29 (1st Cir. 2019). Otherwise, key issues cannot be resolved in "one stroke" for the entire putative class. *See id.*

Plaintiffs cannot meet this standard. Unlike the cases cited in their brief, Plaintiffs are not challenging any "official policy" or "well-defined practice," such as a policy that provides fewer benefits to individuals in the community than those in institutions (*e.g.*, *Fisher v. Oklahoma Health Care Authority*), or a policy that reduces or caps the services authorized by the State (*e.g.*, *M.R. v. Dreyfus*, *Steimel v. Wernert*, *Oster v. Lightbourne*). In fact, Plaintiffs appear satisfied with the expansive, individualized packages of benefits that the New Hampshire Department of Health and Human Services ("DHHS") authorizes participants to receive in the Choices for Independence Waiver program ("CFI Waiver Program"). Instead, Plaintiffs' complaint is that not all of the CFI Waiver participants receive all of the services that DHHS has authorized and agreed to pay for. But Plaintiffs do not point to any state policy or well-defined practice that has caused that alleged result, Defendants have robust policies and practices designed to minimize "service gaps," and those gaps can arise for any number of reasons, as evidenced by the fact that Plaintiffs cannot identify a singular cause that leads to them.

1

Not surprisingly, given the many reasons that "service gaps" occur, Plaintiffs do not cite any case certifying a class in analogous circumstances.[1] Plaintiffs try to satisfy Rule 23 by alleging that Defendants have "practices" of "failing" to monitor service gaps and ensure that participants receive their authorized services. But these are simply restatements of the alleged injury, coupled with allegations that the injury was caused by Defendants' "failing[s]"; they are not policies or "well-defined practices" applicable to all putative class members, many of whom receive all or nearly all of their authorized services. Accordingly, determining whether these alleged "practices" violate federal law will not yield a "common answer[] apt to drive the resolution of the litigation" "in one stroke." *Wal-Mart*, 564 U.S. at 350 (emphasis removed) (internal citations omitted).

## BACKGROUND

The CFI Waiver program, authorized through Section 1915(c) of the Social Security Act (42 U.S.C. § 1396n(c)), covers dozens of distinct home- and community-based services ("HCBS") for approximately 3,800 adults with physical disabilities.[2] Unlike many Section 1915(c) waiver programs in other States,[3] the CFI Waiver program does not have a waiting list. *See* Ex. 1, ¶16.

The amount of CFI Waiver services authorized for each participant is based on a person-centered planning process – facilitated by a private "case management agency" – that results in a

---

[1] Beneficiaries have brought *individual* claims alleging they are not receiving all authorized services. *See, e.g.*, *Nored v. Tenn. Dep't of Intellectual and Dev. Disab.*, No. 19-214, 2021 WL 3729617 (E.D. Tenn. Aug. 23, 2021) (unpublished), *aff'd* No. 21-5826, 2022 WL 4115962 (6th Cir. Sept. 9, 2022); *S.J. v. Tidball*, No. 20-04036, 2020 WL 5440510 (W.D. Mo. Sept. 10, 2020).

[2] *See* Approved Choices for Independence Waiver Application (July 1, 2022), available at https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents2/dltss-cfiwaiver-2022.pdf; N.H. Admin. R. He-E §§ 801.01-801.34, available at https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2022-02/pr-21-15.pdf.

[3] Kaiser Family Foundation, *State Policy Choices About Medicaid Home and Community-Based Services Amid the Pandemic* (Mar. 4, 2022), https://www.kff.org/report-section/state-policy-choices-about-medicaid-home-and-community-based-services-amid-the-pandemic-issue-brief/.

person-centered plan specifying the amount and type of services necessary to "meet the needs" of the participant, § 801.06(a). *See* Approved CFI Waiver Application, *supra*, at 134. Unlike many Section 1915(c) waiver programs in other States, DHHS does not cap the aggregate amount of CFI Waiver services that a participant may receive, and it does not cap the amount of home health, homemaker, personal care, or skilled nursing that can be authorized for a participant. *See* Approved CFI Waiver Application, *supra*. Rather, authorization levels for those services are based entirely on the participant's "needs." § 801.06(a). All person-centered plans include an "individualized contingency plan," N.H. Admin R. He-E § 805.05(c)(3)(f), which "identifies alternative staffing resources in the event that normally scheduled care providers are unavailable," § 805.02(l)(1). DHHS also requires case management agencies to assist participants to identify providers and ensure the delivery or services consistent with the person-centered plan, § 805.05(d), and DHHS provides extensive assistance to case management agencies to minimize and address service gaps. For example, DHHS provides technical assistance to case management agencies, *see* Ex. 1, ¶39, and DHHS's "Case Review and Consultation Committee" resolves service gaps and other issues that cannot be resolved through technical assistance. This Committee works with the case management agency and participant to identify and address the problem(s), which may include DHHS staff conducting outreach to identify potential providers and/or negotiating a "special rate" to entice a provider to serve the participant, among other things, *see* Approved CFI Waiver Application, *supra* at 211. *See* Ex. 1, ¶40. For participants that require services beyond those offered by the CFI Waiver program (*e.g.*, housing), DHHS has established an "Interagency Integration Team," which identifies and executes multi-agency solutions. *See* Ex. 1, ¶41. DHHS has also implemented a "provider not available" marker in the service authorization system to electronically identify CFI Waiver participants who may face service gaps, *see* Ex. 1, ¶38; and,

3

later this fiscal year, DHHS will be implementing "electronic visit verification" to promptly identify when scheduled services are not provided, *see* Approved CFI Waiver Application, *supra*, at 201-02.  Finally, DHHS covers, for every CFI Waiver participant, thirty 24-hour days of respite care per year when there is a "temporary absence" of a worker "or need for relief of those persons normally providing that participant's care."  § 801.27.

For state fiscal year ("SFY") 2020, the legislature approved a 3.1 percent increase in CFI Waiver services fee schedule rates; for SFY 2021, the legislature approved another 3.1 percent increase; and, for SFY 2022, the legislature approved a 5 percent increase to these service rates, except for personal care and homemaker services, which were increased by 15 percent and 6 percent, respectively.  Ex. 1, ¶46; ECF No. 80-13, at 11.  In addition, DHHS has secured approval from CMS to increase these rates each biennium to account for medical inflation, *see* Approved CFI Waiver Application, *supra*, at 211-12, and has obtained $30 million in federal funding to invest in supplemental payments for HCBS providers.[4]  In 2021, the State spent approximately $71 million (state and federal share) on the CFI Waiver program.  Ex. 2, ¶12.

## STANDARD OF REVIEW

The movant bears the burden of proof in establishing that class certification is warranted. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Courts undertake a "rigorous analysis" to ensure conformance with Rule 23.  *Wal-Mart*, 564 U.S. at 351.

## ARGUMENT

Class certification is the exception, not the rule; generally, litigation must be "conducted by and on behalf of the individual named parties only."  *Wal-Mart*, 564 U.S. at 348 (quotation

---

[4] DHHS, *Spending Plan for Implementation of the American Rescue Plan Act of 2021* (July 2021), available at https://www.medicaid.gov/media/file/nh-hcbs-final.pdf.

marks omitted).   Plaintiffs seeking class certification under Rule 23(b)(2) have the burden of

proving: (1) ascertainability; (2) numerosity; (3) commonality; (4) typicality; (5) adequacy; and

(6) that the requested relief is "appropriate respecting the class as a whole."  *See infra*.

