## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Emily Fitzmorris, et al.**

     v.

**New Hampshire Department of
Health and Human Services
Commissioner Lori Weaver, et al.**

Case No. 21-cv-25-PB
Opinion No. 2023 DNH 036

## MEMORANDUM AND ORDER

The plaintiffs in this putative class action are disabled individuals who are enrolled in New Hampshire's Choices for Independence (CFI) waiver program, a Medicaid program administered by the New Hampshire Department of Health and Human Services (DHHS). The CFI waiver program provides home and community-based care services to adults who otherwise would be Medicaid-eligible for nursing home care. The plaintiffs claim that DHHS has failed to operate the CFI waiver program in a way that ensures participants receive all of their authorized services.

The plaintiffs filed a complaint against DHHS and its Commissioner, alleging that the defendants' systemic failure to provide CFI waiver participants with their authorized services violates the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act. The plaintiffs now move for class certification.

## I.  <u>BACKGROUND</u>

**A.    The CFI Waiver Program**

"Medicaid is a cooperative federal-state program that provides medical care to needy individuals." Douglas v. Indep. Living Ctr. of S. Cal., 565 U.S. 606, 610 (2012). States wishing to participate in the program must submit a "state Medicaid plan" that describes the services the state will provide and explains how it will administer the program. <u>See</u> 42 U.S.C. § 1396a. The U.S. Department of Health and Human Services must approve the plan before a state is eligible to receive federal funds. <u>See</u> Douglas, 565 U.S. at 610. States may apply for a "waiver" that exempts a state plan from certain requirements. <u>See</u> 42 U.S.C. § 1396n. Obtaining a waiver enables the state to establish a program to provide home and community-based services to persons who would otherwise require institutional care. <u>See</u> id. at § 1396n(c); <u>see also</u> 42 C.F.R. §§ 441.300 <u>et</u> seq.

New Hampshire established the CFI waiver program pursuant to such a waiver. <u>See</u> Doc. 91-1 at 1-2. The program provides home and community-based services to Medicaid-eligible adults who clinically qualify for nursing home services, but "prefer to be cared for at home or in other settings less acute than a nursing facility." <u>See</u> N.H. Rev. Stat. Ann. §§ 151-E:1(II); 151-E:3(I)(a). DHHS is the state agency "responsible for CFI waiver operations, including waiver program monitoring." Doc. 23-3 at 15.

DHHS implements the CFI waiver program through a network of eight private case management agencies that are licensed and regulated by the state. See Price v. Shibinette, 2021 DNH 179 at 5; Doc. 91-1 at 6. Once DHHS determines that an individual is eligible for the program, the participant is paired with a case management agency. N.H. Admin. R. He-E § 805.07. The case management agency, in turn, determines what services are necessary to meet the needs of the participant and then seeks DHHS authorization for those services. Id. at §§ 801.05; 801.06. When authorization is received, the case management agency is tasked with coordinating the participant's waiver services, which are delivered by private service providers. See id. at § 805.05(c)-(d). Case management agencies are responsible for "[e]nsur[ing] that services . . . are being provided," and must conduct a quarterly review of their participants' records in order to "evaluate the delivery of services." Id. at §§ 805.05(d)(2); 805.10(a). The agency must then "take any remedial action necessary to address deficiencies in service delivery" identified in the quarterly review. Id. at § 805.10(c). Nonetheless, case management agencies retain considerable discretion in determining how best to ensure that participants receive all their authorized services. See id. at §§ 805.05(d); 805.10(c). Notwithstanding the substantial involvement of private actors, the proper administration of the CFI program remains the ultimate responsibility of DHHS. See Price, 2021 DNH 179 at 27.

