# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Emily Fitzmorris, et al.**

      v.

**New Hampshire Department of
Health and Human Services
Commissioner Lori Weaver, et al.**

Case No. 21-cv-25-PB
Opinion No. 2023 DNH 144

## MEMORANDUM AND ORDER

The plaintiffs in this putative class action are disabled individuals who are enrolled in New Hampshire's Choices for Independence (CFI) Waiver program, a Medicaid program administered by the New Hampshire Department of Health and Human Services (DHHS). The CFI Waiver program provides home and community-based care services to adults who would otherwise be Medicaid-eligible for nursing home care. The plaintiffs contend that DHHS's deficient operation of the CFI Waiver program has caused participants to be deprived of necessary medical services in violation of the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act.

The plaintiffs filed an initial motion for class certification, which I denied without prejudice after finding that the plaintiffs failed to establish commonality as required by Federal Rule of Civil Procedure 23(a)(2). The

plaintiffs have now filed a renewed motion for class certification, supported by additional evidence. Because I conclude that the plaintiffs have satisfied each of the requirements of Rule 23, I grant their motion.

## I.   BACKGROUND

### A.   The CFI Waiver Program

"Medicaid is a cooperative federal-state program that provides medical care to needy individuals." Douglas v. Indep. Living Ctr. of S. Cal., 565 U.S. 606, 610 (2012). States wishing to participate in the program must submit a "state Medicaid plan" that describes the services the state will provide and explains how it will administer the program. See 42 U.S.C. § 1396a. States may also apply for a "waiver" that exempts its state plan from certain requirements. See 42 U.S.C. § 1396n. Obtaining a waiver enables the state to establish a program to provide home and community-based services to persons who would otherwise require institutional care. See id.; see also 42 C.F.R. §§ 441.300 et seq.

New Hampshire established the CFI Waiver program pursuant to such a waiver. See Doc. 140-1 at 2. The program provides home and community-based services to Medicaid-eligible adults who are "clinically eligible for nursing facility care because [they] require[] 24-hour care," N.H. Rev. Stat. Ann. § 151-E:3, but "prefer to be cared for at home or in other settings less

acute than a nursing facility." See N.H. Rev. Stat. Ann. §§ 151-E:1, II. DHHS

is the state agency "responsible for CFI Waiver operations, including waiver

program monitoring." Doc. 23-3 at 15.

DHHS implements the CFI Waiver program through a network of eight

private case management agencies that are licensed and regulated by the

state. See Doc. 140-1 at 7. Once DHHS determines that an individual is

eligible for the program, the participant is paired with a case management

agency. N.H. Admin. R. He-E 805.07. The case management agency will then

conduct an assessment to identify the participant's needs and develop a

person-centered care plan describing the services required to meet those

needs. N.H. Admin. R. He-E 805.05(b)-(c). "Once the person-centered plan is

complete, the case manager will develop and submit to [DHHS] a service

authorization request, which identifies the type and amount of all CFI

Waiver program services the individual needs." Doc. 140-1 at 8; see also N.H.

Admin. R. He-E 801.05(b). DHHS must grant authorization for any services

that are "necessary to meet the needs of the CFI Waiver participant." Doc.

140-1 at 9; see also N.H. Admin. R. He-E 801.06(a).

Once authorization is received, the case management agency is tasked

with coordinating the participant's waiver services, which are delivered by

private service providers. See N.H. Admin. R. He-E 805.05(b)-(c). Case

management agencies also have an ongoing responsibility to "[e]nsure that

services . . . are being provided, as described in the [person-centered] care plan[.]" N.H. Admin. R. He-E 805.05(d). Nonetheless, case management agencies retain considerable discretion in determining how best to execute their responsibilities. See id.; N.H. Admin. R. He-E 805.10(c). Notwithstanding the substantial involvement of private actors, the proper administration of the CFI program remains the ultimate responsibility of DHHS. See Price v. Shibinette, 2021 DNH 179, 2021 WL 5397864, *10 (D.N.H. Nov. 18, 2021).

## B.    Statutory Requirements

Like all state Medicaid plans, the CFI Waiver program must comply with a number of federal statutes, including the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act. Under the Medicaid Act, all covered services must be furnished to eligible participants "with reasonable promptness." See 42 U.S.C. § 1396a(a)(8); see also 42 U.S.C. § 1396d(a) (defining "medical assistance" to include "the care and services themselves"); O.B. v. Norwood, 838 F.3d 837, 843 (7th Cir. 2016). To this end, states must "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures[.]" 42 C.F.R. § 435.930(a); see also Vaughn v. Walthall, 968 F.3d 814, 824 (7th Cir. 2020) (applying § 435.930(a) to service delivery); B.K. ex rel. Tinsley v. Snyder, 922 F.3d 957, 975 (9th Cir. 2019) (same); Doe v. Chiles, 136 F.3d 709, 717 (11th Cir. 1998) (same).

Accordingly, some courts have concluded that the so-called "reasonable promptness" provision of the Medicaid Act may be violated where the state's "administrative procedures" delay the provision of services. See Boulet v. Cellucci, 107 F. Supp.2d 61, 72-73 (D. Mass. 2000); see also Waskul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426, 450 (6th Cir. 2020); Guggenberger v. Minnesota, 198 F. Supp.3d 973, 1012 (D. Minn. 2016). Cf. Albiston v. Me. Comm'r of Human Servs., 7 F.3d 258, 267 (1st Cir. 1993) (interpreting a substantially similar regulation under the Social Security Act as "equat[ing] reasonable 'promptness' . . . with an absence of delay due to the State's administrative process").

The CFI Waiver program must also comply with Title II of the Americans with Disabilities Act (Title II), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. §§ 794 et seq. Both Title II and Section 504 prohibit discrimination on the basis of disability.[1] 42 U.S.C. § 12132; 29 U.S.C. § 794. In Olmstead v. L.C. ex rel.

---

[1]     Title II applies to public entities, including state agencies, whereas § 504 applies to programs receiving federal funds. See 42 U.S.C. § 12131; 29 U.S.C. § 794. Nonetheless, "[g]iven the textual similarities between [the two statutes], the same standards govern claims under both, and [courts] rely on cases construing Title II and section 504 interchangeably." Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022) (cleaned up); accord Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 285 n.10 (1st Cir. 2006). Because the parties do not distinguish between the two claims, I discuss the claims in terms of Title II for ease of reference.

Zimring, the Supreme Court held that one form of prohibited discrimination is the "unjustified institutional isolation of persons with disabilities[.]" 527 U.S. 581, 600 (1999).

In the wake of Olmstead, both the Department of Justice and a majority of the courts of appeals have concluded that its holding "is not limited to individuals already subject to unjustified isolation, but also 'extend[s] to persons at serious risk of institutionalization or segregation.'" Davis v. Shah, 821 F.3d 231, 262 (2d Cir. 2016) (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (updated Feb. 28, 2020), https://www.ada.gov/resources/olmstead-mandate-statement [hereinafter "DOJ Statement"]) (alterations in original). But see United States v. Mississippi, 82 F.4th 387, 392 (5th Cir. 2023) (concluding that Olmstead only applies to "actual institutionalization" rather than the "risk of institutionalization"). Accordingly, "a plaintiff may state a valid claim [under Title II] by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons."[2] Shah, 821 F.3d at 263.

---

[2]      The defendants have not challenged the plaintiffs' contention that subjecting individuals with disabilities to the risk of institutionalization violates Title II. Accordingly, for the purposes of the present motion, I assume

Both Title II and Section 504 employ similar implementing regulations, two of which are relevant here: the methods of administration regulation and the integration mandate. The methods of administration regulation prohibits entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]" See 28 C.F.R. § 35.130(b)(3)(i); see also 45 C.F.R. § 84.4(b)(4)(i); 28 C.F.R. § 41.51(b)(3)(i). Under this regulation, entities may not employ methods of administration that subject individuals to the risk of unjustified institutionalization. See, e.g., G.K. ex rel. Cooper v. Sununu, 2021 DNH 143, 2021 WL 4122517, *12 (D.N.H. Sept. 9, 2021); Day v. District of Columbia, 894 F. Supp.2d 1, 22 (D.D.C. 2012).

The integration mandate requires entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." See 28 C.F.R. § 35.130(d); see also 45 C.F.R. § 84.4(b)(2); 28 C.F.R. § 41.51(d). "The most integrated setting is defined as a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 18 (1st Cir. 2019) (hereinafter PPAL) (cleaned up).

---

without deciding that actions that give rise to a serious risk of unjustified institutionalization qualify as actionable discrimination.

Nonetheless, the state's obligation to provide services in the most-integrated setting "is not boundless." Olmstead, 527 U.S. at 603. While a state is required to "make reasonable modifications in policies, practices, or procedures" where "necessary to avoid discrimination on the basis of disability," it need not make modifications that "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Thus, states must provide services in the community, rather than in institutional settings, only where (1) "the State's treatment professionals determine that [community] placement is appropriate;" (2) "the affected persons do not oppose such treatment;" and (3) community "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [disabilities]." Olmstead, 527 U.S. at 607.

## C.    Factual and Procedural Background

The named plaintiffs, Emily Fitzmorris and Kathleen Bates, are disabled New Hampshire residents who have been authorized to receive a range of waiver services pursuant to the CFI Waiver program. See Doc. 134-3 at 2-4; Doc. 134-4 at 1, 3. Fitzmorris is a 38-year-old mother who became a tetraplegic as a result of an accident in 2018. Doc. 81 at 5-6. She lives in an apartment in the community with her teenage son. Doc. 134-4 at 1. Fitzmorris uses an electric wheelchair and requires assistance transferring from her bed to her wheelchair, emptying and cleaning her urinary catheter,

dressing, bathing, preparing meals, and maintaining a clean home. Id. at 2. To meet these needs, Fitzmorris's case management agency determined that she requires 68 hours per week of home care services. Id. at 3-4. Nonetheless, since 2019, Fitzmorris has only received a "small portion" of her authorized CFI Waiver services during the weekdays, and almost no services on the weekends. Id. at 5. When her services are not provided, Fitzmorris relies on assistance from her 73-year-old mother. Id. But her mother is not always available to assist, and Fitzmorris fears that she will have no choice but to move into a nursing facility if her waiver services are not consistently provided. Id. at 5-6.

Bates is 61 years-old and has been diagnosed with cerebral palsy and quadriplegia. Doc. 134-3 at 2-3. She works as a disability advocate and lives alone in her two-bedroom home. Id. at 2. Bates uses a wheelchair and requires assistance transferring from her bed to her wheelchair, toileting, bathing, and dressing. Id. at 3. Bates has been authorized to receive 49 hours of waiver services each week, but often receives less because her service providers quit unexpectedly or simply do not show up. Id. at 4-5. Bates relies on friends and family to fill in for absent service providers, but they are sometimes unavailable. Id. at 5. Although Bates is confident that she could continue to reside in the community with the proper support, she is

concerned that she will be forced to relocate to a nursing facility in order to receive the care she requires. Id.

The named plaintiffs filed a complaint on behalf of themselves and a putative class of similarly situated individuals, alleging that they and their fellow class members "suffer protracted delays in the onset of all or part of their waiver services, frequent interruptions in their waiver services, and/or the unexpected cessation of their waiver services." Doc. 1 at 8-9. The plaintiffs allege that these so-called "service gaps" place them at a serious risk of unjustified institutionalization and are the result of the defendants' maladministration of the CFI Waiver program. Id. at 9, 16.

The plaintiffs allege various violations of Title II, 42 U.S.C. § 12132; Section 504, 29 U.S.C. § 794; and the Medicaid Act, 42 U.S.C. § 1396(a)(8). Doc. 1 at 34-38. Counts I and III of their complaint allege violations of the integration mandate. Id. at 34, 36. Counts II and IV allege violations of the methods of administration regulation. Id. at 35, 37. Count V alleges violations of the Medicaid Act's reasonable promptness requirement. Id. at 38. Each of these claims center on the defendants' alleged failure to provide CFI Waiver participants with the services they have been authorized to receive.[3] Id. at 34-38.

---

[3]      The complaint also alleges that the defendants violated the Medicaid

The plaintiffs filed an initial motion for class certification that argued class action treatment was appropriate because every member of the class shared a serious risk of institutionalization as a result of the defendants' systematic failure to provide them with the services they were authorized to receive under the CFI Waiver program. I concluded that the plaintiffs failed to establish commonality as required by Federal Rule of Civil Procedure 23(a) because they did not offer sufficient evidence that the class was uniformly subjected to a common policy or practice that allegedly drives their shared harm. Accordingly, I denied the plaintiffs' motion, but without prejudice to their ability to file a renewed motion supported by evidence of drivers common to either the class as a whole or discrete subclasses.

