**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

EMILY FITZMORRIS, ET AL.,

     Plaintiffs,

     vs.

NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES, COMMISSIONER, LORI WEAVER, ET AL.,

     Defendants.

Case No. 21-cv-25-PB

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF THEIR PARTIAL MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     The New Hampshire Medicaid Program ............................................................4

II.    The New Hampshire Choices For Independence ("CFI") Waiver .....................5

       A.     CFI Waiver Services .................................................................................6

       B.     CFI Delivery Models .................................................................................8

       C.     Eligibility for CFI .....................................................................................9

       D.     Significance of CFI Services to Class Members....................................10

III.   DHHS Delegation of Responsibility to Case Management Agencies ..............12

       A.     Generally..................................................................................................12

       B.     Assignment of Each Class Member to a Case Management Agency ....13

       C.     Developing and Updating Care Plans. ...................................................13

       D.     Submission of Service Authorization Requests For DHHS Authorization ..........14

       E.     Developing and Updating Contingency Plans .......................................15

       F.     Identification of CFI Service Providers .................................................15

IV.    DHHS's Limited Oversight of CFI Case Management Agencies ....................17

V.     Funding for the CFI Program............................................................................18

VI.    The Insufficient CFI Provider Network: ..........................................................20

       A.     Shortage of Providers..............................................................................20

       B.     Effect on Class Members of the Insufficient CFI Provider Network ...................22

       C.     DHHS Practices Regarding the Insufficient CFI Provider Network ...................23

VII.   Medicaid Reimbursement Rates for the CFI Program......................................24

       A.     Pervasive Inadequate Rates.....................................................................24

       B.     Specialized Rates as an Exception..........................................................27

VIII.  The 2024 CFI Reimbursement "Rate Study"...................................................29

IX.    Class Member Complaints About the CFI Program .........................................31

X.     DHHS Does Not Determine Whether or Not Participants Receive Authorized CFI Services ........................................................................................................................32

XI.    DHHS' Limited Examination of Its Own Data.................................................................33

    A.    Medicaid Claims and Provider Not Available Code...............................................33

    B.    Hospitalization, Rehab, and Skilled Nursing Facility Data Involving Class Members ...............................................................................................................35

    C.    Provider Network...................................................................................................35

    D.    Adult Protective Services (APS)............................................................................36

    E.    Electronic Visit Verification .................................................................................36

XII.    DHHS Does Not Remediate CFI Service Gaps Even When it IS Aware of Those Gaps. ..................................................................................................................................38

XIII.    DHHS Does Not Have an Olmstead Plan.........................................................................39

In support of their Motion for Partial Summary Judgment, Plaintiffs submit this Statement of Undisputed Facts pursuant to Local Rule 56.1(a).

## STATEMENT OF UNDISPUTED FACTS [LOCAL RULE 56.1(A)]

### I.    The New Hampshire Medicaid Program

1.    Medicaid is a program in which the state pays for covered services delivered to enrolled individuals by qualified providers, subject to state and federal requirements about the payment rates, program eligibility, and the scope of benefits, among other things. Ex. S-A[1], Defs.' Suppl. Resp. to Interrog. No. 1.4 ("Def. Suppl. Resp. Interrog.") at 5, Apr. 14, 2025.

2.    The New Hampshire Medicaid program contracts with and/or enrolls and pays third-party providers to deliver services covered by the Medicaid program. Defendants do not employ individuals to directly deliver Medicaid services. Defendants pay third party providers to deliver Medicaid services. *Id.*

3.    The New Hampshire Medicaid program does not directly provide case management services or otherwise deliver services to connect Medicaid beneficiaries to Medicaid providers with the capacity to deliver services. *Id.*

4.    Defendants are public entities under the ADA and Section 504. Ex. S-B, Defs.' Resp. to Pls.' Second Set of Req. for Admis., Admis. 2 and 3 at 4, Aug. 9, 2024.

5.    Lori Weaver, in her official capacity as Commissioner of the New Hampshire Department of Health and Human Services ("DHHS"), is an employee of a "public agency," as that term is defined in N.H. Stat. § 91-A:1-a(V). *Id.* Admis. 2 at 4.

6.    Wendi Aultman, in her role as Bureau Chief of the Bureau of Adult and Aging

---

[1] Plaintiffs will use the designation S for "Statement," to indicate the exhibits to their Statement of Material Undisputed Facts.

Services ("BAAS") (which was formerly known as the Bureau of Elderly and Adult Services or "BEAS"), is an employee of a "public agency," as that term is defined in N.H. Stat. § 91-A:1-a(V). *Id.* Admis. 3 at 4.

## II.    The New Hampshire Choices For Independence ("CFI") Waiver

7.      The CFI Waiver program is governed by a Section 1915(c) waiver application approved by the Centers for Medicare & Medicaid Services ("CMS"), as well as by New Hampshire state law and regulations, including New Hampshire Administrative Rule He-E Sections 801 and 805. Ex. S-C, Decl. of Wendi Aultman ¶ 4-8, Nov. 3, 2022, Doc. 140-1.

8.      The CFI Waiver program is operated pursuant to the rules and requirements in the CMS approved CFI Waiver application, DHHS regulations, Title XIX of the Social Security Act, and CMS's implementing regulations. Ex. S-A, Def. Suppl. Resp. Interrog. at 6.

9.      The purpose of the Choices for Independence ("CFI") Waiver, administered by DHHS, is "to support older people and adults with disabilities to live independently in the community." Ex. S-D, PLTF-0022845, Application for 1915(c) HCBS Waiver: NH.0060.R08.00-Jul 01, 2022 ("Waiver Appl.") at 5.

10.     DHHS voluntarily chooses to operate the CFI Waiver program to provide home- and 9 community- based services ("HCBS") to individuals with disabilities. Ex. S-A, Def. Suppl. Resp. Interrog at 8-9.

11.     The current CFI Waiver expires in 2027. *Id.* at 9.

12.     The CFI Waiver provides coverage of and payment for home- and community-based services for eligible individuals with physical disabilities who otherwise require a level of care provided in a nursing facility. Ex. S-C, Decl. of Wendi Aultman ¶ 3, Nov. 3, 2022, Doc. 140-1.

13.     The CFI Waiver provides supports and services to individuals who are Medicaid

eligible and meet nursing facility level of care through a network of community-based provider agencies who are directly enrolled as NH Medicaid Providers. Ex. S-D, Waiver Appl. at 5.

14. In the 2023 reporting period, there were 4,401 unduplicated participants in the CFI Waiver program. Ex. S-E, CMS 372 Report, NHDHHS2343796 at 1, Nov. 30, 2024.

15. The current approved CFI Waiver application is effective from July 1, 2022 through June 30, 2027. Ex. S-C, Decl. of Wendi Aultman ¶ 7, Nov. 3, 2022, Doc. 140-1.

16. DHHS can and has changed the rules and requirements of the CFI Waiver Program over time subject to CMS' approval, i.e., BAAS representative Kristina Ickes testified that DHHS is in the process of amending He-E 805.  Ex. S-F, Kristina Ickes Dep. ("Ickes Dep.") at 113:9-17, Jan. 27, 2025.

17. There is no waiting list to enroll in the CFI Waiver program. During Director Aultman's tenure with DHHS, the agency has worked to secure sufficient appropriations from the legislature to prevent the need for a waiting list. Ex. S-C, Decl. of Wendi Aultman ¶ 16, Nov. 3, 2022, Doc. 140-1.

### A. CFI Waiver Services

18. The state has defined, within the CFI Waiver, a range of community-based services which support waiver participants. Ex. S-D, Waiver Appl. at 5.

19. Individuals and/or their legal representative work with case managers and the State to identify, through a person-centered planning process, those specific services and supports offered under this waiver that are needed to avoid placement and allow choice of setting. *Id.*

20. According to the waiver, DHHS will make available to CFI participants a "range of assistance to enable waiver participants to accomplish tasks that they would normally do for themselves if they did not have a disability." *Id.* at 63.

