# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

EMILY FITZMORRIS, *et al*.,

Plaintiffs,

v.

NEW HAMPSHIRE DEPARTMENT OF
HEALTH AND HUMAN SERVICES AND
COMMISSIONER LORI WEAVER,

Defendants.

Case No. 21-cv-00025-PB

**AMICUS BRIEF OF JUSTICE IN AGING, THE CENTER FOR MEDICARE ADVOCACY, THE CENTER FOR PUBLIC REPRESENTATION, DISABILITY LAW UNITED, DISABILITY RIGHTS EDUCATION AND DEFENSE FUND, NATIONAL CONSUMER VOICE FOR QUALITY LONG-TERM CARE, AND THE NATIONAL HEALTH LAW PROGRAM IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

ARGUMENT ......................................................................................................... 2

I.   Applicable Law ......................................................................................... 2

II.  Individuals at Risk of Institutionalization State a Claim for Injunctive Relief Under
     Title II and Section 504 and Their Implementing Regulations. .......................................... 7

     A. Court Precedent Pre-Dating the DOJ Statement Recognized that
        Individuals at Risk of Institutionalization Stated a Claim Under Title II and
        Section 504 ............................................................................................ 8

     B. The Supreme Court And Circuit Courts Have Recognized Claims for Risk
        of Harm In Other Contexts. ................................................................... 10

     C. Defendants' Textual Analysis is Misguided .............................................. 12

III. The DOJ Statement Is Entitled to Deference ................................................ 13

IV.  Under *Loper Bright*, This Court Should Grant Due Respect to Title II and Section
     504 Regulations including the Integration Regulation and the DOJ Statement. .............. 15

     A. Congress Expressly Delegated Authority to the DOJ to Issue the Title II
        Regulations and to Each Federal Agency Including HHS to Issue Section 504
        Regulations. ......................................................................................... 16

     B. Congress Reenacted and Adopted the Section 504 and Title II Regulations;
        These Regulations  – Including the Integration Regulation – Have the Force
        of Law .................................................................................................. 18

     C. The Regulations Are Entitled to Respect Because the Supreme Court and
        Lower Courts Have Long Deferred to Agency Interpretations of Section 504
        and Title II. ......................................................................................... 19

     D. The Regulations Are Entitled To Respect Based on Their Long, Consistent,
        Well-Supported History. ......................................................................... 20

V.   Plaintiffs Have a Private Right of Action for Risk of Institutionalization. ..................... 22

VI.  Plaintiffs Have Proven Redressability .......................................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2011) ................................................................................ 22

*Auer v. Robbins,*
  519 U.S. 452 (1997) ................................................................................ 15

*Batterton v. Francis,*
  432 U.S. 416 (1977) ............................................................................ 16, 17

*Bondi v. VanDerStok,*
  145 S. Ct. 857 (2025) .............................................................................. 21

*Bragdon v. Abbott,*
  524 U.S. 624 (1998) ...................................................................... 3, 20, 21

*Chevron U.S.A. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984) ................................................................................ 16

*Commodity Futures Trading Comm'n v. Schor,*
  478 U.S. 833 (1986) ................................................................................ 18

*Connor v. Md. Dep't of Health,*
  No. MJM-12-1423, 2025 WL 1167846 (D. Md. Apr. 22, 2025) ............... 24

*Consol. Rail Corp. v. Darrone,*
  465 U.S. 624 (1984) ............................................................................ 3, 19

*Cruz v. Arnold,*
  No. 10-23048-CIV, 2010 WL 11601831 (S.D. Fla. Nov. 24, 2010) ........... 9

*Cruz v. Dudek,*
  No. 10-23048-CIV, 2010 WL 4284955 (S.D. Fla. Oct. 12, 2010) ............. 8

*Danny B. ex rel. Elliott v. Raimondo,*
  784 F.3d 825 (1st Cir. 2015) .................................................................. 12

*Davis v. Shah,*
  821 F.3d 231 (2d Cir. 2016) ................................................................. 5, 9

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................................ 10

*DG ex rel. Stricklin v. Devaughn,*
    594 F.3d 1188 (10th Cir. 2010) ............................................................... 12

*Diamond Alternative Energy, LLC v. Environmental Protection Agency,*
    145 S. Ct. 2121 (2025) ............................................................................ 24

*Dunn v. Dunn,*
    318 F.R.D. 652 (M.D. Ala. 2016) ........................................................... 25

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................................................ 11

*Fisher v. Okla. Health Care Auth.,*
    335 F.3d 1175 (10th Cir. 2003) ............................................................ 5, 8

*Fitzmorris v. Weaver,*
    No. 21-CV-25-PB, 2023 WL 8188770 (D.N.H. Nov. 27, 2023) ................ 6

*Food and Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................................................... 23, 24

*Garcia v. Navy Federal Credit Union,*
    No. 23-cv-2017-MMA-BLM, 2025 WL 1100898 (S.D. Cal. Apr. 14, 2025) ......................... 15

*Guardians Ass'n v. Civil Serv. Comm'n of New York City,*
    463 U.S. 582 (1983) ................................................................................ 22

*Harrison v. Young,*
    103 F.4th 1132 (5th Cir. 2024) ................................................................. 6

*Helen L. v. DiDario,*
    46 F.3d 325 (3d Cir. 1995) ...................................................................... 20

*Helling v. McKinney,*
    509 U.S. 25 (1993) ................................................................... 7, 11, 12, 22

*Hunter ex rel. Lynah v. Cook,*
    No. 1:08-CV-2930-TWT, 2011 WL 4500009 (N.D. Ga. Sept. 27, 2011) .................. 8

*Isaac A. v. Carlson,*
  775 F. Supp. 3d 1296 (N.D. Ga. 2025) ............................................................. 9, 10

*Iverson v. City of Boston,*
  452 F.3d 94 (1st Cir. 2006) ............................................................................... 22

*Jeremiah M. v. Crum,*
  695 F. Supp. 3d 1060 (D. Alaska 2023) ............................................................. 24

*Kisor v. Wilkie,*
  588 U.S. 558 (2019)...................................................................................... 13-15

*Kosilek v. Spencer,*
  774 F.3d 63 (1st Cir. 2014) ............................................................................... 11

*Lichter v. United States,*
  334 U.S. 742 (1948)........................................................................................... 18

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024)................................................................................... passim

*M.R. v. Dreyfus,*
  697 F.3d 706 (9th Cir. 2012). .................................................................. 2, 9, 15

*Marcus v. Kansas Dep't of Revenue,*
  170 F.3d 1305 (10th Cir. 1999) ......................................................................... 20

*Marks v. Colo. Dep't of Corrs.,*
  976 F.3d 1087 (10th Cir. 2020) ......................................................................... 23

*Marlo M. ex rel. Parris v. Cansler,*
  679 F. Supp. 2d 635 (E.D.N.C. 2010) ................................................................. 9

*Murphy by Murphy v. Minn. Dep't of Human Servs.,*
  260 F. Supp. 3d 1084 (D. Minn. 2017) ............................................................... 24

*Olmstead v. L.C. ex rel. Zimring,*
  527 U.S. 581 (1999)..................................................................................... passim

*Parker v. Universidad de Puerto Rico,*
  225 F.3d 1 (1st Cir. 2000) ................................................................................. 17

*Parsons v. Ryan,*
754 F.3d 657 (9th Cir. 2014) ................................................ 11

*Pashby v. Delia,*
709 F.3d 307 (4th Cir. 2013) .................................................. 5

*Pickens v. Hamilton-Ryker IT Solutions LLC,*
133 F.4th 575 (6th Cir. 2025) ............................................... 15

*Radaszewski ex rel. Radaszewski v. Maram,*
383 F.3d 599 (7th Cir. 2004) ............................................... 5, 8

*School Board of Nassau County v. Arline,*
480 U.S. 273 (1987) ........................................................... 20

*Shotz v. City of Plantation,*
344 F.3d 1161 (11th Cir. 2003) ............................................. 20

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ....................................................... 16, 21

*Snell v. Neville,*
998 F.3d 474 (1st Cir. 2021) ................................................ 17

*Steimel v. Wernert,*
823 F.3d 902 (7th Cir. 2016) ................................................. 5

*Sutherland v. Peterson's Oil Serv., Inc.,*
126 F.4th 728 (1st Cir. 2025) ............................................... 17

*Tennessee v. Becerra,*
131 F.4th 350 (6th Cir. 2025) ............................................... 19

*Timothy B. v. Kinsley,*
No. 1:22-cv-1046, 2024 WL 1350071 (M.D.N.C. Mar. 29, 2024) ......... 24

*Townsend v. Quasim,*
328 F.3d 511 (9th Cir. 2003) .............................................. 5, 8

