## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Emily Fitzmorris, et al.**

v.

**Lori Weaver, Commissioner,**
**New Hampshire Department of**
**Health and Human Services, et al.**

Case No. 1:21-cv-25-PB
Opinion No. 2026 DNH 039

## MEMORANDUM OPINION

The plaintiffs in this class action are disabled individuals who are enrolled in New Hampshire's Choices for Independence ("CFI") Waiver program, a Medicaid program administered by the New Hampshire Department of Health and Human Services ("DHHS"). The defendants are DHHS and its Commissioner, Lori Weaver. The CFI Waiver program provides home and community-based care services to adults who otherwise would be Medicaid-eligible for nursing home care. The plaintiffs allege that the defendants' deficient administration of the CFI Waiver program has placed them at "serious risk of unjustified institutionalization" in violation of both Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.

The case came before me on cross-motions for summary judgment. Doc. 199; Doc. 223. Because material factual disputes remain for trial, I denied

both motions. This Memorandum Opinion explains the reasoning for that decision.

## I.  BACKGROUND

### A.  The CFI Waiver Program

"Medicaid is a cooperative federal-state program created in 1965 as an amendment to the Social Security Act in order to help states provide publicly-funded medical assistance to certain needy citizens." Bruns v. Mayhew, 750 F.3d 61, 63 (1st Cir. 2014). Before a state can qualify for federal funds, it must submit a state Medicaid plan to a federal agency, the Center for Medicare & Medicaid Services ("CMS"). CMS then "reviews the State's plan . . . to determine whether [it] compl[ies] with the statutory and regulatory requirements governing the Medicaid program" before granting approval to the state to receive federal funds. Douglas v. Indep. Living Ctr. of S. Cal., Inc., 565 U.S. 606, 610 (2012).

The Medicaid Act provides states with an option to apply for a "waiver" that exempts their state Medicaid plan from compliance with certain statutory requirements. See 42 U.S.C. § 1396n. Pertinent here, a waiver under section 1396n(c)(1) allows states to provide "home or community-based services" for individuals who would require institutional care "but for the provision of such services." Id. § 1396n(c)(1). As part of its Medicaid program, New Hampshire applied for a waiver under section 1396n(c)(1) and

established the CFI Waiver program pursuant to that waiver. Doc. 140-1 at 2-3.

The CFI Waiver program is administered by DHHS and is designed to "support older people and adults with disabilities to live independently in the community." Doc. 202-5 at 6. In the 2023 reporting period, which lasted from July 1, 2022 through June 30, 2023, the program served 4,401 unique participants in the state. Doc. 202-6 at 2. The program "provides supports and services to individuals who are Medicaid eligible and meet nursing facility level of care through a network of community-based provider agencies who are directly enrolled as [New Hampshire] Medicaid Providers." Doc. 202-5 at 6. To participate in the program, an individual must be "clinically eligible" to receive services in a nursing facility, meaning:

> [The individual] requires 24-hour care for at least one of the following purposes: (1) Medical monitoring and nursing care requiring the skills of a licensed medical professional to provide safe and effective services; (2) Restorative nursing or rehabilitative care with patient-specific goals; (3) Medication administration by oral, topical, intravenous, intramuscular, or subcutaneous injection, or intravenous feeding for treatment of recent or unstable conditions requiring medical or nursing intervention; or (4) Assistance with two or more activities of daily living involving eating, toileting, transferring, bathing, dressing, and continence.

N.H. Rev. Stat. Ann. § 151-E:3. Eligible individuals must also be at least eighteen years old, meet established financial eligibility requirements, require at least one CFI-covered service per month, and elect to receive CFI

Waiver services instead of receiving care in an institutional setting. Id.; N.H. Admin. R. He-E ("AR He-E") 801.03(a).

DHHS implements the CFI Waiver program through a network of eight private case management agencies ("CMAs"). Doc. 223-2 at 11-12. DHHS "delegate[s] to and reimburses case management agencies for, inter alia, working with CFI Waiver participants to arrange for the delivery of authorized CFI Waiver services based on the participants' goals, preferences, and needs." Id. at 11. Once DHHS determines that an individual is eligible to receive CFI Waiver services, that individual is paired with a case management agency. AR He-E 805.07. The assigned case management agency then becomes responsible for developing and maintaining a comprehensive care plan for the CFI Waiver participant in compliance with governing New Hampshire regulations. See AR He-E 801.05. That care plan must include, at minimum, a list of services to be provided to the participant and an "individualized contingency plan" that "addresses unexpected situations that could jeopardize the participant's health or welfare." AR He-E 805.02(l), 805.05(c).

DHHS is ultimately responsible for administering the CFI Waiver program. See Doc. 165 at 4. Thus, DHHS remains responsible for determining participant eligibility and authorizing services. AR He-E 801.04, 801.06. DHHS has implemented several review mechanisms to this end. It

4

requires CMAs to prepare "quality management reports" on a quarterly basis and submit them to DHHS. Doc. 223-2 at 17. Additionally, DHHS holds biweekly Case Review and Consultation Committee ("CRCC") meetings and monthly "technical assistance" meetings to address issues faced by CMAs. Id. at 41-42. DHHS also mandates that CMAs report "sentinel events," such as injury, death, or police involvement with a participant. Id. at 42-43.

New Hampshire benefits from significant cost savings by administering the CFI Waiver program as an alternative to providing institutional care. The costs of providing home and community-based care through the program are, on average, less expensive than providing similar care in a nursing facility. As the New Hampshire Fiscal Policy Institute said in its July 2022 report, "State Budget funding appropriated for each actual [CFI] enrollee totaled $18,997, while for nursing facilities, funding from all sources per actual enrollee was $98,111." Doc. 134-22 at 6. DHHS Medicaid Director Harry Lipman concurred with these findings, testifying that "CFI is close to three times less [costly] than institutional care." Doc. 202-11 at 17.

In recent years, the defendants have undertaken several efforts to expand the resources available to CFI Waiver participants and their providers. In both fiscal years 2020 and 2021, state legislative appropriations increased the fee schedule of reimbursement rates for all Medicaid services, including CFI Waiver services, by 3.1 percent each year. Doc. 228-4 at 15. In

the 2024-2025 biennium, the legislature appropriated over $7.1 million for reimbursement rate increases, $6.4 million of which was appropriated "for the purpose of increasing rates for all Choices for Independence providers not provided rate increases elsewhere in this section" over the two years. H.B. 2 § 239(II), (V), (VII), 2023 Gen. Court, Reg. Session (N.H. 2023). Additionally, DHHS spending on the CFI Waiver program increased from $71 million in 2021 to over $110 million in 2024. Doc. 223-31 at 2.

### B.    Statutory Requirements

As a state Medicaid plan, the CFI Waiver program must comply with several federal statutes. At issue here are Title II of the ADA, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Both Title II and Section 504 prohibit discrimination on the basis of disability.[1] See 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

Title II's general antidiscrimination provision is codified at 42 U.S.C. § 12132. It reads, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

---

[1]    Title II applies to public entities, like DHHS, whereas Section 504 applies to programs that receive federal funds. See 42 U.S.C. § 12131; 29 U.S.C. § 794. Because the statutes share textual similarities, "the same standards govern claims under both, and [courts] rely on cases construing Title II and section 504 interchangeably." Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022) (citation modified). I discuss the plaintiffs' claims under Title II, but my analysis also applies to their Section 504 claims.