In this case, Plaintiffs have not proved that they satisfy any of these six requirements.

## I.    Plaintiffs Have Not Proved that the Putative Class is Ascertainable.

Rule 23 implicitly requires that the class be "'ascertainable with reference to objective

criteria.'"  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) (quoting William B.

Rubenstein, Newberg on Class Actions §§ 3:1, 3:3 (5th ed. 2013)).  The class is unascertainable if

class members are "impossible to identify prior to individualized fact-finding and litigation."

*Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986).

In this case, Plaintiffs seek to certify the following class:

> CFI Waiver participants who, during the pendency of this lawsuit,
> have been placed at serious risk of unjustified institutionalization
> because Defendants, by act or omission, fail to ensure that the CFI
> participants receive the community-based long term care services
> and supports through the waiver program for which they have been
> found eligible and assessed to need.

Doc. 80 at 1.

This class is plainly unascertainable.  All CFI Waiver participants face a "baseline risk" of

institutionalization, Ex. 3, 67:21–68:10, because they all must meet the clinical criteria for nursing

facility placement to be eligible for the CFI Waiver program, § 1396n(c); § 801.03(a), and thus

the class definition's reference to "serious risk of unjustified institutionalization" must mean some

significantly heightened risk of institutionalization caused by Defendants' actions.  *See* Ex. 3,

67:21–69:5.  "There is, however, no simple formula to determine whether an individual is at

'significant risk' of institutionalization.  Indeed, the necessary inquiry is fact-intensive and is

affected by numerous variables."  *Clinton L. v. Wos*, No. 10-cv-123, 2014 WL 4274251, *6

(M.D.N.C. Aug. 28, 2014) (unpublished).   That is, determining whether a participant faces a "serious risk" of institutionalization – and whether that risk is "unjustified" – requires "individualized fact-finding and litigation."[5]

### A.   Receiving Less than 50 Percent of Authorized Services in One of 48 Months Does Not Prove A "Serious Risk of Unjustified Institutionalization."

Plaintiffs try to sidestep the class's ascertainability problem by arguing that any participant who "did not get 50% or more of the [four] key hands-on [CFI Waiver] services" (personal care, homemaker, home health, skilled nursing), *in any single month* over a 48-month period (2018 through 2021), was "at serious risk of unjustified institutionalization" *in the month the participant received less than 50 percent of those services*.[6]   ECF No. 80-1, at 8-9.

Just because a participant received less than 50 percent of certain CFI Waiver services in one of 48 months does not prove that the participant is "at serious risk of unjustified institutionalization."   The services that DHHS authorizes for CFI Waiver participants are not the minimum necessary to avoid "serious risk of unjustified institutionalization"; rather, DHHS authorizes any services that "meet the needs" of the participant.   *See* § 801.06(a).   Moreover, the participant could have received less than 50 percent of authorized services in any single month for

---

[5] *See Crosby*, 796 F.2d at 579-80 (rejecting class of individuals who did not receive a hearing or decision "within a reasonable time" "[b]ecause the standard of 'within a reasonable time' makes class members impossible to identify prior to individualized fact-finding and litigation"); *cf. Steimel v. Wernert*, 823 F.3d 902, 917-18 (7th Cir. 2016) (rejecting as vague a class of waiver enrollees who "require more services each year"); *Carrier v. Am. Bankers Life Assurance Co. of Fla.*, No. 05-CV-430-JD, 2008 WL 312657, *4 (D.N.H. Feb. 1, 2008) (unpublished) ("A class definition that is based on non-specific matters, such as 'wrongful conduct,' or subjective factors, such as 'a reasonable time,' is not objectively ascertainable."); *Shanley v. Cadle*, 277 F.R.D. 63, 66-68 (D. Mass. 2011) (rejecting class because it required "legal judgments, rather than solely objective factual criteria" to determine membership).

[6] Plaintiffs' expert stated that this informs whether a participant was at serious risk of institutionalization in the month in question, not whether she is *currently* at risk.   Ex. 3, at 200:17–202:14.   Plaintiffs seek only prospective relief, and participants who do not currently face such risk lack standing.   *See Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992).

any number of reasons unrelated to Defendants' actions, *see* Section III(A)(2), *infra*, and/or the participant may have received 100 percent of services in all months preceding and following the single month when she did not reach the 50 percent metric.  For example, consider a participant who received 100 percent of authorized services in every single month from 2018 through 2021, but received less than 50 percent of the four "hands-on services" in April 2019 because she was an inpatient in a hospital recovering from surgery.  That individual's lack of services in April 2019 would not, in and of itself, support a finding of "serious risk of unjustified institutionalization."

The only evidence that Plaintiffs introduce to support their position that *all* participants who receive less than 50 percent of certain authorized services in one single month are at a "serious risk of institutionalization" is the report of Dr. Mattan Schuchman.  However, Dr. Schuchman's "serious risk of institutionalization" term has a different meaning than "serious risk of unjustified institutionalization" used in Americans with Disabilities Act ("ADA") case law.  In his deposition, Dr. Schuchman explained he used "serious risk of institutionalization" in his report to mean "substantial, realistic risk" of long-term institutional placement, a short-term inpatient hospital stay, or an outpatient visit to an emergency department. Ex. 3, 66:19–67:2.  Accordingly, all that Dr. Schuchman concluded was that participants who received less than 50 percent of four "hands-on" services faced some heightened risk of an outpatient hospital visit, a short-term inpatient hospital stay, or some other form of what Dr. Schuchman considers "institutionalization." *Id.*  In contrast, in the ADA context, "institutionalization" does *not* include a visit to a hospital emergency department, or a short-term hospital inpatient stay for a surgery or illness, because those types of treatment do not "limit[]" an individual's "'exposure to the outside community'" or constitute "'isolat[ion]'" or "'confinement in an institution [that] severely diminishes the everyday life

7

activities of individuals.'"[7]  Rather, "institutionalization" refers to the "isolation" or "placement" of an individual in a long-term care facility (*e.g.*, a nursing facility, psychiatric facility) such that the individual is not living or receiving services in the community.[8]

In any event, as explained in Defendants' motion to exclude his testimony, Dr. Schuchman freely admits that he is "not an expert on Medicaid waivers," Ex. 3, 56:10–56:14, and the sweeping assumptions he made about thousands of CFI Waiver participants is not supported by any reliable scientific, clinical, or factual basis.  *See generally* ECF No. 80-2.  Dr. Schuchman concluded that all CFI Waiver participants who receive less than 50 percent of the four "hands-on services" in any single month were "likely" to be at "serious risk of institutionalization" by simply "assum[ing]" that the gaps in CFI Wavier services experienced by the Named Plaintiffs "also impact other waiver beneficiaries," Doc. 80-2, ¶¶63-64, without reviewing any records relating to any other putative class members; without knowing the number of participants in the CFI Waiver program; without understanding the services provided through the program; and without reviewing any information about the diagnoses, services, conditions, or needs of participants.[9]  This extrapolation of findings of three participants onto the entire putative class is inherently unreliable.