**B.** **Statutory Requirements**

Like all state Medicaid plans, the CFI waiver program must comply with a number of federal statutes, including the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act. Under the Medicaid Act, all covered services must be furnished to eligible participants "with reasonable promptness." <u>See</u> 42 U.S.C. § 1396a(a)(8); <u>see also</u> 42 U.S.C. § 1396d(a) (defining "medical assistance" to include "the care and services themselves"); Rosie D. v. Romney, 410 F. Supp.2d 18, 27 (D. Mass. 2006); Lewis v. N.M. Dep't of Health, 275 F. Supp.2d 1319, 1344 (D.N.M. 2003). Whether a delay in the provision of services is "reasonable" requires consideration of several factors, including "[t]he urgency of an individual's need, the health and welfare concerns of the individual, the nature of the services required, the potential need to increase the supply of providers, [and] the availability of similar or alternative services[.]" <u>See</u> Murphy ex rel. Murphy v. Minn. Dep't of Human Servs., 260 F. Supp.3d 1084, 1107 (D. Minn. 2017) (quoting U.S. Dep't of Health & Human Servs., <u>Olmstead Update No. 4, HCFA Update</u> at 6 (Jan. 10, 2001)) (alterations in original).

The CFI waiver program must also comply with Title II of the Americans with Disabilities Act (Title II), 42 U.S.C. §§ 12131 <u>et</u> <u>seq.</u>, and

Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. §§ 794 et seq.[1]

Both Title II and Section 504 prohibit discrimination on the basis of

disability. 42 U.S.C. § 12132; 29 U.S.C. § 794. One form of prohibited

discrimination is the "unjustified institutional isolation of persons with

disabilities." See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600 (1999).

Title II and Section 504 employ similar implementing regulations, two of

which are relevant here: the integration mandate and the methods of

administration regulation.[2]

The integration mandate requires entities to "administer services,

programs, and activities in the most integrated setting appropriate to the

needs of qualified individuals with disabilities." See 28 C.F.R. § 35.130(d); see

also 45 C.F.R. § 84.4(b)(2); 28 C.F.R. § 41.51(d). "The most integrated setting

is defined as a setting that enables individuals with disabilities to interact

with nondisabled persons to the fullest extent possible." Parent/Professional

---

[1]     Title II applies to public entities, including state agencies, whereas
Section 504 applies to programs that receive federal funds. See 42 U.S.C.
§ 12131; 29 U.S.C. § 794.

[2]     The parties' briefing assumes that the relevant provisions of Title II
and Section 504 are coextensive. Accordingly, I address the statutory
provisions together. Cf. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998)
("Title II of the ADA was expressly modeled after Section 504 of the
Rehabilitation Act, and is to be interpreted consistently with that
provision.").

Advocacy League v. City of Springfield, 934 F.3d 13, 18 (1st Cir. 2019)

(hereinafter PPAL) (cleaned up). Pursuant to this regulation, entities must

provide services in the community, rather than in institutional settings, if

"the State's treatment professionals have determined that community

placement is appropriate, the transfer from institutional care to a less

restrictive setting is not opposed by the affected individual, and the

placement can be reasonably accommodated, taking into account the

resources available to the State and the needs of others with [disabilities]."

See Olmstead, 527 U.S. at 587.

The related methods of administration regulation prohibits entities

from "utiliz[ing] criteria or methods of administration . . . [t]hat have the

effect of subjecting qualified individuals with disabilities to discrimination on

the basis of disability[.]" See 28 C.F.R. § 35.130(b)(3)(i); see also 45 C.F.R.

§ 84.4(b)(4)(i); 28 C.F.R. § 41.51(b)(3)(i). Entities may not employ methods of

administration that cause individuals to be institutionalized unnecessarily.

See, e.g., Kenneth R. v. Hassan, 293 F.R.D. 254, 259 (D.N.H. 2013); Day v.

District of Columbia, 894 F. Supp.2d 1, 22 (D.D.C. 2012).

## C.   Factual and Procedural Background

The named plaintiffs, Emily Fitzmorris and Kathleen Bates, are

disabled New Hampshire residents who have been authorized to receive a

range of waiver services pursuant to the CFI waiver program. See Doc. 80-4

at 2-4; Doc. 80-5 at 1, 3. Fitzmorris is a 38-year-old mother who became a tetraplegic as a result of an accident in 2018. Doc. 81-1 at 4-5. She lives in an apartment in the community with her teenage son. Doc. 80-5 at 1. Fitzmorris uses an electric wheelchair and requires assistance transferring from her bed to her wheelchair, emptying and cleaning her urinary catheter, dressing, bathing, preparing meals, and maintaining a clean home. Id. at 2. To meet these needs, Fitzmorris's case management agency determined that she requires 68 hours per week of home care services. Id. at 3-4. Nonetheless, since 2019, Fitzmorris has only received a "small portion" of her authorized CFI waiver services during the weekday, and almost no services on the weekends. Id. at 4. When her services are not provided, Fitzmorris relies on assistance from her 73-year-old mother. Id. But her mother is not always available to assist, and Fitzmorris fears that she will have no choice but to move into a nursing facility if her waiver services are not consistently provided. Id. at 4-5.