The plaintiffs have now filed a renewed motion for class certification under Rule 23(b)(2). They seek to certify a class of:

> CFI Waiver participants who, during the pendency of this lawsuit, have been placed at serious risk of unjustified institutionalization because Defendants, by act or omission, fail to ensure that the CFI participants receive the community-based long term care services and supports through the waiver program for which they have been found eligible and assessed to need.

Doc. 134-1 at 9. The defendants object, arguing that the plaintiffs have not

---

Act (Count VII) and the Due Process Clause (Count VI) by failing to notify the plaintiffs of their right to a hearing to challenge the defendants' failure to close their service gaps. Doc. 1 at 39-41. I granted the defendants' motion for summary judgment on those counts in a prior order. See Fitzmorris v. Weaver, 2023 DNH 025, 2023 WL 2665397, *1 (D.N.H. Mar. 28, 2023).

satisfied the requirements of Rule 23.

## II.    STANDARD OF REVIEW

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979). To warrant class action treatment, the party seeking class certification must demonstrate that certification is proper under Rule 23 of the Federal Rules of Civil Procedure. Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003). The four prerequisites to the certification of any class are numerosity, commonality, typicality, and adequacy of representation. Id. A moving party must also demonstrate that their claims fall within one or more of the circumstances listed in Rule 23(b). Id. Where, as here, the moving party seeks certification pursuant to Rule 23(b)(2), they must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" In addition, some courts have identified an implicit requirement that the class be "sufficiently definite to allow the court, parties, and putative class members to ascertain class membership." Kenneth R. ex rel. Tri-County CAP, Inc. v. Hassan, 293 F.R.D. 254, 263 (D.N.H. 2013).

"Rule 23 does not set forth a mere pleading standard." Wal-Mart v. Dukes, 564 U.S. 338, 350 (2011). Instead, parties seeking to certify a class

must prove by a preponderance of the evidence that the requirements of Rule 23 are satisfied. In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015). "Once plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing." Id.

Although the court may need to touch upon the merits of a plaintiff's claims to determine whether the proposed class should be certified, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

### III.   <u>ANALYSIS</u>

The plaintiffs assert that class certification is warranted under Rule 23(b)(2) because their claims arise out of system-wide practices that cause class members to suffer service gaps in violation of Title II, Section 504, and the Medicaid Act. The defendants argue that the plaintiffs' proposed class does not satisfy the implicit requirements of class certification because the class cannot be ascertained by reference to objective criteria and, moreover, constitutes an impermissible "fail-safe" class. They further assert that the plaintiffs have not satisfied the numerosity, typicality, or commonality

13

requirements, nor have they demonstrated that their class fits within the confines of Rule 23(b)(2).

## A.    Implicit Requirements

In addition to the enumerated requirements of Rule 23, some courts have found that the rule imposes certain "implicit threshold requirement[s]," including that the class be sufficiently ascertainable. See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 995 (8th Cir. 2016) (collecting cases). Ascertainability requires, at a minimum, that class members be capable of identification by reference to objective criteria. See William B. Rubenstein, Newberg & Rubenstein on Class Actions § 3:3 (6th ed. 2022) (hereinafter "Newberg") (noting that, despite "linguistic variations" among courts in explaining the ascertainability requirement, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria").

In addition, some courts have prohibited so-called "fail-safe" classes. See Mullins v. Direct Dig., LLC, 795 F.3d 654, 660 (7th Cir. 2015) (collecting cases). "A fail-safe class is a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability." In re Rodriguez, 695 F.3d 360, 369-370 (5th Cir. 2012).

The defendants argue that the plaintiffs' proposed class fails to comply with either of these requirements. First, they assert that the class is unascertainable because there is no objective way to determine when an individual is at "serious risk of unjustified institutionalization" without resort to individualized fact-finding and litigation. Second, they assert that the plaintiffs seek to certify an impermissible "fail-safe" class insofar as the class is defined in reference to the merits of the plaintiffs' claims. The plaintiffs counter that neither argument warrants denial of their motion because neither ascertainability nor the prohibition against fail-safe classes applies to (b)(2) classes.

    1.    Whether (b)(2) classes must be ascertainable

The defendants assert that class certification must be denied where, as here, class members cannot be identified without individualized fact finding and litigation. In support of their argument, the defendants cite to In re Nexium, where the First Circuit stated that "the definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." 777 F.3d at 19 (citing Newberg §§ 3:1, 3:3). In re Nexium, however, considered the propriety of certifying a class under Rule 23(b)(3) and does not indicate that a similar requirement applies to actions under Rule 23(b)(2). Id. at 17.

To the contrary, in Yaffe v. Powers, the First Circuit held that a district court erred in finding that a (b)(2) class could not be certified "because its members had not been sufficiently identified[.]" 454 F.2d 1362, 1366 (1st Cir. 1972). The First Circuit noted that, in denying certification on this basis, the district court had erroneously "applied standards applicable to a subdivision (b)(3) class rather than to a subdivision (b)(2) class." Id. As the court explained, "[a]lthough notice to and therefore precise definition of the members of the suggested class are important to certification of a subdivision (b)(3) class, notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited." Id. Rather, because "the conduct complained of is the benchmark for determining whether a subdivision (b)(2) class exists," such a class is "uniquely situated to civil rights actions in which the members of the class are often 'incapable of specific enumeration.'" Id. (quoting Fed. R. Civ. P. 23 advisory committee's notes (1966)).

The First Circuit subsequently qualified, but did not overrule, this conclusion in Crosby v. Social Security Administration. 796 F.2d 576, 580 (1st Cir. 1986). In that case, the plaintiffs sought to certify a (b)(2) class of social security disability claimants "who have not had a [benefits determination] hearing held within a reasonable time and/or who have not had a decision rendered in such a hearing for benefits within a reasonable time[.]" Id. at

16

578. The plaintiffs requested, among other forms of equitable relief, "an injunction ordering defendants to provide notice to class members of their rights" as well as "periodic reports . . . on the status of the delay situation in Massachusetts." Id. at 579. The First Circuit concluded that the plaintiffs' class was not maintainable in part because the inclusion of the phrase "within a reasonable time" in the class definition "ma[de] class members impossible to identify prior to individualized fact-finding and litigation." Id. at 580.

In reaching its conclusion, the court explained that "[w]ithout an identifiable class of disability claimants, we cannot grant class-wide relief in this case either in the form of granting notices or compiling status reports." Id. The court went on to observe that its concerns could have been alleviated had the plaintiffs sought an injunction requiring notice "to all claimants," rather than only those claimants who did not receive a hearing "within a reasonable time." Id. at 581. But, finding that such relief would not be warranted on the facts of the case, the court concluded that class certification was improper. Id.

The defendants argue that Yaffee and Crosby stand for the proposition that "ascertainability applies to Rule 23(b)(2) classes, but [that] such class definitions may be less 'precise' if the relief sought does not require identifying individual class members." Doc. 140 at 11 n.5. The defendants do

not, however, cite to any cases endorsing their reading of the relevant
precedent. In contrast, this court, the leading treatise on class actions, and
several circuit courts have interpreted First Circuit precedent as rejecting an
implied requirement of ascertainability in (b)(2) classes. See Newberg § 3:7
("The First, Third, Sixth, and Tenth Circuits hold that plaintiffs in Rule
23(b)(2) class actions need not show that a definite class exists."); Cole v. City
of Memphis, 839 F.3d 530, 541 (6th Cir. 2016) (listing the First Circuit as
among those courts that "have held that 'ascertainability' is inapplicable to
Rule 23(b)(2)"); Shelton v. Bledsoe, 775 F.3d 554, 562 (3d Cir. 2015) ("The
Courts of Appeals for the First and Tenth Circuits explicitly rejected an
ascertainability requirement for Rule 23(b)(2) classes."); Shook v. El Paso
Cnty., 386 F.3d 963, 972 (10th Cir. 2004) (citing to Yaffe for the proposition
that ascertainability is not required in (b)(2) classes; Kenneth R., 293 F.R.D.
at 264.

More importantly, the defendants' reading of Yaffe and Crosby is belied
by both the text and the reasoning of the decisions. Yaffe stated, in no
uncertain terms, that the requirement of ascertainability is a "standard[]
applicable to a subdivision (b)(3) class rather than to a subdivision (b)(2)
class." 454 F.2d at 1366. And Crosby, which did not even cite to Yaffe despite
being written by the same circuit judge, did nothing to disturb this
conclusion. To the contrary, it reaffirms Yaffe's reasoning that the

requirement of ascertainability arises out of the need to provide notice to class members by hinging its reasoning on the plaintiffs' request for notice to class members and emphasizing that the issue could have been avoided had different relief been warranted. See Crosby, 796 F.2d at 580-581.

Read together, Yaffe and Crosby indicate that members of a (b)(2) class need not be ascertainable without the need for individualized fact finding and litigation, except in those cases where granting class wide relief would necessitate identification of the class members. Cf. McCuin v. Sec'y of Health & Human Servs., 817 F.2d 161, 167 (1st Cir. 1987) (appearing to agree with a party's assertion that, "where only declaratory and injunctive relief is sought for a class, plaintiffs are not required to identify the class members once the existence of the class has been demonstrated").

This is consistent with other circuit courts, the majority of which have concluded that ascertainability is not generally required of (b)(2) classes. See Shelton, 775 F.3d at 563; Cole, 839 F.3d at 542; Shook, 386 F.3d at 972; accord Newberg § 3:7. Only the Fifth and Seventh Circuits have concluded that ascertainability is required for all class actions. Braidwood Mgmt., Inc. v. Equal Emp't Opportunity Comm'n, 70 F.4th 914, 933 & n.36 (5th Cir. 2023); Jamie S. v. Milwaukee Pub. Schs., 668 F.3d 481, 495 (7th Cir. 2012); accord Newberg § 3:7. But even those circuits have recognized that the requirement of ascertainabiltiy is linked to the need to provide class members

with notice. See, e.g., In re Monumental Life Ins. Co., 365 F.3d 408, 413 (5th Cir. 2004) (applying ascertainability requirement to a (b)(2) class seeking notice and opt-out rights and noting that "[w]here notice and opt-out rights are requested [in a (b)(2) class action] . . . a precise class definition becomes just as important as in the rule 23(b)(3) context."); Steimel v. Wernert, 823 F.3d 902, 918 (7th Cir. 2016) (denying certification of a (b)(2) class that sought an injunction ordering defendants to provide notice and particular services to class members because, without a sufficiently ascertainable class, the court "would not be able to say who should receive notice, be bound by the judgment, and . . . share in any recovery"); see also Cole, 839 F.3d at 541 ("as we read our own precedent and the precedent of other courts, ascertainability is a requirement tied almost exclusively to the practical need to notify absent class members[.]").

In the instant case, granting the plaintiffs' requested class wide relief would not require identifying or providing notice to individual class members. Although the plaintiffs request an injunction ordering the defendants to provide notice to CFI Waiver participants when service gaps occur, such relief would not require identification of individual class members. The relief sought is for the development of systems and policies to facilitate notice to all CFI Waiver participants who experience service gaps, regardless of their identity as class members. Accordingly, even if the defendants are correct

that identifying class members would require individualized litigation, it would not warrant the denial of class certification.

2. Whether the proposed definition creates an impermissible "fail-safe" class

The defendants next assert that the plaintiffs' class cannot be certified because it constitutes an impermissible fail-safe class. The defendants devote only one sentence of their brief to this argument and fail to acknowledge the varied and complex case law surrounding fail-safe classes.