21. The CFI Waiver program does not include any aggregate or service-specific caps

on the amount of services that DHHS may authorize a participant to receive. Ex. S-C, Decl. of Wendi Aultman, ¶ 24, Nov. 3, 2022, Doc. 140-1.

22.    DHHS pays private service providers to deliver all CFI Waiver services. Ex. S-A, Def. Suppl. Resp. Interrog. at 6.

23.    The covered services available under the waiver include: Adult Day Services, Home Health Aide Services, Homemaker, Personal Care, Respite, Supported Employment, Financial Management Services, Participant Directed and Managed Services, Adult Family Care, Community Transition Services, Environmental and Vehicle Modification Services, Home Delivered Meals, In-Home Services, Non-Medical Transportation, Personal Emergency Response Services, Residential Care Facility Services, Skilled Nursing, Specialized Equipment Services, and Supported Housing. Ex. S-D, Waiver Appl. at 5.

24.    The services available under the CFI Waiver include hands-on assistance (actually performing a task for the person) or cueing to prompt the participant to perform a task. *Id.* at 63.

25.    Also available under the CFI Waiver are adaptations "which enable the individual to function with greater independence in the home and community, and without which, the individual would require institutionalization. Such adaptations may include the installation of ramps and grab-bars, widening of doorways, modification of bathroom facilities, or installation of specialized electric and plumbing systems, which are necessary to accommodate the medical equipment and supplies, and services necessary for the participant's health and safety, such as pest eradication, and related cleaning." *Id.* at 84.

26.    The CFI Waiver also can provide "[n]on-medical care, supervision and socialization provided to isolated individuals to prevent institutionalization." According to the waiver application, these services include: "Meal preparation, light housekeeping, laundry and

shopping which are essential to the health and welfare of the participant." *Id.* at 89.

27.    The waiver includes provision for "[s]mart technology including electronic devices that enable participants at risk of institutionalization to summon help in an emergency. … This service assists CFI participants who live alone, live only with someone in poor or failing health, or who are alone at home for 8 hours or more per day and who are: ambulatory and at risk of falls as assessed by a physician, registered nurse or occupational or physical therapist; or identified as at risk of having a medical emergency as identified in the comprehensive care plan; and would require ongoing supervision if the device were not provided. *Id.* at 96.

28.    A participant, guardian, case manager, or service provider can file a "waiver request" form with DHHS to request a modification or exception to CFI Waiver policies and procedures. Ex. S-C, Decl. of Wendi Aultman ¶ 42, Nov. 3, 2022, Doc. 140-1.

29.     Wendi Aultman, as Bureau Chief, (or her designee) must determine whether to approve a waiver request within 30 days of the date the request is received. Ex. S-C, Decl. of Wendi Aultman ¶ 43, Nov. 3, 2022, Doc. 140-1.

### B.    CFI Delivery Models

30.    Participants can choose between three service delivery models that offer different levels of control over their services and service providers: "agency-directed" services, "consumer-directed" services, and "participant directed and managed" services. *Id.* ¶ 28-33.

31.    Under the "agency-directed services" model, a provider agency staffs the participant's service hours with available staff and the agency is responsible for training, supervising, and paying the service providers. *Id.* at 29.

32.    If a participant chooses the "consumer-directed" services model for personal care services, the participant identifies and employs their personal care service provider and oversees the services that are provided to that participant. *Id.* ¶ 30.

33. If a participant chooses the "consumer-directed" services model, DHHS sets a specific rate for the services. *Id.*

34. In a "participant directed and managed" services model, the participant identifies needed services, selects and oversees providers, and decides how to manage and spend funds that the CFI Waiver program provides. *Id.* ¶ 31.

**C.    Eligibility for CFI**

35. An individual is eligible fo**r** enrollment in the CFI Waiver program when the individual is clinically eligible to receive services in a nursing facility, meaning the individual requires 24-hour care for at least one of the following reasons: a) medical monitoring and nursing care requiring the skills of a licensed medical professional to provide safe and effective services; b) restorative nursing or rehabilitative care with patient-specific goals; c) medication administration by oral, topical, intravenous, intramuscular, or subcutaneous injection, or intravenous feeding for treatment of recent or unstable conditions requiring medical or nursing intervention; or d) assistance with two or more activities of daily living involving eating, toileting, transferring, bathing, dressing, and continence. *Id.* ¶ 10.

36. The individual must also be 18 or older, satisfy certain financial eligibility requirements, require the provision of at least one CFI-covered service monthly, and choose to receive CFI Waiver services rather than receive care in an institutional setting. *Id.* ¶ 11.

37. Adults participating in the CFI Program must be 18 or older and meet certain financial and clinical eligibility requirements. Ex. S-D, Waiver Appl. at 5.

38. To be determined clinically eligible to participate in the CFI program, applicants will need to undergo a medical assessment. BAAS will determine if applicants meet the clinical requirements for nursing facility level of care. *Id.*

39. The clinical assessment used to establish eligibility for the CFI Waiver focuses on

the applicant's ability to perform activities of daily living such as eating, bathing, dressing and the criteria found in RSA 151 E:3 related to medical monitoring; restorative nursing need or medication administration. *Id.*

40.     Individuals apply for the CFI Waiver program through New Hampshire's "No Wrong Door System of Access for Long Term Supports and Services," also known as "NHCarePath." Ex. S-C., Decl. of Wendi Aultman ¶ 9, Nov. 3, 2022, Doc. 140-1.

41.     DHHS determines whether an individual who applies for the CFI Waiver is eligible for enrollment by hiring a skilled medical professional to conduct a "medical eligibility assessment." *Id.* ¶ 12.

42.     DHHS must process an individual's application and issue a notice of decision no later than 90 days after the application is submitted. *Id.* ¶ 14.

43.     If an applicant satisfies the eligibility criteria, DHHS sends an approval notice identifying the name and contact information of the case management agency to which the applicant is assigned. *Id.* ¶ 13.

44.     "The portal called New Hampshire EASY is a web-based portal that allows for individuals, participants, and their representatives to manage their eligibility and information within the eligibility system." Ex. S-G, Wendi Aultman 30(b)(6) Dep., at 86:4-8, Dec. 4, 2024.

45.     Each Class Member does not oppose living in the community. Ex. S-B, Defs.' Resps. to Pls.' Second Set of Req. for Admiss, Admiss. 11 at 6 ("Defendants admit that all enrolled CFI Waiver participants must consent to enroll in the CFI Waiver program and thereby choose to receive CFI Waiver Services in community settings.").

### D.     Significance of CFI Services to Class Members

46.     The goal of the CFI Waiver is to give participants the choice to remain in the community, rather than being forced to seek their needed care in a nursing facility. Ex. S-H, Dr.

David Polakoff Dep. ("Polakoff Dep.") at 185:19-186:10, Mar. 24, 2025.

47.    Missing hands-on care services, even for short periods, can lead to an increased risk of institutionalization. *Id.* at 144:14-145:12.

48.    A CFI participant missing skilled nursing services and personal care services poses an increased risk of institutionalization. *Id.* at 121:13-122:14.

49.    Falls are a "common problem" amongst CFI participants that carry serious consequences increasing their risk of institutionalization. *Id.* at 145:21-146:16

50.    Appropriate steps can be taken to mitigate the risk of falls, such as personal care staff availability, walking and transfer support, and clearing trip hazards. *Id.* at 146:17-147:7.

51.    The development of new medical conditions and the exacerbation of existing medical conditions can place an individual at increased risk of institutionalization. *Id.* at 151:9-16. "The lack of a social support network can ultimately lead to long-term care facility admissions." *Id.* at 97:20-98:10.

52.    Physical or functional impairments, specifically those requiring substantive assistance with multiple ADLs and/or assistance with transferring in and out of a wheelchair, lead to an increased risk of institutionalization. Ex. S-H, Polakoff Dep. at 96:13-97:19.

53.    Notifying DHHS of a participant's heightened risk of institutionalization is an important indicator about whether the individual is at risk of institutionalization. *Id.* at 197:4-12. Hospitalization increases the risk of nursing home admission in older adults. *Id.* at 254:12-15. It is often the case that an elderly person is more likely to be permanently admitted to a nursing facility after they have had a hospitalization. *Id.* at 189:12-189:17.