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...................................................... 10, 24

*United States v. Bd. of Comm'rs of Sheffield,*
435 U.S. 110 (1978) ................................................................. 19

*United States v. McIntosh,*
124 F.4th 199 (3d Cir. 2024) .................................................. 13

*United States v. Mississippi,*
82 F.4th 387 (5th Cir. 2023) ......................................... 6, 12, 15

*United States v. Morton,*
467 U.S. 822 (1984) ............................................................... 17

*United States v. Yafa,*
136 F.4th 1194 (9th Cir. 2025) .............................................. 13

*V.L. v. Wagner,*
669 F. Supp. 2d 1106 (N.D. Cal. 2009) ................................... 9

*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
979 F.3d 426 (6th *Cir.* 2020) .......................................... 5, 12

**Statutes**

Rehabilitation Act of 1973
29 U.S.C. § 794 ................................................................. 1, 3, 18
Pub. L. No. 100–259, § 4, 102 Stat 28 (1988) ....................... 19
Pub. L. No. 102–569, § 506, 106 Stat 4344 (1992) ................ 19
Pub. L. No. 95–602, § 120, 92 Stat. 2955 (1978) .................. 19
Pub. L. No. 99–506, § 1003, 100 Stat. 1807 (1986) .............. 19

Americans with Disabilities Act of 1990
42 U.S.C. § 12101 ............................................................... 4, 20
42 U.S.C. § 12131 ..................................................................... 1
42 U.S.C. § 12132 ................................................................. 2, 3
42 U.S.C. § 12134 ................................................... 3, 4, 17, 18
42 U.S.C. § 12201 ......................................................... 3, 18
42 U.S.C. § 12205a ............................................................... 17

The ADA Amendments Act of 2008
Pub. L. No. 110–325, 122 Stat. 3553 (2008) ........................ 19

Title VI of Civil Rights Act of 1964
    42 U.S.C. § 2000d ................................................................................................ 22

**Other Authorities**

*AVOID Definition and Meaning*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/avoid#dictionary-entry-1 (last visited July 30, 2025) ....................... 13

Dep't of Health and Human Servs., *Discrimination on the Basis of Disability in Health and
    Human Service Programs or Activities*, Regulations.gov (Sept. 14, 2023),
    https://www.regulations.gov/document/HHS-OCR-2023-0013-0001 (comment period closed
    Nov. 13, 2023) ................................................................................................................. 6

U.S. Dep't of Just., Statement of the Department of Justice on Enforcement of the Integration
    Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (2011) .......... 5

**Regulations**

28 C.F.R. § 35.130 ............................................................................................... 4, 5, 12, 23

28 C.F.R. pt. 35 app. A ..................................................................................................... 15

28 C.F.R. pt. 35, apps. A-E ............................................................................................... 21

45 C.F.R. § 84.68 (2025) ..................................................................................................... 4

45 C.F.R. § 84.76 ................................................................................................................. 6

45 C.F.R. § 85.51 (1978), .................................................................................................... 4

43 Fed. Reg. 2132 (Jan. 13, 1978). ................................................................................. 3, 4

**Constitutional Provisions**

U.S. Const. amend. VIII ................................................................................................... 10

**Legislative History**

H.R. Rep. No. 101-485, pt. 2, at 84 (1990). ....................................................................... 4

## INTERESTS OF *AMICI CURIAE*

*Amici* Justice in Aging, the Center for Medicare Advocacy, the Center for Public Representation, Disability Law United, Disability Rights Education and Defense Fund, National Consumer Voice for Quality Long-Term Care, and the National Health Law Program (collectively "*Amici*") are all nonprofit organizations that advocate for the rights of disabled people, older people, and people who need or receive long term care, all precisely the populations most at risk of institutionalization under Defendants' and similar policies. In addition, these organizations have decades of experience understanding, interpreting, and enforcing the statutes discussed in this brief: Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. ("Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). *Amici* have a strong interest in ensuring that these statutes are interpreted and applied to prevent unjustified institutionalization of disabled people.

The individual *Amici* and their interests are described in the Memorandum of Law in Support of Motion for Leave to File *Amicus Curiae* Brief on Behalf of Justice in Aging, the Center for Medicare Advocacy, the Center for Public Representation, Disability Law United, Disability Rights Education and Defense Fund, National Consumer Voice for Quality Long-Term Care, and the National Health Law Program.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Disabled people who are living in the community but, by dint of Defendants' policies and policy failures, are at risk of institutionalization state a claim for injunctive relief under Title II Title II[1] and Section 504.[2] This is so whether considered under the language of the statutes

---

[1] 42 U.S.C. § 12131 *et seq.*
[2] 29 U.S.C. § 794

themselves, under the Supreme Court's *Olmstead*[3] decision, under post-*Olmstead* circuit precedent, under long-standing regulations that have the force of law, or under more recent regulations and regulatory interpretations.

Defendants ask this Court to ignore all of this authority on the apparent theory that the Supreme Court's recent decision in *Loper Bright*[4] sweeps away all regulation, regulatory interpretation, and related case law. They argue, instead, that disabled people must go through the trauma and often "irreversible"[5] process of institutionalization – leaving home and family behind – in order to challenge the polices that forced them into the institution.

This runs counter not only to the statutory language and purpose of Title II and Section 504 but to regulations and regulatory interpretations that are entitled to significant deference and respect. It is also counter to Supreme Court precedent in other contexts holding that an individual at risk of harm has standing to assert a claim for injunctive relief to prevent that harm.

Finally, Plaintiffs have standing to challenge Defendants' discriminatory conduct. Defendants' argument that Plaintiffs' injuries are not redressable is inconsistent with well-established precedent holding states liable for discrimination by third-party providers under contract with the state and, further, finding the harm for such discrimination redressable for standing purposes.

## ARGUMENT

### I. Applicable Law

Title II prohibits disability discrimination by public entities. 42 U.S.C. § 12132. Section 504 prohibits such discrimination by recipients of federal financial assistance. 29 U.S.C.

---

[3] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).
[4] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).
[5] *M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2012).

§ 794(a). Defendant New Hampshire Department of Health and Human Services is governed by both statutes.

Both Title II and Section 504 consist of broad language prohibiting covered entities from discriminating against disabled people or excluding them from participation in or denying them the benefits of the entities' programs or activities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Both statutes are enforced through detailed regulations going back to the 1978 Section 504 coordination regulations promulgated by the then Department of Health, Education, and Welfare ("HEW"). 43 Fed. Reg. 2132 (Jan. 13, 1978). When Congress passed the ADA in 1990, it expressly delegated authority to the Department of Justice ("DOJ") to promulgate implementing regulations, 42 U.S.C. § 12134(a), and incorporated by reference both the 1978 HEW regulations and the DOJ's own Section 504 regulations as minimum standards, *id*. § 12134(b). The ADA's statutory language also requires that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under [Section 504] or the regulations issued by Federal agencies pursuant to such title." *Id.* § 12201(a).

Sections 12134(b) and 12201(a) effectively make Section 504 regulations a statutory standard under the ADA. *See, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998) (holding that section 12201(a) "requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act"); *cf. Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 n.15 (1984) (stating that, in passing the 1978 amendments to the Rehabilitation Act, "Congress incorporated the substance of [HEW's] regulations into the statute.").[6]

---

[6] In the legislative history, Congress made clear that one of the purposes of Title II was "to make applicable the prohibition against discrimination on the basis of disability, currently set out in

Both Title II and applicable[7] Section 504 regulations contain almost identical language requiring the integration of disabled people: covered entities are required to administer programs and activities "in the most integrated setting appropriate to the needs of" the disabled person. 28 C.F.R. § 35.130(d) (2025) (Title II regulations); 45 C.F.R. § 84.68(d) (2025) (Department of Health and Human Services ("HHS") Section 504 regulations). This language has been in Section 504 regulations since the original 1978 HEW regulations, 43 Fed. Reg. at 2138, 45 C.F.R. § 85.51(d) (1978), which, again, were incorporated by reference into the statutory language of Title II, 42 U.S.C. § 12134(b). This regulation will be referred to as the Integration Regulation.

In 1999, the Supreme Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability," *Olmstead*, 527 U.S. at 597. That holding was based on the ADA's statutory prohibition on disability discrimination and Congress's statutory findings, including that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," and that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . .." *Id.* at 588 (quoting 42 U.S.C. § 12101(a)(2), (3)). The holding was also informed by the Title II Integration Regulation, which the Court recognized was – as required by the ADA's statutory language – based on language in the Section 504 regulations. *Olmstead*, 527 U.S. at 591-92.