6

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Attorney General adopted regulations to implement section 12132 in 1991. Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694 (July 26, 1991) (codified at 28 C.F.R. § 35.130). These regulations include an "integration regulation," a "methods of administration regulation," and a "reasonable-modifications regulation." 28 C.F.R. § 35.130. The integration regulation states that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Id. § 35.130(d). The methods of administration regulation, meanwhile, provides in pertinent part that "[a] public entity may not, directly or through contractual arrangements, utilize criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." Id. § 35.130(b)(3). And the reasonable-modifications regulation requires public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Id. § 35.130(b)(7)(i).

7

In its landmark opinion in <u>Olmstead v. L.C. ex rel. Zimring</u>, the Supreme Court determined that section 12132 requires persons with disabilities to be placed in community settings when (1) "the State's treatment professionals have determined that community placement is appropriate," (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [] disabilities." 527 U.S. 581, 587 (1999).

In addition to the <u>Olmstead</u> Court's central holding, a plurality of justices also explained that a public entity's obligation to provide community-based treatment to individuals with disabilities "is not boundless." Id. at 603. Relying on their reading of the reasonable-modifications regulation, the plurality stated that "[s]ensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with [] disabilities." Id. at 604. Alternatively, it explained that the regulation would be satisfied if the state could show that it had "a comprehensive, effectively

working plan for placing qualified persons with [] disabilities in less

restrictive settings, and a waiting list that moved at a reasonable pace not

controlled by the State's endeavors to keep its institutions fully populated."

Id. at 605-06.

## C.    The Plaintiffs' Claims

Emily Fitzmorris and Kathleen Bates represent a class of:

> CFI Waiver participants who, during the pendency of this lawsuit, have been placed at serious risk of unjustified institutionalization because Defendants, by act or omission, fail to ensure that the CFI participants receive the community-based long term care services and supports through the waiver program for which they have been found eligible and assessed to need.

Doc. 165 at 79. Relying on Olmstead, the plaintiffs claim that the defendants'

systemic failure to provide class members with the CFI Waiver services they

need to remain in their communities violates Title II by placing them at

"serious risk of unjustified institutionalization." Doc. 1 at 8-19, 34-38. [2]

---

[2]    The plaintiffs assert that the defendants are violating both the integration regulation and the methods of administration regulation in separate claims, but they do not distinguish between these claims in their summary judgment briefing. I follow their lead. See generally G.K. v. Sununu, 2021 DNH 143, 2021 WL 4122517, at *12 (D.N.H. 2021) (noting that an Olmstead claim "encompasses methods of administration that fail to achieve the most integrated setting appropriate to the plaintiffs' needs").

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a reasonable factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

When the parties cross-move for summary judgment, the standard of review is applied to "each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)); see also Mandel v. Bos. Phx., Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, when resolving cross-motions for summary judgment, I must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

10

### III.  ANALYSIS

The defendants base their summary judgment motion on multiple theories. They first argue that the plaintiffs cannot ground their claims on a risk of institutionalization because (1) the risk is too insubstantial to confer standing; (2) only institutionalized persons can assert an Olmstead claim; and (3) the plaintiffs cannot prove that they face a class-wide risk of institutionalization. Next, they contend that the plaintiffs' claims fail because they cannot prove that the defendants' acts or omissions caused the class to face a serious risk of institutionalization. Finally, they invoke the reasonable-modifications regulation and fault the plaintiffs for failing to identify any reasonable and necessary modifications that would not fundamentally alter the CFI Waiver program.

The plaintiffs present a near-mirror image of the defendants' motion. Relying on essentially the same record, they rebut the defendants' arguments and argue that that law compels judgment in their favor.

### A.    Risk of Institutionalization

#### 1.    Do Plaintiffs Have Standing to Sue?

To establish Article III standing, a plaintiff must demonstrate that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)

11

(citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). The defendants argue that the plaintiffs lack standing because their claimed injury, which the defendants argue is "a serious risk of unjustified institutionalization," does not qualify as an injury in fact and is not redressable by a court order.

The defendants' argument fails to persuade because it misapprehends the injury that gives the plaintiffs standing. That injury is not the "risk of institutionalization"; it is the loss of the benefits that class members are entitled to receive in a community setting. See e.g. M.G. v. N.Y. State Off. of Mental Health, 572 F. Supp. 3d 1, 11 (S.D.N.Y. 2021) ("[T]he injury in fact is not actual or imminent institutionalization, but rather the failure to receive services, resulting in Plaintiffs' increased likelihood of institutionalization."). The plaintiffs have produced ample evidence to support their claim that they are not receiving the services to which they are entitled in a community setting, an injury that is both imminent and concrete. Their injury is also plainly redressable by an order from this Court requiring the defendants to implement any changes to the CFI Waiver program that Title II requires. Thus, the plaintiffs have constitutional standing to sue.

2.     Can an Olmstead Claim be Based on a Serious Risk of
Unjustified Institutionalization?

In 2011, the Department of Justice issued subregulatory guidance
construing the integration regulation and concluding that "the ADA and the
Olmstead decision extend to persons at serious risk of institutionalization or
segregation and are not limited to individuals currently in institutional or
other segregated settings." U.S. Dep't of Justice Statement of the Department
of Justice on Enforcement of the Integration Mandate of Title II of the
Americans with Disabilities Act and Olmstead v. L.C. ("DOJ Statement"),
available at www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25,
2020) [https://perma.cc/HN3B-7ENA]. Before that guidance issued, two
courts of appeals had independently concluded that an Olmstead claim can be
brought by a plaintiff who is not currently institutionalized. See Fisher v.
Okla. Health Care Auth., 335 F.3d 1175, 1181 (10th Cir. 2003); Radaszewski
ex rel. Radaszewski v. Maram, 383 F.3d 599, 600 (7th Cir. 2004). And
afterwards, six additional circuit courts concluded that an Olmstead claim
can be premised on a serious risk of institutionalization. See Davis v. Shah,
821 F.3d 231, 263-64 (2d Cir. 2016); Pashby v. Delia, 709 F.3d 307, 322 (4th
Cir. 2013); Waskul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426,
461 (6th Cir. 2020); Steimel v. Wernert, 823 F.3d 902, 911 (7th Cir. 2016);
Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin, 149

13

F.4th 917 (7th Cir. 2025); M.R. v. Dreyfus, 663 F.3d 1100, 1116 (9th Cir. 2011), op. am'd and superseded on denial of reh'g, 697 F.3d 706 (9th Cir. 2012); Powers v. McDonough, 163 F.4th 1162 (9th Cir. 2025); United States v. Florida, 2026 WL 879178, at * 13 (11th Cir. March 31, 2026); but see United States v. Mississippi, 82 F.4th 387, 392 (5th Cir. 2023) (concluding that Olmstead only applies to "actual institutionalization" rather than the "risk of institutionalization").

The defendants contend that the DOJ Statement misreads both Olmstead and the integration regulation in concluding that a Title II claim can be based on a serious risk of institutionalization. They also argue that any deference a court might otherwise be inclined to give to the DOJ Statement is barred either by the Supreme Court's recent decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), or its earlier decision in in Kisor v. Wilkie, 588 U.S. 558 (2019). Because Loper Bright does not apply in this case and the DOJ Statement is entitled to deference under Kisor, I decline the defendants' invitation to ignore the DOJ Statement. Further, because I agree with the vast majority of courts to have addressed the issue that an Olmstead claim may be brought by disabled persons who are at serious risk of institutionalization, I reject the defendants' argument that only institutionalized persons can assert an Olmstead claim.

14

### a.    Loper Bright

In Loper Bright, the Supreme Court overruled its decision in Chevron, and determined that a court may not simply defer to an agency's reasonable interpretation of an ambiguous statute. 603 U.S. at 412 (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984)). Instead, the Court held that lower "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority as the APA requires." Id.