If Dr. Schuchman had more familiarity with Medicaid waiver programs, he would know that some waiver participants do not receive all authorized services in a given month because they do not actually need those services that month for any number of reasons, such as because they are

---

[7] ECF No. 41, at 22-23 (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 596, 600-01 (1999)); *see, e.g.*, *Clinton L.*, 2014 WL 4274251 at *5.

[8] *See Olmstead*, 527 U.S. at 587; *id.* at 600-01 (holding unjustified institutionalization is a form of discrimination in part because "institutional placement" "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and requires individuals to "relinquish participation in community").

[9] ECF No. 80-2, Ex. B; Ex. 3, 31:14–33:1; Ex. 3, 41:22–42:7; Ex. 3, 72:7–72:21; Ex. 3, 131:6–132:7; Ex. 3, 138:4–149:6; Ex. 3, 156:17–157:2; Ex. 3, 157:17–158:6.

an inpatient in a hospital or rehabilitation center for a surgery or illness, or because they are on vacation with family providing them unpaid support. *See* Section III(A)(2), *infra*. But Dr. Schuchman failed to consider these relatively common occurrences. Ex. 3, 201:15–202:22.

Dr. Schuchman also only accounts for four "hands-on services," disregarding other "hands-on services" provided to CFI Waiver participants – *i.e.*, adult day services, respite, residential care facility services, and supportive housing services, and Section 1915(k) state plan personal care services available to participants who use wheelchairs, ECF No. 80-2; Ex. 3, 61:7–62:23 – as well environmental accessibility services; home-delivered meals; non-medical transportation; personal emergency response system ("PERS"); specialized medical equipment. *See* Approved CFI Waiver Application, *supra*, at 54-114; §§ 801.13-801.31. Consider a participant authorized to receive, every month: 100 hours in adult day services (a "hands-on service"); 20 hours of personal care services; PERS; and 40 home-delivered meals. If that participant received all of their services in a month, except for 10.5 of the 20 hours of personal care services, Dr. Schuchman concludes the participant is at "serious risk of institutionalization," without any inquiry into the individual circumstances of that participant, even though the participant received 109.5 of their 120 hours of authorized "hands-on services," plus PERS and meals. There is no basis for this conclusion.

Dr. Schuchman's classwide conclusions are also contradicted by Dr. David Polakoff, who is an expert on Medicaid waiver programs, in addition to being a physician with a geriatric specialty. As Dr. Polakoff explains, analyzing risk of institutionalization requires an individualized analysis of a number of factors, including the amount of services received; the type(s) of services at issue; whether the services that are received can be used "to help fill in, and perform the highest priority tasks" associated with the missed services; "the underlying health conditions and functional support needs of that individual"; and the "personal circumstances of the

participant." Ex. 4, 5-7.  Moreover, Dr. Polakoff explains that it is inappropriate to rely only on percent of services paid, without looking at the *amount* of services not paid, because it is easier to fill a gap of a small number of service hours than it is to fill a gap of a large number of service hours, even if both gaps represent the same percentage of authorized services.  Ex. 4, at 5-6.

In fact, Plaintiffs acknowledge that class membership cannot be determined exclusively with reference to the percent of authorized services received, noting that some participants who exceed the 50 percent metric also face "serious risk of institutionalization."  ECF No. 80-1, at 9; *see also* Ex. 3, 200:3–202:3 (explaining that to "evaluate" "serious risk of institutionalization" Dr. Schuchman would assess whether "activities of daily living are being routinely met and completed" and "do a physical exam" to identify risk signs, such as sores or dehydration); *id.*, 68:11–68:15 ("[W]e need to make an assessment for each individual regarding their particular circumstances"); *id.*, 169:19–170:2 ("[T]hat kind of determination may require more of an in-depth analysis of that particular individual's situation.").  Similarly, Plaintiffs admit that participants' "risk of institutionalization depends in part on the individual's disability(ies) and need(s)," Ex. 5, No. 26, and stated that they lack sufficient information "to admit or deny" whether "all CFI Waiver enrollees are at risk of unnecessary institutionalization," even though Plaintiffs had data about the percent of authorized services each participant has received.  Ex. 5, No. 39.

### B.     An Individualized Inquiry is Required to Determine if "Serious Risk of Unjustified Institutionalization" Was *Caused* By Defendants.

Plaintiffs cannot establish that any risk of institutionalization is caused by an alleged "act," "omission, or "fail[ure]" of Defendants, which is another prerequisite for class membership, ECF No. 1, ¶122, without individualized fact-finding and litigation, because there are many circumstances when a CFI Waiver participant does not receive their authorized services for reasons entirely unrelated to Defendants' conduct, as discussed below.  *See* Section III(A)(2), *infra*.

Indeed, neither of Plaintiffs' experts point to any comparative data to suggest that putative class members who are subject to the alleged "act" or "omission" of Defendants that Plaintiffs challenge (not ensuring that putative class members receive all authorized services) are more likely to transition to institutional placement than the CFI Waiver population as a whole.

### C.   Plaintiffs' Putative Class is a Fail-Safe Class.

Under Plaintiffs' legal theory, the elements of an ADA and Rehabilitation Act claim are that the plaintiff (1) has a disability and (2) is "at serious risk of unjustified institutionalization" (3) caused by Defendants' acts or omission. *See, e.g.*, ECF No. 1, ¶¶4, 8, 59, 103-08. Accordingly, Plaintiffs effectively limit the class to CFI Waiver participants for whom Plaintiffs' merits questions have already been answered, and thus it is an impermissible fail-safe class. *See In re Nexium Antitrust Litig.*, 777 F.3d at 22; *Steimel*, 823 F.3d at 918.

In *Kenneth R. v. Hassan*, this Court held that a class definition limited to individuals institutionalized or "at serious risk of institutionalization" was ascertainable and not a fail-safe class. 293 F.R.D. 254, 264-65 (D.N.H. 2013). That case distinguished the First Circuit's decision in *Crosby* on the ground that plaintiffs in *Crosby* sought notification of class members and status reports that required identification of class members. *Id.* In this case, like *Crosby,* Plaintiffs claim that notice to class members is required, ECF No. 1, ¶¶158-163, and seek an injunction until "all Class Members" receive CFI Waiver services "to the extent required under federal law," *id.* at 43, which would entail exactly the type of status report that *Crosby* found impossible when membership in the class cannot be ascertained without individualized fact-finding.

## II.   Plaintiffs Have Not Proved Numerosity.

Federal Rule of Civil Procedure 23(a)(1) requires the putative class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). That is, "a class representative must show 'that it is extremely difficult or inconvenient to join all the members of

the class.'" *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (quoting 7A C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE § 1762 (3d ed.)).