Bates is 61 years-old and has been diagnosed with cerebral palsy and quadriplegia. Doc. 80-4 at 2-3. She works as a disability advocate and lives alone in her two-bedroom home. Id. at 2. Bates uses a wheelchair and requires assistance transferring from her bed to her wheelchair, toileting, bathing, and dressing. Id. at 3. Bates has been authorized to receive 49 hours of waiver services each week, but often receives less because her service

providers quit unexpectedly or simply do not show up. Id. at 4-5. Bates relies on friends and family to fill in for absent service providers, but they are sometimes unavailable. Id. at 5. Although Bates is confident that she could continue to reside in the community with the proper support, she is concerned that she will be forced to relocate to a nursing facility in order to receive the care she requires. Id.

The named plaintiffs filed a complaint on behalf of themselves and a putative class of similarly situated individuals, alleging that they and their fellow class members "suffer protracted delays in the onset of all or part of their waiver services, frequent interruptions in their waiver services, and/or the unexpected cessation of their waiver services." Doc. 1 at 8-9. The plaintiffs allege that these so-called "service gaps" place them at a serious risk of unjustified institutionalization and are the result of the defendants' maladministration of the CFI waiver program. Id. at 16.

The plaintiffs allege various violations of Title II, 42 U.S.C. § 12132; Section 504, 29 U.S.C. § 794; and the Medicaid Act, 42 U.S.C. § 1396a(a)(8). Doc. 1 at 34-38. Counts I and III of their complaint allege violations of the integration mandate. Id. at 34, 36. Counts II and IV allege violations of the methods of administration regulation. Id. at 35, 37. Count V alleges violations of the Medicaid Act's reasonable promptness requirement. Id. at 38. Each of these claims challenge the defendants' alleged failure to provide

CFI waiver participants with the services they have been authorized to receive.[3] Id. at 34-38.

The plaintiffs moved for class certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Doc. 80 at 1. The proposed class is as follows:

> CFI Waiver participants who, during the pendency of this lawsuit, have been placed at serious risk of unjustified institutionalization because Defendants, by act or omission, fail to ensure that the CFI participants receive the community-based long term care services and supports through the waiver program for which they have been found eligible and assessed to need.

Id.

## II.  STANDARD OF REVIEW

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979). To warrant class action treatment, the party seeking class certification must demonstrate that certification is proper under Rule 23 of the Federal Rules of Civil Procedure. Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003). The four prerequisites to the

---

[3]     The complaint also alleges that the defendants violated the Medicaid Act (Count VII) and the Due Process Clause (Count VI) by failing to notify the plaintiffs of their right to a hearing to challenge the defendants' failure to close their service gaps. Doc. 1 at 39-41. I granted the defendants' motion for summary judgment on those counts in a prior order. See Fitzmorris v. Weaver, 2023 DNH 025 at 2.

certification of any class are numerosity, commonality, typicality, and adequacy of representation. Id. A moving party must also demonstrate that their claims fall within one or more of the circumstances listed in Rule 23(b). Id. Where, as here, the moving party seeks certification pursuant to Rule 23(b)(2), they must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" In addition, courts have identified an implicit requirement that the class be "sufficiently definite to allow the court, parties, and putative class members to ascertain class membership." Kenneth R., 293 F.R.D. at 263.