As an initial matter, the circuits are split as to "whether a fail-safe class definition is an independent bar to Rule 23 class certification." See Sherman v. Trinity Teen Sols., 84 F.4th 1182, 1191 n.6 (10th Cir. 2023). Compare In re White, 64 F.4th 302, 313 (D.C. Cir. 2023) (finding that a district court erred by denying class certification "based on a stand-alone and extra-textual rule against 'fail-safe' classes, rather than applying the factors prescribed by [Rule] 23(a)"); In re Rodriguez, 695 F.3d at 370 ("our precedent rejects the fail-safe class prohibition[.]") (citing Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 n.1 (5th Cir. 1999)) with Orduno v. Pietrzak, 932 F.3d 710, 716 (8th Cir. 2019) (noting that certification of a "fail-safe class . . . is prohibited") (quoting Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012)); McCaster v. Darden Restaurants, 845 F.3d 794, 799 (7th Cir. 2017) ("A case can't proceed as a class action if the plaintiff seeks to

21

represent a so-called fail-safe class[.]"); Young, 693 F.3d at 538 ("a class definition is impermissible where it is a 'fail-safe' class[.]"). The First Circuit has commented in dicta on the "inappropriateness of certifying what is known as a 'fail-safe class,'" but has never held that class certification can be denied on this basis where the requirements of Rule 23 are otherwise satisfied. See In re Nexium, 777 F.3d at 22.

Regardless, even if there is an implied prohibition against fail-safe classes, there is no indication that such a prohibition would extend to (b)(2) classes. Cf. Cole, 839 F.3d at 540-541 (affirming a fail-safe class definition in a (b)(2) class action, despite previously holding that fail-safe classes are impermissible in (b)(3) actions). The First Circuit's only discussion of fail-safe classes appeared in the context of a (b)(3) class action. See In re Nexium, 777 F.3d at 22. And the circuit courts that have denied certification of fail-safe classes have done so in the context of a (b)(3) class action. See, e.g., Orduno, 932 F.3d at 716; McCaster, 845 F.3d at 800; Young, 693 F.3d at 535. The defendants have not cited, and I have not identified, any circuit court cases denying certification of a (b)(2) class that otherwise satisfies the requirements of Rule 23 solely because it constitutes a fail-safe class.[4]

---

[4]    In support of their argument that fail-safe classes are impermissible in (b)(2) actions, the defendants cite to Steimel, 823 F.3d at 918. In that case, the Seventh Circuit affirmed the denial of a (b)(2) class, holding that the

To the contrary, courts have generally accepted class definitions in (b)(2) actions that, like the definition at issue here, are "based on the harm allegedly suffered by putative class members[.]" 1 McLaughlin on Class Actions § 4:2 (20th ed. 2023) (collecting cases); accord Kenneth R., 293 F.R.D. at 264 ("In the absence of any need to notify each class member, or distribute monetary relief, the proposed class here is appropriately defined in part by reference to the harms allegedly suffered by its members as a result of the violations asserted."); Floyd v. City of New York, 283 F.R.D. 153, 171 (S.D.N.Y. 2012) ("general class descriptions based on the harm allegedly suffered by plaintiffs are acceptable in class actions seeking only declaratory and injunctive relief under Rule 23(b)(2)[.]") (quoting Daniels v. City of New York, 198 F.R.D. 409, 415 (S.D.N.Y. 2001)). This is largely because the prohibition against fail-safe classes arises out of the implied requirement of

---

plaintiffs' proposed class of Medicaid recipients who "require more services each year than are available" was impermissibly vague based on the word "require," which the plaintiffs failed to define. Id. at 917-918. While explaining the inherent difficulty of defining the word "require," the court noted that "require" could not be defined as what is needed "so as not to violate the integration mandate" because that would "risk making th[e] class an impermissible 'fail-safe' class." Id. at 918. To the extent this statement implies that fail-safe classes are not permissible in (b)(2) class actions, it is purely dictum. The basis for denying class certification was not that the class definition as proposed created a fail-safe class (it did not), but rather that the definition did not satisfy the Seventh Circuit's requirement of ascertainability because it was too vague to allow for the proper identification of class members.

ascertainability which, for the reasons discussed, does not generally apply to (b)(2) classes. See Newberg § 3:6 (noting that fail-safe classes may "run afoul of the definiteness requirement"); accord Mullins, 795 F.3d at 660 (noting that fail-safe class definitions are impermissible because they cannot satisfy the requirement of ascertainability); Cole, 839 F.3d at 540-541 (holding that a class of individuals who were "unlawfully removed" could be certified under Rule 23(b)(2), notwithstanding the prohibition against fail-safe classes, because ascertainability is not required in (b)(2) class actions).

To be sure, classes defined purely in reference to the merits can raise issues of fairness in (b)(2) and (b)(3) classes alike. As courts have recognized, "if the only members of fail-safe classes are those who have viable claims on the merits, then class members either win or, by virtue of losing, are defined out of the class, escaping the bars of res judicata and collateral estoppel." In re White, 64 F.4th at 313; see also Mullins, 795 F.3d at 660; Randleman v. Fidelity Nat. Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011). Nonetheless, the way to guard against these concerns is to "apply the terms of Rule 23 as written," which are carefully designed to confer sufficient guarantees of fairness on class action defendants. In re White, 64 F.4th at 314.

Accordingly, I decline to deny the plaintiffs' motion for class certification on the basis of any implied requirements of Rule 23 and proceed

to consider whether the textual requirements of Rule 23(a) and (b)(2) are satisfied.

## B.   Numerosity

Numerosity under Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). Numerosity is a "low threshold," which the First Circuit has indicated is generally satisfied where "the potential number of plaintiffs exceeds 40[.]" Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-227 (3d Cir. 2001)). Nonetheless, even smaller classes may be certified where joinder would otherwise be impracticable; after all, "[t]he key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." Anderson v. Weinert Enters., Inc., 986 F.3d 773, 777 (7th Cir. 2021); accord Andrews v. Bechtel Power Corp., 780 F.2d 124, 131 (1st Cir. 1985) (noting that, although the estimated number of putative class members is a relevant consideration, "numbers alone are not usually determinative" of numerosity). In making this inquiry, courts consider, inter alia, "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are

for injunctive relief or damages." In re Modafinil Antitrust Litig., 837 F.3d 238, 253 (3d Cir. 2016).

To demonstrate numerosity, the plaintiffs rely on two expert opinions which, they assert, combine to establish that their class contains at least several hundred members. The plaintiffs' first expert, Dr. Mattan Schuchman, is a medical doctor and gerontologist with experience providing medical care to home-bound individuals. Doc. 134-2 at 3. Dr. Schuchman identified four "key CFI Waiver services"—personal care services, home maker services, skilled nursing services, and home care aide assistance— which he considered to be "clinically the most critical for CFI Waiver participants to ensure that they are not placed at serious risk of being institutionalized." Id. at 4-5. Dr. Schuchman opined that individuals who receive 50% or less of the key services for which they have been authorized are at a serious risk of institutionalization.[5] Id. at 17.

The plaintiffs' second expert, Michael Petron, is a Certified Public Accountant and data analyst who was asked to determine how many CFI Waiver participants fall within the category of individuals identified by Dr.

---

[5]     In his declaration, Dr. Schuchman states that individuals who receive "50% or less of their <u>hands-on</u> services" are at "serious risk of institutionalization." Doc. 134-2 at 17. Nonetheless, both the plaintiffs and the defendants construe Dr. Schuchman's reference to "hands-on services" as referring to the four identified "key services." Doc. 140 at 12-13; Doc. 141-1 at 7-8; Doc. 134-1 at 15; Doc. 150 at 1-2.

Schuchman. Doc. 134-9 at 2-3. Based on his analysis of data comparing the number of authorized service units to the number of paid service units, Petron concluded that, "[f]or any given month from July 2020 through June 2021 there were, on average, 755 unique participants that did not receive at least half of their authorized service units for the [key services]." Id. at 9. This evidence, the plaintiffs argue, demonstrates that their class consists of hundreds of individuals.

The defendants devote only one sentence of their brief to numerosity, asserting that the plaintiffs have not satisfied their burden because "a service gap alone does not establish 'serious risk of unjustified institutionalization' caused by Defendants' acts or omissions, yet Plaintiffs rely entirely on service gap data to support numerosity." Doc. 140 at 13. Notwithstanding their cursory treatment of the matter, the defendants seem to take issue with the assertion that all CFI Waiver participants who receive less than half of their authorized key services are at risk of institutionalization. The defendants submitted a declaration from their own expert, Dr. David Polakoff, who opined that the determination of whether an individual is at serious risk of institutionalization "requires an individualized assessment and analysis" and cannot be made by reference to service gap data alone.[6] Doc. 140-2 at 7. The

---

[6]    The plaintiffs have filed a motion to exclude Dr. Polakoff's opinion

defendants have also filed a motion to exclude Dr. Schuchman's opinion under Federal Rule of Evidence 702, arguing that it does not pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Because Dr. Schuchman's opinion is crucial to the plaintiffs' demonstration of numerosity, I consider the defendants' motion to exclude before returning to the numerosity inquiry.

1.   Motion to exclude Dr. Schuchman's opinions

Under Rule 702 of the Federal Rules of Evidence, expert opinion is only admissible if it "both rests on a reliable foundation and is relevant to the task at hand."[7] Id. at 597. "These two requirements—a reliable foundation and an adequate fit—are separate and distinct." Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012).

---

under Rule 702. Doc. 151. Because Dr. Polakoff's opinion does not impact my ultimate conclusion, that motion is denied as moot, without prejudice to the plaintiffs' ability to raise their arguments at a later time.

[7]   Neither the Supreme Court nor the First Circuit has determined whether expert testimony must satisfy Rule 702 at the class certification stage, and there is some disagreement among the courts of appeal on the matter. See Hicks v. State Farm Fire & Cas. Co., 965 F.3d 452, 465 (6th Cir. 2020) (collecting cases). Cf. Wal-Mart, 564 U.S. at 354 (dicta expressing "doubt" as to a lower court's conclusion "that Daubert did not apply to expert testimony at the certification stage of class-action proceedings"). Nonetheless, neither party argues that Rule 702 is inapplicable at the class certification stage, and both have filed motions to preclude evidence under the rule. Doc. 141-1 at 2; Doc. 151-1 at 3-4. Accordingly, I follow the parties lead and assume that Rule 702 applies.

The reliability prong asks whether "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). "Reliability is a flexible inquiry" that allows for consideration of a variety of factors depending on the facts of the case and the nature of the expert's opinion. Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 98 (1st Cir. 2020); see also United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). Although the reliability determination "necessitates an inquiry into the methodology and the basis for an expert's opinion," Samaan, 670 F.3d at 31; courts "must stop short of weighing the evidence, evaluating credibility, or unnecessarily picking sides in a battle between experts" when determining admissibility under Rule 702, Lawes, 963 F.3d at 98.

The "fit" prong asks whether the expert's conclusions have a "valid scientific connection to the pertinent inquiry." Id. (cleaned up). "This means that the conclusion must not only be relevant to the facts at issue, but also that each step in the expert's process, including the link between the universe of pertinent facts and his conclusions, must be reliable." Id. Thus, while the Rule 702 analysis must principally focus "on principles and methodology, not on the conclusions they generate," a court may nonetheless "conclude that there is simply too great an analytical gap between the data and the opinion

proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (quoting

Daubert, 509 U.S. at 595).

"Although the proponent of an expert witness bears the burden of

proving the admissibility of his opinion, the burden is not especially onerous,

because 'Rule 702 has been interpreted liberally in favor of the admission of

expert testimony.'" Lacaillade v. Loignon Champ-Carr, Inc., 2011 DNH 197,

2011 WL 6001792, *1 (D.N.H. Nov. 30, 2011) (citations omitted) (quoting

Levin v. Dalva Bros, Inc., 459 F.3d 68, 78 (1st Cir. 2006)). "So long as an

expert's scientific testimony rests upon 'good grounds, based on what is

known,'" it should be admitted and tested by the adversarial process.

Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 14 (1st Cir. 2011)

(quoting Daubert, 509 U.S. at 590).

The defendants argue that the plaintiffs have not satisfied this burden

here and seek to exclude Dr. Schuchman's opinion that (1) his identified "key

services" are "the most critical" for preventing institutionalization and (2)

participants who receive 50% or less of their key services are at a serious risk

of institutionalization.[8] Doc. 141-1 at 6-7. The defendants argue that these

opinions do not satisfy either the reliability or the fit prong of Daubert.

---

[8]     The defendants also seek to exclude Dr. Schuchman's opinion that the
named plaintiffs' service gaps are (1) "likely to be generalized to other
Medicaid waiver participants because they are not a result of individual

As to reliability, the defendants argue that Dr. Schuchman's opinions are unsupported by sufficient facts or data, but rather based entirely on his experience. The plaintiffs do not dispute that Dr. Schuchman's opinion is primarily informed by his experience, but assert that this is sufficient under Rule 702.