54.    "Dimensions" such as "cognitive function, medical conditions, physical functioning ability, and social support network... living situation... mental health conditions status

11

and current mental health status" are critical indicators of an individual's risk of institutionalization. *Id.* at 82:5-83:15; 88:10-89:5.

55.    Impaired cognitive function can affect an individual's ability to remain safely in the community. *Id.* at 90:1-20. Although a decline in cognitive function leads to a higher risk of requiring institutional care, individuals with cognitive decline should be allowed to live in the community if possible. *Id.* at 90:21-91:8; 92:18-93:18.

56.    Creation of a contingency plan is a core responsibility of the case management agency and is an essential part of a CFI participant's care plan. *Id.* at. 200:22-203:5

### III.    DHHS Delegation of Responsibility to Case Management Agencies

#### A.    Generally

57.    DHHS has delegated the day-to-day operation of the CFI Waiver to case management agencies that are responsible for working with CFI Waiver participants to arrange for the delivery of authorized CFI Waiver services based on the participants' goals, preferences, and support needs. Ex. S-D, Waiver Appl. at 5.

58.    Once an applicant is found eligible for CFI services and has chosen to participate in the program, participants will be assigned a CFI Case Manager, either based on preference or the availability of a CFI Case Management Agency in the participant's geographic area. Ex. S-D, *Id.* at 5.

59.    According to the waiver application, DHHS has agreed that "[a] representative sample of participant records are reviewed by CFI Case Management Agencies quarterly to evaluate the delivery of services identified in the comprehensive care plan to ensure that participants' needs are being met in the community, including the type, scope, amount, duration, and frequency of services." *Id.* at 21.

### B.    Assignment of Each Class Member to a Case Management Agency

60.    DHHS assigns enrolled participants to one of eight private case management agencies statewide. Ex. S-C, Decl. of Wendi Aultman ¶ 19, Nov. 3, 2022, Doc. 140-1 ¶ 19.

61.    Once a CFI Case Manager has been assigned, participants will receive a letter from DHHS and a representative of the CFI Case Management Agency will reach out to the participant to begin the development of person-centered plan. The CFI Case Manager will also assist with arranging supports and services with enrolled CFI providers, based on the participant's goals, preferences and support needs. Ex. S-D, Waiver Appl. at 5.

### C.    Developing and Updating Care Plans.

62.    Once the individual has selected or has been assigned a CFI Case Management Agency, the Agency assigns a CFI Case Manager. *Id.* at 134.

63.    The case management agencies assign participants to case managers, who work with the participant to develop a person-centered plan. Ex. S-C, Decl. of Wendi Aultman ¶ 20, November 3, 2022, Doc. 140-1.

64.    According to the waiver application, the CFI Case Manager conducts a comprehensive assessment for each CFI participant pursuant He-E 805. Ex. S-D, Waiver Appl., at 134.

65.    The comprehensive assessment informs the Comprehensive Care Plan and includes objectives and goals with timelines, services funded by the CFI Waiver, Medicaid State Plan, or other funding sources, non-paid services, unfilled needs and gaps, existing risks and mitigation plan for those risks, and contingency planning. *Id.* at p. 134.

66.    The care plan must meet requirements set out in Rule He-E 805.05(c), including that it be person-centered, contain measurable goals with timelines, identify specific paid and non-paid services the individual needs with specific providers, and include an individualized

contingency plan. Ex. S-C, Decl. of Wendi Aultman ¶ 21, November 3, 2022, Doc. 140-1.

67.    Each case management agency develops and uses its own care plan template. *Id.*

68.    The case management agency must update a participant's care plan as needed and at least annually. ¶ 22.

    **D.**    **<u>Submission of Service Authorization Requests For DHHS Authorization</u>**

69.    The case manager develops and submits a service authorization request to DHHS based on the participant's care plan. *Id.* ¶ 23.

70.    The service authorization request "identifies the type and amount of all CFI Waiver program services the individual needs." *Id.* ¶ 23.

71.    DHHS reviews service authorization requests and must authorize services that meet the participant's needs as identified in the medical eligibility assessment and other reviews conducted by DHHS-employed program specialists who are registered nurses. at ¶ 24.

72.    Services are authorized according to participants' individual diagnostic and functional needs. *Id.* ¶ 18.

73.    DHHS has the final authority for approval of the CFI Waiver services within the comprehensive care plan. Ex. S-D, Waiver Appl. at 136.

74.    The CFI Waiver program does not have any cap on the amount of personal care services, homemaker services, home health aide, or skilled nursing services that DHHS may authorize for a participant. Ex. S-C, Decl. of Wendi Aultman, ¶ 24, Doc. 140-1.

75.    Once the services are authorized, DHHS submits the approved service authorizations to the providers identified in the participant's care plan, which allows the providers to bill DHHS for the services provided. *Id.* ¶¶ 25-26.

76.    Not all service authorizations are used or paid for, and not all claims that are submitted for reimbursement for the provision of authorized services are paid. *Id.* ¶ 26.

### E.    Developing and Updating Contingency Plans

77.    In addition, in accordance with He-E 805, as part of the planning process, case managers are required to develop, with the participant and others identified by the participant an individualized contingency plan. Ex. S-D, Waiver Appl. at 135.

78.    This contingency plan is person centered, and addresses unexpected situations that could jeopardize the participant's health or welfare. *Id.* at 135.

79.    The contingency plan goes beyond the identification of other settings as an alternative to community-based care, the contingency plan identifies alternate staffing resources in the event that normally scheduled care providers are unavailable … Important information about the participant's desires, preferences, choice and direction are also recorded within this plan, to assist alternate staff in providing services for the participant. *Id.* at 135.

80.    Under the waiver, CFI Case Managers are required to operate and maintain a 24-hour on call back up system. *Id.* at 135.

81.    DHHS has provided guidance to case management agencies that calling 911 can be part of a participant's contingency plan. Ex. S-G, Aultman 30(b)(6) Dep. at 214:7-217:19.

82.    Contingency planning is reviewed as part of the annual quality review of all of the case management agencies. *Id.* at 220:1-10.

### F.    Identification of CFI Service Providers

83.    According to DHHS, the "case management agency is responsible for working with the participant to ensure that the participant is authorized to receive the services they need, identifying and connecting the participant to service providers, and monitoring the delivery of services." Ex. S-C, Decl. of Wendi Aultman, ¶ 27, Nov. 3, 2022, Doc. 140-1 ¶ 27.

84.    According to DHHS, if and when the "participant's needs change the case management agency must update the participant's person-centered plan and request the necessary

service authorizations" from DHHS. *Id.* ¶ 27.

85.    DHHS further delegates these responsibilities: the participant's "case manager can help the participant identify providers, find backup care and reassess the participant's service needs." *Id.* ¶ 34.

86.    DHHS delegates to case management agencies the responsibility to support CFI participants "to access information about the supports and services available to them." *Id.* ¶ 34.

87.    DHHS delegates to case management agencies the responsibility to support CFI participants "to monitor services provided to ensure the type, scope, amount, duration and frequency is provided as authorized." *Id.* ¶ 34.

88.    DHHS delegates to case management agencies the responsibility to "assist participants in identifying a provider, including when necessary to fill care gaps[,] and monitor the delivery of CFI Waiver services to ensure that services are delivered consistent with the care plan." *Id.* ¶ 37.

89.    DHHS instructs case managers to use the "provider not available" indicator" in the service authorization system "to allow DHHS to receive notification of and track potential service gaps." *Id.* ¶ 38.

90.    There can be a lapse in time between when a participant does not receive an authorized service and when it shows up in a report. Ex. S-G, Aultman 30(b)(6) Dep. at 61:12-62:21.

91.    The CFI providers have up to a year to claim on a service. Ex. S-I, Uma Bhusari Dep. ("Bhusari Dep.") at 166:5-166:8, Jan. 22, 2025.