---

regulations implementing section 504 of the Rehabilitation Act of 1973, to all programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto." H.R. Rep. No. 101-485, pt. 2, at 84 (1990).

[7] Each federal agency promulgates at least one set of Section 504 regulations. Defendants appear to agree that the applicable regulations are those of the Department of Health and Human Services. *See* Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Pls' Mot. for Summ. J. ("Defs.' Mem.") at 7, June 16, 2025, ECF No. 223-1.

Whether based on its long history – including incorporation by reference in the delegation provision of Title II – or the Court's decision in *Olmstead*, the prohibition on unjustified institutionalization is now the law.

Starting in 2003, a number of circuits have held that individuals at risk of institutionalization have a cause of action under *Olmstead* and the Integration Regulation. One of the earliest cases recognized the obvious: that the protections of the Integration Regulation "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (citing 28 C.F.R. § 35.130(d)); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608, 615 (7th Cir. 2004); *Townsend v. Quasim*, 328 F.3d 511, 515, 520 (9th Cir. 2003).

In 2011, the Department of Justice adopted this interpretation, stating that:

> [T]he ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent.

U.S. Dep't of Just., Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (2011) ("DOJ Statement").[8] Since that time, several additional circuits have also adopted this interpretation. *See, e.g.*, *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460 (6th *Cir*. 2020); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 262-63 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The Fifth Circuit, an outlier on

---

[8] https://www.ada.gov/resources/olmstead-mandate-statement/ (originally issued June 22, 2011, last updated Feb. 28, 2020). A copy of the DOJ Statement is attached as an appendix to this brief.

this question, rejected the "risk of institutionalization" theory as applied to a state's entire mental health system. *United States v. Mississippi*, 82 F.4th 387, 392 (5th Cir. 2023). Importantly, that court distinguished previous "at risk" cases considering claims for personal care services or medically necessary items pursuant to Medicaid – the very facts here. *Id.* at 396.[9] That court also ruled, two years later, that a Medicaid recipient stated a claim when she was at imminent risk of being forced into an institution. *Harrison v. Young*, 103 F.4th 1132, 1136 (5th Cir. 2024).

In 2024, after thorough rulemaking including consideration more than 5,000 comments,[10] HHS issued updated Section 504 regulations that explicitly prohibit policies that result in "serious risk of [unnecessary] segregation." 45 C.F.R. § 84.76(d).

It is this prohibition that Defendants challenge here. They argue that the well-established prohibition on unjustified institutionalization does not permit Plaintiffs' claims for injunctive relief to *prevent future* unjustified institutionalization. Defendants make two principal arguments.

First, they challenge the legitimacy of the DOJ Statement and its codification in 45 C.F.R. § 84.76(d), arguing that the Supreme Court's recent decision in *Loper Bright* forbids deference to – and thus somehow erases – the prohibition on placing disabled people at risk of institutionalization. Defs.' Mem. at 3-4.

Second, Defendants assert that the text of Title II and Section 504 do not prohibit risk of institutionalization. *Id.* at 4-8. They make much of the fact that the word "risk" is not found in

---

[9] As Plaintiffs explained, this Court has already distinguished the present case from *Mississippi*. *See* Pls.' Reply in Supp. of Their Mot. for Summ. J. and Obj. to Defs.' Cross-Mot. for Summ. J. at 5, July 16, 2025, ECF No. 229 (citing *Fitzmorris v. Weaver*, No. 21-CV-25-PB, 2023 WL 8188770, at *22-24 (D.N.H. Nov. 27, 2023)).

[10] Dep't of Health and Human Servs., *Discrimination on the Basis of Disability in Health and Human Service Programs or Activities*, Regulations.gov (Sept. 14, 2023), https://www.regulations.gov/document/HHS-OCR-2023-0013-0001 (comment period closed Nov. 13, 2023).

the text of either statute, and that that text uses past-tense verbs ("excluded," "denied," "subjected"), suggesting – they argue – that only "actual" rather than "hypothetical" discrimination is prohibited. *Id.* at 5.

Neither argument has merit. *Amici* address them in reverse order.

## II. Individuals at Risk of Institutionalization State a Claim for Injunctive Relief Under Title II and Section 504 and Their Implementing Regulations.

As discussed in greater detail below, based on Congressional delegation of authority and adoption through reenactment, the regulations implementing Title II and Section 504 – including the Integration Regulation – have the force of law. At the very least, based on these factors, Supreme Court and circuit precedent, and their long, consistent, and well-supported history, the Integration Regulation is entitled to deference and respect as a definitive interpretation of those statutes. *See* Section III *infra.*

Defendants' brief targets the DOJ Statement, asking this Court to ignore this authority and rule that individuals who are not yet institutionalized but only at risk of institutionalization cannot state a claim under the statutory language of Title II and Section 504. This is incorrect for several reasons.

First, courts have recognized "at-risk" *Olmstead* claims since long before the DOJ Statement.

Second, the Supreme Court and lower courts have long recognized that an individual at risk of the harm a statute or constitutional provision was meant to prevent have a claim, and "need not await a tragic event" to bring suit. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

Finally, Defendants rely on a textual analysis of Title II, Section 504, and their implementing regulations that cherry-picks words and grammatical features while disregarding key regulatory context that undermines their analysis.

7

Ultimately, without reference to the DOJ's interpretative guidance in the DOJ Statement, the statutory language of Title II and Section 504, as authoritatively interpreted by their respective regulations and the Supreme Court's decision in *Olmstead*, provides a cause of action for injunctive relief to individuals facing a risk of institutionalization.

### A. Court Precedent Pre-Dating the DOJ Statement Recognized that Individuals at Risk of Institutionalization Stated a Claim Under Title II and Section 504.

A number of cases decided in the wake of *Olmstead* but before the DOJ Statement was issued in 2011 held that disabled people who faced a risk of institutionalization stated a claim under Title II and Section 504 as interpreted by the Supreme Court in *Olmstead*. In 2003, the Tenth Circuit held that the plaintiff Medicaid recipients could challenge a policy change that limited the number of prescriptions they could fill per month while living in the community, but imposed no such limit on those living in nursing homes. The plaintiffs were living in the community, and brought suit to ensure that they could continue to do so. The Tenth Circuit held that the protection of the Integration Regulation "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181; *see also Radaszewski*, 383 F.3d at 608, 615 (finding that a plaintiff had stated a claim by showing that defendants' conduct "portend[ed]" future institutionalization); *Townsend*, 328 F.3d at 514, 520 (reversing summary judgment on a claim for violation of the ADA's integration requirement brought by a plaintiff currently living at home who had been informed that he would lose his benefits if he did not submit to institutionalization); *Hunter ex rel. Lynah v. Cook*, No. 1:08-CV-2930-TWT, 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) (quoting *Fisher*); *Cruz v. Dudek*, No. 10-23048-CIV, 2010 WL 4284955, at *1 (S.D. Fla. Oct. 12, 2010), *report and recommendation adopted sub nom. Cruz v. Arnold*, No. 10-23048-CIV, 2010

WL 11601831 (S.D. Fla. Nov. 24, 2010) ("Although *Olmstead* involved plaintiffs who were seeking to be removed from institutions, the holding applies equally to plaintiffs who are seeking to avoid institutionalization."); *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) (granting a preliminary injunction to plaintiffs living in the community who had demonstrated that "if forced from their present settings, both Plaintiffs face a substantial risk of institutionalization."); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009) ("Although *Olmstead* addressed ongoing institutionalization, plaintiffs who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization.").

Post-2011 cases have also recognized at-risk claims grounded in the language of the statute and the *Olmstead* decision, while mentioning the DOJ Statement for additional support. For example, the Ninth Circuit held that "DOJ's interpretation is not only reasonable; it also better effectuates the purpose of the ADA." *M.R.*, 697 F.3d at 735; *see also Davis*, 821 F.3d at 263 (finding "DOJ's and [its] sister circuits' interpretation . . . both consistent with the integration mandate and well-reasoned"). A recent district court case joined the majority of circuit and district courts in recognizing an at-risk claim and specifically grounded that claim in the language of the ADA and *Olmstead* rather than the DOJ Statement. In *Isaac A. v. Carlson*, the court held that "when children are substantially at risk of institutionalization, that risk is precisely the type of insidious discrimination that the ADA was enacted to prevent." 775 F. Supp. 3d 1296, 1348 (N.D. Ga. 2025). The court went on to explain that

> it is not simply that the ADA and *Olmstead* do not foreclose at-risk claims. Rather, the recognition that a substantial risk of institutionalization is itself a form of discrimination is the more accurate reading of *Olmstead* and the ADA's integration mandate, both of which sought to prevent unnecessary institutionalization – not to encourage it for the sake of checking off a legal prerequisite.