The defendants argue that Loper Bright bars courts from affording any deference to the DOJ Statement. The obvious problem with the defendants' argument, however, is that this case concerns an agency's interpretation of its regulations, whereas Loper Bright applies only to agencies' interpretations of statutes. The Supreme Court relatively recently explained how a court should evaluate subregulatory guidance of this kind in Kisor, which remains untouched by Loper Bright. See United States v. Prather, 138 F.4th 963, 975 (6th Cir. 2025) (noting that Loper Bright did not overrule Kisor); United States v. McIntosh, 124 F.4th 199, 205 n.3 (3rd Cir. 2024) ("Loper Bright did not cast doubt on the deference Kisor afforded to an agency's reasonable interpretation of its own genuinely ambiguous regulation."); see also United States v. Poore, 2025 WL 1201946, at *4 (7th Cir. Apr. 25, 2025) (noting that Loper Bright did not "explain the effect of the

15

decision (if any) on Kisor."). While it is possible that the Court may eventually abandon Kisor as it did Chevron, until it does, Kisor, not Loper Bright, provides the governing standard. See Rodriguez de Quijas v. Shearson/American Exp., Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [an inferior court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

### b.    Kisor

Defendants alternatively argue that the DOJ Statement is not entitled to deference even under Kisor because the integration regulation unambiguously applies only after a disabled person has been institutionalized. In Kisor, the Supreme Court determined that a court may defer to an agency's interpretation of its own regulations only if the regulations are ambiguous and the agency's proposed interpretation is reasonable. 588 U.S. at 574-77. Even then, blind deference is unacceptable. Instead, the court must make an "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." Id. at 576. That inquiry requires three steps: first, "the regulatory interpretation must be one actually made by the agency"; second, "the agency's interpretation must in some way implicate its substantive

16

expertise"; and third, "an agency's reading of a rule must reflect 'fair and considered judgment.'" Id. at 577-79. If the agency interpretation passes these three tests, a court can defer to it. See id.

The defendants argue that deference to the DOJ Statement is not warranted because the integration regulation, 28 C.F.R. § 35.130(d), unambiguously applies only to institutionalized persons. I disagree. Because the regulation does not address the issue one way or the other, it is ambiguous. Accordingly, the DOJ Statement satisfies Kisor's first requirement.

Having determined that the regulation is ambiguous, I must decide whether the DOJ Statement is a reasonable interpretation of the regulation. It is. First, the regulatory interpretation was "actually made" by the DOJ; it is the DOJ's official position, not an "ad hoc statement not reflecting the agency's views." Kisor, 588 U.S. at 577. Second, DOJ's interpretation "implicate[s] its substantive expertise." Id. at 577. The DOJ created the integration regulation pursuant to Congress's instruction that the Attorney General "issue regulations implementing [the] provisions of Title II." Olmstead, 527 U.S. at 591 (citing 42 U.S.C. § 12134). Finally, the DOJ's interpretation reflects its "fair and considered judgment." Kisor, 588 U.S. at 579. The Statement is not merely a "convenient litigating position" nor does it create "unfair surprise" to the parties, as it has been in effect since 2011. Id.

(quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012); and then Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170 (2007)). Accordingly, the DOJ Statement is worthy of deference, and plaintiffs can thus base their claims on their contention that the defendants' acts or omissions have placed them at serious risk of unjustified institutionalization.[3]

> 3.  Must All or Substantially All CFI Waiver Participants be at Serious Risk of Institutionalization to Warrant Class-Wide Relief?

The defendants argue that they are entitled to summary judgment because the plaintiffs cannot prove "that the class defined by the plaintiffs (i.e. all CFI Waiver participants) face some heightened 'serious risk' of institutionalization on a class-wide basis." Doc. 223-1 at 20. To support this argument, the defendants suggest that even if the plaintiffs' evidence is construed in their favor, no more than seventeen percent of CFI Waiver

---

[3]   The defendants attempt to reframe their argument by citing to Iverson v. City of Boston, 452 F.3d 94, 100 (1st Cir. 2006). Iverson stands for the proposition that regulations cannot "announce[] an obligation or a prohibition not imposed by the organic statute." Id. at 101. The defendants thus argue that because the ADA does not mention "risk of" institutionalization, the integration mandate cannot prohibit it. This argument is premised on the same incorrect assumption that the statute's silence unambiguously forecloses "risk of" institutionalization claims. Because I accept the DOJ's interpretation of the statute to prohibit state action that puts plaintiffs at "risk of" institutionalization, the defendants' Iverson argument necessarily fails.

participants are at risk of institutionalization in any given month because of alleged gaps in the delivery of authorized CFI Waiver services. Id. They then contend that "[t]hese modest percentages of CFI participants experiencing a 'service gap' or receiving nursing facility care [are] not nearly enough to prove 'serious risk of' institutionalization on a class-wide basis." Id. at 21.

The defendants based their argument primarily on the First Circuit's decision in Connor B. ex rel. Vigurs v. Patrick, 774 F.3d 45 (1st Cir. 2014). There, the court considered a class action claim that the defendants were violating a federal statute by failing to provide class members with individualized case plans. Id. at 61. The class in that case consisted of "8,500 children who are or will be committed to Massachusetts foster care custody as a result of their having suffered from abuse or neglect." Id. at 48. In deciding that the plaintiffs had failed to prove a class-wide failure to comply with the requirement for individual case plans, the district court focused on the plaintiffs' evidence "that the files for 14.6% of children sampled from a group entering foster care and 35.1% of children sampled from a group in foster care for two years or more lacked case plans." Id. at 61. The court concluded that this evidence was insufficient to prove a class-wide failure to comply with the case-plan requirement because although "case plans are generally not well maintained and, in some cases, are entirely unavailable for review," the "failures constituted mere gaps in record keeping, not grave statutory

19

error." Id. (citation modified). The First Circuit relied on this finding when it affirmed the district court, noting, "[t]hat case plans are not well maintained and in some cases . . . entirely unavailable for review is not enough to prove that [defendants are] out of compliance with the statute vis-à-vis the class." Id. at 62.

Here, the defendants' argument fails to persuade because it is based on both a misreading of Connor B. and an incorrect definition of the class defined in this case. The problem the court confronted in Connor B. was that the plaintiffs there were attempting to prove a class-wide failure to engage in adequate case planning based only on evidence showing that a small percentage of the class lacked adequate plans and with no evidence that the deficiency resulted from the defendants' class-wide acts or omissions. Id. In this case, the class consists only of CFI Waiver participants who are at serious risk of institutionalization, not, as defendants erroneously suggest, "all CFI Waiver participants." Doc. 223-1 at 20. Thus, unlike Connor B., all class members in this case are experiencing a deficiency: non-delivery of authorized CFI Waiver services. Moreover, as detailed in the discussion below, the plaintiffs allege that the risk of institutionalization affects the entire class and results from the defendants' systemic acts or omissions. If the plaintiffs are correct that seventeen percent of CFI Waiver participants miss over fifty percent of their authorized, critical services in any given

month and thus are placed at "serious risk of institutionalization," the class of injured plaintiffs would exceed 1,000 people who have all been injured by the defendants' systemic failures to make reasonable and necessary modifications to the CFI Waiver program. Thus, Connor B. is plainly distinguishable from the present case. As such, the defendants' arguments that the plaintiffs cannot prove class-wide risk of institutionalization fails.