In this case, the key evidence Plaintiffs cite prove the numerosity of participants "at serious risk of unjustified institutionalization" because of Defendants' acts or omissions is data that, in any single month, DHHS pays claims of less than 50 percent of the service authorizations for four services for at least 650 CFI Waiver participants.  However, as explained above and below, receiving less than 50 percent of certain authorized services in a single month does not alone prove that a participant was "at serious risk of unjustified institutionalization," let alone that the "risk" was caused by Defendants' acts or omissions.  *See* Section I(A)-(B), *supra*; Section III(A)(2), *infra*.  Nor is this data sufficient to support a conclusion that a subset of the 650 participants were "at serious risk of unjustified institutionalization."  As the Third Circuit has explained, "'where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone.'"  *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013)).

## III.    Plaintiffs Have Not Proved Commonality.

To satisfy commonality, Plaintiffs must establish "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  This language "is easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Wal-Mart*, 564 U.S. at 349.  "What matters to class certification is not the raising of common questions . . .  but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation," such that the "truth or falsity" of the question will "resolve an issue that is central to the validity" of each claim "in one stroke."  *Id.* at 350 (internal citations omitted) (emphasis in the original).

Plaintiffs assert that "commonality is a 'low bar,'" ECF No. 80-1, at 10, but this language comes from an opinion (*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19

(1st Cir. 2008)) that pre-dates the course correction in *Wal-Mart*, in which the Supreme Court clarified that the commonality inquiry required a "rigorous analysis."   *See, e.g.*, *M.D. v. Perry*, 675 F.3d 832, 838-42 (5th Cir. 2012) (rejecting the district court's reliance "on this circuit's pre-*Wal-Mart* case law finding that 'the test for commonality is not demanding'").

The First Circuit's decision in *Parent/Professional Advocacy v. City of Springfield* makes clear that commonality is no longer a "low bar."   In that case, plaintiffs were students with disabilities alleging that a school district had violated the ADA by segregating them in a specialized school, due in part to lack of adequate services in neighborhood schools.   They sought to certify a class of "students with a mental health disability who are or have been enrolled in [the specialized school] who are not being educated in [a] neighborhood school," based on evidence that the school district "engage[d] in common practices of disability discrimination," including an expert report concluding that the district made "common (incorrect) assumptions about the class members and offered them a common set of (insufficient) services."   *Parent/Prof'l Advocacy League*, 934 F.3d at 21, 29-30.   The First Circuit rejected commonality, holding that "the problem" with the plaintiffs' position was that it claimed "to find a pattern of legal harm common to the class without identifying a particular driver – 'a uniform policy or practice that affects all class members' – of that alleged harm."   *Id.* at 30.[10]   The First Circuit explained that a challenge to an "official policy" or "well-defined practice" is generally necessary to "anchor common questions" such that they can be resolved in "one stroke" for the entire putative class, because "[t]he harm to the class members is (in part) that the policy precludes, across-the-board . . . services that the [law]

---

[10] *See also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 505 (7th Cir. 2012) (Rovner, J., concurring in part and dissenting in part) ("[T]he plaintiffs' claims appear to be based on multiple, disparate failures to comply with the school district's statutory child-find obligations rather than a truly systemic policy or practice which affects them all.").

13

requires and that harm is likely to have similar causes (the policy) and effects (denial of services appropriate to that individual student) across the class." *Id.* at 29.

In short, the bar for commonality is no longer "low," and Plaintiffs have not cleared it here.

### A. Plaintiffs Have Not Proved Commonality With Respect to their Substantive ADA, Rehabilitation Act, or Reasonable Promptness Claims.

*Parent/Professional Advocacy League* sets out a two-pronged test for commonality: (1) defendants have an "official policy" or "well-defined practice[] that drives the alleged violation"; and (2) the "official policy" or "well-defined practice" "work[s] similar harm on the class plaintiffs" such that it can be evaluated in "one stroke" for the entire class. *Id.* at 28-29.[11]

In this case, Plaintiffs have not identified any official policy or well-defined practice as violating the ADA, the Rehabilitation Act, or the Medicaid Act's reasonable promptness provision, and they have not proved that the practices they do challenge work similar harm on all putative class members such that they can be resolved in "one stroke" for the entire putative class.

### 1. Plaintiffs Cannot Prove that an Official Policy or Well-Defined Practice Drives the Alleged Violation of Law.

In response to requests for admission, Plaintiffs admit that they do not challenge any statutes, regulations, or written policies as violating the ADA, the Rehabilitation Act, or reasonable promptness. *See* Ex. 5, Nos. 17, 18. Instead, Plaintiffs challenge two unwritten alleged "practices"

---

[11] *See, e.g.*, *Anderson v. Team Prior, Inc.*, No. 19-452, 2022 WL 1156056, *3 (D. Me. Apr. 19, 2022) (unpublished) ("'[C]ommon answers typically come in the form of 'a particular and sufficiently well-defined set of allegedly illegal policies or practices' that work similar harm on the class plaintiffs.'" (quoting *Parent/Prof'l Advocacy League*, 934 F.3d at 28)); *Elisa W. v. City of New York*, No. 15-5273, 2021 WL 4027013, *9 (S.D.N.Y Sept. 3, 2021) (unpublished) (rejecting commonality in part because "Plaintiffs' allegations do not flow from unitary, non-discretionary policies that violate the rights of all class members or cause them all injury"); *T.R. v. Sch. Dist. of Philadelphia*, No. 15-4782, 2019 WL 1745737, *17 (E.D. Pa. Apr. 18, 2019) (unpublished) (rejecting commonality in part because plaintiffs "do not challenge a centralized policy enforced by a single decision-maker, but rather target individualized decisions by various case supervisors, school principals, and teachers as to what services are required in each particular case").

as violating those statutes: (1) Defendants' allegedly "failing to ensure that CFI Waiver participants are provided the services and supports they have been assessed to need," and (2) Defendants' alleged "failure to effectively monitor the service gaps and have backup plans to address any service gap."[12]  *See* Ex. 6, No. 16; *see also* ECF No. 80-1, at 12-13.

Just as "failure to provide [school-based behavioral services]" was not a well-defined practice sufficient to support commonality in *Parent/Professional Advocacy League*, "failure" to "ensure" that CFI Waiver participants receive all authorized services or to "monitor the service gaps" are not well-defined practices sufficient to support commonality.  To the contrary, the alleged "practices" Plaintiffs challenge are nothing more than nebulous descriptions of the harm Plaintiffs allege, coupled with conclusory statements that those harms are caused by Defendants' "failures."  If that were enough to support commonality, classes would be certified whenever plaintiffs could prove any harm impacting program participants, regardless of whether Plaintiffs could prove that the harm was caused by a "common driver" of an official policy or well-defined practice, and *Wal-Mart* and *Parent/Professional Advocacy League* make clear that is not the law. That is why the post-*Wal-Mart* cases that Plaintiffs cite in support of their commonality arguments generally involve challenges to official policies or well-defined practices.[13]

---

[12] These alleged "practices" are reflected in the "common questions" that Plaintiffs advance in their brief.  ECF No. 80-1, at 12-13.  Plaintiffs also allege that a third practice relating to notice and appeals violates the ADA and the Rehabilitation Act. Ex. 6, No. 16; Ex. 7, No. 15.  We address this third alleged practice in Section III(B), *infra*.