"Rule 23 does not set forth a mere pleading standard." Wal-Mart v. Dukes, 564 U.S. 338, 350 (2011). Instead, parties seeking to certify a class must be prepared to "affirmatively demonstrate" that the requirements of the rule have been satisfied. Id.; see also Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013). Although a reviewing court may need to touch upon the merits of a plaintiff's claims to determine whether the proposed class should be certified, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule

23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

### III.   ANALYSIS

The plaintiffs argue that I should certify their proposed class because every member of the class shares a serious risk of institutionalization as a result of the defendants' systematic failure to provide them with the services they have been authorized to receive under the CFI waiver program. The defendants insist that the plaintiffs have not fulfilled any of the prerequisites to class certification. I deny the plaintiffs' motion because they have failed to satisfy the commonality requirement of Rule 23(a).

### A.   Legal Standard

Commonality under Rule 23(a) requires the plaintiffs to demonstrate that there is at least one "question[] of law or fact common to the class[.]" Fed. R. Civ. P. 23(a); see also Wal-Mart, 564 U.S. at 358 ("even a single common question will do") (cleaned up). The Supreme Court explained the contours of this requirement in Wal-Mart, 564 U.S. 338, where it considered whether commonality was satisfied in a class action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., on behalf of all female Wal-Mart employees. Id. at 345. The plaintiffs in Wal-Mart sought to challenge the company's policy of vesting local managers with discretion over pay and promotion decisions, arguing that the policy imposed a disparate

impact on women. Id. at 344. The plaintiffs' legal theory was "that a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." Id. at 345. The courts below granted class certification, concluding that the litigation "raise[d] the common question whether Wal-Mart's female employees nationwide were subjected to a single set of corporate policies . . . that may have worked to unlawfully discriminate against them in violation of Title VII." Id. at 347 (quoting Dukes v. Wal-Mart, 603 F.3d 571, 612 (9th Cir. 2010)).

In reversing the lower courts' rulings, the Supreme Court began by noting that the commonality requirement "is easy to misread, since any competently crafted class complaint literally raises common questions." Id. at 349 (cleaned up). Thus, it is not sufficient for plaintiffs to merely recite broad but common questions; rather, the plaintiffs must "demonstrate that the class members 'have suffered the same injury.'" Id. at 350 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law," since any given law "can be violated in many ways." Id. Rather, the plaintiffs must demonstrate that their claims "depend on a common contention . . . which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." Id.

Accordingly, "[w]hat matters to class certification is not the raising of

common 'questions'—even in droves—but rather, the capacity of a class-wide

proceeding to generate common answers apt to drive the resolution of the

litigation." Id. (cleaned up) (emphasis in original). The Court emphasized that

this burden cannot be satisfied by merely pleading the existence of one or

more common contentions. Id. Instead, the plaintiffs must support their

assertion of commonality with "[s]ignificant proof" that the contention is in

fact common to the proposed class. Id. at 353 (alterations in original) (quoting

Falcon, 457 U.S. at 159 n.15). Applying these standards, the court concluded

that the plaintiffs had failed to satisfy the commonality requirement because

they could not prove that the company's discretionary hiring policy was

affected by a "common mode of exercising discretion that pervades the entire

company." Id. at 356.

     The First Circuit recently applied the Court's holding in Wal-Mart in

PPAL, 934 F.3d 13. In that case, the plaintiffs alleged that the defendants

had violated Title II by systematically sending disabled students to SPDS, a

separate and inferior school for students with behavioral disabilities, instead

of providing students with support services that would allow them to remain

in their neighborhood schools. Id. at 17-18. The plaintiffs moved to certify a

class of "[a]ll students with a mental health disability who are or have been

enrolled in [SPDS]," arguing that their suit raised the common question of "whether [the defendant] discriminates against the class . . . by failing to provide [school-based behavior services] in neighborhood schools and instead placing them in the inferior [SPDS]." Id. at 21, 29. In contending that this common question was susceptible to a common answer, the plaintiffs relied on a report from their expert witness who concluded both that the defendants had engaged in a consistent practice of offering disabled students inadequate support services and that all students could have remained in their neighborhood schools, instead of being sent to the comparatively inferior SPDS, if they had been provided with adequate services. Id. at 30. The First Circuit ultimately determined that the expert report was insufficient to satisfy the commonality requirement because it "claims to find a pattern of legal harm common to the class without identifying a particular driver—a uniform policy or practice that affects all class members—of that alleged harm." Id. (cleaned up). Accordingly, the court concluded that the plaintiffs had not satisfied Rule 23(a)'s commonality requirement. Id.