"An expert witness's testimony can rely solely on experience" so long as the witness "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." United States v. Nacchio, 555 F.3d 1234, 1258 (10th Cir. 2009) (quoting Fed. R. of Evid. 702 advisory committee's notes (2000)); accord Kirk v. Clark Equip. Co., 991 F.3d 865, 876 (7th Cir. 2021) ("an expert may sometimes draw a conclusion based only on their extensive and specialized experience" so long as he "substantiate[s] his opinion, rather than assume[s] it to be true") (cleaned up).

Dr. Schuchman satisfied those requirements here. Dr. Schuchman explained that, as the Medical Director of the Johns Hopkins Home-based Medicine Program, he regularly provides medical care to individuals who, like the putative class members, "experience limitations in independent

---

difference in the participants' conditions" and (2) the result of the "unavailability of reliable personal care providers under the CFI Waiver." Doc. 141-1 at 2, 5. Because these opinions have no bearing on my conclusion in this order, I do not consider their admissibility under Rule 702.

mobility" that are sufficiently severe as to require in-home supports for independent living. Doc. 134-2 at 3-4. In identifying the key services, Dr. Schuchman stated that he reviewed a list of available CFI Waiver services and determined which, based on his experience and general understanding of the services, were the most critical for maintaining health and independence in the community.[9] Doc. 141-2 at 32-33. He further explained how his experience supported his conclusion, noting that the most important services are those that "have direct impact on an individual's activities of daily life," because missing those services tends to lead "most immediately or in the nearest term . . . to harm or institutionalization." Id.

As to his opinions about the risk of institutionalization, Dr. Schuchman explained that they were informed by his "experience with patients in similar situations [as the putative class members] and their outcomes," Doc. 140-4 at 20; which Dr. Schuchman tracks through his work, Doc. 141-2 at 77. Dr. Schuchman explained the sorts of health consequences that can arise when one misses a substantial amount of key services and how those consequences

---

[9] The defendants' assertion that Dr. Schuchman did not "consider" other CFI Waiver services is belied by the record. Dr. Schuchman stated that, in forming his opinion, he reviewed a list of the services offered through the Waiver program and explained his basis for isolating the four key services. Doc. 141-2 at 32-33. That the defendants believe there are other services that could fit within Dr. Schuchman's criteria goes to the weight of his conclusion, not its admissibility.

can lead to institutionalization. Doc. 134-2 at 16-18. In defending his view that identifying the risk of institutionalization in such cases does not necessitate individualized inquiries, Dr. Schuchman explained that these health consequences arise as a result of being denied services that medical professionals have determined to be necessary, and therefore do not depend on the individual's disability or reason for missing the services. Doc. 134-2 at 16; Doc. 140-4 at 62; Doc. 141-2 at 28.

Because Dr. Schuchman grounded his opinions in relevant experience, it is of no consequence that he did not support his views with reference to outside data or literature. See Elosu v. Middlefork Ranch Inc., 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."); United States v. Moshiri, 858 F.3d 1077, 1084 (7th Cir. 2017) ("experience, even in the absence of any empirical data, can provide an adequate basis for the admission of expert testimony."). This is particularly so because his opinion is a medical one, and medical determinations are frequently supported by "knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties[.]" Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010) (cleaned up). Indeed, "much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively." Id. (cleaned up).

33

The defendants next assert that, even if Dr. Schuchman's opinion is reliable, it nonetheless fails the fit prong of Rule 702 because Dr. Schuchman's understanding of what constitutes a "serious risk of institutionalization" is insufficiently defined. Dr. Schuchman understands "institutionalization" to occur when an individual "mov[es] from their home to an institutional setting, even for a brief period of time" and defined "serious risk" to mean "a substantial realistic risk." Doc. 140-4 at 18-19. The defendants take issue with Dr. Schuchman's inability to provide a quantifiable definition of when a risk becomes "serious" and argue that Dr. Schuchman's definition of "institutionalization" inappropriately includes instances of temporary removal from the community such as, for example, visits to the emergency room or respite care in an inpatient facility.

As an initial matter, Dr. Schuchman's working definitions do not appear to substantially deviate from those used by some courts. See Olmstead, 527 U.S. at 600-602 (contrasting "institutional settings" with the "most integrated setting" required by the integration mandate); M.R. v. Dreyfus, 697 F.3d 706, 734-735 (9th Cir. 2012) (defining an actionable risk of institutionalization as one where the contested actions could "cause[] [plaintiffs] to decline in health over time and eventually enter an institution in order to seek necessary care," even if there is no "imminent risk of institutionalization") (cleaned up). Cf. Waskul, 979 F.3d at 563 (noting that

even temporary isolation in the home could state an Olmstead claim because
"there is no numeric threshold that distinguishes 'the most integrated
setting' from a less integrated one"). But even if the defendants are correct
that Dr. Schuchman's definition of a "serious risk of institutionalization" does
not precisely match the proper legal definition, that does not mean that his
opinion must be excluded. While it could indicate that Dr. Schuchman's
opinion is not determinative of who is, in fact, at serious risk of
institutionalization under Olmstead, an expert's opinion need not be
determinative in order to be helpful. See Primiano, 598 F.3d at 565 ("Reliable
expert testimony need only be relevant, and need not establish every element
that the plaintiff must prove, in order to be admissible."). All that is required
is that the opinion "likely would assist the trier of fact to understand or
determine a fact in issue[.]" Ruiz-Troche, 161 F.3d at 81. That is satisfied
here. Dr. Schuchman's explanation of the effects of missing key services and
their likely consequences will assist the court in determining, as relevant
here, whether the plaintiffs' class is sufficiently numerous.

The defendants' remaining objections to Dr. Schuchman's opinions go to
weight rather than admissibility. The defendants argue that Dr.
Schuchman's opinion that all waiver participants who receive less than half
of their authorized key services are at risk of institutionalization contradicts
his later statement that, to evaluate a patient for an ongoing risk of

35

institutionalization, he would conduct an interview and perform a physical examination. As an initial matter, it is not entirely clear that Dr. Schuchman's testimony was inconsistent.[10] In any event, while internal contradictions may provide a reason to doubt the veracity of the expert's opinion, they do not, standing alone, warrant exclusion. See Iconics, Inc. v. Massaro, 266 F. Supp.3d 461, 472 (D. Mass. 2017) (noting that, to the extent an expert's "earlier statements are inconsistent with his final conclusions," it presented opportunities for cross-examination but not a basis for exclusion).

Next, the defendants argue that Dr. Schuchman's opinion is faulty because it fails to account for situations where service gaps occur because the individual does not want or require services, such as when she is on vacation or in the hospital. Although Dr. Schuchman's failure to account for such possibilities could provide a basis for impeaching his conclusion, it does not

---

[10]      During his deposition, Dr. Schuchman differentiated between evaluating a patient for an ongoing risk of institutionalization and evaluating a litigant for a past risk of institutionalization, noting that, although the former may require an interview and examination, the latter could be determined by reviewing the individual's records. Doc. 141-2 at 82-84. Moreover, the testimony cited by the defendants was given in response to a question about evaluating a risk of institutionalization regardless of the size of the individual's service gap. Id. at 82. Dr. Schuchman's conclusion, in contrast, was limited to individuals who experience particularly profound gaps in specific services. Id. at 28. That Dr. Schuchman acknowledged that determining the risk of institutionalization for individuals with less pronounced service gaps may require individualized inquiry, Doc 140-4 at 61-62; does not necessarily conflict with his conclusion that certain service gaps are so severe that they per se place individuals at risk of institutionalization.

provide a basis for excluding it. See Hirchak v. W.W. Grainger, Inc., 980 F.3d 605, 608 (8th Cir. 2020) ("An expert opinion should not be excluded simply because the expert failed to rule out every possible alternative" so long as the expert "account[s] for obvious alternatives") (cleaned up). Moreover, Dr. Schuchman explained that, based on his experience, it would be unnecessary to control for such possibilities because they would be relatively rare or otherwise accounted for. Doc. 140-4 at 68.

In conclusion, Dr. Schuchman's opinions satisfy the requirements of Rule 702 and may be properly considered in ruling on the plaintiffs' motion for class certification.

2.     Whether numerosity is satisfied

Viewing Dr. Schuchman's opinion in combination with Petron's data analysis, the plaintiffs have established that their class is sufficiently numerous. If I were to credit Dr. Schuchman's opinion in full, then there are necessarily several hundred individuals that fit within the class definition, as demonstrated by Petron's analysis. But even if I were to consider and credit the opinion of the defendants' expert, Dr. Polakoff, numerosity would be satisfied. Although Dr. Polakoff opined that it is unreasonable to conclude that all individuals who experience severe service gaps are at risk of institutionalization, he did not dispute that at least some of the individuals who meet Dr. Schuchman's criteria would be at risk of institutionalization.

Indeed, Dr. Polakoff indicated that some individuals may be at risk of institutionalization even if they receive the vast majority of their authorized services. Doc. 151-2 at 44.

Accordingly, neither Dr. Polakoff's opinion nor any of the other evidence undermines the conclusion that at least some portion of the several hundred individuals who receive less than half of their authorized services in a given month are at risk of institutionalization. Even if Dr. Schuchman vastly overestimated who is at risk of institutionalization and, say, only 10% of his identified group is truly at risk of institutionalization, that would leave, on average, more than 70 individuals each month that fit within the class definition.[11] That is more than sufficient to satisfy numerosity, particularly in a (b)(2) class action such as this one where "the numerosity requirement is relaxed[.]" See Sueoka v. United States, 101 F. App'x 649, 653 (9th Cir. 2004); accord Gomes v. U.S. Dep't of Homeland Sec., 561 F. Supp.3d 93, 99 (D.N.H. 2021) (noting that, in an (b)(2) class action, "plaintiffs need not identify all

---

[11]    To the extent the defendants intend to argue that numerosity is not satisfied because the plaintiffs have not provided proof that the putative class members' risk of institutionalization is caused by the defendants' acts or omissions, that argument is insufficiently briefed and therefore does not warrant further discussion. Moreover, as I will explain, the question of causation is one for the merits and need not be proved at the class certification stage.

38

members of the proposed class, warranting 'relaxation of the requirement of a rigorous demonstration of numerosity'") (quoting McCuin, 817 F.2d at 167).

Moreover, the putative class members' circumstances and characteristics indicate that joinder would be impracticable. First, that the class includes future claimants who cannot yet be identified renders joinder "not merely impracticable but effectively impossible." Gomes, 561 F. Supp.3d at 99 (cleaned up); see also Ried v. Donelan, 297 F.R.D. 187, 189 (D. Mass. 2014) ("Unforeseen members will join the class at indeterminate points in the future, making joinder impossible.") (emphasis in original). Second, given the eligibility requirements for participation in the CFI Waiver program, all putative class members possess limited financial means and suffer from significant disabilities. See N.H. Rev. Stat. Ann. § 151-E:3, I (discussing clinical and financial eligibility for participation in the waiver program). Finally, because the proposed class spans the entire state, the geographic diversity of the class members would make it difficult to identify and join plaintiffs. See Risinger ex rel. Risinger v. Concannon, 201 F.R.D. 16, 19 (D. Me. 2001) (noting that "geographic dispersion of [the putative class members] throughout the state of Maine" supported the conclusion that joinder was impracticable). These circumstances, viewed in combination with the significant number of putative class members, make joinder impracticable. See Kenneth R., 293 F.R.D. at 265 ("The size of the class, the asserted

disabilities of proposed class members, and geographic diversity, make it highly unlikely that separate actions would follow if class treatment were denied.") (cleaned up). Accordingly, the plaintiffs have satisfied the requirements of Rule 23(a)(1).

## C.    Commonality

Commonality under Rule 23(a)(2) requires plaintiffs to demonstrate that there is at least one "question[] of law or fact common to the class" for each of the class claims. As the Supreme Court has explained, this requires proof that each of the class claims "depend upon a common contention," the "truth or falsity" of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350 Accordingly, "[w]hat matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (cleaned up) (emphasis in original).

The First Circuit has recognized that such "common answers typically come in the form of a particular and sufficiently well-defined set of allegedly illegal policies or practices that work similar harm on the class plaintiffs." PPAL, 934 F.3d at 28; see also Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) ("commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."). As I

explained in my order addressing the plaintiffs' initial motion for class certification, commonality in a case such as this one generally requires plaintiffs to identify and prove the existence of uniformly applicable policies or practices that allegedly drive the class harm and give rise to common questions capable of yielding common answers. Fitzmorris v. Weaver, 2023 DNH 036, 2023 WL 2974245, *5 (D.N.H. April 17, 2023).