92.    CFI providers typically bill for their services quickly, i.e., within a month. *Id.* at 166:5-166:17.

93.    When a participant or case management agency alerts DHHS to a "potential service gap or other issues," DHHS can provide what it calls "technical assistance." Ex. S-C, Decl. of Wendi Aultman ¶ 39, Nov. 3, 2022, Doc. 140-1.

94.    This technical assistance may include "DHHS staff outreach to provider agencies to find a worker to service the participant either in the short-term or the long-term." *Id.*

95.    If an issue cannot be resolved through technical assistance, DHHS has a "Case Review and Consultation Committee." *Id.* ¶ 40.

96.    The Case Review and Consultation Committee has the authority to contact provider agencies to identify available providers and to negotiate "special reimbursement rates to incentivize providers to provide services to the CFI Waiver program participant." *Id.* ¶ 40.

97.    When issues implicate other state agencies, DHHS's "Interagency Integration Team," consisting of representatives from multiple state agencies, may consult with CFI case management agencies and participants to identify multi-agency solutions. *Id.* ¶ 41.

98.    DHHS provides guidance regarding Risk Identification, Mitigation and Planning, through the use of a structured assessment process referred to as the "RIMP." CFI Case Managers use this process to assess risk and development of a mitigation plan. Ex. S-D, Waiver Appl. at 135.

99.    According to DHHS, the RIMP form and process is intended to guide CFI Waiver case managers, providers, applicants, participants, and family members in determining the amount and types of risks involved in their current community living arrangements or in their transitions from nursing homes to community living. The protocol includes a list of potential risk factors, their definitions, alternate options considered and plans to mitigate identified risks. *Id.* at 135.

IV.    **DHHS's Limited Oversight of CFI Case Management Agencies**

100.    Pursuant to He-E 805 the CFI Case Management Agencies are required to perform quarterly reviews and develop quality management reports which are reviewed quarterly as part

of the quality process. The requirement is that on a quarterly basis, case management agencies shall conduct a participant record review to evaluate the delivery of services identified in the comprehensive care plan to ensure participant needs are being met in the community, and shall document and submit to DHHS the results of the review quarterly in a quality management report with specific details as required from He-E 805 Administrative Rules. *Id.* at 195.

101.    On a quarterly basis, Case Management Agencies are also expected to conduct a review of all reported complaints, incidents and sentinel events related to the delivery of services identified in the comprehensive care plan, and to document and submit to DHHS the results of the review in a quarterly quality management report. *Id.* at 195.

102.    According to the waiver application, Case Management Agencies are guided by the [DHHS] Administrative Rules to plan and take any remedial action necessary to address deficiencies in service delivery identified in the quarterly quality management reports. *Id.*

103.    Case Management Agencies are subject to monitoring by DHHS to ensure that services are provided in accordance with He-E 805. *Id.*

104.    Medicaid funding would not be impacted if DHHS was both licensing and contracting with case management agencies. Ex. S-J, Henry Lipman Dep. ("Lipman Dep.") at 90:5-92:5; 118:7-119:17. Feb. 5, 2025.

## V.    <u>Funding for the CFI Program</u>

105.    Individuals are more likely to develop disabilities that may qualify them for the CFI Waiver program as they age. Ex. S-A, Defs.' Suppl. Resp. Interrog. at 12.

106.    On information and belief, the number and percentage of New Hampshire residents age 65 or older will substantially increase by 2030, and continue to increase through 2045. *Id.*

107.    On information and belief, the number and percentage of New Hampshire residents age 75 or older will substantially increase by 2030 and continue to increase through 2045. *Id.*

108.    On information and belief, the number and percentage of New Hampshire residents eligible for the CFI Waiver program will increase substantially by 2030, if the eligibility requirements remain the same as they are today. *Id.*

109.    DHHS's BAAS wrote in a "Money Follows the Person Demonstration Expansion Proposal" dated May 25, 2022 that "[w]hile NH has one of the fastest growing populations of older adults in the nation, the State is far behind others in offering a balanced system of care. NH's spending on home and community-based services (HCBS) as a percent of LTSS [long term supports and services] spending for older people and adults with disabilities is 14%, far below the national average of 45%, putting NH 50th in the country. Ex. S-K, NHDHHS1023329 at 3.

110.    DHHS received a $5 million federal grant from the United States Department of Health and Human Services to expand access to home- and community-based services through Medicaid's "Money Follows the Person" program. Ex. S-C, Decl. of Wendi Aultman ¶ 48, Nov, 3, 2022, Doc. 140-1.

111.    In their 2024-2025 Biennium Budget Request, DHHS acknowledged that New Hampshire is demographically older than most states and that more than 200,000 adults were estimated to be between the age of 55 and 64 years in 2019. DHHS wrote that, this population is aging into the use of Nursing Facility and Choices for Independence services "necessitating an increase in the budgeted amount to accommodate. If not included in the budget, the Department will lack sufficient appropriations to provide projected service use." Ex. S-L, State of New Hampshire 2024-2025 Biennium - Form D - Activity Level - Prioritized Special and Problematic Needs, PLTF-0042281 ("2024-2025" Biennium) at 1.

112.    With respect to requesting legislative funding for the CFI program, DHHS's "preparation for the requests -- requests that we've made for the budget includes the review of the

trending of services delivered and the projected -- the projections on those claiming trends." Ex. S-G, Aultman 30(b)(6) Dep. at 251:2-21.

113.    Gaps in authorized services versus delivered services are "not factored into the development of how we [DHHS] request the funding." *Id.* at 252:4-11.

114.    According to DHHS BAAS Bureau Chief Wendi Aultman, ". . . [I]n order to ensure 100 percent of [CFI] services are provided 100 percent of the time, it would take significant program changes in order to ensure that, including staff at the department and mechanisms in place to ensure backup coverage whenever service provision was not provided." *Id.* at 270:21 - 271:6.

115.    In July 2022, a report of the New Hampshire Fiscal Policy Institute determined that "[i]n State Fiscal Year 2021, State Budget funding appropriated for each actual Choices for Independence enrollee totaled $18,997, while for nursing facilities, funding from all sources per actual enrollee was $98,111." Ex. S-M, Fiscal Policy Institute - Long Term Services and Supports in New Hampshire at 2 (July 2022), PLTF-0023081, Doc. 134-22.

116.    According to DHHS Medicaid Director Henry Lipman "I would suggest – sort of suggest CFI is close to three times less than institutional care . . ." Ex. S-J, Lipman Dep. at 100:18-20.

## VI.    **The Insufficient CFI Provider Network:**

### A.    **Shortage of Providers**

117.    Defendants do not dispute that "the nationwide direct care workforce shortage creates significant challenges for CFI Waiver service providers in New Hampshire, which has an aging population and a particularly tight labor market." Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification, May 30, 2023, Doc. 140 at 17.

118.    There is a statewide shortage of personal care providers and home health aides to deliver CFI Waiver services. Ex. S-N, Wendi Aultman Dep. ("Aultman Dep. I") at 39:20 - 40:9,

Dec. 8, 2022, Doc. 134-10.

119.    CCRC reports have "refer[ed] to overall staff shortages of CFI providers." *Id.* at 5.

120.    It is the opinion of Wendi Aultman, DHHS's Rule 30(b)(6) witness that, with respect to the CFI provider network, DHHS "needs to improve the amount of workforce that is needed to meet the needs of individuals. Certainly, we've tried to make efforts to make improvements to that." Ex. S-G, Aultman 30(b)(6) Dep. at 273:10-14. "…[F]or specific services, certainly there are -- are gaps in workforce, and [DHHS] would like to see providers with additional workforce to address the -- the needs of participants." *Id.* at 238:7-11.

121.    DHHS has the "responsibility to ensure that a service provider network sufficient to serve all CFI Waiver participants' needs exists." Ex. S-W, Aultman Second Declaration, May 29, 2023, Doc. 140-3 at ¶ 13.

122.    In July 2022, the New Hampshire Fiscal Policy Institute found that home and community-based services "can currently be difficult to access, primarily because providers cannot find enough workers to provide all the services needed." Ex. S-M at 3.