*Id.* Finally, that court expressly disavowed reliance on the DOJ Statement: "It is not necessary to consult DOJ's guidance to hold that a serious risk of institutionalization is precisely the type of discrimination countenanced by *Olmstead*." *Isaac A.*, 775 F. Supp. 3d at 1348 n.30.

### B. The Supreme Court and Circuit Courts Have Recognized Claims for Risk of Harm In Other Contexts.

The concept that a plaintiff may state a claim for injunctive relief for risk of future harm is also well-established. As the Supreme Court recently held, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (holding that "future injuries . . . may suffice [to establish standing] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.").

This principle has been well developed in the Supreme Court's Eighth Amendment jurisprudence, in which the Court has held that prisoners have a claim not only for current harm but for an unreasonable risk of future harm. This principle has also been widely applied in considering the risk of harm under a substantive due process theory, for example, to children in foster care. Here, this principle provides further support – from outside of the DOJ's interpretation – for the conclusion that a plaintiff at risk of institutionalization states a claim under Title II and Section 504.

The Eighth Amendment states that "[e]xcessive bail shall not be required, … nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. While this use of the past tense ("inflicted") might suggest to Defendants that only past harm is actionable, *see infra* Section II.C, that is not the way the Supreme Court has interpreted this text. Rather, the Court has held that a prisoner may state cause of action under the Eighth Amendment if he alleges "an

unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35. The plaintiff in that case alleged that exposure to environmental tobacco smoke ("ETS") in prison posed risk to his health. The defendant prison argued that unless he could prove current, serious medical problems, the prisoner did not have a claim under the Eighth Amendment. *Id.* at 32. The Court rejected that argument, holding that the plaintiff had "state[d] a cause of action under the Eighth Amendment" by alleging that the prison's actions "exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Id.* at 35; *see also Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."); *Kosilek v. Spencer*, 774 F.3d 63, 85 (1st Cir. 2014) (recognizing that "[a] significant risk of future harm that prison administrators fail to mitigate" may state a claim under the Eighth Amendment).

Claims alleging risk of harm are especially salient in cases like the present in which a plaintiff class challenges systemic policies that put the class at risk of harm. For example, in *Parsons v. Ryan*, the Ninth Circuit held that a class of prisoners satisfied the commonality requirement of Fed. R. Civ. P 23(a) when they alleged that class members were all exposed, "as a result of specified statewide [prison] policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm." 754 F.3d 657, 678 (9th Cir. 2014). Similarly, in a case challenging future harm to children in foster care, the Tenth Circuit affirmed certification of a class of such children, finding a common issue of fact in that "all members of the class [were] allegedly exposed to the same unreasonable risk of harm as a result of Defendants' unlawful practices. Though each class member may not have actually suffered abuse, neglect, or the risk of such harm, Defendants' conduct allegedly poses a risk of impermissible harm to all children in [Defendants'] custody." *DG ex rel. Stricklin v. Devaughn*,

594 F.3d 1188, 1196 (10th Cir. 2010); *cf. Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825, 834 (1st Cir. 2015) (reciting the substantive due process standard of risk of future harm; citing *Helling* and *DG*).

Ultimately, as the *Helling* Court held, "a remedy for unsafe conditions need not await a tragic event." 509 U.S. at 33. Similarly, disabled people do not have to await the tragedy of institutionalization to have a claim under the ADA.

### C. Defendants' Textual Analysis is Misguided.

Defendants base their argument against a claim for risk if institutionalization in part on the fact that several of the verbs in the statutory language are in the past tense. They rely on the analysis in *United States v. Mississippi*, 82 F.4th at 392, arguing that the fact that the statutory language prohibits disabled people from being "excluded," "denied" or "subjected to discrimination" means that the statute only applies to "'actual, not hypothetical administration of public programs.'" *See* Defs.' Mem. at 5. Moving on to the regulatory language, Defendants have no past-tense verbs or case law to point to, so they assert without support that the prohibition on using methods of administration that have the effect of discriminating against disabled people and the requirement that a covered entity administer programs in an integrated setting both require an institutionalization *fait accompli*. *Id.* at 5-6.

This analysis fails to address the Title II regulation on which remedies for at-risk and actual institutionalization claims are based: the requirement that covered entities make "reasonable modifications in policies, practices, or procedures when the modifications are necessary *to avoid discrimination on the basis of disability*," unless doing so would be a fundamental alteration. 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). It is this regulation that plaintiffs rely on in *Olmstead* cases to request that states modify their policies to provide services in the community. *See, e.g. Waskul*, 979 F.3d at 463; *cf. Olmstead*, 527 U.S. at 597 (discussing

"the States' obligation to *avoid unjustified isolation* of individuals with disabilities" under

§ 35.130(b)(7) (emphasis added)). This command to make modifications to *avoid* discrimination

is entirely forward-looking: avoiding discrimination requires preventing it from happening in the

future.[11]

\* \* \*

For these reasons, individuals at risk of institutionalization state a claim for injunctive

relief under Title II and Section 504 without reference to or reliance on the DOJ Statement.

**III.    The DOJ Statement Is Entitled to Deference.**

Defendants rely on the Supreme Court's recent decision in *Loper Bright* to attack the

DOJ Statement adopting the interpretation that the ADA and the *Olmstead* case extend to persons

at serious risk of institutionalization or segregation. As discussed above, this Court does not need

to reach this question, as the statutes themselves provide a cause of action for individuals at risk

of institutionalization.

In addition, Defendants' reliance on Loper Bright is misplaced. The DOJ Statement is an

agency interpretation of its own regulation rather than an agency interpretation of a statute. As

such, Loper Bright does not apply. Rather, *Kisor v. Wilkie* requires deference to an agency's

interpretation of its own regulations when the regulation is "genuinely ambiguous," the

interpretation is reasonable, is made by the agency, implicating its substantive expertise, and

reflects its fair and considered judgment. 588 U.S. 558, 574, 575 (2019).[12]

---

[11] Merriam-Webster defines "avoid" as "to prevent the occurrence or effectiveness of." *AVOID Definition and Meaning*, Merriam-Webster, https://www.merriam-webster.com/dictionary/avoid#dictionary-entry-1 (last visited July 30, 2025).

[12] Although *Loper Bright* was decided after *Kisor*, a number of circuits have held that *Loper Bright* "did not call *Kisor* into question." *United States v. Yafa,* 136 F.4th 1194, 1197 n.4 (9th Cir. 2025); *United States v. McIntosh*, 124 F.4th 199, 205 n.3 (3d Cir. 2024) ("*Loper Bright* did not

Again, for the reasons set forth in Section II above, Title II, Section 504, and the Integration Regulation unambiguously prohibit measures that would put disabled individuals at risk of institutionalization. If this Court agrees, no *Kisor* analysis is required, and Defendants' motion should be denied.

Should this Court consider the Integration Regulation to be ambiguous on the question whether it extends to individuals at risk of institutionalization, the DOJ Statement satisfies the requirements for *Kisor* deference.

For the reason first discussed in *Fisher*, the interpretation in the DOJ Statement is reasonable: it would render the Integration Regulation meaningless if disabled people had to subject themselves to segregation and institutionalization to challenge a discriminatory practice. The DOJ Statement is also clearly the DOJ's authoritative, official position and reflects its "fair and considered judgment" as demonstrated in the Statement itself. It is not a "convenient litigating position," *Kisor*, 588 U.S. at 579, or new interpretation and in no way conflicts with earlier interpretations.

Interpreting the long-standing regulation requiring administration of programs in the most integrated setting appropriate is squarely within the DOJ's substantive expertise. Again, Congress explicitly delegated to that agency the authority to promulgate regulations mandated to be consistent with the 1978 Section 504 regulations that – then and now – included the Integration Regulation. Regulatory guidance accompanying the Title II regulations reflects extensive consideration of integration and segregation in a variety of contexts. *See, e.g.*, 28

---

cast doubt on the deference *Kisor* afforded to an agency's reasonable interpretation of its own genuinely ambiguous regulation").

C.F.R. pt. 35 app. A at 654 (play areas), 667 (transient lodging), 669 (hospitals), 672 (prisons), 693 (access to performance stages) (2024).