**B.    Causation**

The defendants next argue that the plaintiffs cannot prove their Olmstead claims because they "do not cite any concrete evidence from which a reasonable fact-finder could conclude that Defendants' actions cause class-wide 'service gaps,' or that those 'service gaps' in turn caused class-wide serious risk of unjustified institutionalization." Doc. 223-1 at 22 (citation modified). The plaintiffs respond by claiming that they do not need to prove causation. I am not convinced that either party has the causation issue quite right.

Because the plaintiffs' Olmstead claims are based on section 12132, they must prove that they are being placed at serious risk of institutionalization "by reason of [their] disability." 42 U.S.C. § 12132. To satisfy this requirement, Title II plaintiffs ordinarily must prove that their disability is a "but-for" cause of their inability to enjoy a public benefit. See Doe v. R.I. Interscholastic League, 137 F.4th 34, 41 (1st Cir. 2025). In the

21

Olmstead context, however, the Supreme Court has determined that "undue institutionalization qualifies as discrimination 'by reason of . . . disability.'" 527 U.S. at 597-600. And it has specified that institutionalization is "undue" when the state agrees that a community placement is appropriate, the placement is not opposed by the disabled person, and the placement can be "reasonably accommodated," yet the disabled person remains institutionalized. Id. at 587. The reasonableness of a proposed modification, in turn, is assessed using the reasonable-modifications regulation, and that regulation, as I will explain, requires proof that, on its face, the proposed modification is both "reasonable" and "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). To the extent that causation plays a role in this analysis, then, it is when assessing whether the proposed modifications are necessary to avoid discrimination on the basis of disability, rather than in determining whether the defendants' acts or omissions have caused the plaintiffs to be at serious risk of institutionalization in the first place. See Wis. Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 754 (7th Cir. 2006) (en banc) (holding that whether a modification is necessary under Title II is "framed by our cases as a causation inquiry" and established "only when the plaintiff shows that, 'but

for' his disability, he would have been able to access the services or benefits desired.").[4]

That said, because my preliminary assessment of how causation works when assessing an Olmstead claim differs from the parties' assumptions, I will leave the resolution of that issue for a later date. For the purpose of the following analysis, I assume that the defendants' theory of causation is correct when analyzing their contentions that the plaintiffs cannot prove the defendants' acts or omissions caused the class to be at serious risk of institutionalization.

---

[4]    The defendants cite three cases to support their erroneous argument that "the plaintiff must prove that the defendant caused the 'serious risk'" of institutionalization, none of which support that proposition. Doc. 223-1 at 20. The two district court cases cited by the defendants merely show that a plaintiff cannot succeed in requesting a reasonable modification if the plaintiff's own actions, rather than the actions of the state, prevent him or her from receiving community-based services. See Nored v. Tenn. Dep't of Intell. and Developmental Disabilities, 2021 WL 3729617, at *11 (E.D. Tenn. Aug. 23, 2021) and Woods v. Tompkins, 2019 WL 1409979, at *10 (N.D.N.Y. Mar. 28, 2019). As for M.R., the Ninth Circuit indeed said there that a plaintiff need not show that institutionalization is "inevitable," but rather that the challenged state action "creates" serious risk of institutionalization. 697 F.3d at 734. In doing so, however, the Circuit was merely correcting the district court's mistaken belief that risk must be "imminent" in order for an Olmstead claim to proceed; it did not import a new standard of causation for all Olmstead plaintiffs, as demonstrated by its lack of any meaningful discussion of causation.

1.     Evidence that Defendants Caused Service Gaps

The defendants' first causation argument is that the plaintiffs cannot prove that the defendants caused the service gaps that place class members at serious risk of institutionalization. In response, the plaintiffs argue that the defendants engage in four sets of practices that create or worsen service gaps. They allege the defendants provide inadequate reimbursement rates, fail to track service delivery, fail to implement adequate contingency plans, and fail to hold CMAs accountable. Each one of these practices, they allege, contribute to service gaps. Below, I assess the evidence plaintiffs present to demonstrate the existence of these four practices.

**a.     Defendants' inadequate reimbursement rates create service gaps.**

The plaintiffs argue that the defendants' failure to provide adequate reimbursement rates to providers is a common driver of workforce shortages that produce service gaps experienced by CFI Waiver participants. The defendants respond that the plaintiffs present no evidence that the defendants' current reimbursement rates are insufficient, and, even if they could, they fail to show such reimbursement rates cause service gaps.

In support of their claims, the plaintiffs begin by presenting evidence of a workforce shortage problem in the CFI Waiver program.  They point out that the defendants' own witness, Chief of the Bureau of Adult and Aging

Services Wendi Aultman, conceded that there are "trends related to workforce concerns" and that "for specific services, certainly there are . . . gaps in workforce, and we would like to see providers with additional workforce to address the . . . needs of participants." Doc. 202-8 at 237, 239. Independent reports confirm these workforce shortages. See Doc. 202-14 at 7 (Fiscal Policy Institute report finding that because providers could not find enough workers, CFI Waiver services were "difficult to access"); Doc. 202-12 at 9 (Money Follows the Person Demonstration Expansion proposal confirming workforce shortages for Long Term Services and Supports).

The plaintiffs next contend that the defendants create these workforce shortages by setting insufficient reimbursement rates for CFI Waiver services. The plaintiffs retained Dr. David Blanchflower, an economist, to "provide expert testimony on labor markets and how such markets impact the ability of CFI service providers to hire workers and provide authorized services to CFI Waiver participants." Doc. 199-7 at 2. To create his report, he examined, among other things, historical reimbursement rates provided for CFI Waiver services, market wage rates for both the state and the nation, and current job listings as a means of "better understand[ing] the applicable labor market." Id. at 6. He additionally examined a rate study that DHHS conducted in 2024, which had not been implemented at the time of his report, to assess its validity. Id. at 24.

In his report, Dr. Blanchflower concludes that the "CFI Waiver program sets Medicaid reimbursement rates for services that do not allow service providers to pay an hourly rate of pay that is comparable to the private market rates in New Hampshire thereby causing workforce shortages. Id. at 2. As a result, "CFI participants suffer in a tight labor market or when the wages offered are not competitive, as either there are no service providers available, or providers fail to show up." Id. at 11. He concludes that in the CFI Waiver program, "the package of pay and benefits is too low to hire and retain a sufficient number of service providers," adding that "reimbursement rates are too low and generated worker shortages and inadequate delivery of services." Id. at 11, 22.

The plaintiffs further corroborate the insufficiency of existing reimbursement rates through additional evidence. Amy Moore, the director of an agency that provides in-home care to CFI Waiver participants, noted that rate increases DHHS instituted before 2023 did not affect the workforce-shortage problem and were insufficient to recruit staff as of June 2023. Doc. 202-21 at 2-3. The Fiscal Policy Institute report likewise states that reimbursement rates "fell behind several measures of inflation for most of the last decade," which the plaintiffs contend further supports the rates' inadequacy. Doc. 202-14 at 6.

The defendants counter that Blanchflower used outdated reimbursement rates in his report and failed to take into consideration the rate increases that the defendants recently implemented. The plaintiffs acknowledge that the defendants' 2024 rate study led to increases in many of the reimbursement rates examined by Blanchflower, Moore, and the Fiscal Policy Institute. However, the plaintiffs maintain that this rate study has not and will not resolve existing workforce shortages or service gaps. Blanchflower opines that "[w]orkforce shortages are likely to continue and/or increase given that [DHHS's] June 2024 rate study is flawed, has not yet been implemented, and imposes rate freezes on 18 of the 27 CFI services and nominal increases in the remaining 9 CFI services." Doc. 199-7 at 2. He criticizes the study for not considering private-sector market rates, proposing rates that are consistent with market rates in the state, or acknowledging that the current workforce shortages exist because rates are too low. Id. at 24-30. He further opines that the study's recommendations—namely, to leave eighteen rates unchanged and nominally increase the other nine—make "little sense" and leave the core cause of workforce shortages unaddressed. Id. at 26.  In his analysis, he contrasted statistics showing low statewide unemployment and an increase in private sector wages, two indicators that the market demands increased wages to attract workers, with the rate study's marginal increases in reimbursement rates. Id. Based on this

comparison, he concludes that the 2024 rate study's recommendations do not align with upward market trends and will not remedy the workforce shortage problem. Id.