[13] *See Gomes v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 101 (D.N.H. 2021) (inhibiting detainees' ability to socially distance during the COVID-19 pandemic); *Doe v. Comm'r, N.H. Dept. of Health and Human Servs.*, No. 18-1039, 2020 WL 2129717, at *5 (D.N.H. May 4, 2020) (unpublished) (not providing a probable cause hearing until a certain time); *Kenneth R.*, 293 F.R.D. at 260 (non-coverage of "mobile crisis services, Assertive Community Treatment . . . , supported housing, and supported employment"); *Oster v. Lightbourne*, No. C09-4668, 2012 WL 685808, at *5 (N.D. Cal. Mar. 2, 2012) (unpublished) (20 percent reduction in HCBS for certain individuals).

Plaintiffs claim New Hampshire underfunds HCBS, alleging that New Hampshire spent just $42 per resident on HCBS, while it spent $258 per resident on nursing facility services, and that "New Hampshire ranked 47th out of 50 states in its Medicaid spending for home and community-based spending."  ECF No. 80-1, at 18.  However, Plaintiffs do not (nor could they) claim that underfunding is a "well-defined practice" that can support commonality, and their allegations about underfunding are not true.  Plaintiffs' claims are based on statements by AARP about Medicaid expenditures in 2016, ECF No. 80-1, at 18, but the federal government's most recent annual report on Medicaid expenditures shows that, in 2019, New Hampshire spent approximately $404 million in Medicaid HCBS (state and federal share), or $296.75 per resident, ranking 23rd of 50 States in per resident Medicaid HCBS spending.[14]

### 2. The "Practices" Do Not "Work Similar Harm" on All Putative Class Members that Can be Resolved in "One Stroke."

The CFI Waiver program serves a population with "extraordinary diversity of diagnoses," Ex. 4, at 2, from adults with physical limitations caused by pulmonary disease who can independently work and travel in the community and need a few hours assistance each day, to medically complex quadriplegics who need assistance with every activity of daily living. Diagnoses for CFI Waiver participants include, among others: pulmonary disease, hypertension, diabetes, heart disease, neurologic conditions, and behavioral health conditions (*e.g.*, schizophrenia, bipolar disorder).  Ex. 4, at 2-3.  As a result, "[a] broad, in fact enormous, range exists of the amount services authorized."  Ex. 4, at 4.  For example, in 2021, 10 percent of CFI Waiver participants were authorized to receive $1,790 or less in services annually; the median

---

[14] CMS, Medicaid Long Term Services and Supports Annual Expenditures Report, tbls. C.6, C.7 (Dec. 9, 2021), available at: https://www.medicaid.gov/medicaid/long-term-services-supports/downloads/ltssexpenditures2019.pdf.

service authorization was $17,852; and the 10 percent of CFI Waiver participants were authorized to receive $40,567 or more in services annually. Ex. 2, ¶20. Many CFI Waiver participants are authorized for an average of less than 5 hours of services per week, whereas others are authorized for an average of more than 96 hours of services per week. Ex. 4, at 4. Similarly, participants receive different types of services. For example, in 2021, 39 percent of CFI Waiver participants received agency-directed personal care services; 18 percent received consumer-directed personal care services; 16 percent received residential care services; and 4 percent received adult day services. Ex. 2, ¶23.

In addition, CFI Waiver participants receive services in a decentralized environment. Participants' person-centered plans are developed and overseen by one of eight (8) different case management agencies; services are provided by one of over 200 provider agencies, employing or helping supervise thousands of direct care workers; and participants have a choice of receiving services through one of three different delivery models:

1) "Agency-directed." A provider agency staffs the participant's service hours and is responsible for employing, training, supervising, and paying the direct care worker.

2) "Consumer-directed." For personal care services, the participant may select and employ the direct care worker and oversees the services provided.

3) "Participant-directed and managed model." The participant decides how the authorized funding is to be distributed among the different services; sets the rates for the various CFI Waiver services; "design[s] the services that will be provided"; selects the provider; and performs "oversight of the services provided."

*See* Approved CFI Waiver Application, *supra*, at 75, 134, 151; § 801.02(ai); Ex. 1, ¶¶28-34.

Many CFI Waiver Participants receive all, or nearly all, of their authorized services. In 2021, at least 36 percent of participants received over 90 percent of their authorized services, and another 27 percent received at least 70 percent of their authorized services. Ex. 2, ¶19. In contrast,

19 percent of participants had paid claims for between 50 percent and 69 percent of their authorized services, and 17 percent had paid claims for less than 50 percent. *Id.*

In part because of the diversity of needs of CFI Waiver participants, the wide variation in service authorizations, and the decentralized structure through which participants receive services, the alleged practices that Plaintiffs challenge do not "work similar harm" on all putative class members such that their legality can be evaluated in "one stroke" for the entire putative class. That is, an individualized analysis for each putative class member is necessary to determine whether Defendants violate the ADA, the Rehabilitation Act, and reasonable promptness through their alleged "practices" of "failing to ensure that CFI Waiver participants are provided the services and supports they have been assessed to need" and "fail[ing] to effectively monitor the service gaps and have backup plans to address any service gap." *See* Ex. 6, No. 16.

To begin with, whether a CFI Waiver participant's service gap gives rise to a "serious risk" of institutionalization – and whether that "serious risk" is "unjustified" – will depend on a host of individualized factors, including, among other things, the amount of services the participant received or did not receive; the types of services received; the participant's personal circumstances (e.g., living situation, family support); and the participant's "unique disabilit[ies] and needs," *Parent/Prof'l Advocacy League*, 934 F.3d at 31. *See* Section I(A), *supra*.[15] As one court has

---

[15] *See also, e.g.*, *Jamie S.*, 668 F.3d at 497-98 (overturning certification because the individualized circumstances of each class member mean that key legal and factual questions "must be answered separately for each child," and "the answers are unique to each child's particular situation"); *McDaniel v. Bd. of Educ. of Chicago*, No. 13-3624, 2013 WL 4047989, *6 (N.D. Ill. Aug. 9, 2013) (unpublished) (holding that commonality did not exist because individual education plans ("IEPs") are individualized and "Plaintiffs have failed to show that the school closings will render the IEPs of putative class members inadequate on a class-wide basis"); *EQT Production Co. v. Adair*, 764 F.3d 347, 363 (4th Cir. 2014) (holding that "individualized review precludes a finding of commonality"); *Carson P. v. Heineman*, 240 F.R.D. 456, 508 (D. Neb. 2007) ("When the resolution of a 'common' legal issue is dependent on factual determinations that will be different for each putative class plaintiff, a common issue of law does not exist for the purposes of Rule

explained, grounding a class claim in an alleged violation of an "amorphous and individualized" statutory requirement, as opposed to a clear statutory mandate to provide a specific service, is "not subject to common enforcement" and "precludes a finding of commonality," because such a requirement "does not proscribe a certain course of conduct," "but rather requires a fact-intensive inquiry into the individual circumstances." *T.R.*, 2019 WL 1745737, at *14-15.  That is exactly the situation in this case: "serious risk of unjustified institutionalization" is an "amorphous and individualized" standard.