When Wal-Mart and PPAL are read together, they leave no doubt that the existence of a harm common to the class, standing alone, will not be sufficient to satisfy the commonality requirement. Instead, commonality requires at least one common contention linking the defendants to the alleged harm that, if proved, is capable of resolving an issue that is important to each

class members' claim. Ordinarily, this common contention will take the form of an official policy or an unofficial but well-defined practice that drives the plaintiffs' common claims. Without both a common contention and proof that the contention applies to the class as a whole, litigation must proceed on an individual rather than a class-wide basis.

## B.   Application

The plaintiffs' claims in the instant case, while brought under different statutes, are each based on the same premise: that the defendants are systematically failing to provide CFI waiver participants with the full amount of services they have been authorized to receive, and that this failure exposes participants to a serious risk of unjustified institutionalization. To support this contention, the plaintiffs produced expert evidence that (1) many CFI waiver participants experience substantial and prolonged service gaps, and (2) exposure to such service gaps places participants at a serious risk of unnecessary institutionalization. See generally Doc 80-2; Doc. 80-8. In the plaintiffs' view, "[t]he common thread or 'glue' which unites their common factual and legal claims" is the defendants' "failure to provide CFI waiver services necessary to avoid the institutionalization of people with disabilities." Doc. 80-1 at 21.

Perhaps plaintiffs' argument would have carried the day prior to Wal-Mart. But not so now. See DL v. District of Columbia, 713 F.3d 120, 126 (D.C.

Cir. 2013) (hereinafter DL I) ("Wal-Mart's interpretation of Rule 23(a)(2) has changed the landscape"). Both Wal-Mart and PPAL make clear that identifying "a pattern of legal harm"—such as the existence of service gaps—is insufficient to demonstrate commonality. See PPAL, 934 F.3d at 30; see also Wal-Mart, 564 U.S. at 346 (declining to certify a class of all female employees, despite "statistical evidence about pay and promotion disparities between men and women at the company"). Rather, plaintiffs seeking class certification must demonstrate that their claims turn on a common contention, generally by identifying a common policy or practice driving the class members' shared harm. See id. at 350; PPAL, 934 F.3d at 30.

The plaintiffs do not meaningfully engage with either Wal-Mart or PPAL, but assert in a footnote that PPAL is distinguishable because the plaintiffs in that case sought to challenge "discretionary, individualized determinations" about students' needs. See Doc. 108 at 13 n.2. As they see it, the present case is different because they are challenging the defendants' systemic failure to provide services that class members have been authorized to receive rather than type of decentralized and discretionary determinations that were at issue in Wal-Mart and PPAL. See id. Accordingly, they argue that they can satisfy the commonality requirement without having to allege and prove that the entire class is being subjected to a common policy or practice that can be causally connected to the service gaps.

The plaintiffs are certainly correct that PPAL, like Wal-Mart, involved a challenge to a decentralized system of discretionary decision-making. But neither case suggested that the need to identify a common driver applies only when the plaintiffs are challenging discretionary decisions. Indeed, the structure of both opinions seems to belie such an assertion.

The Court's decision in Wal-Mart turned entirely on the plaintiffs' inability to supply evidence of a "uniform employment practice that would provide the commonality needed for a class action." 564 U.S. at 355. The Court noted that "[t]he only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters." Id. (emphasis in original). This, however, was "just the opposite of a uniform employment practice," and thus it could not satisfy the commonality requirement unless the plaintiffs united the various discretionary decisions through proof of "a common mode of exercising discretion that pervades the entire company." Id. at 355-356. Accordingly, what was of paramount importance to the Court was not that the plaintiffs were challenging a system of discretionary decision-making, but rather that the plaintiffs failed to identify a "uniform employment practice" altogether. Id. at 355.