In their renewed motion for class certification, the plaintiffs identified and proffered evidence of four sets of practices which, they contend, affect the entire class and drive their shared harm. Specifically, the plaintiffs assert that DHHS (1) "delegates authority to case management agencies without effective oversight or support of those agencies;" (2) "maintains a practice of neither tracking nor remediating" service gaps; (3) "refus[es] to notify CFI Waiver participants in writing of their ability to request a fair hearing" when service gaps occur; and (4) "maintain[s] an inadequate CFI Waiver provider network" that lacks the "capacity to meet the assessed needs of the CFI Waiver participants." Doc. 134-1 at 19.

The defendants concede that they do not provide notice to CFI Waiver participants when service gaps occur and that this is, in fact, a well-defined practice of theirs. Doc. 140 at 14; Doc. 153 at 29; Doc. 91 at 26. But, as to the remaining alleged practices, the defendants argue that they are not "well-defined practices" but rather "nebulous descriptions of alleged administrative

shortcomings" that are too vague to support commonality. Doc. 140 at 14. The defendants further argue that, even if the plaintiffs' proposed practices could constitute "well-defined practices," they have been insufficiently proved. Finally, the defendants assert that the plaintiffs cannot satisfy commonality because they have not produced evidence that any of the challenged practices cause service gaps. I begin by addressing the evidence supporting the plaintiffs' challenged practices before considering whether those practices satisfy commonality.

    1.   <u>Evidence of practices</u>

    **a.**   **Oversight and support of case management agencies**

The plaintiffs assert that the defendants provide inadequate oversight and support to case management agencies. As I have explained, DHHS has chosen to implement the CFI Waiver program by delegating certain responsibilities to private case management agencies that, although licensed by the state, do not contract with the state. <u>See</u> <u>generally</u> N.H. Admin. R. He-E 805.05; <u>see</u> <u>also</u> Doc. 134-11 at 8; Doc 134-10 at 11. DHHS regulations outline certain responsibilities and requirements that case management agencies must satisfy, <u>see</u> <u>generally</u> N.H. Admin. R. He-E 805; but afford case management agencies substantial discretion in determining how best to meet these obligations, <u>see</u> Doc. 140-3 at 3.

The evidence indicates that DHHS systematically and proactively monitors agency compliance with the regulatory requirements in two ways. First, DHHS performs an "annual quality assessment" of all case management agencies to evaluate their compliance with the departments' requirements. N.H. Admin. R. He-E 805.10(f)-(g); see also Doc. 140-3 at 6. During this annual assessment, DHHS will analyze a sample of approximately 32 participant records and, if less than 80% of those records are compliant, DHHS will require the case management agency to "develop and participate in a quality improvement plan process." Doc. 140-3 at 6. Second, DHHS requires case management agencies to perform quarterly quality management assessments, during which the agency must review some portion of participants' records as well as "all reported complaints, incidents, and sentinel events related to the delivery of services[.]" N.H. Admin. R. He-E 805.10(a)-(d). The agency must then produce a quarterly report documenting its findings and submit it to DHHS. Id. (requiring the production of a quarterly report that must be provided to DHHS "upon request"); see also Doc. 140-7 at 28-29 (noting that, since approximately 2021, DHHS has implemented a standing request for case management agencies to provide all quarterly reports to the department).

The plaintiffs do not dispute that the defendants engage in these oversight efforts, but nonetheless identify certain monitoring efforts that

DHHS has failed to institute. See Doc. 134-13 at 6 (statement by a contractor retained to analyze the CFI Waiver program that their analysis found DHHS "provided limited oversight of the case management entities"). For example, one of the responsibilities delegated to case management agencies is the development of person-centered care plans, which identify the participant's needs and describe the services required to meet those needs. N.H. Admin. R. He-E 805.05(c)(3). All care plans must contain an "[i]ndividualized continency plan" that "[i]dentifies alternative staffing resources in the event that normally scheduled care providers are unavailable." N.H. Admin. R. He-E 805.02(1)(l); see also N.H. Admin. R. He-E 805.05(c)(3); Doc. 140-1 at 8. So long as these and other requirements are satisfied, agencies are not required to use a standard form and are permitted to develop their own care plan templates. Doc. 134-10 at 15; Doc. 140-1 at 8.

But DHHS does not—and, in many instances, cannot—review participants' care plans in their entirety for completeness. DHHS reviews service authorization requests for each waiver participant, which include information from the individual's care plan on what services he or she requires, but does not review "every complete person-centered plan for every CFI beneficiary." Doc. 147-1 at 16, 19.[12] Rather, DHHS will only review

---

[12]    The plaintiffs submitted this and several other exhibits as "rebuttal

portions of a participant's care plan "upon request" based on certain

"triggers," such as if the case management agency approaches DHHS for

assistance on a particular case or during an annual quality assessment. Doc.

140-7 at 11, 30. But, even on these occasions, DHHS may be prevented from

reviewing the care plans in their entirety: Because some case management

agencies "consider the[ir] care plans to be proprietary," Doc. 134-10 at 15;

they refuse to provide DHHS with "the entire care plan," Doc. 140-7 at 12.

    In addition to developing care plans, DHHS also charges case

management agencies with coordinating and monitoring the delivery of

waiver services. N.H. Admin. R. He-E 805.05(d); Doc. 140-1 at 10. According

---

evidence" in response to the defendants' objection to their renewed motion for
class certification. Doc. 147. The defendants move to exclude the plaintiffs'
rebuttal evidence, arguing that it amounts to a reply brief in violation of both
L.R. 7.1(e)(2) and my order to hold oral arguments in lieu of a reply brief and,
moreover, that its late submission is unfairly prejudicial. Doc. 155. As an
initial matter, the plaintiffs' rebuttal evidence is just that; the plaintiffs'
submission marshals evidence without argument and therefore does not
constitute a reply brief within the meaning of my order or the local rules. See
L.R. 7.1(e)(2) (placing restrictions on a "memorandum in reply to an
objection"). That neither my order nor the local rules expressly authorize the
submission of rebuttal evidence is not grounds for excluding it. Nor is there
any reason to think that considering the evidence would be unfair to the
defendants. The defendants had the opportunity to respond to the evidence at
the motion hearing and did, in fact, advance arguments challenging the
evidence in their motion to exclude it. See Doc. 155 at 2-3. Moreover,
although they have not sought to do so, nothing prevented the defendants
from submitting their own rebuttal evidence to counter the plaintiffs' newly
proffered evidence. Because the defendants have not articulated proper
grounds for exclusion, their motion is denied.

to Wendi Aultman, the Chief of the Bureau of Elderly and Adult Services (BEAS) within DHHS, the primary mechanism through which the department ensures compliance with these requirements is through the collection and review of quarterly reports. Doc. 140-7 at 27-29. But the reports provide only limited insight into whether and how agencies are fulfilling their obligation to coordinate and monitor service delivery. The report form asks agencies to respond to certain prompts but, given the non-specific and open-ended nature of the prompts, agencies may or may not choose to discuss their service coordination and monitoring efforts or the efficacy of those efforts.[13] Indeed, an example of a quarterly report submitted by the defendants contains only two pages of text and responds to each of the prompts in no more than three sentences, without any discussion of service gaps or the agency's efforts to ensure that appropriate services are delivered. Doc. 140-3 at 22-23.

Where these or other monitoring efforts reveal compliance issues, DHHS has only limited means to enforce its programmatic requirements.

---

[13]    The quarterly report form requires agencies to (1) report the "[n]umber of participants' records reviewed;" (2) "describe the adequacy of participants' care plans;" (3) "describe how well participants' services met their needs;" (4) "describe identified best practices;" (5) "[i]dentify [d]eficiencies;" (6) "[d]escribe all planned or already imposed remedial action[]" to correct the identified deficiencies; and (7) report on any complaints, incidents, or sentinel events over the course of the quarter. Doc. 140-3 at 22-23.

Because DHHS regulates, but does not contract with, case management agencies, their only recourse when an agency falls out of complaince is to terminate the agency. Doc. 134-16 at 4. Utilizing contracts, rather than a licensing scheme, would likely allow DHHS to "hav[e] a better line of sight and control over" case management agencies. Doc. 134-13 at 7.

Beyond their system of oversight, the plaintiffs also contend that DHHS provides insufficient support to agencies in carrying out their duties. The defendants offer evidence, and the plaintiffs do not dispute, that DHHS supports case management agencies by (1) providing "technical assistance" to agencies when issues arise; (2) convening a "Case Review and Consultation Committee" (CCRC) that brings together DHHS staff, case management agencies, service providers, and participants to resolve case-specific issues; and (3) activating DHHS's "Interagency Integration Team" (IIT) for problems that "implicate other state agencies," such as issues arising out of a participant's housing insecurity or substance abuse. Doc. 140-1 at 13-14. As a part of technical assistance, CCRC, or IIT, DHHS may assist case management agencies in identifying and securing service providers to fill service gaps. Id.

However, in the normal course of events where issues are not so elevated, DHHS does not meaningfully assist case management agencies with identifying available service providers. Although DHHS maintains a list

47

of enrolled service providers, Doc. 140-3 at 7; they do not require service providers to report on their capacity, Doc. 134-8 at 14; or otherwise monitor which of the enrolled providers are available to provide services at any given time, Doc. 147-1 at 7. Rather, case management agencies are required to proactively reach out to provider agencies "to see if they're available or if they have staff." Doc. 147-1 at 7.

In sum, the evidence indicates that DHHS (1) provides assistance when cases are elevated to DHHS for technical assistance, CCRCs, or IITs and (2) monitors agency compliance with programmatic requirements by reviewing service authorization requests and quarterly reports, as well as conducting annual audits. DHHS does not, however, (1) review care plans in their entirety for each waiver participant; (2) regularly solicit reports specific to case management agencies' efforts to coordinate or monitor service delivery; (3) contract with case management agencies; or (4) monitor service provider capacity or provide case management agencies with information on service provider availability.

### b.   Tracking and remediating service gaps

The plaintiffs assert that the defendants neither appropriately track nor adequately respond to service gaps. The evidence indicates that DHHS systematically tracks service gaps in two ways. First, Aultman regularly solicits reports that compare the total amount of services authorized against

the total amount of service claims paid, which reveal the aggregate amount of unused services. Doc. 140-7 at 21. Second, DHHS uses a tool that allows case management agencies to report when they are unable to locate a service provider to meet a participant's needs—the so-called "provider not available indicator." Doc. 140-1 at 13. DHHS has instructed case management agencies to make use of this tool when submitting their authorization requests, Doc. 140-3 at 12, and regularly produces reports on how often the provider not available indicator is utilized, Doc. 147-1 at 12-13.

But, again, there are additional steps that DHHS has failed to take to monitor service gaps. For example, reports comparing authorized services to service claims are produced only upon request, rather than on a set basis, and only compare service gaps in the aggregate across all waiver services and participants. Doc. 140-7 at 21; see also Doc. 140 at 22 (clarifying that Aultman's testimony refers to "data reports comparing the aggregate amounts of services authorized to the aggregate amount of services paid"). DHHS only reviews service gap data specific to particular waiver services "on an occasional basis, not a set basis." Doc. 134-14 at 6-7.  And DHHS does not regularly or systematically track service gaps on the participant level. DHHS does not, for example, regularly generate reports that compare service authorizations to service claims for individual participants. Doc. 140-7 at 22 (statement that DHHS has, on "occasion[]," requested data comparing service

authorization to service claims "at the participant level"); Doc. 147-1 at 8-10 (statement that DHHS would like to implement, but does not currently possess, an IT system that would automate data comparing "services that individuals are authorized versus what they've been getting"). Nor does DHHS solicit reports identifying which participants have been unable to access an authorized service for more than a year. Doc. 134-10 at 12.

Additionally, DHHS currently lacks the capacity to track service delivery in real time. As I explained, DHHS primarily identifies service gaps by comparing service authorizations to claims for payment. Doc. 134-11 at 6-7; see also Doc. 153 at 36. But, because claims for payment may not be filed for a year or more after services are delivered, claiming data is necessarily "lagged data." Doc. 153 at 36; see also Doc. 145 at 11. Although DHHS is currently working to implement a system that would allow it to track service delivery in real time by requiring service providers to contemporaneously report when services are delivered, that system is not expected to launch until 2024. Doc. 140-7 at 26-27; Doc. 140-3 at 12.