123.    DHHS's Bureau of Elderly and Adult Services (now BAAS) wrote in a "Money Follows the Person Demonstration Expansion Proposal" dated May 25, 2022 that "[t]oday, demand for workers across all industries is at a record high, while labor force participation is decreasing. The number of posted job openings nearly doubled from 10,000 a month in January 2019 to 19,000 in April 2022. During this period, job postings in home health care, skilled nursing facilities, and continuing care and retirement facilities have increased from 170 in January 2019 to 440 in April 2022. Industries serving older adults have slightly more workers at or near retirement age than other industries. Workers ages 55-64 comprise 20% of all workers yet account for 22% of workers in continuing care, home health, and skilled NFs [nursing facilities]. Ex. S-K,

NHDHHS1023329 at 9.

124.    For the reporting year of 2023, DHHS submitted a CMS 372 Report to the Centers for Medicare and Medicaid Services that noted "the low unemployment rate in NH contributing to limited workforce availability." Ex. S-E, CMS 372 Report at 2, Nov. 30, 2024.

125.    BAAS's Information Technology Manager does not interact with any data concerning CFI service provider unavailability. Ex. S-I, Bhusari Dep. at 156:2-10.

126.    According to the DHHS Medicaid Director, the workforce is stressed and there is a shortage in the CFI Waiver program.[2] Ex. S-J, Lipman Dep. 124:20-125:9.

### B.    Effect on Class Members of the Insufficient CFI Provider Network

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

128.    If CFI participants are not getting the care that they need from the CFI program, that is one reason why someone may need to move into a nursing home. Ex. S-N, Aultman Dep. I at 49:4-19.

129.    DHHS has acknowledged workforce shortages in budget requests in 2020-2021, citing "[d]ue to workforce challenges as well as client change, not all of those authorized [CFI Waiver services] were accessed." Ex. S-P, State of New Hampshire 2020-2021 Biennium Budget Request ("2020-2021 Biennium") at 4, Doc. 134-25 at 4.

130.    When there is no staff available, DHHS does not expect the case management agency to be looking for the staff. DHHS would expect the case management agency to work with

the enrolled providers and find a provider who has available staff. The provider agency would be responsible for ensuring that there's staff to provide that service. Ex. S-G, Aultman 30(b)(6) Dep. at 114:17-115:1.

131.    From October 2019 through June 19, 2020, there were hundreds of CFI service requests with no assigned service provider. Ex. S-Q, Guidehouse Rpt. Doc. 134-8 at pp. 29-30.

132.    According to the Guidehouse Report, only 7% of CFI Waiver stakeholders agree that there are "sufficient direct service providers to deliver all covered" waiver services. *Id.* at 18.

133.    The Guidehouse report found that "[t]here are significant gaps in service access and provider capacity which often leads to individuals not receiving care or receiving care in an inappropriate setting (e.g., hospital v. home)" *Id.* at 15.

### C.    DHHS Practices Regarding the Insufficient CFI Provider Network

134.    CFI provider agencies are not required to report worker shortages to DHHS. Ex. S-G, Aultman 30(b)(6) Dep. at 246:8-9.

135.    DHHS does not have a statewide list of CFI personal service workers available to provide care to CFI participants. Ex. S-N, Aultman Dep. I, at 47:7-14.

136.    DHHS does not currently track whether service providers have staff capacity to take additional referrals. Ex. S-G, Aultman 30(b)(6) Dep. at 132:11-17.

137.    DHHS does not have the authority to make a provider agency admit an individual. *Id.* at 132:1-7.

138.    DHHS does not have the enforcement authority to call the provider agency and instruct them and say they have to send somebody to a CFI participant who is without their authorized CFI services. Instead, DHHS has "conversations with providers about their role in providing services to CFI individuals and finding staff." *Id.* at 112:9-16.

139.    DHHS staff makes calls to find available providers once or twice a month. *Id.* at

176:11-19.

140.    DHHS has not done a formal assessment at the provider level to look at provider availability by geographic region other than secure a vendor to "review and do a service assessment and gaps analysis." *Id.* at 245:22-246:4.

141.    DHHS Associate Commissioner Christine Santaniello does not remember any time when BAAS Director Wendi Aultman or Director of Long Term Supports and Services Melissa Hardy raised a concern to her in her role as associate commissioner relating to lack of CFI services providers. Ex. S-R,     Christine Santaniello Deposition ("Santaniello Dep."), February 11, 2025, at 34:1-22.

142.    DHHS Associate Commissioner Christine Santaniello is not sure whether or not DHHS has any capacity to do any monitoring of the availability of direct service workers for CFI participants. *Id.* at 96:7-17

143.    DHHS Medicaid Director Lipman was called to intervene in January 2025 when a CFI participant did not have a ride to medical appointment the following day. Ex. S-J, Lipman Dep. at 65:13-66:12.

## VII.    Medicaid Reimbursement Rates for the CFI Program

### A.    Pervasive Inadequate Rates

144.    According to DHHS Associate Commissioner Christine Santaniello, the Department's Medicaid reimbursement rates are one factor having an affect on the availability of direct service providers to serve CFI participants in the community. Ex. S-R., Santaniello Dep., at 59:5-22.

145.    DHHS's Bureau of Elderly and Adult Services (now BAAS) wrote in a "Money Follows the Person Demonstration Expansion Proposal" dated May 25, 2022 that the "direct care workforce providing HCBS [home and community-based] and NF [nursing facility] care to older

adults and people with disabilities was already experiencing challenges nationwide pre-pandemic. In 2019, the starting wage for direct support professionals was $12/hour, yet entry-level food service and retail jobs were $15/hour. Ex. S-K, NHDHHS1023329, Money Follows the Person Demonstration Expansion Proposal ("MFP Proposal"), at 8 (NHDHHS1023336).

146.    "Medicaid reimbursement rates (which as of 2019 had not increased for 13 years) were blamed for restricting LTSS [Medicaid long-term supports and services] worker wages. While a rate increase of 3.1% was enacted in 2019, wages were still low compared to other industries; such wage disparities are problematic given the growing costs of basic needs, particularly housing in NH. Additionally, given the rurality of NH and the high percentage of older residents in NH's rural communities, there is a lack of adequate workers in areas most in need of direct care workers." *Id.* at 8-9 (NHDHHS1023336-7).

147.    As of 2019, CFI Medicaid reimbursement rates had not increased for 13 years. *Id.* at 8 (NHDHHS1023336).

148.    According to the New Hampshire Fiscal Policy Institute in July 2022, "[r]ecent wage data for home health and personal care aides in New Hampshire show hourly pay in the Granite State for low-wage workers is less than it is in neighboring states for the same work, which could make keeping workers in New Hampshire, or working in home and community-based services more difficult." Ex. S-M, Fiscal Policy Institute, Long Term Services and Supports in New Hampshire at 3, July 2022, PLTF-0023081, Doc. 134-22.

149.    The DHHS-commissioned Guidehouse Report in 2021 noted that "[k]ey informants believe low reimbursement rates are causing direct service provider shortages." Ex. S-Q, New Hampshire Long Term Supports and Services (LTSS) for Seniors & Individuals with Physical Disabilities, Findings and Recommendations, March 12, 2021, ("Guidehouse Rpt.") at 15, Doc.

134-08.

150.    The DHHS-commissioned Guidehouse Report in 2021 noted that "[k]ey informants believe reimbursement rates are not adequate or equitable, which they suggested affects the quality of care that can be provided and network adequacy." *Id.*

151.    According to the New Hampshire Fiscal Policy Institute in July 2022, commonly used reimbursement rates for specific CFI services fell behind several measures of inflation for most of the last decade. Ex. S-M at 2.

152.    According to the New Hampshire Fiscal Policy Institute in July 2022, "[a]s prices and wages quickly change with inflation accelerating, nursing facilities and home and community-based services agencies that depend on fixed Medicaid reimbursement rates for paying their staff's wages report struggling to attract and retain workers." *Id.* at 3.