For these reasons, the DOJ Statement is entitled to deference and cases that have relied on it have in no way been "'superseded by *Kisor*.'" Defs.' Mem. at 6 (quoting *United States v. Mississippi*, 82 F.4th at 393-94 & n.10.)[13]

## IV. The Title II and Section 504 Regulations are Entitled to Deference Under Loper Bright.

Defendants assert, without additional analysis, that the Supreme Court's recent decision in *Loper Bright* "squarely forbids deference to . . . agency interpretation of statutes" and that "'serious risk of' unjustified institutional[ization] claims are no longer viable after *Loper Bright*." Defs.' Mem. at 3, 4. That is, Defendants treat *Loper Bright* as some sort of regulatory kryptonite. It is not. "*Loper Bright* . . . does not instruct the Court to relegate all agency regulations or interpretations to the legal anti-canon nor presume their incorrectness by virtue of their existence." *Garcia v. Navy Federal Credit Union*, No. 23-cv-2017-MMA-BLM, 2025 WL 1100898, at *18 (S.D. Cal. Apr. 14, 2025); *see also Pickens v. Hamilton-Ryker IT Solutions LLC*, 133 F.4th 575, 587 (6th Cir. 2025) ("In doing away with deference, however, *Loper Bright* did not do away with discretion."). As explained below, *Loper Bright* contained far more nuanced analyses, all of which underscore the deference due – and the status of – the Title II and Section 504 regulations.

*Loper Bright* applies to agency regulations that interpret statutory language, reversing the automatic deference afforded under *Chevron U.S.A. v. Natural Resources Defense Council*, 467

---

[13] Pre-*Kisor*, the Ninth Circuit afforded *Auer* deference to a DOJ statement of interest articulating the at-risk standard. *M.R.*, 697 F.3d at 735 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

U.S. 837 (1984), and holding that courts are to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright*, 603 U.S. at 412.

Although the target of Defendants' argument is the DOJ Statement recognizing at-risk claims, Defendants appear to be brandishing *Loper Bright* to attack the entire 47-year history of Section 504 and, later, Title II regulations. That case, they announce, has "lift[ed] the fog of deference that has long precluded courts from independently analyzing the ADA and the Rehabilitation Act." Defs.' Mem. at 4. To the contrary: Title II and Section 504 regulations satisfy *Loper Bright*'s standards for continued deference or at the very least substantial respect to agency interpretations of statutes. As explained in the sections that follow, the Title II regulations were promulgated pursuant to express Congressional delegation of authority; for over forty years, the Supreme Court and circuit courts have deferred to the DOJ's, HEW's, and HHS's regulatory interpretation of these two statutes; and the regulations are reliable based on contemporaneous issuance, longstanding consistency, and expertise. *See Loper Bright*, 603 U.S. at 388 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also id.* at 394, 412, 413.

A. **Congress Expressly Delegated Authority to the DOJ to Issue the Title II Regulations and to Each Federal Agency Including HHS to Issue Section 504 Regulations.**

*Loper Bright* held that "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." 603 U.S. at 413; *see also id.* at 394-95 ("In a case involving an agency . . . the statute's meaning may well be that the agency is authorized to exercise a degree of discretion," citing *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). *Batterton*, in turn, held that where Congress expressly delegated the power to issue regulations, that regulation "is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or

16

otherwise not in accordance with law.'" 432 U.S. at 426; *see also United States v. Morton*, 467 U.S. 822, 834 (1984) (holding that where "Congress explicitly delegated authority to construe the statute by regulation," the Court "must give the regulations legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute.").

As explained above, the statutory language of Title II expressly delegates authority to the DOJ to promulgate implementing regulations and mandates consistency with existing Section 504 regulations. 42 U.S.C. § 12134(a), (b). The First Circuit has recognized that "[b]ecause Congress explicitly authorized the Attorney General to promulgate regulations under the ADA," the regulations "must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 n.5 (1st Cir. 2000) (quoting *Morton*, 467 U.S. at 834)); *see also Snell v. Neville*, 998 F.3d 474, 499 n.33 (1st Cir. 2021) (same, quoting *Parker*).

Following the Court's decision in *Loper Bright*, the First Circuit recognized that the delegation of authority to the Equal Employment Opportunity Commission ("EEOC") in the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12205a, was a "quintessential example of Congress 'expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term.'" *Sutherland v. Peterson's Oil Serv., Inc*., 126 F.4th 728, 738 n.5 (1st Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 394). This is significant because the delegation language of the ADAAA – directing the EEOC, the DOJ, and the DOT to "issue regulations implementing" the that statute – tracks the language delegating to the DOJ authority to issue regulations implementing Title II. *Compare* 42 U.S.C. § 12205a *with id*. § 12134(a) ("promulgate regulations . . . that implement" the statute).

In addition to the express delegation in Title II, in the 1978 amendments to Section 504, Congress delegated to each agency authority to promulgate implementing regulations and instructed that the regulations be submitted to Congress for review. 29 U.S.C. § 794(a). Since that time, myriad agencies and other executive administrative bodies have promulgated regulations implementing Section 504 as to both the agencies themselves and as to recipients of their funding.

**B. Congress Reenacted and Adopted the Section 504 and Title II Regulations; These Regulations – Including the Integration Regulation – Have the Force of Law.**

As noted above, the provision delegating authority to the DOJ to issue regulations implementing Title II explicitly referenced the 1978 HEW Section 504 regulations, 42 U.S.C. § 12134(b), essentially incorporating them into the statute itself. *See, e.g.*, *Lichter v. United States*, 334 U.S. 742, 783 (1948) (where Congress "substantially incorporated into the statute the [relevant] administrative practice . . . [i]t thus became an express congressional definition" of that practice). *See also* 42 U.S.C. § 12201(a) (requiring the ADA to be construed to apply standards at least as strong as those in the Section 504 regulations).

Even when it does not expressly incorporate a regulatory interpretation into statutory language, Congress effectively adopts a such an interpretation when it re-enacts the statute without disavowing it. *See, e.g. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" (internal citation omitted)). This doctrine of legislative re-enactment is stronger where, as here,[14] there is explicit evidence that Congress was aware of and agreed

---

[14] *See supra* n.6.

with the regulatory interpretation in question. *See United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 135 (1978) (holding that where "there ha[s] been a longstanding administrative interpretation of a statute when Congress re-enacted it, and . . . the legislative history of the re-enactment showed that Congress agreed with that interpretation" Congress is deemed to have ratified the interpretation). Congress has re-enacted Section 504 on numerous occasions[15] and the ADA once[16] since their original passage, at no time calling into question the interpretation reflected in the then-applicable regulations, including the Integration Regulation.

### C. The Supreme Court and Lower Courts Have Long Deferred to Agency Regulations Interpreting Section 504 and Title II.

The *Loper Bright* Court also emphasized that it "[did] not call into question prior cases that relied on the *Chevron* framework." 603 U.S. at 412. A recent Sixth Circuit case concluded that "prior cases" in this context included circuit precedent. *Tennessee v. Becerra*, 131 F.4th 350, 365-66 (6th Cir. 2025). Forty years of Supreme Court and circuit precedent, all remaining good law, recognize the authority and reasonableness of Title II and Section 504 regulations.

A number of Supreme Court and circuit court decisions have deferred to the HEW, HHS, and DOJ Section 504 regulations, in some cases recognizing that they have the status of law. The earliest of these, *Darrone*, noted that, in passing the 1978 amendments to the Rehabilitation Act, "Congress incorporated the substance of [HEW's] regulations into the statute." 465 U.S. at 634 n.15. Three years later, in *School Board of Nassau County v. Arline*, the Court stated, "the regulations promulgated by [HHS] are of significant assistance. As we have previously recognized, these regulations were drafted with the oversight and approval of Congress . . . [and

---

[15] Pub. L. No. 95–602, § 120, 92 Stat. 2955, 2982 (1978); Pub. L. No. 99–506, § 1003, 100 Stat. 1807, 1845 (1986); Pub. L. No. 100–259, § 4, 102 Stat 28, 29 (1988); Pub. L. No. 102–569, § 506, 106 Stat 4344, 4428 (1992).
[16] The ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008).

thus] provide 'an important source of guidance on the meaning of § 504.'" 480 U.S. 273, 279-80 (1987) (internal citations omitted). In *Bragdon*, the Court held that section 12101(a) – discussed above – required the Court "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act." 524 U.S. at 632. The Third Circuit has held that, "because Congress mandated that the ADA regulations be patterned after the section 504 coordination regulations, the former regulations have the force of law." *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995).[17]

For these reasons, both the Title II and Section 504 regulations have the force of law.

### D.  The Regulations Are Entitled To Respect Based on Their Long, Consistent, Well-Supported History.

*Loper Bright* held that regulations with a long and consistent history merit court respect, even if not full or automatic deference. 603 U.S. at 386. The Title II and Section 504 regulations – including the Integration Regulation – have the necessary characteristics of consistency, longevity, thorough consideration, and expertise, and are thus entitled to judicial respect.