Separately, Blanchflower takes issue with the fact that DHHS did not monitor the delivery of authorized services in advance of conducting its rate study, which impeded DHHS's ability to tailor its study to remedy actual service gaps. Id. at 27. He contends that if DHHS had performed such monitoring, the rate study would have "been able to better identify what additional service providers were needed in the CFI Waiver program and thus what—necessarily higher—rates need to be adjusted." Id.

In a final attempt to refute the plaintiffs' evidence, the defendants argue that they have started to offer special rates as a means of attracting workers and mitigating the workforce shortage problem. The defendants' current policies allow them to offer reimbursement rates above those set by the fee schedule upon a request from a CMA or participant—what they call "special rates." Doc. 202-8 at 142-43. In response, the plaintiffs contend that the specialized rate system does not address the inadequacies in the service-provider network. However, the plaintiffs allege that the specialized rate process is too arduous for CMAs to regularly pursue. Moreover, they believe that the evidence of persistent difficulties attracting service providers proves

28

that the specialized rate program has not adequately addressed the workforce shortage problem.

Based on the foregoing, the plaintiffs argue that the defendants' failure to adequately increase reimbursement rates plays a significant role in creating service gaps. They contend that by failing to offer competitive reimbursement rates to CFI service providers, the defendants allow an existing workforce shortage problem to persist and worsen. The workforce shortage, in turn, leaves service providers without adequate personnel to deliver authorized services. Therefore, according to the plaintiffs, insufficient reimbursement rates are a substantial factor contributing to the service gaps that CFI Waiver participants experience. Without deciding the merits of these allegations, I agree that the above evidence raises a dispute of material fact as to whether the defendants' insufficient reimbursement rates are a cause of the service gaps that class members experience.

### b.   Defendants' failure to track service delivery exacerbates service gaps.

The plaintiffs next argue that by failing to collect data regarding the provision of CFI Waiver services in real time, the defendants contribute to service gaps that could be readily remedied if they collected such data. They argue both that the defendants have no policy of verifying whether CFI Waiver participants actually receive their authorized services and that they

fail to effectively deploy the tools they already have to track the provision of services in real time. The defendants' inactions on this front, the plaintiffs argue, allow service gaps to persist unaddressed.

The plaintiffs rely on their Olmstead experts, Nancy Weston and Randall Webster, to prove that the defendants do not verify whether authorized services are delivered.[5] Weston and Webster's analysis finds "very little evidence in the case management records that DHHS is even aware of the plight of so many of the CFI participants who are not getting their critical hands-on services." Doc. 199-3 at 27. Moreover, they note that "DHHS does not have a policy of verifying that CFI participants actually receive the services that DHHS authorizes." Id. at 24.

The plaintiffs argue that the defendants' own witnesses affirm these findings. Specifically, in her deposition, Aultman conceded that she was "not aware of a DHHS or [BAAS] policy" of "verifying that CFI participants actually received the services that DHHS authorized." Doc. 202-8 at 178-79.

---

[5]     Weston and Webster's expert report analyzes a random sample of 100 CFI Waiver participants who missed over fifty percent of their authorized, critical services in one or more months. Doc. 199-3 at 20. Plaintiffs' statistical expert Michael Petron drew this sample of 100 participants from his broader sample frame of 1,814 CFI Waiver participants who had missed their more than fifty percent of their authorized, critical services in any given month for services that were authorized starting June 1, 2021 and ended by December 1, 2022. Doc. 199-5 at 6-12. I hereafter refer to these 100 participants as the "sample participants."

Aultman further acknowledged that service gaps exist but added that "[she] wouldn't say that [DHHS] collect[s] the data on that to verify that or . . . justify that." Id. at 190. CFI Program Administrator Kristina Ickes likewise testified that DHHS is not "entirely dependent, but very dependent, largely dependent" on CMAs to know whether a CFI provider delivered authorized services to a client. Doc. 202-7 at 30. Additionally, Aultman said it "could be impossible to know [for] every [] single participant at every moment in time whether or not they receive their service and how or why the individual did not receive their service." Doc. 202-8 at 118.

Not only do the defendants fail to track data regarding service delivery in real time, according to the plaintiffs, but plaintiffs allege they also fail to effectively implement their own data-tracking tools. Specifically, the plaintiffs argue the defendants fail to use their Medicaid Management Information System ("MMIS") data, "provider not available" code, or Electronic Visit Verification ("EVV") system to effectively track service delivery in real time.

The plaintiffs first note that the defendants do not effectively use data collected through MMIS for contemporaneous monitoring efforts. Aultman explained that DHHS extracts an MMIS report that compares services authorized with services claimed on a monthly basis. Doc. 202-8 at 57. The purpose of this MMIS report is "to identify any authorizations for services

31

either at a service level or at an individual level where [DHHS] may want to follow up with case management agencies or conduct additional analysis." Id. However, Aultman conceded that there may be a time lapse between when a participant receives their authorized service and the claim for that authorized service of "up to a year." Id. at 63. Still, she clarified that services delivered with higher frequency, such as personal care, homemaking, and home-delivered meals, are typically claimed within the month they have been provided, so data regarding undelivered services is generated contemporaneously. Id.

The plaintiffs argue that because the defendants allow CMAs to take up to a year to file a claim on an authorized service, the MMIS reports DHHS currently extracts recording gaps between services authorized and services claimed are of limited utility, as they cannot capture real-time data about service gaps experienced by participants. Still, to the extent that MMIS reports could be useful in identifying and monitoring gaps in service, the plaintiffs argue that DHHS nonetheless does not run such reports on a sufficiently frequent basis. In fact, according to the plaintiffs' evidence, DHHS does not run reports using MMIS data weekly or monthly to "identify which individual class members are not receiving their authorized services." Doc. 199-1 at 34.

Similarly, the plaintiffs identify evidence suggesting that the defendants do not effectively use the "provider not available" code to "monitor and remediate CFI gaps." Id. The "provider not available" code is a marker that DHHS implemented in the service-authorization system to "electronically identify CFI Waiver participants who may face service gaps." Id. However, Aultman acknowledged that when a CMA enters the "provider not available" code into the service authorization system, DHHS does not set a limit on the amount of time within which that code must be addressed. Doc. 202-8 at 192. Thus, even if the "provider not available" code could be used to effectively monitor gaps in services, the plaintiffs assert that the defendants have ineffectively deployed it to achieve such ends.

Finally, the plaintiffs contend that the defendants do not use the EVV system to do real-time monitoring on the provision of services. Aultman stated that the EVV system is a "mechanism and tool that allows for [CFI] provider agencies to enter information about services or visits in the home that are provided." Id. at 71. Currently, she said, the EVV system is used by the defendants to "verify that a visit has been made, and that data and information is provided to the department through its vendored EVV system." Id. However, Ickes conceded that the defendants do not use the EVV system in real time to see if services are delivered. Doc. 202-7 at 27.