Further, determining whether Defendants' alleged practices *caused* any "serious risk of unjustified institutionalization" requires an individualized analysis of *the reason why* the participant did not receive all of the authorized services.  As Plaintiffs admit, there are many reasons why a participant may not receive authorized services.  Ex. 5, No. 2.  For example:

- Participants frequently do not receive all of their services because they are in the hospital for several weeks for a surgery, illness, or some other reason.  *See* Ex. 1, ¶26; Ex. 8, No. 1.

- Participants often refuse services for any number of reasons, including because they are afraid to interact with caregivers because of COVID-19, Ex. 3, at 121:16–122:21, or they do not want strangers in their home, *see, e.g.*, Ex. 9.

- Participants have physically assaulted or verbally abused their workers, resulting in the providers refusing to continue to provide services.  *See, e.g.*, Ex. 10; Ex. 11; Ex. 12; Ex. 13.

- Participants have fired workers without cause or refused to hire certain workers for unjustified or individualized reasons, such as the worker's "heavy accent," *see* Ex. 14; Ex. 15; Ex. 16; Ex. 5, No. 2, or because the participant has a negative reaction to the laundry detergent the worker uses for the worker's own clothes or because the worker has a faint odor of smoke, Ex. 17, Ex. 18, Ex. 19, 34:9–35:6.

---

23(a)(2).”); *J.B. v. Valdez*, 186 F.3d 1280, 1288-89 (10th Cir. 1999) (holding that commonality did not exist because class members' experiences "differ drastically" from person to person).

- Providers have refused to provide services because of unsanitary or dangerous conditions in the participants' homes, such as a flea infestation or the presence of illegal drugs. *See* Ex. 20; Ex. 21.

- Participants choosing to receive services through the consumer-directed model have been unable to find a provider or direct care worker. *See, e.g.*, Ex. 22.

The State does not violate the ADA, the Rehabilitation Act, or reasonable promptness when a participant does not receive all authorized services because, for example, she is in a hospital for several weeks, she voluntarily refuses services, she fired her worker without cause, or the worker quit as the result of the participant's abuse   *See., e.g.*, *Nored*, 2021 WL 3729617; *Woods v. Tompkins Cnty.*, No. 16-cv-7, 2019 WL 1409979, *9-10 (N.D.N.Y. Mar. 28, 2019) (unpublished).

### B.   Plaintiffs Have Not Proved Commonality With Respect to their Procedural Notice-and-Hearing Claims.

Plaintiffs challenge Defendants practice of not "notify[ing] CFI participants when they are not going to receive their CFI Waiver services with reasonable promptness so that they may challenge the denial, termination, or change in the services . . . ." Doc. 80-1, at 13.  In contrast to the "practices" underlying their "common questions" for their substantive ADA, Rehabilitation Act, and reasonable promptness claims, Plaintiffs' notice-and-hearing claim is anchored in an actual, well-defined practice of Defendants.  In accordance with federal and state rules, DHHS provides notice and hearing rights whenever it takes an action to deny, reduce, or terminate any participant's benefits, *see* 42 C.F.R. § 431.210; N.H. Rev. Stat. § 126-A:5; §§ 801.04(e), 801.06(d), but DHHS does not provide notice when a participant does not receive authorized services for some reason other than DHHS's denial, reduction, or termination.

However, this practice cannot support commonality with respect to Plaintiffs' notice-and-hearing claim, for two reasons.  First, as explained in Defendants' forthcoming Motion for Partial Summary Judgment, none of the federal laws cited by Plaintiffs – Due Process, the Medicaid Act, the ADA, and the Rehabilitation Act – require a State to provide notice and appeal rights whenever

a Medicaid participant does not actually receive an authorized Medicaid service.   Second, Defendants' practice does not "work similar harm on the class plaintiffs" such that its legality can be evaluated in "one stroke" for the entire putative class.   *Parent/Prof'l Advocacy League*, 934 F.3d at 28-29 (citing *Wal-Mart*, 564 U.S. at 350).   Plaintiffs assert that Due Process and the Medicaid Act require Defendants to provide participants with notice and an opportunity to appeal whenever they experience an "*effective* denial, reduction, or termination of CFI Waiver services." ECF No. 1, ¶124(f).   This theory is difficult to discern, but Plaintiffs seem to suggest that an "effective denial, reduction, or termination" of services occurs whenever a participant does not receive all authorized services, unless the lack of services was caused by Plaintiffs own voluntary actions or the service gap is relatively small, *see* Ex. 23, 41:22-24 (Plaintiffs' counsel acknowledging that "there may not be a reason to give a notice to someone who's just not getting an hour of services").   Accordingly, even under Plaintiffs' theory, analyzing the legality of Defendants' practice of not providing a notice for "effective" denials of service will require an individualized inquiry into the extent to which each participant received all authorized services and, where applicable, the reasons why the participant did not receive the services.   Indeed, this Court has already suggested that Plaintiffs' notice-and-hearing claims hinge on "case-specific circumstances."  ECF No. 41, at 38.

## IV.    Plaintiffs Have Not Proved Typicality.

While commonality "looks at the relationship among the class members generally," typicality looks "at the relationship between the proposed class representative and the rest of the class."  Herbert B. Newberg et al., NEWBERG ON CLASS ACTIONS § 3:26 (5th ed. 2014).

### A.    The Named Plaintiffs' Claims Are Not Typical Because They Receive A Type of Service Different than Most Putative Class Members.

21

The vast majority of the CFI Waiver services received by both Named Plaintiffs are the same: consumer-directed personal care services. Ex. 2, ¶6. However, in state fiscal year 2021, only 18 percent of participants received consumer-directed personal care services. Ex. 2, ¶23. Accordingly, even if Plaintiffs could prove that the Named Plaintiffs are "at serious risk of unjustified institutionalization" because of a lack of consumer-directed personal care services, that would say nothing about Defendants' practices with respect to the 82 percent of participants who do not receive those services, but instead receive, for example, agency-directed personal care services, adult day service, homemaker services, supportive housing, and/or residential care facility services. The challenges of providing consumer-directed personal care services differ from those associated with providing other services. For example, the participant is responsible for finding and employing a worker to deliver consumer-directed personal care services, whereas those responsibilities fall to the provider for agency-directed personal care and other services. Ex. 1, ¶¶29-30. Similarly, consumer-directed personal care services involve different staffing challenges than homemaker services, adult day services, and residential facility services. Personal care services require a worker able to assist with bathing, transfers, and personal hygiene, whereas homemaking only requires someone able to cook meals or handle other household chores. *See* §§ 801.24(b), 801.21(b). And adult day services and residential care facility services involve multiple workers providing services to multiple participants at a central location, often with lower staffing ratios (i.e., not 1-to-1) than personal care services, *see* §§ 801.02(b), 801.26, and therefore staffing of adult day services is more stable than staffing in-home 1-to-1 services.