The First Circuit's decision in PPAL similarly implies that plaintiffs must identify a common policy or practice that drives their harm, even when

they are not challenging a system of discretionary decision-making. Indeed,

PPAL's "basic account of the law" discusses the importance of identifying a

common policy or practice before the court ever considers the particular facts

of the case. 934 F.3d at 28 & n.14. In laying out the requirements of Rule

23(a), the First Circuit explained that commonality typically requires proof of

"policies or practices that work similar harm on the class plaintiffs." Id. at 28

(cleaned up). The court then cited to a number of class actions that did not

challenge systems of discretionary decision-making, but nonetheless

"involved a definable policy or practice imposed by a single entity or a small

group of actors" which "facilitated the formulation of questions apt for class

resolution." See id. at n.14; see, e.g., Parsons v. Ryan, 754 F.3d 657, 678 (9th

Cir. 2014) (challenge to medical practices in prison); Chi. Teachers Union,

Local No. 1 v. Bd. of Educ. of Chi., 797 F.3d 426, 435-436 (7th Cir. 2015)

(challenge to "objective criteria" for determining which schools should be

closed); Yates v. Collier, 868 F.3d 354, 362 (5th Cir. 2017) (challenge to

prison's heat-mitigation measures). The court then went on to note that

"[i]dentification of an unofficial yet well-defined practice (or set of practices)

that is consistently and uniformly applied" could satisfy commonality, before

clarifying how this might be accomplished "[i]n a suit like this one

challenging hundreds of individualized decisions made in a decentralized

environment." PPAL, 934 F.3d at 29. Although the court's discussion of a

"common mode of exercising discretion" was directed at cases involving discretionary decision-making, its broader statement requiring a "well-defined" and "uniformly applied" practice was not. Id. Accordingly, PPAL does not hold that the existence of a common policy or practice is required only in cases that involve discretionary decision-making.

I have explained why the plaintiffs' attempt to distinguish Wal-Mart and PPAL is based on a misreading of both decisions. But even if they are correct that the need to identify a common driver for a common harm is only required in cases where the proposed class is attacking injuries that result from decentralized or discretionary decision-making, their effort to distinguish Wal-Mart and PPAL on this basis fails because the plaintiffs in this case seek to recover for injuries that are, in fact, the result of a decentralized and largely discretionary system. As I have explained, the state implements the CFI waiver program by using several private case management agencies, each of which is afforded substantial discretion in determining how best to ensure that participants in the program receive the services to which they are entitled. See N.H. Admin. R. He-E § 805.10(a)-(c); see also Doc. 91-1 at 9-12. Thus, while the plaintiffs are correct that the obligation to provide waiver services rests with the state, the fact remains that services are ultimately delivered through a decentralized system of disparate community agencies that exercise discretion in determining how to

respond to service gaps. In this way, the harm complained of flows from a

decentralized system of discretionary decision-making, much like the harm at

issue in PPAL. See 934 F.3d at 30-31. This observation does not absolve the

defendants of responsibility for the service gaps, but rather underscores the

need to identify a common policy or practice that unites the identified service

gaps.

 Without any meaningful basis on which to distinguish Wal-Mart and

PPAL, I am bound by their holdings.[4] Just as it was insufficient for the

plaintiffs in PPAL to merely identify a pattern of failing to provide adequate

support services, it is insufficient for the plaintiffs here to rest their

---

[4] Although not specifically pressed by the plaintiffs, it might be argued
that Wal-Mart can be distinguished on the basis that the disparate impact
claim in that case required that the plaintiffs "demonstrate that it is the
application of a specific or particular employment practice that has created
the disparate impact under attack." See Wards Cove Packing Co. v. Antonio,
490 U.S. 642, 657 (1989), superseded by statute on other grounds, 42 U.S.C. §
2000e-2(k). For this reason, at least one circuit court has concluded that Wal-
Mart is of "limited relevance" where the plaintiff's claim "does not depend on
the reason for a defendant's failure." See DL v. District of Columbia, 860 F.3d
713, 725 (D.C. Cir. 2017) (hereinafter DL II). PPAL, however, forecloses this
distinction. In that case, the First Circuit required proof of a common driver
in an "Olmstead case[]" quite similar to this one. See 934 F.3d at 19, 22.
Indeed, the plaintiffs in PPAL cited to DL II to argue that Wal-Mart was of
little import in cases where the plaintiffs were "challenging needless
segregation" because, in such cases, there is no need to resolve the "reason"
behind the segregation. See Reply Brief of Appellants, PPAL v. City of
Springfield, Nos. 18-1867, 18-1778, 18-1813, 18-1976, 2019 WL 1595729 at
*44-45. Although the court in PPAL did not explicitly address this argument,
it implicitly rejected it when it refused to certify the class given the absence
of a common driver for the plaintiffs' injuries.