Furthermore, DHHS has not implemented a policy dictating any particular response when the department becomes aware that service gaps are occurring or that providers are unavailable. Although DHHS monitors how frequently and for what services the provider not available indicator is being selected, they do not have a policy that "drives what they do with that

information" or sets formal time limits on how long that indicator can be in place before a response is required. Doc. 147-1 at 12-14; see also Doc. 134-11 at 10. Aultman stated that, when she becomes aware of service gaps, she will respond on a case-by-case basis by, for example, "ask[ing] for additional data" or "follow[ing] up with case management [agencies] to inquire about" the deficiency, rather than following a set policy. Doc. 140-7 at 22. And, in any event, DHHS has "no way right now of investigating why" service gaps are occurring, beyond engaging in anecdotal conversations and reviewing documentation from annual quality reviews. Id. at 23-25.

All told, the evidence indicates that, although DHHS reviews regular reports on the use of the provider not available indicator and the aggregate amount of authorized services that go unclaimed, they have not developed policies guiding their response to this information. Moreover, DHHS does not systematically track service gaps at the service or participant level, nor do they monitor service delivery in real time or systematically investigate why service gaps are occurring.

c.    **Failure to ensure adequate provider network**

Finally, the plaintiffs assert that the defendants have failed to develop a network of service providers sufficient to meet the collective needs of CFI Waiver participants. As Aultman recognized, it is DHHS's "responsibility to ensure that a service provider network sufficient to serve all CFI Waiver

participants' needs exists." Doc. 140-3 at 7. Nonetheless, the evidence indicates that there are not enough available providers to fully service the needs of waiver participants. Doc. 134-10 at 5-7 (Aultman acknowledging that there is a "statewide shortage" of personal care providers and home health aides to deliver CFI Waiver services); Doc. 147-1 at 5 (Aultman acknowledging that some CCRC reports have "refer[ed] to overall staff shortages of CFI providers"); Doc. 134-8 at 31 (preliminary report indicating that there are hundreds of service requests with no assigned service provider); id. at 19 (survey indicating that only 7% of CFI Waiver stakeholders agree that there are "sufficient direct service providers to deliver all covered" waiver services); Doc. 134-25 at 4 (budget request from DHHS explaining that, "[d]ue to workforce challenges as well as client change, not all of those authorized [CFI Waiver services] were utilized").

Service providers and case managers alike have expressed their belief that the shortage arises, at least in part, from low reimbursement rates for waiver services. Doc. 147-5 at 2; Doc. 134-8 at 16; Ex. Y[14] at 1:22. Their observations receive further support from empirical data indicating that, at least up until 2021, the reimbursement rates for some waiver services had

---

[14]     Cited at Doc. 134-1 at 28 and available at
https://www.youtube.com/watch?v=KlgGB6DZsbY&t=3842s.

not kept up with inflation, and thus "very likely fell significantly behind

rising costs faced by [home and community-based services] agencies

providing these services." Doc. 134-23 at 3; see also Doc. 134-22 at 6.

As the defendants point out, this analysis is somewhat stale insofar as

DHHS has raised reimbursement rates by 5 to 15 percent since the data was

analyzed, Doc 140-1 at 16; and additional rate increases will go into effect in

2024, Doc. 154-1 at 2. The defendants further note that, aside from the rate

increases, DHHS has taken a number of steps in recent years to increase the

network for CFI Waiver service providers.[15]

Nonetheless, there is evidence that the service provider shortage has

persisted despite these efforts, Doc. 147-5 at 2; and the defendants do not

dispute that the shortage remains extant today, Doc. 140 at 17; Doc 134-10 at

5-7. In the plaintiffs' view, this means that the defendants must do more to

increase the network of service providers, such as by increasing

---

[15]     For example, the defendants have (1) used federal funding to provide
various incentives for service providers, Doc. 140-1 at 16; (2) partnered with
the New Hampshire Department of Employment Security to recruit and train
service providers, id. at 16-17; (3) secured a federal grant that will be put
towards tracking and developing the network of service providers; id. at 17;
(4) increased the use of "special reimbursement rates" when participants are
unable to find providers willing to work for the standard rate, Doc. 140-3 at 8;
and (5) obtained legislative approval to expand the category of individuals
permitted to serve as personal care service providers, Doc. 154-1 at 12.

reimbursement rates even further and engaging in additional recruitment efforts.[16]

While the defendants have indisputably taken some steps towards addressing the service provider shortage, their failure to go further or take additional steps in the face of a persistent shortage is a practice to which all class members are subject. To be clear, this is not to stay that DHHS's efforts are inadequate or that they have a legal obligation to do more. Those are questions reserved for a later stage of the proceedings. For now, it is enough that the plaintiffs have demonstrated that, in implementing the waiver program, DHHS has failed to take additional steps to correct the shortage of service providers.

2.   Whether the alleged practices support commonality

The evidence outlined above identifies various common acts or omissions by the defendants in supervising case management agencies, tracking and remediating service gaps, and developing the network of service

---

[16]    In their brief, the plaintiffs discuss an instance where DHHS "terminated" a particular service provider agency with "no back-up plan" and "with virtually no notice to the CFI case management agencies that depended upon that provider for staff." Doc. 135 at 26. Although the plaintiffs seemingly rely on this incident to demonstrate that DHHS has exacerbated the service provider shortage, it is not indicative of a common practice that affects all class members. There is no evidence that all class members were impacted by the termination of this particular service provider agency, nor is there evidence that DHHS has a consistent practice of terminating service providers without notice or appropriate back-up plans.

providers. Nonetheless, the defendants argue that the evidence does not support the plaintiffs' assertion that they have a "well-defined practice" of "failing to effectively oversee and support case management agencies," "failing to track and remediate service gaps," or "failing to maintain an adequate provider network." Doc. 140 at 15-20. Such "nebulous descriptions of alleged administrative shortcomings," the defendants assert, are insufficiently specific to support commonality. Id. at 14. Moreover, the defendants argue that the plaintiffs have not proved that these practices are, in fact, occurring. In advancing this argument, the defendants do not contest the plaintiffs' evidence of the actions they have not taken, but rather point to the evidence of the actions that they have taken. As the defendants see it, these efforts undermine the assertion that they have a "practice" of "failing" to take "adequate" or "effective" steps to oversee and support case management agencies, track and remediate service gaps, or develop the network of service providers.

The defendants' arguments quibble with the phrasing of the plaintiffs' challenged practices rather than their substance. Although the plaintiffs have used normative terms in articulating their challenged practices, the evidence outlined above identifies concrete acts and omissions by the defendants in administering the CFI Waiver program. And again, the defendants largely do not dispute the reality of those acts and omissions—

only that they amount to "failures" or are otherwise "inadequate" or "ineffective." But whether the defendants' acts are legally sufficient is, for present purposes, beside the point. What matters is that the plaintiffs have identified and provided evidence of "well-defined practices" in the form of specific acts or omissions.

Moreover, because these practices all pertain to the ways in which the defendants administer the CFI Waiver program writ large, they necessarily apply uniformly to all class members. That is, all class members are affected by what DHHS does or does not do to oversee and support case management agencies, track and remediate service gaps, and increase the network of service providers.[17] Because these practices are systemic and do not vary from participant to participant, they constitute the sort of common practices that bind together the class. See PPAL, 934 F.3d at 30; see also Rodriguez v. Nat'l City Bank, 726 F.3d 372, 383 (3d Cir. 2013) (noting that class

---

[17]     The defendants assert that delegating discretionary authority to case management agencies cannot constitute a "uniform practice" under Wal-Mart, but is rather "a policy against having uniform practices." Doc 140 at 21 (cleaned up). Unlike the plaintiffs in Wal-Mart, I do not understand the plaintiffs here to be challenging the defendants' decision to delegate authority, but rather their acts and omissions in supervising the exercise of that authority. See Doc. 134-1 at 20 (challenging DHHS's "practice of delegating the implementation of the CFI waiver program to case management agencies without effective oversight, monitoring, or support"). Those acts and omissions, rather than the delegation itself, is what supports commonality here.

certification is appropriate where "each class member was subjected to the specific challenged practice in roughly the same manner").

In the defendants' view, however, proving the existence of common practices is not enough; the plaintiffs must also prove that the common practices, in fact, "drive[] and [are] causally connected to the class wide legal violation and harm." Doc. 140 at 23. The defendants' argument appears to be principally based on PPAL, where the First Circuit discussed the need for plaintiffs seeking class certification to identify a "uniformly applied, official policy of the [defendant], or an unofficial yet well-defined practice, that drives the alleged violation." 934 F.3d at 29. The First Circuit ultimately concluded that the plaintiffs in that case did not satisfy commonality because they presented only evidence of "a pattern of legal harm common to the class without identifying a particular driver—'a uniform policy or practice that affects all class members'—of that alleged harm." Id. at 30 (quoting DL v. District of Columbia, 713 F.3d 120, 128 (D.C. Cir. 2013)); see also id. at 28 n.14 (finding that "the plaintiffs have not identified a common policy or practice driving the alleged wrongdoing"). The defendants argue that the First Circuit's references to "driver[s]" and practices that "drive" the violation imply that plaintiffs must demonstrate that the challenged common practices bear some causal connection to the class harm. In the defendants' view, because the plaintiffs have not demonstrated that the common practices

57

cause service gaps, they have not proven the existence of the sort of common drivers required by PPAL.

The defendants' argument reads too much into PPAL. Because that case turned entirely on the plaintiffs' inability to prove that they were subject to common practices, the court had no occasion to consider whether the plaintiffs were also required to affirmatively prove that those practices caused their class harm. Nor was that issue briefed by the parties. Requiring plaintiffs to prove that a defendant's common practices in fact caused their harm would constitute the sort of sea change in class certification law that one would expect to see stated more explicitly after considered argument, rather than vaguely insinuated without the benefit of appropriate briefing.

In any event, the language employed by the First Circuit does not support the defendants' argument. The court in PPAL repeatedly referred to drivers of an "alleged harm;" "alleged wrongdoing," and "alleged violation." Id. at 28 & n.14, 29. The consistent inclusion of the word "alleged" seems to eschew any need for evidence of causation at the class certification stage of the proceedings; after all, if plaintiffs were required to prove that common practices caused their harm, they would first have to affirmatively prove—rather than merely allege—that the harm occurred. Cf. Rikos v. Procter & Gamble Co., 799 F.3d 497, 505 (6th Cir. 2015) (rejecting the argument that

plaintiffs must "prove at the class-certification stage that all or most class members were in fact injured").

Besides pointing to PPAL's references to common drivers, the defendants do not cite to any cases holding that plaintiffs seeking class certification must prove at class certification that common practices in fact caused their claimed injuries.[18] Nonetheless, the defendants assert that proof of such a causal connection is necessary to demonstrate that litigating the class claims will generate common answers that resolve the class members' claims, as required by Wal-Mart.  As the defendants see it, litigating challenges to common practices cannot resolve class members' claims unless the common practices are actually causing the harm giving rise to the class members' claims.

Wal-Mart, however, only requires proof that litigating the case on a class wide basis has the "capacity . . . to generate common answers apt to drive the resolution of the litigation." 564 U.S. at 350. In other words, plaintiffs need not prove that the common answers will, in fact, address a

---

[18]     In support of their argument, the defendants cite to my order addressing the plaintiffs' first motion for class certification. That order, however, rested entirely on the plaintiffs' failure to identify and prove common practices and did not address the need for proof of a causal connection. The portions of the order quoted in the defendants' brief either borrow the language of PPAL—which, for the reasons I explained, does not require proof of causation—or summarize the parties' arguments without purporting to establish a legal standard.

harm that the class has demonstrably suffered; it is enough that plaintiffs demonstrate "there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case." Rikos, 799 F.3d at 505.

Moreover, as multiple courts have recognized, the question of whether the challenged conduct is actually causing the plaintiffs' harm is itself a common question. See, e.g., In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 722 F.3d 838, 853-854 (6th Cir. 2013); McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 489-490 (7th Cir. 2012); Jonathan R. v. Justice, 344. F.R.D. 294, 313 (S.D.W.V. 2023); Kenneth R., 293 F.R.D. at 267. Regardless of the outcome, the answer to that question will drive the resolution of the class members' claims "in one stroke" by determining whether the plaintiffs have demonstrated that the defendants bear responsibility for their alleged harm. Wal-Mart, 564 U.S. at 350.