153.    DHHS obtained reimbursement rate increases for providers of CFI Waiver program services in state fiscal years 2020 and 2021. Ex. S-C, Decl. of Wendi Aultman, November 3, 2022, Doc. 140-1 ¶ 46.



155.    According to a representative of one CFI provider, because CFI service providers

are not receiving adequate Medicaid funding to pay their workers delivering CFI services a livable wage, they are unable to recruit sufficient staff. Every day, the services providers have to turn people on CFI away who need help. Lack of available CFI providers to service CFI participants is a problem throughout the State of New Hampshire. Ex. S-T, Amy Moore Decl. ¶ 6, June 7, 2023. Doc. 147-5.

156.    According to a representative of one CFI provider, rate increases prior to June 2023 have not made a meaningful difference in the ability of service providers to recruit sufficient staff to serve CFI participants. *Id.* ¶¶ 7 and 8.

157.    DHHS Associate Commissioner Christine Santaniello did not recall asking BAAS staff to provide her with any data relating to the effect of reimbursement rate increases on the providers. Ex. S-R, Santaniello Dep., at 78:20-23.

158.    DHHS Associate Commissioner Christine Santaniello does not know whether or not the 2023 or 2024 CFI reimbursement rate increases eliminated workforce shortages in the CFI program "across the board" but "would have to look at the numbers to see utilization." *Id.* at 84:13-20.

159.    For the reporting year of 2023, DHHS submitted a CMS 372 Report to the Centers for Medicare and Medicaid Services noting that "[r]ates of reimbursement were also cited as challenges, but NH responded with ARPA [American Rescue Plan Act] funding and enabled specialized rates within the waiver during this reporting period, to help ameliorate the staffing issues." Ex. S-E, NHDHHS2343796 at p.2 ,Nov. 30, 2024.

### B.    Specialized Rates as an Exception

160.     Prior to November 2023, DHHS did not have any formal guidance on specialized rates. Ex. S-G, Aultman 30(b)(6) Dep. at 136:16-138:22.

161.    DHHS may authorize the payment of a specialized rate for individual CFI Waiver

providers in specific circumstances pursuant to BAAS's "CFI Specialized Rate Request" policy in the Provider Notice Manual. Ex. S-B, Defs' Responses to Pls' Second Set of Requests for Admission, August 9, 2024, Admission 25 at 10.

162.    The DHHS "CFI Specialized Rates Requests" is NHDHHS1848103-NHDHHS1848108, labeled here as Ex. S-U. Ex. S-B, Defs' Responses to Pls' Second Set of Requests for Admission, August 9, 2024, Admission 25 at 10.

163.    DHHS has the ability to pay service providers a higher rate than typically authorized through a special rate authorization when it deems that an increased rate is necessary to attract service providers. *Id.*

164.    Currently, DHHS would approve a specialized rate request when a provider will only provide services at a higher rate, but the case management agency must first provide documentation that they have exhausted efforts to find a provider at the current rates. Ex. S-G, Aultman 30(b)(6) Dep. at 141:9-142:1.

165.    DHHS has no cap or limit on special rates that it can approve. *Id.* at 149:2-5.

166.    A CFI provider, a CFI case management agency or a CFI participant can request a special rate. *Id.* at 149:9-14.

167.    It is usual for participants to hear that they can request a special rate through conversations with their case management agency. *Id.* at 149:15 - 150:3.

168.    According to DHHS BAAS Administrator IV Kristina Ickes, a CFI case management agency requesting a specialized rate for a CFI provider "will indicate to us that they have exhausted the network, and they may provide us proof of all of the agencies that they spoke to and what the responses are." Ex. S-F, Ickes Dep. at 102:6 -104:20.

169.    DHHS expects CFI case managers to contact as many as 45 CFI providers to

attempt to secure services for a CFI participant. *Id.* at 105:4-11.

170.    In 2024, there were only five requests for specialized rates, all of which were approved. *Id.* at 170:15-171:4.

171.    DHHS does not typically indefinitely approve specialized rates. Instead, DHHS enters a time limit when it approves a specialized rate. Ex. S-G, Aultman 30(b)(6) Dep. at 156:14-19.

## VIII.    The 2024 CFI Reimbursement "Rate Study"

172.    BAAS's Information Technology Manager has never seen data concerning CFI waiver service rates for CFI service providers outside of rate studies. Ex. S-I, Bhusari Dep. at 193:2-10.

173.    In June 2024, NHDHHS completed a rate study ("2024 Rate Study") of the CFI Waiver program. Ex. S-V, NHDHHS1959854.

174.    According to the DHHS Medicaid Director, in other DHHS rate study work he has examined Medicare rates and Medicaid rates in other New England states as well as Bureau of Labor Statistics reporting data which would include Medicaid and private pay. Ex. S-J, Lipman Dep. at 131:5 -132:4.

175.    The 2024 Rate Study did not mention private market rates. Ex. S-V, NHDHHS1959854. *Accord*, Ex. S-G, Aultman 30(b)(6) Dep. at 249:9-250:1 (when asked about whether DHHS examines and considers private market rates when seeking legislative funding to increase Medicaid reimbursement rates, she replied that she did not believe that the Rate Study report identified private sector data.)

176.    As part of the June 2024 Rate Study, the DHHS Rate Setting Unit "sent a voluntary survey requesting the data utilized in the baseline methodology such as Direct Support wages, benefit expense, supervisor wage, hours and benefit expense, mileage, and costs for services such

as food costs for Home Delivered meals." Ex. S-V, NHDHHS1959854 at 3 (NHDHHS1959858).

177.    "The responses to the voluntary survey from the providers were low for many of the services. Some of the data the Department's Rate Study Unit received back was incomplete. The survey was sent out to 214 providers with 26 responses received." *Id.*

178.    According to the DHHS Medicaid Director, the June 2024 Rate Study was not a cost-based methodology. Ex. S-J, Lipman Dep. at 155:5-13.

179.    In the State of New Hampshire 2026-2027 Biennium Budget Request, the Defendants sought CFI rate increases based on the legislatively mandated rate study conducted in CFY 2024.  See Form D, Activity level - Prioritized Special and Problematic Needs, State of New Hampshire 2026-2027 Biennium.  In this Budget request, the Defendants stated that "[i]ncreases are needed to promote equity across all home and community-based services, efficiency, economy, quality of care and access to services." Ex. S-Z, PLTF-0042281

180.    For certain CFI waiver program services, DHHS "manually prices" the reimbursement rate, which means DHHS will consider information or quotes demonstrating the market rate for the service and will set the reimbursement rate at a competitive rate based on that market information. Ex. S-W, Aultman Second Declaration ¶ 16, May 29, 2023.

181.    DHHS sets rates for nursing homes based on a cost-based methodology which does not exist in CFI Waiver program. Ex. S-J Lipman Dep. at 141:11-13; 142:9-15.

182.    According to the DHHS Medicaid Director, if there is a Medicare rate for a service, then DHHS would be hard pressed to justify to CMS why DHHS paid more than Medicare. But if there is no Medicare rate, then DHHS can look at a number of "different measures" including the "commercial market." *Id.*, Lipman Dep. at 137:16-138:6.

183.    According to the DHHS Medicaid Director, DHHS could pay "beyond the

Medicare rate" in case of a "workforce shortage" where DHHS "could not find workers to deliver authorized services." *Id.* at 138:16-20.

## IX.    **Class Member Complaints About the CFI Program**

184.    Administrative Rule He-E 310, which was just recently approved as of December 2024, outlines the rights of individuals receiving CFI services and describes how individuals or their representatives can file a complaint to DHHS directly. There is also a local 603 number to call, an email address, and a fax or mailing address for people to send complaints. Ex. S-G, Aultman 30(b)(6) Dep. at 88:21-89:13.

185.    Before the new He-E 310 rule, DHHS "did not have a dedicated phone line for filing or issuing a grievance. We did not have a dedicated email … for filing a grievance." *Id.* at 89:21-90:4; 91:6-8.