First, a regulatory interpretation warrants respect when it was "issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 603 U.S. at 386. The Court underscored this point in a recent decision upholding the interpretation of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that the Gun

---

[17] *See also Shotz v. City of Plantation*, 344 F.3d 1161, 1179 (11th Cir. 2003) ("Congress expressly authorized the Attorney General to make rules with the force of law interpreting and implementing the ADA provisions generally applicable to public services.   The DOJ issued its rules contemporaneously with its implementation of these provisions, using conventional notice-and-comment rulemaking procedures. . . . The resulting rules are therefore entitled to controlling weight unless they are procedurally flawed, substantively arbitrary and capricious, or plainly contradict the statute." (internal citations omitted)); *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1306 n.1 (10th Cir. 1999) ("because Congress mandated that the ADA regulations be patterned after the [1978 HEW 504 regulations], the former regulations have the force of law" (quoting *Helen L.*)).

Control Act applied to weapon parts kits, often referred to as "ghost guns." Quoting *Loper Bright*, the Court held that the plaintiffs' novel reading of the statute – attempting to exclude such guns – ran contrary to the ATF's consistent interpretation over "decades." *Bondi v. VanDerStok*, 145 S. Ct. 857, 873-74 (2025). "[W]hile 'courts must exercise independent judgment in determining the meaning of statutory provisions,' the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning." *Id.* at 874 (quoting *Loper Bright*, 603 U.S. at 394). The *Bragdon* Court, interpreting the definition of disability, emphasized that its "holding is confirmed by a consistent course of agency interpretation before and after enactment of the ADA" and conformed to conclusion of "[e]very agency to consider the issue under the Rehabilitation Act." *Id.* 524 U.S. at 642. As noted above, the Integration Regulation has been part of the Section 504 and Title II regulations consistently since 1978. It thus provides evidence of the statutes' meaning and is entitled to respect.

The *Loper Bright* Court further held that regulations that reflected, among other things, "specialized experience," and "thoroughness [of] consideration" were entitled to respect. 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139-40). The Section 504 and Title II regulations reflect the expertise of not only HEW and DOJ, but of the many agencies that each issued their own Section 504 regulations and the myriad experts and stakeholders who were consulted during the drafting process. For example, the DOJ regulations implementing Title II currently include five appendices describing the extensive process and comments that were involved in the original issuance and the subsequent amendment of those regulations.[18]

* * *

---

[18] 28 C.F.R. pt. 35, apps. A – E.

For the reasons set forth above, far from being swept away like fog, the Title II and Section 504 regulations have legislative and controlling weight and are entitled to deference or at the very least great respect.

## V.    Plaintiffs Have a Private Right of Action for Risk of Institutionalization.

Defendants argue that Plaintiffs do not have a private right of action to enforce their right to be free of serious risk of institutionalization. Defs.' Mem. at 8-9 (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2011)). *Alexander* held that the plaintiff did not have a private right of action to enforce a regulation prohibiting disparate impact discrimination under Title VI of the Civil Rights Act of 1964,[19] *id.* at 293, based on the fact that the Court had earlier limited such claims to intentional discrimination, *id.* at 280 (citing *Guardians Ass'n v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 612-13 (1983)).

In contrast, the Supreme Court explicitly held in the *Olmstead* decision that both that Title II and Section 504 prohibit unjustified institutionalization, *id.* 527 U.S. at 597, and has further held that plaintiffs generally have standing to assert a claim for injunctive relief when at risk of harm, *see, e.g.*, *Helling*, 509 U.S. at 35. As the First Circuit has held, "a regulation that simply effectuates an express mandate contained in the organic statute may nonetheless be enforceable through the private right of action available under the statute itself." *Iverson v. City of Boston*, 452 F.3d 94, 100-01 (1st Cir. 2006).

The First Circuit in *Iverson* rejected a private right of action to enforce the Title II provision requiring covered entities to conduct self-evaluations on the grounds that a covered entity's "failure to self-evaluate does not in and of itself render [its] services, programs, or activities inaccessible to disabled persons." *Id.* at 101. Self-evaluation is essentially an

---

[19] 42 U.S.C. § 2000d.

administrative reporting requirement rather than a substantive antidiscrimination requirement. In contrast, the requirement that disabled people not be put at risk of institutionalization is a core antidiscrimination requirement of Title II, Section 504, and their legally-binding regulations. Given that the at-risk claim is well-grounded in the statutory language, *see supra* Section II, Plaintiffs have a private right of action to enforce those rights.

## VI.    Plaintiffs Have Proven Redressability

Defendants contend that Plaintiffs lack standing to bring their ADA and Section 504 claims because their injuries are not redressable. Defendants argue that Plaintiffs' injuries are not redressable because "implementing the relief [requested by Plaintiffs] depends on the actions of third parties, such as the willingness of private individuals to choose to serve as workers delivering CFI Waiver services." Defs.' Mem. at 49. Defendants' argument is misplaced.[20]

As a general matter, the Supreme Court "has identified a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff" which is redressable through judicial relief. *Food and Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 384 (2024)*.* The several examples identified in *Alliance for Hippocratic Medicine* include "when the government regulates (or under-regulates) a business" and "the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain," including customers. *Id.* at 384-85. Plaintiffs have proven that they experience "downstream" injuries stemming from

---

[20] There can be no question that Defendants are liable for disability discrimination committed by their contracting entities. *See, e.g.*, 28 C.F.R. § 35.130(b) (prohibiting discrimination "directly or through contractual, licensing, or other arrangements"); *see also e.g.*, *Marks v. Colo. Dep't of Corrs.*, 976 F.3d 1087, 1096-97 (10th Cir. 2020) (holding state department of corrections liable for discriminatory acts of private community corrections provider under contract with the department).

Defendants' under-regulation of service providers, such as not receiving the community-based services for which they are approved.

Specifically in ADA/504 cases, courts routinely find claims against government agencies actionable where they are brought to remedy deficiencies in the administration of social service programs, including deficiencies in the oversight of third-party service providers. *See e.g. Connor v. Md. Dep't of Health*, No. MJM-12-1423, 2025 WL 1167846, at *4 (D. Md. Apr. 22, 2025) (finding redressability in ADA/504 methods of administration claims); *Timothy B. v. Kinsley*, No. 1:22-cv-1046, 2024 WL 1350071, at *7-9 (M.D.N.C. Mar. 29, 2024) (finding redressability in ADA/504 integration and methods of administration claims); *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1089-90 (D. Alaska 2023) (finding redressability in ADA/504 integration claims); *Murphy by Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084, 1102-03 (D. Minn. 2017) (same); .

Equally misplaced is Defendants' contention that it is "pure 'guesswork'" that the relief Plaintiffs seek would lessen instances of service gaps. Defs.' Mem. at 49. Defendants' oversight (or non-oversight) of its contracted service providers creates "predictable," rather than "speculative," effects. *See Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 145 S. Ct. 2121, 2134 (2025) (citing *Alliance for Hippocratic Medicine*, 602 U.S. at 383). The very purpose of Defendants' oversight of the CFI Waiver program is to create "predictable" effects for both providers and waiver participants. The dispositive question is not whether the relief Plaintiffs seek necessarily will result in fewer service gaps. It is whether it is "likely" to do so. *See Diamond Alternative Energy*, 145 S. Ct. at 2133 (quoting *TransUnion*, 594 U.S. at 423). Indeed, it is almost guaranteed that instances of service gaps will *not* be detected and corrected if Defendants continue with their "know-nothing, do nothing" approach to

detecting and preventing failures to provide already approved, medically-necessary home health services. *Dunn v. Dunn*, 318 F.R.D. 652, 665 n.12 (M.D. Ala. 2016) ("The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA.").

## CONCLUSION

For the reasons set forth above, *Amici* respectfully request that this Court deny Defendants' Motion for Summary Judgment as to Plaintiffs' claims under Title II and Section 504.

Respectfully submitted,

FOX & ROBERTSON, PC

*/s/ Amy F. Robertson*
Amy F. Robertson, CO Bar No. 25890
1550 Wewatta St., Suite 200
Denver, CO 80202
303.951.4164
arob@foxrob.com
*Pro hac vice pending*

JUSTICE IN AGING

*/s/ Liam McGivern*
Liam McGivern, FL Bar No. 98684
9555 SW 175th Terrace, # 665
Palmetto Bay, FL 33157
202.792.3680
lmcgivern@justiceinaging.org
*Pro hac vice pending*

RED SNEAKER LAW, PLLC

*/s/ Kirk Simoneau*
Kirk Simoneau, NH Bar No. 19291
P.O. Box 1216
Amherst, NH 03031
603.336.2028
kirk@redsneakerlaw.com

Counsel for *Amici*

Dated: July 30, 2025

## Certificate of Service

I hereby certify that on July 30, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Kirk Simoneau
Kirk Simoneau



**ADA.gov**

**U.S. Department of Justice
Civil Rights Division**

# Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead* v. L.C.