33

At bottom, the plaintiffs argue that the defendants have these several tools at their disposal which could be used to monitor the provision of CFI Waiver services in real time yet fail to use them effectively. The result, the plaintiffs contend, is that when service gaps do emerge, the defendants are negligent in their response, often allowing gaps to continue and swell over time. I agree that the plaintiffs have presented sufficient evidence that a dispute exists regarding whether the defendants, by failing to monitor service delivery in real time, contribute to and exacerbate service gaps.

### c.    Defendants' failure to ensure CFI Waiver participants have valid contingency plans makes service gaps worse.

The plaintiffs additionally contend that the defendants fail to ensure that participants' contingency plans comply with regulatory requirements. In turn, they argue that by allowing so many participants to maintain invalid contingency plans, the defendants allow existing service gaps to worsen.

As noted above, individualized contingency plans are required by state regulations. See AR He-E 805.02(l); 805.05(c)(3)(f). These regulations mandate that a contingency plan "[i]dentifies alternative staffing resources in the event that normally scheduled care providers are unavailable." AR He-E 805.02(l)(1).

Contingency plans are designed to provide back-up coverage when participants face service gaps. When contingency plans are ineffectively

34

designed to provide such back-up coverage, however, the plaintiffs argue that participants experience prolonged service gaps. Therefore, although the plaintiffs do not appear to argue that invalid contingency plans alone cause service gaps in the first instance, they argue such invalid plans play a substantial role in allowing service gaps to worsen.

Despite these regulatory requirements, Weston and Webster found that only four percent of sample participants "had a contingency plan that identified alternative staffing resources." Doc. 199-3 at 38. They further conclude that such insufficient planning had impacts on those participants. Id. For example, according to Weston and Webster, sixty-five percent of the sample participants "needed to secure unpaid caregivers to fill in gaps in services when paid caregivers were unavailable." Id. at 35-36.

The plaintiffs argue that this absence of valid contingency planning "is compelling evidence of the ways in which Defendants' utter failure to administer oversight of the CFI Waiver places Plaintiffs at risk of being institutionalized." Doc. 199-1 at 21. They suggest that regulatorily compliant contingency plans would provide participants with back-up relief in the face of undelivered services. Deficient contingency plans, conversely, do not remedy service gaps and can leave participants without authorized, critical services for prolonged periods of time. I thus find that the plaintiffs have

provided sufficient evidence to raise triable issues of fact as to whether

invalid contingency plans make existing service gaps worse.

### d.    Defendants' failure to hold CMAs accountable creates and exacerbates service gaps.

Finally, the plaintiffs argue that the defendants' failure to hold CMAs

accountable for nondelivery of authorized services perpetuates service gaps.

In that vein, Weston and Webster's analysis found that that on occasions

when the defendants were made aware of the sample participants not

receiving authorized services, there was "little evidence in the records that

DHHS provided any remedial help to stop the suffering of the participants."

Doc. 199-3 at 27. They added:

> [E]ven the 29 people whose records show that DHHS had notice
> that they were at heightened risk of institutionalization did not
> receive effective help from DHHS to remedy their situation. For
> the majority of the 29 people, DHHS was on notice of their
> situation because of reports to APS. Our review found scant
> evidence that DHHS took effective steps to resolve their problems.

Id. at 35 (citations omitted).

The plaintiffs further note that when a CMA alerts the defendants to a

service gap that they are unable to fill, the defendants' response is ineffective.

In such instances, the plaintiffs argue, the defendants claim to respond by

asking "probing questions" and "provid[ing] guidance" to CMAs; however, the

plaintiffs allege that the defendants provide no evidence that "there is a

systemic response from DHHS to ensure that the CFI participant is not

endangered when a provider is not available to deliver their authorized services." Doc. 229 at 27. While the plaintiffs concede that the defendants do have several policies that are aimed at this problem—CRCC meetings, the Interagency Integration Team, and technical assistance—they still contend that the defendants still fail to "identify, much less remediate, the problems faced by Plaintiffs languishing without their Medicaid services." Doc. 199-1 at 34. The plaintiffs note that Weston and Webster's report found that "the vast majority of [sample participants] had no record of encountering the CRCC process despite having large service gaps and other issues." Id. at 35. Perhaps more notably, Weston and Webster "did not see evidence that CMAs suffer consequences when they fail to seek the intervention of the CRCC." Id. Aultman confirmed this, noting that she could not remember any instance in which the defendants made policy changes in response to recommendations made by the CRCC. Doc. 202-8 at 249. This evidence sufficiently raises a triable question of fact as to whether defendants' inaction—namely their inability to hold CMAs accountable for delivering authorized services—is a substantial factor in the creation of service gaps.

2.    Evidence that Service Gaps Place Individuals at Risk of Institutionalization

The defendants next argue that the plaintiffs cannot prove that the "service gaps" experienced by class members caused "serious risk of"

37

unjustified institutionalization. In response, the plaintiffs present the following evidence to show that they do. Here, they rely primarily upon their Olmstead experts and the opinion of Dr. Mattan Schuchman.

### a.     The Weston and Webster Report

Plaintiffs' Olmstead experts provide evidence showing that service gaps place class members at serious risk of institutionalization. In their analysis of the CFI Waiver program, they examined two sets of documents: those pertaining to DHHS's administration of the CFI Waiver program, and CMA records for the sample participants. Doc. 199-3 at 15. This analysis yielded three primary conclusions.

First, Weston and Webster determine that missing over fifty percent of authorized services was correlated with stays in nursing facilities. Doc. 199-3 at 35. Their review found that thirty sample participants were admitted to a nursing facility during the relevant time period. Id. at 35. Based on this high rate of admissions, Weston and Webster conclude that many CFI Waiver participants "could have avoided segregation in a nursing facility if they had received their authorized services." Id.

Second, Weston and Webster found that sixty-five of the sample participants "needed to secure unpaid caregivers to fill in gaps in services when paid caregivers were unavailable." Id. at 36. Based on this finding, they opine that such unpaid caregivers are unreliable, and when CFI Waiver

38

participants must rely on these unreliable sources of care, safety concerns can arise when "unpaid caregivers [are] unable to meet the needs of their loved ones." Id. at 35-36. Weston and Webster conclude that service gaps, which lead participants to rely upon unpaid caregivers, can create a strain on both families and participants that "heightens the risk that the participant will be unjustifiably institutionalized." Id. at 36.

Third, Weston and Webster's review reveals that the records of seventy-eight percent of sample participants included "information about how the person experienced adverse consequences that were related to their not receiving their services." Id. at 38-39. They defined "adverse consequences" as "medical, emotional, or psychological harm that results from a [CFI] waiver participant not receiving their authorized services." Id. at 38. Medical harms included, inter alia, sustaining injuries, being hospitalized, visiting the emergency room, experiencing medication errors, and being admitted to a long-term care facility. Id. In light of this evidence of adverse consequences experienced by CFI Waiver participants who experienced significant service gaps, they conclude that "DHHS has systemic deficiencies in how it administers the CFI program which place participants at unnecessary risk of institutionalization." Id. at 39.

When considered collectively and in the light most favorable to the plaintiffs, the analysis Weston and Webster conducted on the sample

39

participants raises triable issues of fact on the question of whether service gaps place participants at serious risk of institutionalization. Every participant in the random sample experienced service gaps in delivery of at least fifty percent of authorized, critical services. Weston and Webster's review causally links such service gaps to those participants' risk of institutionalization. They show that out of 100 sample participants: thirty were admitted to nursing homes; sixty-five resorted to relying on unpaid care; and ninety-six did not have a contingency plan that identified alternative staffing resources. Id. at 35-39. Moreover, despite their finding that seventy-eight participants experienced adverse outcomes as a result of service gaps, DHHS was made aware of a participant's heightened risk of institutionalization in only twenty-nine cases. Id.