> **B.    The Named Plaintiffs' Claims Are Not Typical Because Their Needs and Challenges Are Not Typical of the Putative Class.**

Both Named Plaintiffs allege that they have needs that are so significant that they require assistance with nearly every activity of daily living, such as bathing, toileting, personal hygiene,

transfers, transportation, and household chores.  ███████████████████████

████████████████████████████████████████████████████████████████

██,[16] ████████████████████████████. ECF No. 80-2, ¶¶17-19, 28; Ex. 24.  ████████

████████████████████████████████████████████████████████████

███████████████████████████. ECF No. 80-2, ¶¶53-54; Ex. 25.

Plaintiffs have not introduced any evidence that the Named Plaintiffs' challenges and needs are typical of others participating in the CFI Waiver program, and they are not.  Indeed, the Named Plaintiffs face some of the most significant needs of any CFI Waiver participants.  Of the 3,834 individuals who were participating in the CFI Waiver program as of May 2022, less than 70 participants (2 percent) ████████████████████████, and less than 100 participants (3 percent) ████████████████████. *See* Ex. 2, ¶5.  The most common diagnoses of CFI Waiver participants are those associated with aging or obesity, such as arthritis; emphysema and other pulmonary disease; diabetes; hypertension and heart diseases; and Alzheimer's Disease. *See* Ex. 1, ¶18.  While the physical limitations caused by these types of diagnoses vary greatly, the vast majority of participants are able to walk, toilet, and do some household chores.  In contrast,

████████████████████████████████████████████████████████████

████████████████████████████████████. *See supra* at 22-23.  As a result, ████

████████████████████████████████████████████████████████████

████████████████, whereas the median CFI Waiver service authorization is $17,852, and only 10 percent of participants are authorized to receive over $40,567 in services annually.  Ex. 2, ¶¶6, 20.

---

[16] ████████████████████████████████████████████████████████████
████████████

Because the Named Plaintiffs have atypical needs, challenges, and service authorizations, their claims are also not typical of the putative class. To begin with, it is more challenging to staff all the authorized services for Named Plaintiffs than it is for other participants, and therefore the fact that Named Plaintiffs do not actually receives some of their services (and the reasons why Named Plaintiffs may not have received all of their services) says little about whether putative class members received all their services (or the reasons why putative class members may not receive all their services).[17] For example, finding a worker(s) to fill 5 hours a week of personal care is a different undertaking ███████████████████████████████████████. This may be one reason (of many) that the Named Plaintiffs received a considerably lower percentage of their authorized services than the putative class as a whole. ████████████████████████████████████████ ███████████████████████, ECF No. 80-8, at 9, chart 4, whereas DHHS paid claims for 77 percent of all authorized services for the CFI Waiver population as a whole in 2021. Ex. 2, ¶12.

In addition, the alleged "risk of institutionalization" that Named Plaintiffs may face if they do not receive all authorized services is not typical of putative class members who do not receive all authorized services. Plaintiffs allege that the Named Plaintiffs are at risk of institutional placement if they do not receive all authorized services for even a short period of time because they cannot move out of bed or use the toilet independently, exposing them to hunger, dehydration, infections in medication ports, and bed sores, among other things. *See, e.g.*, ECF No. 1, ¶¶84, 91.

---

[17] *Cf. Belezos v. Board of Selectmen of Hingham, Mass.*, No. 17-12570, 2019 WL 6358247, *10 (D. Mass. Nov. 27, 2019) (unpublished) (holding that plaintiffs did not prove typicality because "it is not likely that plaintiff, in pursuing his claims . . . will advance the interests of the putative class members"); *Pimentel v. City of Methuen*, No. 17-11921, 2019 WL 6699667, *6 (D. Mass. Dec. 9, 2019) (unpublished) (holding that plaintiffs did not prove typicality because "whether they were injured depends on additional facts that likely vary between class members").

But Plaintiffs have not proved that other putative class members will experience similar alleged harm from a similar lack of services. *Cf.* Ex. 4, at 7 (explaining that the "the risk incurred by a participant as a result of undelivered services is determined" in part "by the underlying health conditions and functional support needs of that individual").



### C. The Named Plaintiffs' Claims Are Not Typical Because Their Lack of Services Was Caused By Their Unique Demands.



. Ex. 26; Ex. 27.

. Ex. 28; *see also* Ex. 26; Ex. 27.

Ex. 28; *see also* Ex. 29.  Similarly,

. *See* Ex. 30; Ex. 31; Ex. 32; Ex. 33.

, their cases will not provide insight into whether Defendants' practices violate the ADA, the Rehabilitation Act, or Medicaid's reasonable promptness requirement with respect to other putative class members. *Cf., e.g.*, *Elisa W.*, 2021 WL 4027013, at *11 (rejecting typicality in part because it was not possible

to determine the cause of the alleged harm "without evaluating all of the other contributing facts and influences").

## V.   Plaintiffs Have Not Proved Adequacy.

To satisfy Rule 23(a)(4)'s requirement that named plaintiffs be "adequate" representatives of the putative class, the moving party must prove "that the interests of the representative party will not conflict with the interests of any of the class members." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985); *see also, e.g.*, *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189-90 (11th Cir. 2003) (citing cases).

In this case, Named Plaintiffs' individual interests present a tangible risk of conflict with the interests of the putative class. Plaintiffs allege that there are not sufficient workers to deliver all participants' authorized services, *see* ECF No. 1, ¶¶34-38, but seek an injunction requiring Defendants to, among other things "ensure" that all participants actually receive "the services they need to avoid . . . serious risk of institutionalization." Ex. 32, No. 1. If Plaintiffs' allegation about an insufficient number of workers is true, an order requiring Defendants to "ensure" that all participants actually receive "the services they need to avoid . . . serious risk of institutionalization" may require DHHS to redistribute service hours to ensure that the allegedly limited labor pool can provide all services necessary to avoid "serious risk of institutionalization," *e.g.*, limit coverage to only CFI Waiver services that are necessary to avoid "serious risk of institutionalization," instead of covering any CFI Waiver services that "meet the needs" of the participant, as Defendants currently do, *see* § 801.06(a). Any such relief would necessarily create a fundamental conflict between the Named Plaintiffs and some putative class members: Named Plaintiffs may see an increase in the services they receive, but that increase would be at the expense of other putative class members who currently receive more services than the minimum necessary "to avoid . . . serious risk of institutionalization."

26

**VI.    Plaintiffs Have Not Proved that the Requested Relief is "Appropriate Respecting the Class as a Whole."**

Plaintiffs seeking class certification under Rule 23(b)(2) face a heightened bar, in part because class members may not opt-out of a Rule 23(b)(2) class.  *See Reid v. Donelan*, 17 F.4th 1, 11 (1st Cir. 2021).  Specifically, plaintiffs must prove that defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Reid*, 17 F.4th at 11 (quoting *Wal-Mart*, 564 U.S. at 360).

Courts have interpreted Rule 23(b)(2) to impose two requirements: (1) the classwide injunctive relief requested must "satisfy the limitations of Federal Rule Civil Procedure 65(d)— namely, the requirement that [the injunction] 'state its terms specifically; and describe in reasonable detail the act or acts restrained or required,'" *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (quoting Fed. R. Civ. P. 65(d)(1)); and (2) "class members must have been harmed in essentially the same way" such that the injunctive relief sought would benefit all putative class members, *M.D.*, 675 F.3d at 845.