allegations of commonality solely on evidence of service gaps. See 934 F.3d at 29-30; cf. Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 497 (7th Cir. 2012) (finding that a class could not be certified based on allegations that "[a]ll potential class members have suffered as a result of [the defendants'] failure to ensure their Child Find rights under IDEA"); DL I, 713 F.3d at 127 (holding that, after Wal-Mart, "defining the class by reference to the [defendants'] pattern and practice of failing to provide [a free and appropriate public education] speaks too broadly because it constitutes only an allegation that the class members have all suffered a violation of the same provision of law," and that the district court erred by certifying the class "[i]n the absence of identification of a policy or practice that affects all members of the class") (cleaned up). Such evidence demonstrates that class members suffer a common harm, but not that their claims as a class will yield "common proof leading to a common answer to the common question at the heart of each plaintiff's claim." See Brown v. District of Columbia, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (emphasis in original). Unless the plaintiffs can demonstrate that the putative class is uniformly subjected to a common policy or practice that allegedly drives their shared harm, I cannot determine whether the plaintiffs' claims arise from "a truly systemic policy or practice which affects them all" or simply "multiple, disparate failures," and therefore cannot be satisfied that litigating the plaintiffs' claims will result in the sort of "one

stroke" solution required by <u>Wal-Mart</u> and <u>PPAL</u>. See <u>PPAL, 934 F.3d at 28, 31</u> (cleaned up).

The plaintiffs identify several practices that ostensibly could satisfy the commonality requirement after <u>Wal-Mart</u> and <u>PPAL</u>. For example, the plaintiffs allege that the defendants have failed to (1) develop a sufficient network of service providers; (2) track and remediate service gaps; and (3) notify CFI waiver participants when service gaps occur. <u>See</u> Doc. 1 at 8-16; <u>see</u> <u>also</u> Doc. 108 at 13. Nonetheless, because the plaintiffs' primary argument is that their evidence of service gaps is sufficient to satisfy the commonality requirement, they have made little to no effort to cite to evidence to prove that these are practices common to the class.  In independently reviewing the record, I located some evidentiary support for the plaintiffs' allegations, but not enough to certify the class the plaintiffs seek on my own. In any event, "[i]t is the parties' obligation to accurately cite to record evidence to support their factual allegations and not the Court's obligation to peruse through the submitted evidence to determine whether the fact is supported somewhere in the record." <u>See</u> <u>Jones v. Montachusett Reg'l Transit Auth.,</u> 594 F. Supp.3d 237, 242 n.6 (D. Mass 2022); <u>see</u> <u>also</u> <u>Mercado-Alicea v. P.R. Tourism Co.,</u> 396 F.3d 46, 51 (1st Cir. 2005) ("District courts are not required to ferret through sloppy records in search of evidence supporting a party's case.").

Because the plaintiffs' theory of commonality is untenable as presented, but nonetheless may be redeemed with proper evidentiary support, I deny the plaintiffs' motion for class certification without prejudice to their ability to file a renewed motion within 14 days, supported by evidence of drivers common to either the class as a whole or discrete subclasses.[5]

## IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' motion for class certification (Doc. 80) is denied without prejudice. The outstanding motions to strike (Doc. 92; Doc. 94; Doc. 109) are denied as moot. Should the plaintiffs wish to file a renewed motion for class certification, they are instructed to do so within 14 days of entry of this order.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

April 17, 2023

cc:    Counsel of record

---

[5]    Both the plaintiffs and the defendants have moved to strike certain expert opinions filed in support of their opposing party's class certification motion. See Doc. 92; Doc. 94; Doc. 109. Because the challenged opinions have no bearing on my conclusion, the motions are denied as moot.