Without any authority directing me to do so, I decline to unnecessarily wade into the merits of the plaintiffs' claims by analyzing their evidence of causation. Both the Supreme Court and the circuit courts have made clear that, although class certification may involve some overlap with the merits, district courts are not to "turn class certification into a mini-trial on the merits." Edwards v. First Am. Corp., 798 F.3d 1172, 1178 (9th Cir. 2015)

(cleaned up); <u>see</u> <u>also</u> Amgen Inc., 568 U.S. at 466 ("Rule 23 grants courts no

license to engage in free-ranging merits inquiries at the certification stage.");

Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir.

2012) ("the court should not turn the class certification proceedings into a

dress rehearsal for the trial on the merits."); Gooch v. Life Inv'rs Co. of Am.,

672 F.3d 402, 432 (6th Cir. 2012) ("the relative merits of the underlying

dispute are to have no impact upon the determination of the propriety of the

class action.") (quoting Thompson v. Cnty. of Medina, 29 F.3d 238, 241 (6th

Cir. 1994)). Yet requiring the plaintiffs to prove that the conduct complained

of in fact caused the class harm would do just that. Because plaintiffs would

be required to prove most, if not all, of the essential elements of their claims

at the certification stage, there would be little left for the merits stage. <u>See</u>

Sullivan v. DB Inv., Inc., 667 F.3d 273, 306 (3d Cir. 2011) ("the Rules and our

case law have consistently made clear that plaintiffs need not actually

establish the validity of claims at the class certification stage."); <u>accord</u> Fed.

R. Civ. P. 23 advisory committee's notes (2003) ("an evaluation of the

probable outcome on the merits is not properly part of the certification

decision[.]"). In sum, plaintiffs need only prove the existence of common

practices that give rise to common questions capable of generating common

answers, and need not prove that those practices, in fact, drive the class

harm.

The plaintiffs have satisfied that burden here. As I explained, the plaintiffs have identified several system-wide practices that they allege drive the class members' service gaps, thereby exposing the class to a serious risk of unjustified institutionalization. As courts have frequently recognized, challenges to systemic practices such as these raise common questions regarding their legal sufficiency which satisfy commonality. See PPAL, 934 F.3d at 28 n.14 (collecting cases and noting that "a definable policy or practice imposed by a single entity or a small group of actors . . . facilitate[s] the formulation of questions apt for class resolution"); Elisa W. v. City of New York, 82 F.4th 115, 125-126 (2d Cir. 2023) (recognizing that a challenge to systemic practices raised common questions of whether those "practices lead to permanency delays thereby placing all foster children at an unreasonable risk of harm"); Parsons v. Ryan, 754 F.3d 657, 678 (9th Cir. 2014) (noting that commonality is satisfied where there is a question of "whether the specified statewide policies and practices to which they are all subjected" are lawful); J.N. v. Or. Dep't of Educ., 338 F.R.D. 256, 266 (D. Or. 2021) ("there is commonality because the statewide policies and procedures are 'the glue that holds the class together,' such that their legality 'can be properly litigated in a class setting.'") (quoting B.K., 922 F.3d at 969).

For example, to succeed on their Medicaid Act claim, the plaintiffs will need to demonstrate that the defendants failed to ensure that required

services were delivered with reasonable promptness. See 42 U.S.C.

§ 1396a(8); see also Waskul, 979 F.3d at 449. Thus, the plaintiffs' Medicaid

Act claim raises the common questions of (1) whether the alleged practices

are, in fact, occurring and (2) whether those practices delay service delivery

or otherwise fail to ensure the prompt delivery of services. See Murphy v.

Piper, No. 16-2623 (DWF/BRT), 2017 WL 4355970, *9 (D. Minn. Sept. 29,

2017).

As for their Title II claims, the plaintiffs will need to demonstrate that

"the challenged state action creates a serious risk of institutionalization."

M.R., 697 F.3d at 734; see also Davis, 821 F.3d at 263. The plaintiffs will also

need to demonstrate that the defendants' actions could be reasonably

modified, considering the state's resources and obligations to others with

disabilities. Olmstead, 527 U.S. at 587. Relatedly, the court will need to

consider the defendants' affirmative defense that the plaintiffs' claims "seek

modifications that would fundamentally alter the nature of the services at

issue[.]" Doc. 45 at 20; see In re Checking Account Overdraft Litig., 307

F.R.D. 630, 650-651 (S.D. Fla. 2015) (noting that affirmative defenses may

"raise common questions" where they can be addressed "through the use of

common evidence"). Cf. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d

288, 295 (1st Cir. 2000) ("affirmative defenses should be considered in

making class certification decisions."). Accordingly, the plaintiffs' Title II

claims raise common questions that include (1) whether the alleged practices are occurring; (2) whether those practices expose the class to a serious risk of institutionalization; (3) whether those practices can be reasonably modified; and (4) whether instituting the requested modifications would require the state to fundamentally alter its program. See Kenneth R., 293 F.RD. at 267.

Answering these questions will require an analysis of the general effect of the defendants' practices on the delivery of CFI Waiver services and the resulting risk of institutionalization to class members, as well as the feasibility of modifying those practices. See id. at 267 n.4 ("no individualized inquiries need to be made to determine whether a systemic condition places class members at serious risk of unnecessary institutionalization; instead the inquiry can properly turn on systemwide proof"). In this way, the plaintiffs' case will rise or fall on class-wide proof of the aggregate impact of system-wide practices, and not individualized proof regarding a class member's service gaps or risk of institutionalization. Compare PPAL, 934 F.3d at 30-31 (finding that commonality was not satisfied because the plaintiffs' claims required litigating the efficacy and appropriateness of individualized IEP plans rather than systemic policies or practices) with G.T. v. Bd. of Educ. of Cnty. of Kanawha, No. 2:20-cv-00057, 2021 WL 3744607, *14 (S.D.W.V. 2021) (finding that commonality was satisfied in case challenging "the procedures that [the defendant] uses, or does not use, to develop and implement

[behavioral supports]" rather than "the behavioral supports that should be provided to the individual students within the proposed class"). For this reason, commonality is satisfied even if the defendants' expert is correct that determining a particular individual's risk of institutionalization requires an individualized inquiry.

The defendants disagree, and argue that integration mandate claims necessarily require individualized inquiries that defeat commonality. In support of their argument, the defendants cite to the Fifth Circuit's recent decision in United States v. Mississippi, 82 F.4th 387 (5th Cir. 2023). In that case, the Department of Justice brought suit against the state of Mississippi on the theory that "systemic deficiencies in the state's operation of mental health programs" placed "every person in Mississippi suffering from a serious mental illness . . . at risk of improper institutionalization in violation of Title II." Id. at 389 (emphasis in original). The court rejected the government's theory, concluding that Olmstead was incompatible with "[a] claim of system-wide risk of institutionalizing some unspecified group of patients" and that the government's evidence of "'generalizations' drawn from a patient survey" failed to establish "that individuals suffered 'unjustified isolation' en masse." Id. at 394, 396.

In so holding, the court noted that the first two Olmstead factors—that community-based treatment is appropriate and that the individual does not

65

oppose such treatment—are "necessarily patient-specific" and therefore cannot be litigated on a "system-wide" basis. Id. at 394. The Fifth Circuit acknowledged "decisions from a number of circuits" finding that <u>Olmstead</u> claims could be litigated based on a system-wide risk of institutionalization, but distinguished those cases by noting that they considered "individual or class claims for personal care services or medically necessary items[.]" Id. at 396. Those cases, the court reasoned, were meaningfully different because "what a physically disabled person needs to maintain life and health is not subject to the unpredictable and varied symptoms and needs of a patient who manifests serious mental illness." Id. Thus, although "[t]he consequences of providing personal care services for eight hours a day versus twenty-four hours . . . are susceptible of quantification and, indeed, generalization," discerning the consequences of failing to provide "appropriate" mental health services required individualized considerations that could not be litigated on a system-wide basis. Id.

The Fifth Circuit's decision is inapposite for at least two reasons. First, the Fifth Circuit's concerns about the individualized nature of the first two <u>Olmstead</u> factors are inapplicable here. Before an individual may be enrolled in the CFI Waiver program, the state must confirm that the participants' needs can be met through community-based services and the individual must agree to community placement. See N.H. Admin R. He-E 801.03. Since all

putative class members necessarily satisfy the first two <u>Olmstead</u> factors, it

is irrelevant that those factors require individualized inquiries. Rather, at

issue in this case is the third <u>Olmstead</u> factor, which asks whether

community-based treatment can be reasonably accommodated in light of the

"resources available to the State and the needs of others with [disabilities]."

<u>Olmstead,</u> 527 U.S. at 607. That factor, unlike the first two, is necessarily

analyzed on a system-wide basis. <u>See</u> <u>id.</u> at 597 (noting that the third factor

looks to "not only the cost of providing community-based care to the litigants,

but also the range of services the State provides others with [disabilities]");

<u>see</u> <u>also</u> <u>Kenneth R.,</u> 293 F.R.D. at 262 n.3 (noting that <u>Olmstead</u> cases may

be particularly well-suited to class treatment because they necessitate "an

inquiry into the needs of all persons served by the state's mental health

system," which turns on class-wide proof).

Second, this case fits squarely within the category of cases that the

Fifth Circuit found "distinguishable" because it is a class action that

challenges the failure to provide necessary medical services to individuals

with physical disabilities. The Fifth Circuit seemed to agree that, because the

effects of such a failure are "susceptible of quantification and, indeed,

generalization," those claims could turn on system-wide proof. <u>Mississippi,</u> 82

F.4th at 396. Accordingly, the Fifth Circuit's reasoning is inapplicable to the

instant case and does not disturb my conclusion that the plaintiffs' claims raise common questions that can be effectively litigated on a class-wide basis.

Because the plaintiffs have demonstrated that the class is subject to common practices that will yield common answers to the common questions at the core of their claims, commonality is satisfied.

## D. Typicality

Typicality under Rule 23(a)(3) requires that "the claims or defense of the representative parties are typical of the claims or defenses of the class[.]" This is satisfied where the named plaintiff's claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." Garcia-Rubiera, 570 F.3d at 460 (cleaned up). It is not necessary that the named plaintiffs' claims be identical to the class member's claims, so long as they "share the same essential characteristics." Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 26 (D. Mass. 2003) (quoting 5 Moore's Federal Practice § 23:24[4]); see also Gonzalez v. U.S. Immigration & Customs Enf't, 975 F.3d 788, 809 (9th Cir. 2020) (noting that typicality only requires that "a class plaintiff's claims be reasonably coextensive with those of absent class members") (cleaned up).

The defendants argue that the named plaintiffs' claims are not typical for three reasons. First, the defendants assert that the named plaintiffs suffer from relatively uncommon disabilities and "face some of the most

significant needs of any CFI Waiver participant." Doc. 140 at 26. Second, the

defendants note that the named plaintiffs receive "consumer-directed

personal care services," which only a small portion of waiver participants

receive. Id. at 27-28. Finally, the defendants contend that the named

plaintiffs' "service gaps were caused in part by their unique demands," citing

evidence that some service providers refused to work with the named

plaintiffs after their employees complained of negative interactions. Id. at 27.

     The defendants' arguments misunderstand both the nature of the

typicality requirement and the plaintiffs' claims. The typicality inquiry turns

on "the nature of the claim or defense of the class representative" rather than

"the specific facts from which [the claim] arose[.]" Johnson v. City of Grants

Pass, 72 F.4th 868, 888 (9th Cir. 2023) (quoting Parsons, 754 F.3d at 685);

see also Newberg § 3:34. Accordingly, "even relatively pronounced factual

differences will generally not preclude a finding of typicality where there is a

strong similarity of legal theories or where the claim arises from the same

practice or course of conduct." Newton v. Merrill Lynch, Pierce, Fenner &

Smith, Inc., 259 F.3d 154, 184 (3d Cir. 2001) (quoting In re Prudential Ins.

Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998));

see also Postawko v. Mo. Dep't of Corrs., 910 F.3d 1030, 1039 (8th Cir. 2018);

DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010); De La

Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983).