186.    Instead, DHHS would receive phone calls from individuals receiving services, case management agencies, provider agencies, family members, the governor's office, other state representatives, and the commissioner's office. *Id.* at 90:7-13.

187.    Currently, staff within the BAAS share responsibility for logging grievances in their internal shared drive. *Id.* at 101:1-9.

188.    The person that logs the grievance is responsible for determining whether they need to follow up with the case management agency. *Id.* at 104:17-105:4.

189.    When the person investigating a grievance finds that a service provider failed to come in when expected, DHHS would make a referral to licensing or a referral to health facilities. *Id.* at 107:1-18.

190.    Licensing would investigate whether or not the provider agency fulfilled the requirements under the administrative rules. *Id.* at 107:19 - 108:4-7.

191.    "[I]f a provider agency is unable to fulfill the needs of an enrolled individual, then

they would need to formally discharge that person and go through the formal discharge process." *Id.* at 111:8-12.

## X.   DHHS Does Not Determine Whether or Not Participants Receive Authorized CFI Services

192.   DHHS does not have a policy of verifying that CFI participants actually receive the services DHHS authorized. *Id.* at 177:21 - 178: 5.

193.    DHHS's 30(b)(6) witness BAAS Bureau Chief Wendi Aultman testified that "I don't believe we have anything in our administrative rules or statute or in policy that identifies a time frame" for how long a CFI participant can wait to receive authorized services. *Id.* at 188:10-12.

194.   DHHS has implemented a "provider not available" marker in the service authorization system to "electronically identify CFI Waiver participants who may face service gaps." Ex. S-A, Def. Suppl. Interr. at 8, April 14, 2025.

195.   DHHS depends on case management agencies to enter the "provider-not-available" marker in the service authorization system. Ex. S-G, Aultman 30(b)(6) Dep. at 190:19-191:3, 66:9-67:1, Dec. 4, 2024.

196.   There is no time limit or cap on the amount of time that a service authorization can be associated with a provider-not-available code. *Id.* at 191:16-21.

197.   "[T]he [DHHS] staff try to have service-provider-not-available indicators resolved through the case management agency. It's not typically something that we would jump to taking action on the part of the unit because that takes away resources from processing and -- and other elements. We want to try to ensure that the case management agencies are doing what they can and doing what they're obligated to do per role." *Id.* at 205:6-15.

198.   DHHS considers that it's the job of the case managers to make sure that CFI

participants receive their authorized services, and then it's between "Wendi and Kristina to monitor at a high level what's happening with the program." Ex. S-R, Santaniello Dep. at 57:6-23, Feb. 11, 2025.

## XI.    DHHS' Limited Examination of Its Own Data

### A.    Medicaid Claims and Provider Not Available Code

199.    DHHS recognizes it does have the responsibility "to monitor the waiver participants and the performance of case management agencies to ensure that the services that are authorized are [ ] meeting the needs of individuals." Ex. S-G, Aultman 30(b)(6) Dep. at 50:7-22, Dec. 4, 2024.

200.    The DHHS Medicaid Management Information System or "MMIS" is used for Medicaid claims payment. Ex. S-X, Kerri King Deposition ("King Dep.")(December 9, 2022), at 25:3- 26:20.

201.    DHHS can run reports in the MMIS to compare paid claims against the services that DHHS authorized. *Id.* at 26:2-23.

202.    According to Wendi Aultman, "it could be impossible to know [for] every -- every single participant at every moment in time whether or not they receive their service and how or why the individual did not receive their service." Ex. S-G, Aultman 30(b)(6) Dep. at 117:5-13.

203.    Wendi Aultman does acknowledge that it would "potentially" be possible for DHHS to identify CFI participants who missed a week of their services, but "there would need to be a reason" why DHHS "would be looking for that information." *Id.* at 120:21 - 122:14.

204.    DHHS does not run reports on CFI participants who have missed a week of their services. *Id.* at 123:20-124:3.

205.    DHHS is able to pull reports related to services it authorized to compare to the Medicaid claims requested against those authorizations." *Id.* at 55:22-56:3.

206.    DHHS Information Technology Manager Uma Bhusari does not regularly prepare

any data reports for the CFI Waiver population dealing with a difference between authorized services and claimed services. Ex. S-I, Bhusari Dep. at 96:12-17; 116:6-117:16.

207.    BAAS's Information Technology Manager has only analyzed MMIS data on one occasion since July 28, 2023 and no other job title at DHHS would otherwise analyze this data. *Id.* at 24:2-19, 50:8-22, 54:8-16.

208.    DHHS does not track any kind of MMIS data for the CFI Waiver beyond eligibility trends. *Id.* at 55:16-59:2.

209.    DHHS does not generate any reports of MMIS data related to the CFI Waiver on a regular basis. *Id.* at 86:2-6.

210.    BAAS's Information Technology Manager does not regularly generate MMIS reports containing data on both authorized services and claimed services for CFI participants. She has remembered creating these reports twice in her tenure at DHHS; both occurrences were at the request of Wendi Aultman during this litigation. *Id.* at 117:9-16.

211.    DHHS does not compile data concerning a case management agency's discharge of CFI participants from any source of data. *Id.* at 144:12-15.

212.    BAAS Director Aultman has looked at data on use of the provider-not-available code five or less times in the past year. Ex. S-G, Aultman 30(b)(6) Dep. at 194:6-12.

213.    DHHS has not conducted a large-scale survey of participants to see if they've received their authorized services in her time at DHHS. *Id.* at 179:17-21.

214.    DHHS does not have any policy setting a time frame for how long a service authorization can be associated with a "Provider Not Available" code. Ex. S-N, Aultman Dep. I") at 107:1-5.

## B. Hospitalization, Rehab, and Skilled Nursing Facility Data Involving Class Members

215.    DHHS does not track on a monthly basis how many CFI participants do not receive their services because they go into a hospital or rehab center. Ex. S-G, Aultman 30(b)(6) Dep. at 186:12-19.

216.    The report pulling data for CFI participants who had hospital stays is not a report DHHS regularly produces. *Id.* at 211:20 –212:1.9

217.    BAAS's Information Technology Manager has only reported MMIS data related to the number of CFI participants admitted to nursing facilities for litigation purposes. Ex. S-I, Bhusari Dep. at 106:2-6.

218.    BAAS's Information Technology Manager has only interacted with data concerning CFI participant hospital stays in the context of this litigation. *Id.* at 159:18-160:1.

219.    BAAS's Information Technology Manager does not interact with any data concerning CFI Participants who leave the Waiver for a nursing facility placement. *Id.* at 149:3-7.

## C. Provider Network

220.    BAAS's Information Technology Manager does not compile data concerning a service provider's discharge of CFI participants from any source. *Id.* at 144:16-19, 164:9-11.

221.    As of the date of her deposition, BAAS's Information Technology Manager does not compile any data concerning CFI service provider capacity or availability from any source. *Id.* at 144:20-146:17.

222.    On a quarterly or "every other month" basis, BAAS's Information Technology Manager compiles a list of CFI providers with their address and email information so that the DHHS has current email information for sending out notices. *Id.* at 147:6-148:18.

223.    BAAS's Information Technology Manager does not interact with any data

concerning CFI service provider unavailability. *Id.* at 156:2-10.

224.    BAAS's Information Technology Manager has never seen data concerning a CFI participant's refusal of CFI services. *Id.* at 167:19-22.

225.    BAAS's Information Technology Manager has never looked at data concerning job benefits for CFI service providers. *Id.* at 194:11-21.

### D.    Adult Protective Services (APS)

226.    APS asks for data on CFI participants approximately three to five times per year. *Id.* at 210:6 – 18.

227.    BAAS only considers data concerning CFI participants who have been referred to APS for the purpose of reporting that data to a third-party. *Id.* at 88:15-89:5, 209:10-17.

### E.    Electronic Visit Verification

228.    "[E]lectronic visit verification is a mechanism and tool that allows for provider agencies to enter information about services or visits in the home that are provided. It's only for certain services that are provided within the home. It's not for the full menu of CFI services or state plan services. And it is used to verify that a visit has been made, and that data and information is provided to the department through its vendored EVV system." Ex. S-G, Aultman 30(b)(6) Dep. at 70:10-20.