Last updated: February 28, 2020

In the years since the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), the goal of the integration mandate in title II of the Americans with Disabilities Act – to provide individuals with disabilities opportunities to live their lives like individuals without disabilities – has yet to be fully realized. Some state and local governments have begun providing more integrated community alternatives to individuals in or at risk of segregation in institutions or other segregated settings. Yet many people who could and want to live, work, and receive services in integrated settings are still waiting for the promise of *Olmstead* to be fulfilled.

📁 **Guidance & Resources**

Read this to get specific guidance about this topic.

For a beginner-level introduction to a topic, view Topics
For information about the legal requirements, visit Law, Regulations & Standards

In 2009, on the tenth anniversary of the Supreme Court's decision in *Olmstead,* President Obama launched "The Year of Community Living" and directed federal agencies to vigorously enforce the civil rights of Americans with disabilities. Since then, the Department of Justice has made

# APPENDIX

enforcement of *Olmstead* a top priority.  As we commemorate the 12th anniversary of the *Olmstead* decision, the Department of Justice reaffirms its commitment to vindicate the right of individuals with disabilities to live integrated lives under the ADA and *Olmstead*.  To assist individuals in understanding their rights under title II of the ADA and its integration mandate, and to assist state and local governments in complying with the ADA, the Department of Justice has created this technical assistance guide.

# The ADA and Its Integration Mandate

In 1990, Congress enacted the landmark Americans with Disabilities Act "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." [1] In passing this groundbreaking law, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem. [2]  For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[3]

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on regulations issued under section 504 of the Rehabilitation Act. [4] The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." [5] The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."[6]

In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities.  The Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity. [7]  The Supreme Court explained that this holding "reflects two evident judgments."  First, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.[8]

To comply with the ADA's integration mandate, public entities must reasonably modify their policies, procedures or practices when necessary to avoid discrimination.[9] The obligation to make reasonable modifications may be excused only where the public entity demonstrates that the requested modifications would "fundamentally alter" its service system.[10]

Statement of the Department of Justice on Enforcement of the Integrati...

https://www.ada.gov/resources/olmstead-mandate-statement/

In the years since the passage of the ADA and the Supreme Court's decision in *Olmstead*, the ADA's integration mandate has been applied in a wide variety of contexts and has been the subject of substantial litigation. The Department of Justice has created this technical assistance guide to assist individuals in understanding their rights and public entities in understanding their obligations under the ADA and *Olmstead*. This guide catalogs and explains the positions the Department of Justice has taken in its Olmstead enforcement. It reflects the views of the Department of Justice only. For questions about this guide, you may contact our ADA Information Line, 800-514-0301 (voice), 833-610-1264 (TTY).

# Questions and Answers on the ADA's Integration Mandate and *Olmstead* Enforcement

---

### 1. What is the most integrated setting under the ADA and *Olmstead*?

A. The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."[11] Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible. Evidence-based practices that provide scattered-site housing with supportive services are examples of integrated settings. By contrast, segregated settings often have qualities of an institutional nature. Segregated settings include, but are not limited to: (1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities.

### 2. When is the ADA's integration mandate implicated?

A. The ADA's integration mandate is implicated where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities. More specifically, a public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and or/programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) through its planning, service system design, funding choices, or service implementation practices,

promotes or relies upon the segregation of individuals with disabilities in private facilities or programs.[12]

### 3. Does a violation of the ADA's integration mandate require a showing of facial discrimination?

A. No, in the *Olmstead* context, an individual is not required to prove facial discrimination.  In *Olmstead*, the court held that the plaintiffs could make out a case under the integration mandate even if they could not prove "but for" their disability, they would have received the community-based services they sought.  It was enough that the state currently provided them services in an institutional setting that was not the most integrated setting appropriate.[13]  Additionally, an *Olmstead* claim is distinct from a claim of disparate treatment or disparate impact and accordingly does not require proof of those forms of discrimination.

### 4. What evidence may an individual rely on to establish that an integrated setting is appropriate?

A. An individual may rely on a variety of forms of evidence to establish that an integrated setting is appropriate. A reasonable, objective assessment by a public entity's treating professional is one, but only one, such avenue.  Such assessments must identify individuals' needs and the services and supports necessary for them to succeed in an integrated setting. Professionals involved in the assessments must be knowledgeable about the range of supports and services available in the community.  However, the ADA and its regulations do not require an individual to have had a state treating professional make such a determination. People with disabilities can also present their own independent evidence of the appropriateness of an integrated setting, including, for example, that individuals with similar needs are living, working and receiving services in integrated settings with appropriate supports.  This evidence may come from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source. Limiting the evidence on which *Olmstead* plaintiffs may rely would enable public entities to circumvent their *Olmstead* requirements by failing to require professionals to make recommendations regarding the ability of individuals to be served in more integrated settings.

### 5. What factors are relevant in determining whether an individual does not oppose an integrated setting?

A. Individuals must be provided the opportunity to make an informed decision.  Individuals who have been institutionalized and segregated have often been repeatedly told that they are not capable of successful community living and have been given very little information, if any, about how they could successfully live in integrated settings.  As a result, individuals' and their families' initial response when offered integrated options may be reluctance or hesitancy.  Public entities must take affirmative steps to remedy this history of segregation and prejudice in order to ensure that individuals have an opportunity to make an informed choice. Such steps include providing information about the benefits of integrated settings;

facilitating visits or other experiences in such settings; and offering opportunities to meet with other individuals with disabilities who are living, working and receiving services in integrated settings, with their families, and with community providers. Public entities also must make reasonable efforts to identify and addresses any concerns or objections raised by the individual or another relevant decision-maker.

### 6. Do the ADA and *Olmstead* apply to persons at serious risk of institutionalization or segregation?

A. Yes, the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent. For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.

### 7. May the ADA and *Olmstead* require states to provide additional services, or services to additional individuals, than are provided for in their Medicaid programs?

A. A state's obligations under the ADA are independent from the requirements of the Medicaid program.[14] Providing services beyond what a state currently provides under Medicaid may not cause a fundamental alteration, and the ADA may require states to provide those services, under certain circumstances. For example, the fact that a state is permitted to "cap" the number of individuals it serves in a particular waiver program under the Medicaid Act does not exempt the state from serving additional people in the community to comply with the ADA or other laws.[15]

### 8. Do the ADA and *Olmstead* require a public entity to provide services in the community to persons with disabilities when it would otherwise provide such services in institutions?

A. Yes. Public entities cannot avoid their obligations under the ADA and *Olmstead* by characterizing as a "new service" services that they currently offer only in institutional settings. The ADA regulations make clear that where a public entity operates a program or provides a service, it cannot discriminate against individuals with disabilities in the provision of those services.[16] Once public entities choose to provide certain services, they must do so in a nondiscriminatory fashion.[17]

### 9. Can budget cuts violate the ADA and *Olmstead*?

A. Yes, budget cuts can violate the ADA and *Olmstead* when significant funding cuts to community services create a risk of institutionalization or segregation. The most obvious example of such a risk is where budget cuts require the elimination or reduction of community

services specifically designed for individuals who would be institutionalized without such services. In making such budget cuts, public entities have a duty to take all reasonable steps to avoid placing individuals at risk of institutionalization. For example, public entities may be required to make exceptions to the service reductions or to provide alternative services to individuals who would be forced into institutions as a result of the cuts. If providing alternative services, public entities must ensure that those services are actually available and that individuals can actually secure them to avoid institutionalization.

### 10. What is the fundamental alteration defense?

A. A public entity's obligation under *Olmstead* to provide services in the most integrated setting is not unlimited. A public entity may be excused in instances where it can prove that the requested modification would result in a "fundamental alteration" of the public entity's service system. A fundamental alteration requires the public entity to prove "that, in the allocation of available resources, immediate relief for plaintiffs would be inequitable, given the responsibility the State [or local government] has taken for the care and treatment of a large and diverse population of persons with [ ] disabilities."[18] It is the public entity's burden to establish that the requested modification would fundamentally alter its service system.

### 11. What budgetary resources and costs are relevant to determine if the relief sought would constitute a fundamental alteration?