The plaintiffs assert that these apparent correlations establish a link between a participant missing over fifty percent of authorized, hands-on services and likelihood of nursing facility admission. Doc. 199-1 at 18. Moreover, they seem to argue that because participants' back-up plans are often unreliable, a gap in the delivery of critical services can leave participants fending for themselves in performing activities of daily living ("ADLs"). This finding is particularly troublesome when considered alongside Dr. Schuchman's observation that "[p]articipants in New Hampshire's CFI Waiver program often experience limitations in independent mobility, have

40

complex medical care needs and require assistance with multiple ADLs" and that "a one-day gap creates a risk of dangerous crises and admission to institutional settings." Doc. 199-2 at 7-8. The plaintiffs thus contend that when class members experience service gaps without a reliable back up plan—as could become the case for the sixty-eight sample participants who relied on unpaid caretakers or the ninety-six whose contingency plans offered no alternative staffing—they are placed at unjustified risk of institutionalization.

Finally, the plaintiffs suggest that the adverse consequences sample participants faced establish that service gaps place them at serious risk of institutionalization. Although Weston and Webster's report does not describe with specificity the adverse consequences experienced by sample participants, Dr. Schuchman's profiles of the same sample participants show that they experienced falls, developed new medical conditions, or had medical conditions worsen when they did not receive their authorized services. Doc. 199-1 at 18. These types of adverse consequences, the plaintiffs argue, also place class members at risk of unjustified institutionalization. Id.

### b.   Dr. Schuchman's Report

In his report, Dr. Schuchman likewise argues that service gaps place class members at serious risk of institutionalization. Schuchman's analysis consisted of two primary components. First, he identified nine CFI Waiver

participants from Weston and Webster's random sample and analyzed their records for "the ways in which those class members were placed in danger and specifically, placed at an unjustified risk of being institutionalized, as a result of receiving fewer hands-on services than authorized." Doc. 199-2 at 11. Second, he reviewed narrative opinions produced by Weston and Webster regarding each of the 100 sample participants. He concluded that "[g]aps in provision of care have the potential to pose serious harm, even if services are only missed for short periods." Id. at 7.

The plaintiffs argue that Schuchman's report demonstrates that service gaps can place CFI Waiver participants at risk of unjustified institutionalization. This argument flows from three of Dr. Schuchman's conclusions after reviewing the sample's case management records and Weston and Webster's opinions. First, he concludes that "lack of authorized hands-on care, even for short periods, can place a person at increased risk of physical injury and discomfort," both of which "can lead to institutionalization." Id. at 26. He found that falls were a common outcome experienced by CFI Waiver participants who experienced service gaps, adding that if personal care services had been delivered as authorized, providers could have assisted CFI Waiver participants in mitigating against fall risk by providing mobility support and "clearing trip hazards." Id. at 27-28. Moreover, he found that participants who required assistance with

42

toileting and bathing often developed physical discomfort and medical conditions when they did not receive authorized services to assist with such activities. Id. at 28. Finally, he found that in cases where participants were authorized housekeeping services but did not receive them, their homes could become "so derelict that a participant's continued safe housing was in jeopardy," making institutionalization "a forced alternative" to his or her housing. Id.

Second, Dr. Schuchman concludes that "[w]hen authorized CFI services are not provided, medical conditions can be exacerbated, or new conditions may develop in a number of ways that will put individuals at risk for institutionalization." Id. Participants facing service gaps can experience difficulty administering medication, which Dr. Schuchman says can lead to adverse health effects and possible institutionalization. Id. at 29. He additionally found that for participants who cannot transfer independently, "lack of personal care services will mean that they are confined all day." Id. In several cases, participants experiencing this problem developed pressure ulcers and osteomyelitis, a condition that he commented "may also necessitate institutionalization." Id. at 30. He also notes that service gaps could leave participants unable to feed themselves; indeed, two of the sample participants experienced weight loss when experiencing service gaps and died shortly thereafter. Id. at 31. Finally, he found that participants who do not

43

receive appropriate medical equipment—a CFI service itself—can develop medical conditions that "put individuals at risk." Id. In addition to the above adverse medical outcomes actually experienced by sample participants, Dr. Schuchman describes several other medical conditions participants might experience if they do not receive services for which they are authorized. Id. In sum, Dr. Schuchman concludes that the host of adverse medical outcomes that can result from missing services can place individuals at risk of institutionalization.

Third, Dr. Schuchman concludes that "unpredictability [in] the provision of CFI waiver services . . . takes a psychological toll" on participants and can place class members at risk of institutionalization. Id. He found that when participants experienced gaps in services, they often turned to family and friends to supplement care. While Dr. Schuchman admits that reliance on close relations has provided "a lifeline for CFI participants who do not receive their authorized hours," he also notes that relying on unpaid caregivers puts strain on those relationships. Id. at 32. In the cases he reviewed, Schuchman found that "[o]verreliance on family and friends is a common theme," and opines that when reliance on unpaid caregivers breaks down, a "participant is at increased risk of institutionalization." Id. Finally, he argues that gaps in homemaking services can lead to home conditions becoming unsanitary, which, in turn, causes "psychological distress." Id. In at

least two reviewed cases, participants experienced "deteriorated home environment[s]" that resulted in them being forced from their homes. Id. at 33. Drawing from these experiences, Dr. Schuchman concludes that service gaps can undermine participants' sense of psychological safety, a quality he argues is "critical for someone to be able to live in the community." Id. at 31. In the absence of psychological safety, he opines that plaintiffs are placed at increased risk of institutionalization.

Considered in the light most favorable to the plaintiffs, both Weston and Webster's and Schuchman's reports presents a triable claim that the service gaps faced by class members place them at risk of unjustified institutionalization.

## C.    The Reasonable Modifications Regulation

The parties' remaining disagreements concern the meaning and application of the reasonable-modifications regulation. The regulation consists of two parts. First, it obligates public entities to make "reasonable modifications" that are "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Second, it provides a public entity with an affirmative defense if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Id. I address each part of the regulation in turn, explaining how burdens of proof are allocated and describing ways in which the burdens can be met. I then

45

assess each party's contention that the regulation entitles them to summary judgment.

1.     Reasonable and Necessary Modifications

Unlike Title I, which expressly requires employers to provide "reasonable accommodations," 42 U.S.C. § 12112(b)(5), and Title III, which specifies that public accommodation providers must provide "reasonable modifications" that are "necessary" for a person with disabilities to access a public accommodation, id. § 12182(b)(2)(A), Title II does not expressly articulate a duty to either accommodate or modify. Instead, Title II's duty to modify is derived from its general antidiscrimination provision and expressed in the reasonable-modifications regulation. See 28 C.F.R. § 35.130(b)(7).