**A.    Plaintiffs' Requested Injunctive Relief Does Not "Describe in Reasonable Detail" the Acts Restrained or Required.**

Throughout this case, Plaintiffs have been unable to "describe in reasonable detail" the injunction they seek, and instead characterize their requested relief at a high level of abstraction. *See, e.g.*, ECF No. 80-1, at 2.  For example, in response to an interrogatory, Plaintiffs stated that they seek an injunction requiring Defendants to "ensure" that "participants receive [the] CFI services . . . they need to avoid the serious risk of institutionalization" and "manage and facilitate a sufficient CFI service provider network," but Plaintiffs did not identify any specific, concrete

actions that the Court should order Defendants to take achieve these outcomes.  Ex. 34, No. 1.

This requested relief begs the question of what type and amount of services are necessary for each

putative class member to "avoid the serious risk of institutionalization," and what actions must

Defendants take to have a "sufficient" provider network.  Similarly, Plaintiffs seek an injunction

to require Defendants to "end fiscal policies that incentivize institutionalization" and "other

particularized improvements," but Plaintiffs do not identify the "fiscal policies" that should be

enjoined or the "other particularized improvements" they seek.[18]  *Id.*  Finally, Plaintiffs ask the

Court to order Defendants to implement several, vague "necessary improvements" to the program:

"exercis[e] greater control and knowledge of" services; "timely" and "accurately" track

participants' service authorizations and levels; and "develop[] and implement[]" a process by

which participants' "unmet service needs" are "promptly" evaluated and "specific action" is taken

to address the unmet service needs.  *Id.*  But Plaintiffs do not specify what is meant by, or how to

measure, the subjective standard of "improvement[]."

Plaintiffs' requested relief boils down to a court order directing Defendants to "ensure"

that CFI Waiver enrollees receive all of the services "they need to avoid the serious risk of

institutionalization."  *See* Ex. 34, No. 1; *see also* ECF No. 1, at 42.  But this request for a general

outcome does not suffice to meet the standard of specificity in Rule 65.  *See* Fed. R. Civ. P.

65(d)(1); *cf. Shook*, 543 F.3d at 607 (holding that an injunction requiring "increased" staffing and

"adequate" screening was not sufficiently specific).

**B.**     **The Putative Class Members Have Not Been Harmed in the Same Way Such that the Injunctive Relief Would Benefit the Entire Putative Class.**

---

[18] Further, Plaintiffs admit that they do not challenge "fiscal policies" set out in any statute, regulation, or written policy of the Defendants.  Ex. 5, Nos. 17-18.

"The difficulty in specifying exactly what [Plaintiffs] seek from an injunction highlights the fact that individualized issues here overwhelm class cohesiveness," *Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 524 (5th Cir. 2007); that is, Plaintiffs' difficulty in identifying any concrete relief that they seek highlights that the requested relief is not "appropriate for *the class as a whole*," *Shook*, 543 F.3d at 604 (emphasis in original).

Even Plaintiffs acknowledge that their claims of "deficient" "administ[ration]" of the CFI Waiver program have significantly different impacts on different participants, with many participants receiving all or nearly all of their authorized services while others do not. *See* ECF No. 80-8. Further, as explained above, participants are authorized to receive a wide array of different services in various amounts; service gaps have individualized impacts depending on the participant's unique needs and circumstances; and there are many reasons why a CFI Waiver recipient may not receive all of their services in a given month entirely unrelated to Defendants' operation of the program. *See supra* at 16-20. Accordingly, it is impossible for Plaintiffs to show that all participants – or even all participants who received less than 50 percent of certain authorized services in a given month – "have been harmed in essentially the same way," *see M.D.*, 675 F.3d at 845. And, for the same reason, Plaintiffs cannot identify (and have not identified) injunctive relief that is "appropriate for *the class as a whole*," Shook, 543 F.3d at 604 (emphasis in original).

In *Shook v. Board of County Commissioners of the County of El Paso*, the Tenth Circuit upheld the denial of certification of a class seeking "safe and appropriate housing for prisoners with serious mental health needs" because the putative class members' injuries were not "sufficiently similar that they can be addressed in a[] single injunction." 543 F.3d at 604-05. As the court explained, "what is 'safe and appropriate' depends on the nature and severity of an

29

individual's mental illness, not simply on the fact that he is mentally ill"; for example, what is safe for a suicidal inmate "may not be the same" as what is safe for an inmate with less acute needs. *Id.* at 605 (internal citations omitted).  Similarly, in *T.R. v. School District of Philadelphia*, the court rejected the relief sought by plaintiffs – to require "that the School District 'adopt and implement a new written special education plan and District policy to provide legally mandated translation and sufficient interpretation services to members of the Parent Class and the Student Class'" – as inconsistent with Rule 23(b)(2) because it would "simply initiate[] a process through which highly-individualized determinations of liability and remedy are to be made," *i.e.*, what was necessary for each putative class member to receive "legally mandated translation and sufficient interpretation services."  2019 WL 1745737, at *22; *see also Jamie S.*, 668 F.3d at 498-500 (overturning district court's decision that putative class claims satisfied Rule 23(b)(2)).

Just as determining what is necessary to comply with an injunction ordering "safe and appropriate housing for prisoners with serious mental health needs" "depends on the nature and severity of an individual's mental illness," *see Shook*, 543 F.3d 604-05, so too does determining what is necessary to "ensure" that CFI waiver participants receive all services necessary "to avoid the serious risk of institutionalization," Ex. 4, at 7.  And just as ordering the provision of "legally mandated translation and sufficient interpretation services" would merely "initiate[] a process" for "highly-individualized determinations" of what are "sufficient" services for each plaintiff, *T.R.*, 2019 WL 1745737, at *22, ordering that Defendants "ensure" that CFI waiver participants receive all services necessary "to avoid the serious risk of institutionalization" merely initiates an individualized process for determining what type and amount of CFI Waiver services each putative class member "need[s] to avoid the serious risk of institutionalization."

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Respectfully submitted,

November 14, 2022

/s/ Philip J. Peisch
Philip J. Peisch,
D.C. Bar No. 1005423 (*pro hac vice*)
Caroline M. Brown,
D.C. Bar No. 438342 (*pro hac vice*)
Julia M. Siegenberg,
D.C. Bar No. 1671457 (*pro hac vice*)
Kendra Doty,
D.C. Bar No. 1671624 (*pro hac vice*)
Brown & Peisch PLLC
1233 20th Street NW, Suite 505
Washington, DC 20036
202-499-4258
ppeisch@brownandpeisch.com
kdoty@brownandpeisch.com

/s/ Laura Devine
Laura D. Devine, Bar No. 265766
Brendan O'Donnell, Bar No. 268037
New Hampshire Department of Justice (Civil Bureau)
33 Capitol Street
Concord, NH 03301
603-271-3650
laura.d.devine@doj.nh.gov
brendan.a.odonnell@doj.nh.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Philip J. Peisch, hereby certify that a copy of the foregoing was sent by ECF to all counsel of record on this date.

Dated:  November 14, 2022

/s/ Philip J. Peisch<br>Philip J. Peisch