69

Here, typicality is satisfied because the plaintiffs' claims arise out of the same common practices that impact the entire class and assert the same claims for relief.[19] See Garcia-Rubiera, 570 F.3d at 460. Because the plaintiffs' claims turn on system-wide proof of the effects of the defendants' practices, the factual distinctions noted by the defendants do not bear on the "essential characteristics" of the plaintiffs' claims and therefore do not defeat typicality. See Newberg § 3:34; see also Steward v. Janek, 315 F.R.D. 472, 490 (W.D. Tex. 2016) ("the atypical characteristics of individual Plaintiffs are not relevant to the Court's assessment of typicality because they do not shed light on meaningful differences between Plaintiffs and prospective class members"). Accordingly, the plaintiffs' claims are typical, even if their disabilities, waiver services, or service gaps are not. See Rapuano v. Tr. of Dartmouth Coll., 334 F.R.D. 637, 648 (D.N.H. 2020) (collecting cases and noting that "[c]ourts have found typicality satisfied where a group of putative class members are exposed to the same systemic failures of an institution"); Connor B. ex rel. Vigurs v. Patrick, 278 F.R.D. 30, 35 (D. Mass. 2011) (finding that typicality was satisfied, despite factual variations, because the plaintiffs

---

[19]    Although the defendants contend that there are differences between how "consumer-directed" services are coordinated and delivered and how other CFI Waiver services are coordinated and delivered, they do not assert that the common practices challenged by the plaintiffs do not apply to consumer-directed services. Doc. 140 at 27-28.

"alleged specific systemic policies or practices that expose the entire class to the same unreasonable risk of harm").

While it is true that typicality may be defeated where the class representatives' claims are "likely to be 'subject to unique defenses that would divert attention from the class's common claims,'" that is not the case here. Levy v. Gutierrez, 448 F. Supp.3d 46, 67 (D.N.H. 2019) (quoting In re Dial Complete Mktg. & Sales Practices Litig., 312 F.R.D. 36, 54 (D.N.H. 2015)). Given that the plaintiffs' claims challenge system-wide practices, allegations that the named plaintiffs' actions exacerbated their own service gaps are only marginally (if at all) relevant, and therefore unlikely to become a "major focus of the litigation." Newberg § 3:45; see also Swack v. Credit Suisse First Bos., 230 F.R.D. 250, 264 (D. Mass. 2005) ("The mere fact that a putative class representative . . . is subject to a unique defense does not render her atypical for the purposes of 23(a) unless that defense threatens to become to focus of litigation thereby prejudicing absent class members.") (alteration in original). Accordingly, typicality is satisfied.

**E.    Adequacy**

Rule 23(a)(4), the so-called "adequacy" requirement, requires plaintiffs to demonstrate that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this requirement, plaintiffs "must show first that the interests of the representative party will not

conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." Andrews, 780 F.2d at 130.

In their renewed motion for class certification, the plaintiffs advance arguments and proffer evidence as to why they satisfy adequacy. The defendants do not address these arguments in their objection to the plaintiffs' motion, and therefore have waived any objection to adequacy. See Iverson v. City of Boston, 452 F.3d 94, 103 (1st Cir. 2006). Accordingly, I assume for present purposes that adequacy is satisfied.

## F.    Rule 23(b)(2)

In addition to satisfying each of the prerequisites of Rule 23(a), parties seeking class certification must also demonstrate that their class fits within one or more of the circumstances outlined in Rule 23(b). The plaintiffs here are seeking certification under Rule 23(b)(2), which allows for class treatment where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As the plain text indicates, (b)(2) imposes two related requirements: first, that the challenged act or omission be "generally applicable to all class members" and, second, that injunctive or declaratory relief "settling the legality of the

behavior with respect to the class as a whole must be appropriate." Newberg § 4:26 (cleaned up).

As I have explained, the plaintiffs have demonstrated the existence of common practices that apply uniformly across all class members. They have therefore demonstrated that the defendants' actions apply generally to the class and satisfied the first prong of (b)(2). See M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 847-848 (5th Cir. 2012) (noting that cases challenging system-wide practices are appropriate for (b)(2) certification).

The defendants do not appear to contest as much, but rather assert that the plaintiffs have not satisfied the second prong of (b)(2). In the defendants' view, the plaintiffs have not demonstrated that injunctive relief would be appropriate because they have failed to specify the terms of an injunction that satisfies the requirements of Federal Rule of Civil Procedure 65(d). The defendants further contend that crafting such an injunction would be impossible in light of the amorphous practices that form the basis for the plaintiffs' claims. I disagree.

The defendants' suggestion that the plaintiffs must propose an injunction that complies with Rule 65(d) rests on a misreading of the Tenth Circuit's decision in Shook v. County of El Paso. 543 F.3d 597 (10th Cir. 2008). In that case, the court affirmed the denial of class certification in an action challenging the treatment of mentally ill prisoners after finding that

the requirements of (b)(2) were not satisfied because the plaintiffs failed to demonstrate that the court could issue an appropriate injunction remedying the plaintiffs' harm. Id. at 604. The court noted that the plaintiffs' requested injunctions either required different treatment for different class members based on the characteristics of their mental illness, "rather than prescribing a standard of conduct applicable to <u>all</u> class members," or else imposed too vague of standards by defining the required acts in terms of what was "appropriate" or "adequate." Id. at 605 (emphasis in original).

Nonetheless, the court was careful to emphasize that plaintiffs are not "required to come forward with an injunction that satisfies Rule 65(d) with exacting precision at the class certification stage." Id. at n.4. Rather, it is sufficient that the plaintiffs "demonstrate that such injunctive relief— relative to the class—is <u>conceivable</u>[.]" Id. at 608.

This holding is consistent with a number of other courts which have recognized that plaintiffs need not propose a precise injunction that complies with Rule 65(d) so long as they demonstrate that "a sufficiently specific injunction can be conceived." M.D. v. Perry, 294 F.R.D. 7, 30 (S.D. Tex. 2013); <u>see also</u> B.K., 922 F.3d at 972 (noting that the argument that plaintiffs must propose a "specific injunction that could satisfy . . . Rule 65(d)" in order to obtain class certification "has no basis in existing law"); Ward v. Hellerstedt, 753 F. App'x 236, 249 (5th Cir. 2018) (stating that plaintiffs "are not required

to spell out 'every jot and tittle of injunctive relief' at the class certification stage" so long as they can "explain 'how a court could define or enforce meaningful injunctive relief.'") (citations omitted). Thus, the question is not whether the plaintiffs have proposed an injunction that complies with Rule 65(d), but rather whether their claims are such that they would be amenable to an injunction that complies with Rule 65(d), the precise contours of which "can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." Parsons, 754 F.3d at 689 n.35.

That requirement is satisfied here. As I explained, despite the defendants' qualms with the plaintiffs' phrasing of the challenged practices, the plaintiffs have identified several specific acts and omissions that could be enjoined or otherwise altered through an appropriate injunction. See B.K., 922 F.3d at 972 (finding that (b)(2) was satisfied where the plaintiffs sought an injunction "enjoining [the defendant] to abate" the common practices that supported commonality). This case is therefore distinguished from Shook, where the plaintiffs requested an injunction ordering "appropriate" and "adequate" systemic relief without providing further substance as to what that relief would entail. 543 F.3d at 605-606. Here, the plaintiffs have appropriately outlined what could be enjoined or altered by specifying the precise practices allegedly driving their service gaps.

Moreover, the injunction sought by the plaintiffs would modify the way in which the defendants operate the waiver program writ large, rather than dictating particular actions towards particular class members. Accordingly, granting the plaintiffs' injunction would benefit the entire class without the need to "differentiate between class members."[20] Id. at 604; see also G.T., 2021 WL 3744607 at *16 (finding that the requirements of (b)(2) were satisfied in a case that sought injunctive relief to remedy "systemic problems with the way [the defendant] addresses disability-related behavioral problems" and thus did not require consideration of "the content of each student's IEP or the disciplinary decisions made following each behavioral infraction"); N.B. v. Hamos, 26 F. Supp.3d 756, 774 (N.D. Ill. 2014) ("success

_____

[20] The defendants argue that the plaintiffs have not satisfied (b)(2) because they have failed to provide evidence that enjoining the challenged practices would resolve the class members' harm. Therefore, in the defendants' view, it is "purely speculative" that an injunction would benefit the class. Doc. 140 at 30. But an injunction will only issue if the plaintiffs succeed on the merits—that is, if they prove that the defendants acts or omissions are, in fact, unreasonably delaying their services or exposing them to a risk of institutionalization. Should the plaintiffs make such a showing, it is more than speculative that issuing an injunction altering the practices that cause them harm would benefit the class. Rule 23(b)(2) requires no more. See Wal-Mart, 564 U.S. at 360 (noting that (b)(2) is appropriate where an injunction "would provide relief to each member of the class"); D.L., 860 F.3d at 726 ("To certify a class under [(b)(2)], a single injunction must be able 'to provide relief to each member of the class'") (quoting Wal-Mart, 564 U.S. at 360). Cf. Parker v. Time Warner Enter. Co., L.P., 331 F.3d 13, 20 (2d Cir. 2003) (noting that (b)(2) classes may be certified where "injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits").

on the plaintiffs' claims will require policy modifications to properly implement [the Medicaid Act] and the integration mandate; by their very nature such policy changes are generally applicable, and therefore will benefit all class members.").

For these reasons, it is possible to "conceive of an injunction" that would resolve the plaintiffs' claims while complying with the requirements of Rule 65(d). Monreal v. Potter, 367 F.3d 1224, 1236 (10th Cir. 2004). For example, the court could craft an injunction requiring the defendants to produce monthly reports disclosing which CFI Wavier participants experienced service gaps and institute a policy mandating a particular response to that data. Cf. J.N., 338 F.R.D. at 275 (finding the requirements of (b)(2) were satisfied by a request for an injunction to "stop relying on policies and practices that violate the law" and "develop, adopt, and implement policies and practices that ensure future complaince with the law" where "the precise policies and practices that fall within each order can be given greater specificity at later stages of litigation").

Or the court could calculate the approximate number of additional service providers needed to meet the aggregate needs of the class and order the defendants to formulate and institute a plan to retain that number of service providers. Cf. Brown v. District of Columbia, 928 F.3d 1070, 1075, 1083 (D.C. Cir. 2019) (finding (b)(2) satisfied where plaintiffs requested an

injunction requiring defendants to "[s]uccessfully transition Plaintiffs from nursing facilities to the community" pursuant to a schedule mandating a certain number of transfers each year); O.B., 838 F.3d at 842 (affirming an injunction ordering the state to "take prompt measures to obtain home nursing for the class members"); A.H.R. v. Wash. State Health Care Auth., 469 F. Supp.3d 1018, 1050 (W.D. Wash. 2016) (issuing a preliminary injunction requiring the defendants to "take all actions within their power necessary for Plaintiffs to receive 16 hours per day of private duty nursing" pursuant to a plan that identifies "the need for additional providers, methods of finding, securing, and retaining additional providers, and a timeline for accomplishing needed tasks"). Because the state has already determined what services class members need, the number of man-hours required to meet those needs is susceptible to precise definition. See NB, 26 F. Supp.3d at 774-775 (noting that the requirements of (b)(2) were satisfied in a case challenging the state's failure to provide medical services because the state had already determined what services were "medically necessary"). Thus, unlike the injunction at issue in Shook ordering the defendants to ensure "adequate staffing," an injunction ordering the defendants to take additional steps to recruit a specific number of service providers would not impose impermissibly vague standards. 543 F.3d at 606; see also Brown, 928 F.3d at 1075 (finding (b)(2) satisfied where plaintiffs requested an injunction

requiring defendants to "[e]nsure sufficient capacity of community-based long-term care services . . . as measured by enrollment in these long-term care programs").

Of course, the precise contours of the injunction—if any—will be informed by the evidence adduced on the merits. For now, it suffices that the plaintiffs' claims could be remedied by an appropriate injunction modifying the challenged practices. Accordingly, the requirements of Rule 23(b)(2) are satisfied.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the parties' respective motions to exclude (Doc. 141; Doc. 151; Doc. 155) are denied and the plaintiffs' renewed motion for class certification (Doc. 134) is granted. The court certifies the class of:

> CFI Waiver participants who, during the pendency of this lawsuit, have been placed at serious risk of unjustified institutionalization because Defendants, by act or omission, fail to ensure that the CFI participants receive the community-based long term care services and supports through the waiver program for which they have been found eligible and assessed to need.

Plaintiffs Emily Fitzmorris and Kathleen Bates are appointed as class representatives, and their chosen counsel are appointed as class counsel.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 27, 2023
cc:    Counsel of record