229.    According to the CFI Waiver, DHHS has initiated an electronic visit verification program, the stated goals of which include: "[e]nsuring individuals receive the services that they are authorized to receive in order to stay healthy and safe in the community." Ex. S-E, Waiver Application at 201-202.

230.    When DHHS requested approval for its EVV contract from Governor Sununu and the Executive Council on September 2, 2022, DHHS stated as an objective for the EVV that it "[e]nsure individuals receive the services they are authorized to receive." Ex. S-Y, Requested

Action, at 2.

231.    When DHHS requested approval for its EVV contract from Governor Sununu and the Executive Council on September 2, 2022, DHHS included as a performance measure that the "Contractor must provide a real-time performance monitoring dashboard that is available ninety-nine percent (99%) of the time, twenty-four (24) hours a day, seven (7) days a week, excluding Department-approved planned downtime. *Id.* at 3.

232.    According to the DHHS Medicaid Director, the EVV system can run reports on whether a CFI participant has received their service the day before he does not know if DHHS is running those reports.  Ex. S-J, Lipman Dep. at 210:20- 211:5.

233.    It is possible to use the EVV system to do real-time service verification. Ex. S-F, Ickes Dep. at 136:14-137:11.

234.    DHHS is not using EVV to "monitor whether or not CFI participants are receiving their CFI services in a timely manner."  Ex. S-R, Santaniello Dep., at 126-7.

235.    When asked "Are you using the EVV system to monitor in real time whether participants in the CFI program are getting their authorized services?" DHHS's 30(b)(6) witness Wendi Aultman answered "I don't know." Ex. S-G, Aultman 30(b)(6) Dep. at 77:2-16.

236.    Real-time data would be most useful for case managers to monitor whether CFI participants receive their authorized services. Ex. S-F, Ickes Dep. at 136:14- 137:12-22

237.    DHHS could use EVV to see, in "realtime" whether or not an individual CFI participant is getting the personal care services that they are authorized to receive. Ex. S-N, Aultman Dep. I at 53:1-9.

238.    DHHS is using EVV only to "ensure that if a provider claims for a service, that the service occurred."  Ex. S-R, Santaniello Dep. at 126:12-17.

**XII.    DHHS Does Not Remediate CFI Service Gaps Even When it IS Aware of Those Gaps.**

239.    Case management agencies are expected to find CFI service providers for the participants that they're assigned to serve. Ex. S-G, Aultman 30(b)(6) Dep. at 29:2-6.

240.    When a case management agency cannot find a service provider, "typically what will happen is they will consult with the department. We have monthly meetings where concerns or issues may come up. We call them technical assistance meetings." *Id.* at 29:7-17.

241.    The DDHS case consultation review form is the specific DHHS policy that tells the case management agency what to do if they cannot find a service provider. *Id.* at 31:4-15.

242.    The DHHS Case Review and Consultation Committee ("CRCC") meets every two weeks to review referrals and schedule meetings. *Id.* at 231:20- 2:3-5.

243.    CFI participants are not guaranteed that their case will be heard at the monthly convening of the CRCC due to scheduling constraints.. . . DHHS could hold more CRCC meetings if demand increases. Ex. S-F, Ickes Dep. at 228:5-230:10.

244.    When a case management agency tells DHHS they cannot find a provider, DHHS asks "probing questions" and for additional documentation on contingency planning and comprehensive care plan documents. Then DHHS will talk with the agency about other options and provide guidance. Ex. S-G, Aultman 30(b)(6) Dep. at 31:21 - 32:9.

245.    On a monthly basis, DHHS "ask[s] [case management agencies] if there's any potential concerns or issues with CFI participants they're serving that need to be brought to our attention." *Id.* at 122:8-11.

246.    If a CFI participant who is not receiving their authorized services is involved with Adult Protective Services ("APS"), APS may play a role in finding a provider or mitigating a barrier to getting services. *Id.* at 226:22- 227-16.

247.    APS does not have authority to find a provider for a CFI participant. *Id.* at 228:4-

14.

248.    Sentinel event reports are required when "someone has been injured, at risk of injury, police involvement, things like that," with case management agencies and some mental health providers as mandatory reporters. Ex. S-F, Ickes Dep. at 157:7-158:12; 159:9-160:4.

249.    DHHS reviews a sentinel event report when DHHS receives one. However, sentinel events are sometimes missed due to late reports or lack of awareness by case management agencies. *Id.* at 161:1-163:7, 164:19–166:4.

250.    Sentinel events are a quality function managed by the Bureau of Program Quality, which lacks authority to impose consequences for underreporting. *Id.* at 185:2-186:18.

251.    DHHS does not log calls from case management agencies requesting assistance with finding providers outside of the monthly technical assistance meetings. Ex. S-G, Aultman 30(b)(6) Dep. at 48:15- 49:2-3.

252.    DHHS's BAAS gets "notification when there's an issue or concern for an individual's service plan that cannot be resolved at the case management or service provider level and they seek guidance from the department." *Id.* at 20:11-16.

253.    According to Wendi Aultman, "we do look at service utilization in terms of authorized versus claimed services in a way to monitor and follow up when there are questions or indicators that may lead to us asking case management agencies to address needs or things that we're seeing and provide answers as to why we're seeing things that we're seeing." *Id.* at 280:17-281:2.

## XIII.    DHHS Does Not Have an Olmstead Plan

254.    According to the DHHS Associate Commissioner, New Hampshire is not required to have an Olmstead plan. She added that New Hampshire does not have either a written or an unwritten plan to "ensure that people can access services in the community and not be in an

institution…" Ex. S-R, Santaniello Dep. at 128:16-129:11.

255.    Henry Lipman has not seen a plan on making a forward commitment to how and what priorities it will put into place for deinstitutionalization of people with disabilities under the CFI program. Ex. S-J, Lipman Dep. at 240:8-21.

                                   Respectfully submitted,

Dated: May 15, 2025               EMILY FITZMORRIS, and KATHLEEN BATES
                                   on behalf of themselves and all others similarly situated,

                                   By Their Attorneys,


                                      */s/ Mark T. Knights*
                                   Mark T. Knights

Cheryl S. Steinberg (#10063)
NEW HAMPSHIRE LEGAL ASSISTANCE
117 N. State Street
Concord, NH
03301
T: (603) 206-2210
csteinberg@nhla.org

Kay E. Drought
(#12851)
Jessica Morrissey-Jeffery (#271978)
NEW HAMPSHIRE LEGAL ASSISTANCE
154 High Street
Portsmouth, NH 03801
T: (603) 206-2253
kdrought@nhla.org
jmorrissey@nhla.org

Kierstan E. Schultz (#20682)
kschultz@nixonpeabody.com
W. Daniel Deane (#18700)
ddeane@nixonpeabody.com
Mark Tyler Knights (#670991)
mknights@nixonpeabody.com
Tammy Nguyen
tnguyen@nixonpeabody.com
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
T: (603) 628-4000
F: (603) 628-4040

Jennifer Eber (#8775)
Hannah Roberts (#272288)
jennifere@drcnh.org
hannahr@drcnh.org
DISABILITY RIGHTS CENTER–
NEW HAMPSHIRE
64 North Main Street, Suite 2
Concord, NH 03301
T: (603) 228-0432
F: (603) 225-2077

Kelly Bagby *pro hac vice*
Maame Gyamfi *pro hac vice*
Stefan Shaibani *pro hac vice*
Samantha Wehrle, *pro hac vice*

kbagby@aarp.org
mgyamfi@aarp.org
sshaibani@aarp.org
sgerleman@aarp.org
AARP FOUNDATION
601 E Street NW
Washington, DC 20049
T: (202) 434-2103
F: (202) 434-6622

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 15 day of May, 2025 the foregoing court paper will be filed through the ECF system and served electronically on the registered participants identified on the Notice of Electronic Filing (NEF).


Dated:  May 15, 2025          _/s/ Mark. T. Knights_____