A. The relevant resources for purposes of evaluating a fundamental alteration defense consist of all money the public entity allots, spends, receives, or could receive if it applied for available federal funding to provide services to persons with disabilities. Similarly, all relevant costs, not simply those funded by the single agency that operates or funds the segregated or integrated setting, must be considered in a fundamental alteration analysis. Moreover, cost comparisons need not be static or fixed. If the cost of the segregated setting will likely increase, for instance due to maintenance, capital expenses, environmental modifications, addressing substandard care, or providing required services that have been denied, these incremental costs should be incorporated into the calculation. Similarly, if the cost of providing integrated services is likely to decrease over time, for instance due to enhanced independence or decreased support needs, this reduction should be incorporated as well. In determining whether a service would be so expensive as to constitute a fundamental alteration, the fact that there may be transitional costs of converting from segregated to integrated settings can be considered, but it is not determinative. However, if a public entity decides to serve new individuals in segregated settings ("backfilling"), rather than to close or downsize the segregated settings as individuals in the plaintiff class move to integrated settings, the costs associated with that decision should not be included in the fundamental alteration analysis.

### 12. What is an *Olmstead* Plan?

A. An *Olmstead* plan is a public entity's plan for implementing its obligation to provide

individuals with disabilities opportunities to live, work, and be served in integrated settings. A comprehensive, effectively working plan must do more than provide vague assurances of future integrated options or describe the entity's general history of increased funding for community services and decreased institutional populations. Instead, it must reflect an analysis of the extent to which the public entity is providing services in the most integrated setting and must contain concrete and reliable commitments to expand integrated opportunities. The plan must have specific and reasonable timeframes and measurable goals for which the public entity may be held accountable, and there must be funding to support the plan, which may come from reallocating existing service dollars. The plan should include commitments for each group of persons who are unnecessarily segregated, such as individuals residing in facilities for individuals with developmental disabilities, psychiatric hospitals, nursing homes and board and care homes, or individuals spending their days in sheltered workshops or segregated day programs. To be effective, the plan must have demonstrated success in actually moving individuals to integrated settings in accordance with the plan. A public entity cannot rely on its *Olmstead* plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case. Any plan should be evaluated in light of the length of time that has passed since the Supreme Court's decision in *Olmstead*, including a fact-specific inquiry into what the public entity could have accomplished in the past and what it could accomplish in the future.

### 13. What must a public entity show to establish a fundamental alteration defense based on an *Olmstead* plan?

A. A public entity raising a fundamental alteration defense based on an *Olmstead* plan must show that it has developed a comprehensive, effectively working *Olmstead* plan that meets the standards described above, and that it is implementing the plan. A public entity that cannot show it has and is implementing a working plan will not be able to prove that it is already making sufficient progress in complying with the integration mandate and that the requested relief would so disrupt the implementation of the plan as to cause a fundamental alteration.

### 14. What is the relevance of budgetary shortages to a fundamental alteration defense?

A. Public entities have the burden to show that immediate relief to the plaintiffs would effect a fundamental alteration of their program. Budgetary shortages are not, in and of themselves, evidence that such relief would constitute a fundamental alteration. Even in times of budgetary constraints, public entities can often reasonably modify their programs by re-allocating funding from expensive segregated settings to cost-effective integrated settings. Whether the public entity has sought additional federal resources available to support the provision of services in integrated settings for the particular group or individual requesting the modification – such as Medicaid, Money Follows the Person grants, and federal housing vouchers – is also relevant to a budgetary defense.

**15. What types of remedies address violations of the ADA's integration mandate?**

A. A wide range of remedies may be appropriate to address violations of the ADA and *Olmstead*, depending on the nature of the violations. Remedies typically require the public entity to expand the capacity of community-based alternatives by a specific amount, over a set period of time. Remedies should focus on expanding the most integrated alternatives. For example, in cases involving residential segregation in institutions or large congregate facilities, remedies should provide individuals opportunities to live in their own apartments or family homes, with necessary supports. Remedies should also focus on expanding the services and supports necessary for individuals' successful community tenure. *Olmstead* remedies should include, depending on the population at issue: supported housing, Home and Community Based Services ("HCBS") waivers,[19] crisis services, Assertive Community Treatment ("ACT") teams, case management, respite, personal care services, peer support services, and supported employment. In addition, court orders and settlement agreements have typically required public entities to implement a process to ensure that currently segregated individuals are provided information about the alternatives to which they are entitled under the agreement, given opportunities that will allow them to make informed decisions about their options (such as visiting community placements or programs, speaking with community providers, and meeting with peers and other families), and that transition plans are developed and implemented when individuals choose more integrated settings.

**16. Can the ADA's integration mandate be enforced through a private right of action?**

A. Yes, private individuals may file a lawsuit for violation of the ADA's integration mandate. A private right of action lies to enforce a regulation that authoritatively construes a statute. The Supreme Court in *Olmstead* clarified that unnecessary institutionalization constitutes "discrimination" under the ADA, consistent with the Department of Justice integration regulation.

**17. What is the role of protection and advocacy organizations in enforcing *Olmstead*?**

A. By statute, Congress has created an independent protection and advocacy system (P&As) to protect the rights of and advocate for individuals with disabilities.[20] Congress gave P&As certain powers, including the authority to investigate incidents of abuse, neglect and other rights violations; access to individuals, records, and facilities; and the authority to pursue legal, administrative or other remedies on behalf of individuals with disabilities.[21] P&As have played a central role in ensuring that the rights of individuals with disabilities are protected, including individuals' rights under title II's integration mandate. The Department of Justice has supported the standing of P&As to litigate *Olmstead* cases.

**18. Can someone file a complaint with the Department of Justice regarding a violation of the ADA and *Olmstead*?**

A. Yes, individuals can file complaints about violations of title II and *Olmstead* with the Department of Justice.  A title II complaint form is available on-line at archive.ada.gov and can be sent to:

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Individuals may also call the Department's toll-free ADA Information Line for information about filing a complaint and to order forms and other materials that can assist you in providing information about the violation.  The number for the ADA Information Line is (800) 514-0301 (voice) or (833) 610-1264 (TTY).

In addition, individuals may file a complaint about violations of *Olmstead* with the Office for Civil Rights at the U.S. Department of Health and Human Services. Instructions on filing a complaint with OCR are available at http://www.hhs.gov/ocr/civilrights/complaints/index.html

1. 42 U.S.C. § 12101(b)(1). Back to text

2. 42 U.S.C. § 12101(a)(2). Back to text

3. 42 U.S.C. § 12132. Back to text

4. See 42 U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Executive Order 12250, 45 Fed. Reg. 72995 (1980), reprinted in 42 U.S.C § 2000d-1. Section 504 of the Rehabilitation Act of 1973 similarly prohibits disability-based discrimination. 29 U.S.C § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."). Claims under the ADA and the Rehabilitation Act are generally treated identically. Back to text

5. 28 C.F.R. § 35.130(d) (the "integration mandate"). Back to text

6. 28 C.F.R. Pt. 35, App. A (2010) (addressing § 35.130). Back to text

7. *Olmstead v. L.C.*, 527 U.S.at 607. Back to text

8. Id. at 600-01. Back to text

9. 28 C.F.R.§ 35.130(b)(7). Back to text

10. Id.; *see* also *Olmstead*, 527 U.S. at 604-07. Back to text

11. 28 C.F.R. pt. 35 app. A (2010). Back to text

12. See 28 C.F.R. § 35.130(b)(1) (prohibiting a public entity from discriminating "directly or through contractual, licensing or other arrangements, on the basis of disability"); § 35.130(b)(2) (prohibiting a public entity from "directly, or through contractual or other arrangements, utilizing criteria or methods of administration" that have the effect of discriminating on the

basis of disability"). <u>Back to text</u>

13. *Olmstead*, 527 U.S. at 598; 28 C.F.R. 35.130(d). <u>Back to text</u>

14. *See* CMS, *Olmstead* Update No. 4, at 4 (Jan. 10, 2001), available at <u>https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd011001a.pdf</u> <u>Back to text</u>

15. Id. <u>Back to text</u>

16. 28 C.F.R. § 35.130. <u>Back to text</u>

17. See U.S. Dept. of Justice, ADA Title II Technical Assistance Manual § II-3.6200. <u>Back to text</u>

18. *Olmstead*, 527 U.S. at 604. <u>Back to text</u>

19. HCBS waivers may cover a range of services, including residential supports, supported employment, respite, personal care, skilled nursing, crisis services, assistive technology, supplies and equipment, and environmental modifications. <u>Back to text</u>

20. 42 U.S.C. §§ 15001 et seq. (Developmental Disabilities Assistance and Bill of Rights Act, requiring the establishment of the P&A system to protect and advocate for individuals with developmental disabilities); 42 U.S.C. § 10801 et seq. (The Protection and Advocacy for Individuals with Mental Illness Act, expanding the mission of the P&A to include protecting and advocating for individuals with mental illness) <u>Back to text</u>

21. 42 U.S.C. §§ 10805, 15043. <u>Back to text</u>

---

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

Originally issued: June 22, 2011

Last updated: February 28, 2020