The regulation plainly states that, as with Titles I and III, modifications must be both "reasonable" and "necessary." See id. However, it does not specify how the burden of proof should be allocated for these requirements. Id. The Olmstead majority opinion sheds no further light on this question, as it held only that a community placement can be required under Title II if "the placement can be reasonably accommodated," neglecting to assign the burden of proof either to the plaintiff or the defendant. See 527 U.S. at 587. Circuit courts that have addressed the issue are in agreement that the plaintiff must propose the modifications on which its Olmstead claim is based, but they have otherwise described how the burden of proof should be

46

allocated in varying ways. See e.g., Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2nd Cir. 2003) ("[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which facially do not clearly exceed its benefits") (citation omitted); Frederick L. v. Dep't of Pub. Welfare, 364 F.3d 487, 492 n.4 (3rd Cir. 2004) ("[T]he plaintiff first bears the burden of articulating a reasonable accommodation. The burden of proof then shifts to the defendant . . . ."); United States v. Florida, 2026 WL 879178, at * 22 (4th Cir. 2026) (noting that the plaintiff has the "initial burden to identify a reasonable, necessary accommodation—a burden that is not a heavy one"); Brown v. District of Columbia, 928 F.3d 1070, 1077 (D.C. Cir. 2019) ("[T]he State bears the burden of proving the unreasonableness of a requested accommodation once the individual satisfies [Olmstead's] first two requirements . . . .").

The First Circuit has not yet determined how the reasonable-modifications regulation should be applied to an Olmstead claim. However, its decisions in Reed v. LePage Bakeries, Inc., 244 F.3d 254, 258-59 (1st Cir. 2001), addressing the duty to make reasonable accommodations under Title I, and Pollack v. Regional School Unit 75, 886 F.3d 75, 81 (1st Cir. 2018), applying the reasonable-modifications regulation to a Title II accommodation claim, suggest that an Olmstead plaintiff must establish that

47

a proposed modification is reasonable and necessary "on its face" to satisfy its burden of proof.

In <u>Reed</u>, the court confronted the tension in a Title I accommodation case between the plaintiff's initial burden to establish that a proposed accommodation is reasonable and the defendant's "undue burden" affirmative defense. 244 F.3d at 258. After canvasing how other courts have addressed the issue, the First Circuit held that to satisfy their initial burden, "a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." <u>Id.</u> at 259. The Supreme Court later followed the First Circuit's lead and adopted this allocation of the burden of proof for Title I accommodation claims. <u>See</u> <u>U.S. Airways, Inc. v. Barnett,</u> 535 U.S. 391, 401-02 (2002) (citing <u>Reed</u> and explaining that an accommodation is facially reasonable if it is reasonable "in the run of cases").

At issue in <u>Pollack</u> was a Title II accommodation claim by the parents of a public school student who wanted to wear an audio recording device in school as an accommodation for his disability. 886 F.3d at 79. Following its established practice, the court looked to the reasonable-modifications regulation to address the claim even though the plaintiff's explicit request was for an accommodation because "there is no material difference between

48

the terms." Id. at 80 n.3; see also Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 31 n.14 (1st Cir. 2023) ("[W]hile Title II of the ADA uses the term 'reasonable modifications' and Title I uses the more familiar term 'reasonable accommodation,' these terms are often used interchangeably."). Construing the reasonable-modifications regulation, the court placed the burden on the plaintiff to "make several showings, one of which [was] the 'effectiveness' of the proposed accommodation." Pollack, 866 F.3d at 81. In support of this allocation, the court cited Reed's holding above, reiterating that the plaintiff has the initial burden under the regulation to prove that the regulation is facially reasonable and effective. Id. (citing Reed, 244 F.3d at 259).

Together, Reed and Pollack teach that the reasonable-modifications regulation places the initial burden on the plaintiff to propose the modifications on which their claims are based and demonstrate that those proposed modifications are facially reasonable and necessary. I agree, however, with other courts which have suggested that satisfying this burden is "not a heavy one." See, e.g., Henrietta D., 331 F.3d at 280; Florida, 2026 WL 879178, at *22. In other words, once the plaintiff has shown that a proposed modification "seems reasonable on its face, i.e., ordinarily or in the run of cases," Barnett, 535 U.S. at 401, the burden shifts to the defendants to demonstrate that the modification is otherwise unreasonable or unnecessary to avoid discrimination on the basis of disability.

## 2.   Fundamental Alteration

The reasonable-modifications regulation permits a public entity to defeat an Olmstead claim if it "can demonstrate that making the [proposed] modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). A public entity can prove this affirmative defense in two ways. First, it can demonstrate that "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with [] disabilities." Olmstead, 527 U.S. at 604. In the alternative, it may establish the defense by proving that it has a "comprehensive, effectively working plan for placing qualified persons with [] disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." Id. at 605-06.

## 3.   Application

The plaintiffs have presented the Court with a list of sixteen proposed modifications to the CFI Waiver program that they claim are reasonable and necessary to address the service gaps that are exposing the class to a serious risk of unjustified institutionalization. See Doc. 223-2 at 57-59 (Defendants'

Statement of Undisputed Facts).[6] While some of their proposed modifications

identify specific program modifications (e.g., "[p]roduce monthly reports

identifying which CFI Waiver participants 'experienced severe gaps and

institute a policy mandating a particular response to that data'"), others are

stated at such a high level of generality that they are not capable of being

analyzed under the framework above (e.g., "[e]nd fiscal policies that

incentivize institutionalization and place CFI Waiver participants at serious

risk of institutionalization"). Id. at 58. Still others cannot be analyzed

because they ask the Court to order the defendants to achieve certain

outcomes without specifying the policy change that would be required to do so

(e.g., "'[e]nsure,' in each year of the Court's Injunctive Order, 'that an

increasing percentage (90%) of CFI Waiver participants receive at least an

increasing percentage (to be set by the court) of their authorized CFI

services'"). Id. at 59. The plaintiffs then argue incorrectly that they have no

obligation to establish the facial reasonableness of their modifications and

---

[6]     Plaintiffs never specify in their briefs what their requested relief is. Defendants, in their Statement of Undisputed Facts, cite to the plaintiffs' interrogatories to draw up a summary of sixteen proposals for relief that they understand the plaintiffs to request. See Doc. 223-2 (citing Doc. 223-8 at 4-5); see also Doc. 229-7 at 5-7. At oral argument, both parties appeared to agree that the plaintiffs' requested modifications were accurately encompassed within pages 57 through 59 of Defendants' Statement of Undisputed Facts. As such, I treat the list of sixteen proposed modifications included within those pages as the plaintiffs' requested relief.

simply assert that the defendants cannot prove that the proposed modifications are unreasonable, unnecessary, or would fundamentally alter the CFI Waiver program. Given this current state of the record, I am in no position to grant the plaintiffs' motion for summary judgment.

The defendants also fail to make a convincing case for summary judgment on this score. To the extent that the defendants contend that the CFI Waiver program is immune to attack because it is a "comprehensive and effectively working plan" to maximize community-based services, they fail to account for the plaintiffs' evidence that the plan, in its current form, is unjustifiably leaving class members at serious risk of institutionalization. See generally Steimel, 823 F.3d at 917 (dismissing the state's argument that it has a "comprehensive, effectively working plan" where that plan is "just what plaintiffs are attacking" and "[plaintiffs'] evidence shows that this 'plan' is undermining, not furthering, the integration mandate."). Nor have they demonstrated an entitlement to summary judgment based on their contentions that the plaintiffs' proposed modifications are unreasonable or would fundamentally alter the CFI Waiver program. Broad assertions that the proposed modifications are "impossible to implement" or "would cost Defendants tens of millions of dollars annually" are not sufficient to end this case without a trial. Doc. 223-1 at 11.

52

In short, neither side has done the hard work that is required to bring this case to a conclusion on a summary judgment motion. I denied both parties' motions as a result.

## IV.  <u>CONCLUSION</u>

For the reasons explained above, neither the defendants nor the plaintiffs are entitled to summary judgment on their ADA and Rehabilitation Act claims. I have denied both of their cross-motions for summary judgment as a result. Doc. 199; Doc. 223.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

April 17, 2026

cc:    Counsel of Record